UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

TIMOTHY E. LANDO, JR.,

                                    Plaintiff,

                                                              9:18-CV-1472
v.                                                            (TJM/TWD)

ANTHONY J. ANNUCCI, STEVEN A. CLAUDIO,
KENNETH GILBERT, MARGARET MONTFORT-
BALFOUR, JAY MOSS, TAMMY GRONAU,
KENNETH PALMER, BRIAN REED, JASON RHODES,

                                    Defendants.
_____

APPEARANCES:                            OF COUNSEL:

TIMOTHY E. LANDO, JR.
  Plaintiff, *pro se*
23 Volney Street
Apartment 1
Phoenix, New York 13135

HON. LETITIA JAMES                      ERIK BOULE PINSONNAULT, ESQ.
Attorney General for the State of New York    Assistant Attorney General
  Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

On December 20, 2018, Timothy E. Lando, Jr. ("Plaintiff"), then an inmate in custody of

the New York State Department of Corrections and Community Supervision ("DOCCS"),

commenced this action pursuant to 42 U.S.C. § 1983 ("Section 1983"), asserting certain DOCCS

personnel implemented conditions of parole that were arbitrary and capricious and violated his

procedural and substantive due process rights.  (Dkt. No. 1.)  On February 14, 2019, the District

Court ordered the following categories of claims survived initial review and required a response:

(1) Plaintiff's claims seeking money damages against Defendant Parole Officers Tammy Gronau ("Gronau"), Brian Reed ("Reed"), Jason Rhodes ("Rhodes"), and Deputy Commissioner Steven A. Claudio ("Claudio") in their individual capacities regarding Plaintiff's various special conditions of parole; and (2) Plaintiff's claims seeking injunctive relief against Defendant Acting Commissioner Anthony J. Annucci ("Annucci"), Claudio, Regional Director Kenneth Gilbert ("Gilbert"), Bureau Chief Margaret Montfort-Balfour ("Montfort-Balfour"), Senior Parole Officer Jay Moss ("Moss"), and Senior Parole Officer Kenneth Palmer ("Palmer") in their official capacities regarding those same special conditions.  (Dkt. No. 7.)

In lieu of answering, Defendants Annucci, Claudio, and Gilbert moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiff's claims against them.  At the time Annucci, Claudio, and Gilbert moved to dismiss, Defendants Gronau, Reed, Rhodes, Gilbert, Montfort-Balfour, and Moss had not yet been served.  In their motion, Annucci, Claudio, and Gilbert argued Plaintiff had not pled a supervisory liability claim against Claudio and his claim for injunctive relief was moot because he was re-incarcerated on a parole violation.  (Dkt. No. 29-1.)  This Court recommended granting Claudio's motion regarding supervisory liability with leave to replead and denying the motion with respect to whether the claims for injunctive relief were moot.  (Dkt. No. 45.)  The Honorable Thomas J. McAvoy, United States Senior District Judge, adopted this Court's Report-Recommendation with the caveat that it found Plaintiff's claim for injunctive relief was likely not ripe.  (Dkt. No. 54.)  The District Court granted Plaintiff leave to amend and Defendants leave to renew their motion to dismiss on ripeness grounds.  *Id.*

Plaintiff thereafter filed an amended complaint addressing the issues related to Claudio and supervisory liability.  (Dkt. No. 55.)  In light of the newly-filed amended complaint, this

Court granted Defendants' request to file a consolidated motion to dismiss to address the ripeness challenge among other issues.  (Dkt. Nos. 56, 57.)  Defendants thereafter filed the current motion before the Court.  (Dkt. No. 58.)

In their motion, Defendants argue Plaintiff's claims for injunctive relief are not ripe, are meritless, and should be dismissed under the standards of *Ex Parte Young*.  (Dkt. No. 58-1 at 12-18.)  Defendants also assert Claudio, Gronau, Reed, and Rhodes are entitled to qualified immunity.  *Id*. at 18-22.  Plaintiff responded and Defendants replied.  (Dkt. Nos. 66, 68.)  After reviewing the parties' filings and the applicable law, this Court recommends granting Defendants' motion with respect to the ripeness challenge and denying it in all other respects.

## I.    FACTUAL BACKGROUND[1]

On August 11, 2016, Plaintiff was released from prison into the custody of DOCCS Division of Parole.[2]  (Dkt. No. 55 at ¶ 18.)  Gronau was assigned as Plaintiff's parole officer and served in that capacity until approximately January 2017.  (*Id*. at ¶¶ 18, 33-34.)  During her tenure as Plaintiff's parole officer, she denied Plaintiff's requests to visit his father in the hospital, have any contact with his children, and attend holiday events with his family.  (*Id*. at ¶¶ 19, 20, 22, 30, 32.)

---

[1]  The following facts are derived from the amended complaint and are accepted as true for the purposes of deciding the pending motion.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  The Court also considers the exhibits included with the complaint to the extent they are relevant to the incidents at issue.  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (a complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference").

[2]  Plaintiff was convicted of First-Degree Rape in violation of New York State Penal Law § 130.35(1) in Onondaga County Court on September 29, 2006, following his plea of guilty.  (Dkt. No. 7 at 5.)

Plaintiff asserts Oswego County Family Court Judge James K. Eby issued an order granting him joint custody of his two minor children, visitation with his children while he was incarcerated, and permission to have verbal and written communication with his minor children. (*Id*. at ¶ 21.) Gronau was aware of the Family Court's Order but nevertheless imposed special condition 13(j), which prohibited him from having contact with his children or their mother. (*Id*. at ¶¶ 22, 24.)

Gronau also imposed a special condition requiring Plaintiff to submit to GPS monitoring and arrived at his place of work to issue the GPS monitor. (*Id*. at ¶¶ 25, 27.) According to Plaintiff, Gronau made disparaging remarks to him on a regular basis. (*Id*. at ¶¶ 28-29, 31, 33.)

In January 2017, Reed became Plaintiff's parole officer. (*Id*. at ¶ 34.) Despite his requests, Reed did not remove Plaintiff from GPS monitoring, or allow him to drive or visit with his children. (*Id*. at ¶ 35-37.)

In May 2017, Rhodes became Plaintiff's parole officer and maintained the same restrictions as the previous parole officers. (*Id*. at ¶¶ 39, 41.) Before Rhodes became Plaintiff's parole officer, Plaintiff started a romantic relationship with a woman. (*Id*. at ¶ 38.) In June 2017, Rhodes promised Plaintiff he could reside with his girlfriend in "three months," however, Rhodes later denied his subsequent requests to live with her in September and December 2017. (*Id*. at ¶¶ 43, 45, 47.) Rhodes also denied Plaintiff's requests to attend family holiday events in November and December 2017, because children under the age of 18 would be present. (*Id*. at ¶¶ 46, 48.) Rhodes also denied Plaintiff's request to have the restriction regarding visitation with his children and family lifted. (*Id*. at ¶¶ 42, 51.) In January 2018, Rhodes created a new condition of parole restricting Plaintiff's ability to enter or be around his fiancée's residence. (*Id*. at ¶ 50.)

In February 2018, Plaintiff's girlfriend and mother wrote letters to Annucci, the DOCCS Commissioner, "to address issues with parole isolating and restricting plaintiff from maintaining a relationship with family that love and support him." (*Id*. at ¶ 52.) Claudio, the DOCCS Deputy Commissioner, "responded to the [letters], but failed to consider the effect on the plaintiff and the impact on his rehabilitative needs to be successful in society." (*Id*.)

In May 2018, Plaintiff violated his parole when he went to a bar and broke his curfew. (*Id*. at ¶ 56.) He was ordered to serve a 24-month time assessment for his violation. (*Id*.) It is the Court's understanding that Plaintiff has now been released from his time assessment.

Based on these allegations, Plaintiff seeks injunctive relief to remove the following special conditions imposed upon him that allegedly restrict his ability to associate with his family: special condition 13(j), which prohibits his contact with his children; special condition 13(z1-z10), which provides for GPS monitoring; special condition 13(aa), which imposes a curfew; and special condition 13(bb), which restricts his ability to visit his girlfriend's (now wife) residence. Plaintiff also seeks monetary damages against certain parole officers in their individual capacities and against Claudio as a supervisory official.

## II.   DISCUSSION

Defendants move to partially dismiss Plaintiff's amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. No. 58-1.) To that end, Defendants move to dismiss Plaintiff's claims for injunctive relief pursuant to Rule 12(b)(1) because, according to Defendants, they are not ripe for review. (*Id*.) Furthermore, Defendants contend the Court should dismiss Plaintiff's claims against Claudio, Gronau, Reed, and Rhodes in their individual

capacities because they are entitled to qualified immunity.[3]  (*Id.*)  The Court will consider these arguments in turn.

### A.    Claims for Injunctive Relief

#### 1.    *Standard of Review*

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint."  *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (internal quotation marks omitted).  "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *see also Butler v. Ross*, No. 16-CV-1282, 2016 WL 3264134, at *3 (S.D.N.Y. June 14, 2016) (same).  While a district court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction," "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (alteration and internal quotation marks omitted); *see also Ray Legal Consulting Grp. v. Gray*, 37 F. Supp. 3d 689, 696 (S.D.N.Y. 2014)

---

[3]  Defendants do not seek dismissal of Plaintiff's claims as they relate to the special condition that restricted his access to his own children.  (Dkt. No. 58-1 at 7 n.5.)

("[W]here subject matter jurisdiction is contested a district court is permitted to consider evidence outside the pleadings, such as affidavits and exhibits.").

### 2.    *Analysis*

In his amended complaint, Plaintiff seeks injunctive relief to remove certain special conditions imposed upon him as a condition of his parole.  The Court finds that, as currently pled, Plaintiff's claims for injunctive relief are not ripe for review.  Ripeness is intended to avoid the "premature adjudication" of abstract disagreements.  *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (internal quotation marks omitted).  "To be justiciable, a cause of action must be ripe—it must present a real, substantial controversy, not a mere hypothetical question." *Id*. (internal quotation marks omitted).  While "[i]t is sufficient if the injury plaintiff alleges is 'certainly impending,'" *Jungels v. New York*, 50 F. App'x 43, 44 (2d Cir. 2002) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (internal quotation marks and citation omitted)), "[f]ederal courts may not issue opinions 'advising what the law would be upon a hypothetical state of facts.'" *Id*. (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990) (internal quotation marks and citation omitted)).  "'When the events alleged in a plaintiff's cause of action have not yet occurred, a federal court is precluded from exercising subject matter jurisdiction because a real case or controversy does not exist for purposes of Article III.'" *Id*. (quoting *Auerbach v. Board of Educ.*, 136 F.3d 104, 108-09 (2d Cir. 1998)).

This action was commenced, and Plaintiff amended his complaint, while he was in DOCCS's custody based on his admission to violating two conditions of his parole.  (Dkt. No. 55 at ¶ 57.)  Accordingly, because Plaintiff was not under any of the conditions of parole he challenged when this action was commenced, his claims for injunctive relief were not ripe. Therefore, the Court recommends granting Defendants' motion to dismiss Plaintiff's claims for

injunctive relief because they are not ripe, and the Court lacks subject matter jurisdiction to consider them.[4, 5]

### B.    Qualified Immunity

#### 1.    *Standard of Review*

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion tests the legal sufficiency of the complaint and whether it conforms to Rule 8(a)(2) of the Federal Rules of Civil Procedure. To survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id*. at 679 (internal citation and punctuation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears there are not "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. While Rule

---

[4]  The Court uses the past tense in this context because it is aware Plaintiff has been released from custody regarding his violation of parole during the pendency of this motion. (Dkt. No. 70.)  In other words, the gravamen of the Court's ruling relative to ripeness is that Plaintiff sought injunctive relief for parole conditions that *could not* apply to him because he was incarcerated at the time of the challenge.

[5]  Given the Court's finding with respect to subject matter jurisdiction, it declines to consider Defendants' arguments with respect to whether Plaintiff's claims for injunctive relief survive on the merits or the doctrine of *Ex Parte Young*.

8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).  In other words, a complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice.  *Id*. (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*).  Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted).  An opportunity to amend is not required where "[t]he problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id*.

## 2.    *Analysis*

Defendants Claudio, Gronau, Reed, and Rhodes argue they are entitled to qualified immunity insofar as Plaintiff is seeking money damages with respect to his challenge to the conditions of parole restricting his ability to interact with other members of his family, live with his fiancée, and be free from GPS monitoring.  (Dkt. No. 58-1 at 18-22.)  Defendants argue they are entitled to qualified immunity "because neither the Supreme Court nor the Second Circuit has clearly established the process that is due to a sex offender parolee, who stands convicted of a forcible sex crime against a minor, with respect to special parole conditions . . . [.]"  *Id*. at 20.  For the reasons discussed below, this Court finds Defendants' arguments unpersuasive.

"Parolees are entitled to some form of due process in the imposition of special conditions of parole."  *Yunus v. Robinson*, No. 17-CV-5839, 2019 WL 168544, at *20 (S.D.N.Y. Jan. 11, 2019) (internal quotation marks and alteration omitted).  "Generally, the imposition of conditions . . . must be upheld as long as they are reasonably related to a parolee's past conduct, are not arbitrary and capricious, and are designed to deter recidivism and prevent further offenses."  *Trisvan v. Annucci*, 284 F. Supp. 3d 288, 298-99 (E.D.N.Y. 2018) (internal quotation marks omitted); *see Muhammad v. Evans*, No. 11-CV-2113, 2014 WL 4232496, at *9 (S.D.N.Y. Aug. 15, 2014) ("In the Second Circuit, special restrictions on a parolee's rights are upheld where they 'are reasonably and necessarily related to the interests that the Government retains after his conditional release.'") (quoting *Birzon v. King*, 469 F.2d 1241, 1243 (2d Cir. 1972)); *see also United States v. Myers*, 426 F.3d 117, 125 (2d Cir. 2005) (in federal supervised release context, conditions "must involve no greater deprivation of liberty than is reasonably necessary for the purposes of sentencing") (internal quotation marks and alteration omitted); *Doe v. Lima*, 270 F. Supp. 3d 684, 702 (S.D.N.Y. 2017) (applying *Myers* to state parole context), *aff'd sub nom. Doe*

*v. Cappiello*, 758 F. App'x 181 (2d Cir. 2019) (summary order); *Doe v. Annucci*, No. 14-CV-2953, 2015 WL 4393012, at *13 (S.D.N.Y. July 15, 2015) (applying *Myers* in addressing qualified immunity in state parole context). "However, where the condition is not related to the parolee's criminal history or to the State's interests, it may be prone to tailoring or invalidation." *Robinson v. New York*, No. 09-CV-455, 2010 WL 11507493, at *6 (N.D.N.Y. Mar. 26, 2010) (collecting cases in which parole conditions were not reasonably related to offense). And where the condition deprives the parolee of a liberty interest that "is fundamental" under the Constitution, "a deprivation of that liberty is 'reasonably necessary' only if the deprivation is narrowly tailored to serve a compelling government interest." *Myers*, 426 F.3d at 126; *see Lima*, 270 F. Supp. 3d at 702 ("The Second Circuit has applied strict scrutiny to restrictions on liberty incident to post-prison supervisory regimes, whether denominated as parole (as in New York State) or as supervised release (as in the federal system).").

"[W]hile a plaintiff who claims that his parole conditions are arbitrary and capricious must provide enough information concerning his underlying crimes to plausibly allege that those conditions are not reasonably related to his prior conduct," the plaintiff need not "establish the lack of a rational relationship between these parole conditions and his criminal history by describing in detail the facts underlying his crime of conviction as found at trial and explaining why the parole conditions are unreasonable or unnecessary despite the actions for which he was convicted." *Yunus*, 2018 WL 3455408, at *39 (internal quotation marks, emphasis, and alterations omitted), report and recommendation adopted, 2019 WL 168544.

Turning to Plaintiff's amended complaint, he alleges Gronau placed him on GPS monitoring for no legitimate reason and was issued the GPS monitor at his workplace. (Dkt. No. 55 at ¶¶ 25, 27.) Specifically, he alleges the notes in his file claim GPS monitoring was ordered

because he visited his daughter, but Plaintiff denies that ever happened. (*Id.* at ¶ 57.) Moreover, the amended complaint adequately alleges that the special conditions related to his relationship with his fiancée and his ability to interact with members of his family bear no relationship to his charged conduct.[6] Plaintiff's amended complaint also asserts Gronau was malicious towards Plaintiff and did not treat him in a reasonable or rational manner. (*Id.* at ¶¶ 28, 29.) Here, given the facts as alleged in the amended complaint, there is no reason to find that the restrictions were "reasonably related to [Plaintiff's] past conduct." *Trisvan*, 284 F. Supp. 3d at 299. Indeed, Defendants do not even attempt to explain why these conditions are reasonably related to his offense. Rather, they focus solely on arguing that they are entitled to qualified immunity. (Dkt. No. 58-1 at 21.) Having first found that Plaintiff's allegations adequately allege a constitutional violation, the Court turns to whether Defendants are entitled to qualified immunity.

Qualified immunity is available to officials so long as their actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether defendants enjoy qualified immunity, the Court "consider[s] the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014). The plaintiffs are not required to cite a case "directly on point." *Id.* at 230 (internal

---

[6] The Court notes that the restriction relative to his family with respect to interacting with minors might have a relationship with his conviction for forcible rape of a minor. *See Scott v. Rosenberger*, No. 19-CV-1769 (CS), 2020 WL 4274226, at *7 (S.D.N.Y. July 24, 2020) (finding that "restricting his access to minors is thus reasonably related to Plaintiff's past conduct and is designed to prevent Plaintiff from committing further offenses"). However, Plaintiff also challenges conditions that made it impossible for him to see his father in the hospital. Thus, the condition restricting Plaintiff's contact with family members is not limited to restricting Plaintiff's access to minors.

quotation marks omitted); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (finding that whether the very action in question has not previously been held unlawful is not determinative); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ( "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").  However, "in the light of pre-existing law the unlawfulness must be apparent."  *Id*. at 739 (internal quotation marks omitted).

To be sure, as Defendants argue, qualified immunity should be resolved "at the earliest possible stage in litigation."  *Pearson v. Callahan*, 555 U.S. 223, 232  (2009) (internal quotation marks omitted).  However, the Second Circuit recently discussed that there is a "corollary to that principle: The immunity question cannot be resolved before the earliest possible stage, *id*., i.e., prior to ascertainment of the truth of the plausible factual allegations on which a finding of qualified immunity is premised."  *Chamberlain ex rel. Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) (internal quotation marks and citations omitted).  In other words, the Second Circuit has cautioned district courts against granting motions to dismiss on qualified immunity grounds.  *See id.*; *see also Barnett v. Mount Vernon Police Dep't*, 523 F. App'x 811, 813 (2d Cir. 2013) (summary order) ("[A] defendant asserting a qualified immunity defense on a motion to dismiss faces a formidable hurdle and is usually not successful.") (internal quotation marks and alteration omitted); *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983) (noting that, as a general rule, "the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion").

The Second Circuit has explained that: "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route."  *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir.

2004) (citations, internal quotation marks, and alterations omitted).  Thus, a qualified immunity

defense presented on a Rule 12(b)(6) motion "faces a formidable hurdle . . . and is usually not

successful."  *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006) (internal

quotation marks omitted).  "Otherwise, plaintiffs alleging a violation of their constitutional rights

would face a heightened pleading standard under which they must plead not only facts sufficient

to make out their claim but also additional facts to defeat an assertion of qualified immunity."

*Chamberlain*, 960 F.3d at 110 (citing *Castro v. United States*, 34 F.3d 106, 111 (2d Cir. 1994)).

"Put another way, advancing qualified immunity as grounds for a motion to dismiss is almost

always a procedural mismatch."  *Chamberlain*, 960 F.3d at 110 (citing *Jacobs v. City of

Chicago*, 215 F.3d 758, 775 (7th Cir. 2000)).

  Here, the Court finds Defendants do not clear this high bar.  As noted above, "it is well

settled that conditions of release must be reasonably related to the parolee's underlying offense,

and all parole officers should be aware of this fundamental legal principle setting the parameters

of the conditions they may or may not impose."  *Scott*, 2020 WL 4274226, at *12.  Viewed in the

light most favorable to Plaintiff, the facts as alleged are sufficient to overcome the Defendants'

assertion of a qualified immunity defense, at least until further facts are submitted on a motion

for summary judgment or at trial.  In sum, Plaintiff has plausibly alleged Defendants' imposition

of the challenged special conditions was arbitrary and not related to his criminal offense and,

therefore, a violation of his clearly established rights.  On one hand, once the facts are developed

in discovery, it may come to light that Plaintiff's right to be free from all or some of his special

conditions, given the facts and circumstances of his case, was not clearly established.  On the

other hand, it may become clear that no reasonable parole officer in the position of Defendants

could have thought the restrictions to be constitutional.  At this point, the Court finds it would be

premature to dismiss these claims on qualified immunity grounds and therefore recommends denying Defendants' motion to dismiss.

## III.    CONCLUSION

For the reasons set forth above, the Court recommends Defendants' motion to dismiss (Dkt. No. 58) be granted in part and denied in part.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' Rule 12(b)(1) motion to dismiss Plaintiff's claims for injunctive relief against Annucci, Gilbert, Moss, Palmer, and Montfort-Balfour (Dkt. No. 58) be **GRANTED** and those claims **DISMISSED**; and it is further

**RECOMMENDED** that Defendants' Rule 12(b)(6) motion to dismiss (Dkt. No. 58) be **DENIED** in all respects; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[7]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993)

---

[7]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72.


Dated: March 3, 2021
      Syracuse, New York

Therèse Wiley Dancks
United States Magistrate Judge

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 17 of 134

Butler v. Ross, Not Reported in Fed. Supp. (2016)

2016 WL 3264134
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Susan BUTLER, Plaintiff,
v.
Norman ROSS, Defendant.

16cv1282 (DLC)
|
Signed 06/14/2016

**Attorneys and Law Firms**

For plaintiff: Barry R. Fischer, The Barry Fischer Law Firm L.L.C., 555 Fifth Avenue, Suite 1700, New York, NY 10036.

For defendant: Martin Druyan, Martin Druyan and Associates, 450 7th Avenue, New York, NY 10123.

OPINION & ORDER

DENISE COTE, District Judge

**\*1** Plaintiff Susan Butler seeks an accounting of funds she entrusted to defendant Norman Ross. The defendant has filed a motion to dismiss the complaint. For the reasons stated below, the motion is denied.

BACKGROUND

The following facts are taken from the complaint. Plaintiff Butler is a citizen of Australia and Canada and a resident of Montreal, Canada. In early 1987, the plaintiff met defendant Ross, a United States citizen and resident of New York.

Beginning in or around 1989, the defendant began managing the plaintiff's financial affairs. The plaintiff alleges that she was earning "substantial income" and "gradually ceded complete control over her finances to Defendant, who professed to be [an] expert in managing finances and investing." The defendant persuaded her to execute a power of attorney in his favor so that he could have free reign to manage her finances. She relied on him to manage and invest finances in excess of $1 million. When the plaintiff would occasionally inquire about her investments, the defendant "assured her that her money was safe, conservatively invested and earning good returns." More recently, the defendant refused to provide any information in response to the plaintiff's inquiries.

In or about September 2015, the plaintiff served on the defendant a revocation of the power attorney she had given to him. On or about September 24, the plaintiff made a written demand on the defendant to submit to an investigation and accounting of her financial affairs. The defendant refused to provide the requested accounting.

The plaintiff filed this lawsuit on February 19, 2016. The complaint pleads only one count seeking an accounting. On April 12, the defendant filed a motion to dismiss the complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P. The motion became fully submitted on May 12.

DISCUSSION

In his motion to dismiss, the defendant generally takes issue with the accuracy of the complaint's description of events. It appears that the defendant also asserts both that the complaint fails to state a claim, and that the complaint should be dismissed for lack of subject-matter jurisdiction.

**I. Factual Sufficiency of the Complaint**

In considering a motion to dismiss, a court must accept as true all allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. Loginovskaya v. Batratchenko, 764 F.3d 266, 269-70 (2d Cir. 2014). "To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege sufficient facts which, taken as true, state a plausible claim for relief." Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 68 (2d Cir. 2014); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (citation omitted)). A claim has facial plausibility when "the factual content" of the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted).

**\*2** New York law appears to govern this dispute since it is alleged that the defendant, a resident of New York, breached his obligations as the plaintiff's fiduciary and has refused to provide her with an accounting. Under New York's interest

Butler v. Ross, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 18 of 134

analysis, "in cases involving conduct-regulating laws," the locus of the tort usually provides the substantive law. Krock v. Lipsay, 97 F.3d 640, 646 (2d Cir. 1996); see also Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 399-400 (S.D.N.Y. 2010); Caudle v. Towers, Perrin, Forster & Crosby, Inc., 580 F. Supp. 2d 273, 280 (S.D.N.Y. 2008).

Under New York law, a party seeking an accounting under must establish four conditions:

(1) relations of a mutual and confidential nature;

(2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal.

Mega Tech Int'l Corp. v. Miller Elec. MFG. Co., 97cv1085 (DLC), 1997 WL 790750 (S.D.N.Y. Dec. 23, 1997) (citation omitted). Accordingly, the right to an accounting "is premised upon the existence of a confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest." Dee v. Rakower, 976 N.Y.S.2d 470, 478 (2d Dep't 2013) (citation omitted). A fiduciary relationship, "whether formal or informal, is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another [and] might be found to exist, in appropriate circumstances, between close friends or even where confidence is based upon prior business dealings." Lawrence v. Kennedy, 944 N.Y.S.2d 577, 580 (1st Dep't 2012) (citation omitted). A power of attorney creates a fiduciary relationship between the principal and her agent. See, e.g., Matter of Ferrara, 7 N.Y.3d 244, 251-55 (2006); In re Garson, 793 N.Y.S.2d 397, 397-98 (1st Dep't 2005); In re Roth, 724 N.Y.S.2d 476, 477 (2d Dep't 2001).

An accounting under New York law is an equitable claim. When a party bringing an accounting claim primarily seeks monetary damages, "[t]he accounting is merely a method to determine the amount of the monetary damages. The action therefore sounds in law and not in equity." Arrow Commc'n Labs., Inc. v. Pico Products, Inc., 632 N.Y.S.2d 903, 905 (4th Dep't 1995) (citation omitted).

The statute of limitations in New York for an accounting claim is six years. Golden Pac. Bancorp v. F.D.I.C., 273 F.3d 509, 518 (2d Cir. 2001); In re Barabash's Estate, 31 N.Y.2d 76, 80 (1972); N.Y. C.P.L.R. § 213. The limitations period for claims arising out of a fiduciary relationship does not commence "until the fiduciary has openly repudiated his or her obligation or the relationship has been otherwise terminated." Golden Pac. Bancorp, 273 F.3d at 518 (citation omitted).

The plaintiff has adequately plead a claim for an accounting under New York law. The complaint pleads the existence of a confidential or fiduciary relationship. It asserts that the plaintiff entrusted the defendant with over $1 million of her personal finances to manage and invest, and executed a power of attorney naming him as her attorney-in-fact. The complaint also alleges a breach of that duty by describing how the defendant failed to provide any information about the plaintiff's funds. The plaintiff also sufficiently pleads that she has "no adequate remedy at law, since she is unaware of the nature, location and exact amount of her assets" and describes how her demand for an accounting was refused.

**\*3** The motion to dismiss principally argues that the complaint lacks specificity. The Rule 8, Fed. R. Civ. P., pleading standard governs here and there is no obligation for the plaintiff to include more detailed information in the complaint than it presently contains.

The defendant also asserts that it is "illogical" for the plaintiff to claim an accounting without pleading legal claims as well. The defendant implies that the plaintiff has an adequate remedy at law and therefore has not pleaded an essential element of her accounting claim. Yet, obtaining an accounting is often a critical predicate for asserting legal claims, and the absence of a legal remedy is plausible given the defendant's alleged refusal to provide information to the plaintiff.

The defendant next claims that the plaintiff's accounting claim is barred by the six year statute of limitations. The complaint asserts that the defendant did not openly repudiate his role as a fiduciary until September 2015, when he refused to provide an accounting to the plaintiff. Prior to that date, he merely failed to provide information to the plaintiff regarding her funds and acted without her knowledge. Accordingly, taking the facts alleged as true, the statute did not begin to run until September 2015.

Butler v. Ross, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 19 of 134

Lastly, the defendant appears to question whether New York law applies to the plaintiff's claims. He implies that foreign law applies since the events giving rise to the plaintiff's suit occurred in Australia or Canada. Since the defendant is alleged to have performed, or failed to perform, his fiduciary duties in New York, New York law shall be applied to the accounting claim at this stage of the proceedings. See Krock, 97 F.3d at 645-46; see also Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 198 (1985) ("[W]hen the conflicting rules involve the appropriate standards of conduct ... the law of the place of the tort will usually have a predominant, if not exclusive, concern ....").

## II. Jurisdiction

Although the defendant does not bring a motion to dismiss pursuant to Rule 12(b)(1), Fed. R. Civ. P., he nonetheless generally suggests that this Court lacks subject matter jurisdiction over the plaintiff's accounting claim.[1] "Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted).

There is no question that jurisdiction based on diversity of citizenship exists in this case. The defendant has admitted that he is a United States citizen residing in New York. The plaintiff is a citizen of Australia and Canada residing in Montreal. Moreover, the complaint alleges that the defendant managed over $1 million of the plaintiff's finances, which sufficiently satisfies the amount in controversy requirement.

The defendant argues that the complaint does not "plead and prove beyond speculation or truthful good faith the $75,001 Dollar [sic] amount in controversy as required by FRCP." Absent a showing "to a legal certainty" that the amount in controversy does not meet the jurisdictional threshold, this Court must accept the material allegations of the complaint as true. Scherer v. Equitable Life Assurance Soc'y of U.S., 347 F.3d 394, 397 (2d Cir. 2003) (citation omitted).

### CONCLUSION

**\*4** Defendant's April 11, 2016 motion to dismiss is denied.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2016 WL 3264134

## Footnotes

1    The defendant also appears to suggest that this Court lacks personal jurisdiction over the defendant. As a New York resident, the defendant is subject to general jurisdiction in New York. N.Y. C.P.L.R. § 301.

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

50 Fed.Appx. 43
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Georgiana H. JUNGELS, Plaintiff,
Paul Zarembka, Individually and on behalf of
all academic and all professional employees
with State University of New York employee
contract(s) who are now, or will be forty (40) years
of age or older while the State/UUP 1995-1999
Agreement is "in effect" and all other similarly
situated persons, and as a Representative
Plaintiff under the Age Discrimination
in Employment Act, Plaintiff-Appellant,
v.
State of NEW YORK, George E. Pataki,
Governor, United University Professions,
William E. Scheuerman, President, New
York State United Teachers, Linda Agnello,
Michael P. Rowan, Allen C. Demarco,
Walter J. Pellegrini, Defendants-Appellees.

Docket No. 02-7205.
|
Nov. 1, 2002.

Appeal from judgment of the United States District Court
for the Western District of New York (John T. Curtin,
Judge) dismissing plaintiff's lawsuit for lack of subject
matter jurisdiction.

**Attorneys and Law Firms**

David M. Fish, Rosen, Leff, Esqs., Robert M. Rosen, Rosen,
Leff, Esqs., Anna Marie Richmond, Buffalo, NY, on the brief,
Hempstead, NY, for Plaintiff-Appellant.

Andrea Oser, Assistant Solicitor General, Eliot Spitzer,
Attorney General, Daniel Smirlock, Deputy Solicitor
General, on the brief, Albany, NY, for State Defendants-
Appellees.

Anthony J. Brock James R. Sandner, on the brief, Albany, NY,
for Union Defendants-Appellees.

Present MESKILL, NEWMAN and POOLER, Circuit
Judges.

SUMMARY ORDER

**\*\*1** ON CONSIDERATION WHEREOF, IT IS
HEREBY ORDERED, ADJUDGED, AND DECREED
that the judgment of the District Court be and it hereby is
AFFIRMED.

Plaintiff Paul Zarembka appeals the January 18, 2002,
judgment of the United States District Court for the Western
District of New York (John T. Curtin, Judge) dismissing his
civil rights lawsuit for lack of subject matter jurisdiction.
Zarembka, a tenured employee of the State University of
New York ("SUNY"), filed a lawsuit on behalf of
himself and a purported class of 10,000 tenured SUNY
employees to challenge Article 36 of the collective bargaining
agreement between the executive branch of New York
State and United University Professions ("UUP" or "the
union"). UUP is the union representing plaintiff and class
members. Article 36, which is present in the collective
bargaining agreements covering the periods 1995 to 1999 and
1999 to 2003, permits the state to contract out for goods
and services and entitles employees affected by the state's
action to "redeployment consideration" or **\*44** transition
benefits including retraining and education, severance pay,
and employment with the contractor. According to plaintiff,
Article 36 disparately impacts employees over age 40
and deprives employees of their property interests in their
tenured jobs. In his second amended complaint, plaintiff
brought causes of action under the Age Discrimination in
Employment Act, 42 U.S.C. § 1983, and New York Human
Rights Law. Plaintiff named both the state and UUP, as well
as various individuals, as defendants. The state never has
used or threatened to invoke Article 36 against any tenured
SUNY employee. Both the state and union defendants moved
to dismiss plaintiff's complaint pursuant to Fed.R.Civ.P.
12(b)(1) and (6). In a January 15, 2002, Decision and Order,
the district court granted the motions without prejudice
pursuant to Rule 12(b)(1) because Zarembka's claims were
not ripe for judicial review. Plaintiff now appeals.

Because federal courts only may adjudicate actual cases or
controversies pursuant to Article III of the Constitution, "[t]o
invoke the jurisdiction of a federal court, a litigant must have
suffered, or be threatened with, an actual injury traceable to
the defendant and likely to be redressed by a favorable judicial
decision." *Lewis v. Continental Bank Corp.,* 494 U.S. 472,

477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). The ripeness doctrine is designed to prevent premature adjudication of abstract disagreements and "turns on the 'fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.' " *Pacific Gas & Elec. v. State Energy Res. Conservation and Dev. Comm'n,* 461 U.S. 190, 200-01, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). It is sufficient if the injury plaintiff alleges is "certainly impending." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (quotation marks and citation omitted). Federal courts may not issue opinions "advising what the law would be upon a hypothetical state of facts." *Lewis,* 494 U.S. at 477, 110 S.Ct. 1249 (quotation marks and citation omitted). "When the events alleged in a plaintiff's cause of action have not yet occurred, a federal court is precluded from exercising subject matter jurisdiction because a real case or controversy does not exist for purposes of Article III." *Auerbach v. Board of Educ.,* 136 F.3d 104, 108-09 (2d Cir.1998).

**\*\*2** Zarembka contends that his complaint satisfies these jurisdictional requirements because it presents a purely legal question and he will suffer hardship if adjudication is delayed because he "and the other 10,000 tenured professionals are reasonably concerned about their future economic security, and Article 36 has a direct effect on their futures." We disagree. First, the question is not purely legal because the contracting out provision never has been invoked and the court has no way of knowing how the state would implement the provision. As Appendix A-27 to the collective bargaining agreement demonstrates, the procedures for redeploying contracted-out employees depend on the circumstances of the case, and it is impossible to anticipate whether an affected employee would lose tenure benefits. Contrary to plaintiff's claims on appeal, there is no facial inconsistency between Article 36 and N.Y. Educ. Law §§ 6210, 6212, which by their terms apply not to SUNY but to the City University of New York in any event.

Second, plaintiff failed to show any hardship or certainly impending injury. As the district court noted, the fact that defendants never invoked or even threatened to invoke Article 36 is highly probative of the speculative nature of Zarembka's claim. **\*45** Defendants point out that the next collective bargaining agreement may not contain the disputed provision. This is not a case like *Riva v. Commonwealth of Mass.,* 61 F.3d 1003, 1010-11 (1st Cir.1995), upon which plaintiff relies, because the future injury in *Riva* was relatively certain to occur. The only injury-in-fact that Zarembka alleges is the fear that class members will lose tenure if the state invokes Article 36, and this vague fear is insufficient to support a speculative claim. *See Auerbach,* 136 F.3d at 109 (holding that teachers' challenge to existing retirement plan was unripe and speculative because teachers had not yet retired, had suffered no loss in benefits, and a different plan might exist at the time of their actual retirement). Zarembka contends that the challenged provisions of the collective bargaining agreement currently deprive him of property without due process of law because they deny him tenure. Even if we were to assume that tenure, as distinguished from employment, is a property interest protected by the Fourteenth Amendment, the provisions do not say anything about tenure. The complaint provides no basis for entertaining a claim that tenure has now been lost. Moreover, a claim of current loss of a property interest in tenure without due process of law would encounter the objection that the challenged provision was negotiated and endorsed by the union that represents Zarembka. The tenure interest, if constitutionally protected and if impaired, which we do not decide, was not altered by any unilateral action of the state. The allegation of current loss of tenure fails to state a valid claim for relief. If tenure should be impaired in the future, the issue will then arise whether the impairment had been accomplished without due process of law.

**\*\*3** Because we hold that plaintiff's claims are not ripe for review, we do not reach defendants' alternative arguments regarding 11th Amendment immunity for the state and the absence of Section 1983 liability for the union. We have considered all of plaintiff-appellant's remaining arguments and find them to be without merit.

**All Citations**

50 Fed.Appx. 43, 2002 WL 31478981

---

**End of Document**   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 168544
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Equan YUNUS, Sr., Plaintiff,
v.
J. Lewis ROBINSON et al., Defendants.

17-cv-5839 (AJN)
|
Signed 01/11/2019

**Attorneys and Law Firms**

David Benjamin Berman, Emery Celli Brinckerhoff & Abady
LLP, New York, NY, for Plaintiff.

Kacie Alina Lally, Amanda Shoffel, Daniel A. Schulze,
NYS Office of the Attorney General, New York, NY, for
Defendants.

OPINION & ORDER

ALISON J. NATHAN, United States District Judge

 *1  Since 2016, Plaintiff has been required to register as a sex
offender and has been subject to parole conditions designed
to control the threat posed by sex offenders, including
limitations on where he can live and travel, what websites
he can access and what technology he can possess, and
whether he can own a pet or rent a post office box. Plaintiff
was even re-incarcerated for several months for possessing
a smartphone and laptop. Report & Recommendation ("R
& R"), Dkt. No. 79, at 61. Yet the record before the Court
does not indicate that Plaintiff has ever committed any
sexual misconduct. Instead, Plaintiff pled guilty to a crime—
kidnapping of an unrelated minor under the age of 17—that
automatically rendered him a sex offender under New York's
Sex Offender Registration Act ("SORA"), N.Y. Correct.
Law (CL) § 168-a. No evidence before the Court suggests that
there was anything sexual about Plaintiff's crime, but rather
that it was carried out to ransom the victim in exchange for
money and drugs. At the state court hearing to determine his
risk level classification as a sex offender, the judge found that
there was "virtually no likelihood that [Plaintiff] will commit
a sex crime ever." R & R at 10. Indeed, for the purposes of
these two motions, Defendants have conceded that there was
no sexual element to Plaintiff's offense.

Plaintiff brought this action under 42 U.S.C. §
1983, alleging that this situation violates several of his
constitutional rights. Plaintiff argues that being forced to
register as a sex offender violates his substantive and
procedural due process rights, while a number of his
specific conditions of parole violate his rights under the
Due Process Clause and the First Amendment. Plaintiff
sought a preliminary injunction on some of his claims, while
Defendants moved to dismiss his complaint in its entirety.
These motions were referred to Magistrate Judge Moses for
a Report and Recommendation. Judge Moses recommended
that the Court grant a preliminary injunction on Plaintiff's
claim that SORA, as applied to him, violates his right to
substantive due process. Judge Moses also recommended
granting Defendants' motion to dismiss in part and denying
it in part.

For the reasons given below, the Court adopts Judge Moses'
recommendation and grants Plaintiff a preliminary injunction
on his substantive due process claim. The Court also grants
Defendants' motion to dismiss as to several of Plaintiff's
claims, including all of his claims for damages, while denying
it as to his substantive due process claim, his challenges to his
conditions of parole limiting where he can travel, his ability
to seek alternate residences, his access to social media, what
technology he can own and use, and his ability to interact with
minor members of his family.

**I. Background**

The Court assumes the parties' familiarity with the facts of this
case and will rely on Judge Moses's thorough discussion of the
factual and procedural history of this case in her Report and
Recommendation to the Court. See R & R at 8-18. In short,
Plaintiff pleaded guilty in 2002 to two counts of kidnapping
for ransom under New York law. R & R at 9. One of the
victims was a boy under seventeen years old who was not
Plaintiff's child. R & R at 9. Under SORA, a conviction
for kidnapping a minor who is not the kidnapper's child is
designated as a "sex offense." N.Y. Correct. Law § 168-
a(2)(a)(i). Plaintiff was classified a level one sex offender—
the lowest possible level—at a SORA hearing following his
term of incarceration. R & R at 10-11. However, there was
no allegation of a sexual component to Plaintiff's crime and
he has never been accused of committing any form of sexual
misconduct. R & R at 9. Furthermore, at his SORA hearing,
the presiding judge—Justice Obus, who had also presided
over Plaintiff's sentencing in his underlying criminal case

**Yunus v. Robinson, Not Reported in Fed. Supp. (2019)**

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 23 of 134

—found that there was virtually no likelihood that Plaintiff would ever commit a sex crime. R & R at 10. Plaintiff was released to parole on July 14, 2016, and numerous parole conditions were imposed, some mandatory and some discretionary. *See* R & R at 11-18 (outlining relevant parole conditions and modifications that have been made over time to those conditions).

**\*2** On August 1, 2017, Plaintiff commenced this action by filing a pro se complaint. Dkt. No. 2. Following the appearance of pro bono counsel for Plaintiff, he filed a motion for a preliminary injunction on March 26, 2018 and a Second Amended Complaint on March 29, 2018. *See* Mot. for PI, Dkt. No. 43; SAC, Dkt. No. 54. In his Second Amended Complaint, Plaintiff challenges his designation as a sex offender on procedural due process and substantive due process grounds. SAC ¶¶ 139-51. He also challenges numerous specific conditions of his parole, arguing that they are void for vagueness, SAC ¶¶ 152-58, violate his First Amendment rights, SAC ¶¶ 159-63, violate his due process right by interfering with his family relations, SAC ¶¶ 164-69, and impose conditions that are arbitrary and capricious, SAC ¶¶ 170-75. The Court referred the motion for a preliminary injunction to Magistrate Judge Barbara Moses for a Report and Recommendation. Dkt. No. 51.

On April 17, 2018, the Defendants in this action filed a motion to dismiss the Second Amended Complaint. Def. Mot. to Dismiss, Dkt. No. 59. The Court referred consideration of this motion to Judge Moses as well. Dkt. No. 62. On June 29, 2018, Judge Moses filed her Report recommending resolution of Plaintiff's motion for a preliminary injunction and Defendants' motion to dismiss. *See* R & R at 84-86. On July 20, 2018, both parties timely filed their objections to the Report, Pl. R & R Obj., Dkt. No. 85; Def. R & R Obj., Dkt. No. 86, and responded to one another's objections, Def. R & R Obj. Resp., Dkt. No. 93, Pl. R & R Obj. Resp., Dkt. No. 94. After having reviewed Judge Moses's Report and the parties' objections, the Court requested supplemental briefing on (1) whether preclusion doctrines barred some of Plaintiff's claims and (2) whether Defendants had waived any preclusion arguments by failing to raise them in the first instance before Judge Moses. Dkt. No. 98. The parties provided briefing, Def. Supp. Br., Dkt. No. 101; Pl. Supp. Br., Dkt. No. 102, and the Court held oral argument on October 3, 2018.

**II. Legal Standards**

## A. Review of Objections to a Magistrate Judge's Report

A court may "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition" of certain motions, including motions for injunctive relief and motions to dismiss. 28 U.S.C. § 636(b)(1)(B). A party to the action may file objections to the proposed findings and recommendations. *Id.* § 636(b)(1)(C). Specific objections to a magistrate judge's recommendation are reviewed *de novo. See, e.g.,* *Amadasu v. Ngai,* No. 05-CV-2585(RRM), 2012 WL 3930386, at \*3 (E.D.N.Y. Sept. 9, 2012). Where a party does not object, or simply makes "conclusory or general objections," the district court will review for clear error. *Id.* (citing cases). Under this standard, portions of the report to which no objections were made will be accepted unless they are "facially erroneous." *Bryant v. New York State Dep't of Corr. Servs.,* 146 F.Supp.2d 422, 424–25 (S.D.N.Y. 2001); *see also DiPilato v. 7-Eleven, Inc.,* 662 F. Supp. 2d 333, 339–40 (S.D.N.Y. 2009) ("A decision is 'clearly erroneous' when the Court is, 'upon review of the entire record, [ ] left with the definite and firm conviction that a mistake has been committed.' ") (alteration in original) (quoting *United States v. Snow,* 462 F.3d 55, 72 (2d Cir. 2006) ).

## B. Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008). A court may issue a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. Ordinarily, a party seeking a preliminary injunction must make one of two showings: First, he may "show that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest." *ACLU v. Clapper,* 785 F.3d 787, 825 (2d Cir. 2015). Alternatively, he "may show irreparable harm and either a likelihood of success on the merits or 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.' " *Id.* (quoting *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.,* 696 F.3d 206, 215 (2d Cir. 2012) ). However, if "the moving party seeks to

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 24 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim." *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (quoting *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989) ). When the moving party seeks a mandatory injunction, " '[t]he moving party must make a clear or substantial showing of a likelihood of success' on the merits, a standard especially appropriate when a preliminary injunction is sought against government." *D.D. ex rel. V.D. v. N.Y. Bd. Of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006) (alteration in original) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) ).

### C. Motion to Dismiss

**\*3** A case is properly dismissed for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b) (1), a district court ... may refer to evidence outside the pleadings." *Id.* The party asserting subject matter jurisdiction "has the burden of proving by a preponderance of the evidence that it exists." *Id.* Jurisdiction "must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998).

To survive a motion to dismiss for failure to state a claim under Rule 12(b) (6), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim achieves "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, and if plaintiffs cannot "nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed," *Twombly*, 550 U.S. at 570. "Plausibility ... depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). When considering a motion to dismiss under Rule 12(b)(6), "a court must accept as true all of the [factual] allegations contained in [the] complaint." *Iqbal*, 556 U.S. at 678. However, the court should not accept legal conclusions as true: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### D. Qualified Immunity

Several of Plaintiff's claims seek money damages, all of which Defendants contend should be dismissed on the grounds of qualified immunity. Def. Mot. to Dismiss, Dkt. No. 60, at 17-20. Because this issue arises at a number of points in the opinion, the Court provides a summary of the standard here.

Qualified immunity may be raised on a motion to dismiss under Rule 12(b)(6). However, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). In such cases, the facts supporting the immunity defense must be plain on the face of the complaint and "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.*

The defense of qualified immunity "protects government officials from suit if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ). The qualified immunity analysis asks whether (1) a plaintiff has sufficiently pled the violation of a constitutional or statutory right, (2) whether that right was "clearly established," and (3) whether it was "objectively reasonable" for the official to believe their conduct was lawful. *Id.* at 154-55 (citing

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 25 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

*Taravella v. Town of Wolcott*, 599 F.3d 129, 133–34 (2d Cir. 2010) ). A right may be clearly established by either controlling authority or "a robust consensus of cases of persuasive authority." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011) (internal quotation marks omitted) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999) ). The applicable legal rule at issue should not be defined "at a high level of generality," but rather must be "particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 551–52 (2017) (internal quotation marks omitted). It is not necessary that "the very action in question" have been previously held unlawful, as "an officer might lose qualified immunity even if there is no reported case 'directly on point.' " *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866–67 (2017). On the other hand, "in the light of pre-existing law, the unlawfulness of the officer's conduct must be apparent." *Id. at 1867* (internal quotation marks omitted).

**\*4** As to the reasonableness inquiry, this turns on whether the official could have reasonably believed that their actions were legal given the law at the time of the actions in question. *Berg v. Kelly*, 897 F.3d 99, 109 (2d Cir. 2018). Objective reasonableness is a mixed question of law and fact, which "requires examination of the information possessed by the officials at that time (without consideration of subjective intent)." *Id. at 109-10*. The operative question is "whether a reasonable official would reasonably believe that his conduct did not violate a clearly established right[.]" *Id.*

### III. Judge Moses's Report and Recommendation
As a threshold matter, Judge Moses's Report addresses Defendants' arguments that Plaintiff's due process challenges are barred by the *Rooker-Feldman* doctrine, recommending that this case did not meet the narrow conditions for the doctrine to apply. Turning to the merits of the motion to dismiss, the Report recommends granting the motion to dismiss with respect to the following claims:

The First Claim, in its entirety;

The Third Claim, to the extent it alleges that Special Condition No. 24 (the "consenting adult" rule) is void for vagueness;

The Third Claim, to the extent it seeks damages against any of the Parole Officer Defendants [1] for their past

enforcement of any of the parole conditions challenged as void for vagueness;

The Fourth Claim, to the extent it seeks damages against the Parole Officer Defendants other than PO Lewis-Robinson for their past enforcement of the cellphone, computer, and social media restrictions contained in Special Conditions No. 12, 22, 35, 39, and 48;

The Fourth Claim, to the extent it seeks damages against PO Lewis-Robinson arising from her conduct prior to the decision in *Packingham*;

The Fifth Claim, to the extent it seeks damages against the Parole Officer Defendants other than PO Lewis-Robinson for their past enforcement of Special Condition No. 15 (no contact with minors);

The Sixth Claim, to the extent it seeks damages against any of the Parole Officer Defendants for their past conduct in denying plaintiffs' requests to move in with his fiancée and his uncle;

The Sixth Claim, to the extent it seeks damages against the Parole Officer Defendants other than PO Lewis-Robinson in connection with the denial of Plaintiff's request to move in with Ms. Blake;

The Sixth Claim, to the extent it seeks damages against any of the Parole Officer Defendants for their past enforcement of Special Condition No. 24;

The Sixth Claim, to the extent it seeks either damages or injunctive relief in connection with Special Conditions No. 31 and 32 (motor vehicles), No. 14 (sexually explicit materials), No. 19 (pets) or No. 37 (Post Office boxes).

R & R at 84. The Report recommends denying Defendants' motion to dismiss as to the remaining claims. The Report also recommends that the Court grant Plaintiff's request for a preliminary injunction in part. R & R at 85. It concludes that Plaintiff's designation as a sex offender violates his substantive due process rights and therefore recommends that the Court enjoin Defendants from "enforcing, as against plaintiff, the registration and notification provisions made applicable to designated sex offenders by SORA (CL §§ 168a-168w), or the mandatory conditions prescribed by EL §§ 259-c(14) and (15) for parolees sentenced for an offense for which registration as a sex offender is required," and directing Defendants "to rescind the discretionary provisions of the Sex Offender Conditions (Yunus Decl. Ex. C, at ECF pages 4-10)

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 26 of 134

except to the extent they deem those conditions appropriate for plaintiff in light of his *non-sexual* criminal history and characteristics." R & R at 85. Alternatively, Judge Moses recommends that if the Court does not grant a preliminary injunction on Plaintiff's substantive due process claim, it should grant a preliminary injunction as to several of his parole conditions. R & R at 85-86.

## IV. Discussion

 **\*5**  The Court first addresses Defendants' claims that the *Rooker-Feldman* doctrine deprives it of subject-matter jurisdiction. The Court will then examine the issue of preclusion, which was only raised by Defendants after Judge Moses's Report, and the related question of waiver. The Court will then turn to the merits of Defendants' motion to dismiss and Plaintiff's motion for a preliminary injunction, addressing each in turn.

### A. Plaintiff's First and Second Claims Are Not Barred by the *Rooker-Feldman* Doctrine

Defendants argue that Plaintiff's first and second claims, which challenge his designation as a sex offender on procedural due process and substantive due process grounds, are barred by the *Rooker-Feldman* doctrine. The *Rooker-Feldman* doctrine bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." 📖 *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). This doctrine deprives federal courts of subject-matter jurisdiction to hear cases "that are, in substance, appeals from state court judgments[.]"

📖 *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005). For the *Rooker-Feldman* doctrine to apply, four conditions must be met:

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[ ] of injuries caused by [a] state-court judgment[.]" Third, the plaintiff must "invit[e] district court review and rejection of [that] judgment[ ]." Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced" – i.e., *Rooker-Feldman* has no application to federal court suits proceeding in parallel with ongoing state-court litigation.

*Id.* at 85 (alterations in original) (footnote omitted) (quoting 📖 *Exxon-Mobil*, 544 U.S. at 284).

The Report recommends that the *Rooker-Feldman* doctrine does not deprive the Court of subject-matter jurisdiction here, both because Plaintiff did not lose in state court and because the injuries he complains of resulted from the SORA statute rather than a state court judgment. R & R at 22-25. Defendants raise several objections, which the Court reviews *de novo*.

First, Defendants object that Plaintiff's SORA hearing *did* address whether it was constitutional to require Plaintiff to register as a sex offender. Def. R & R Obj. at 6-7. Yet it is clear from the surrounding context that the section of the hearing transcript they cite to only addresses what level of classification should apply to Plaintiff and does not challenge that SORA as applied to him is unconstitutional. SORA Tr. 5:12-22. The Court agrees with the Report that SORA's constitutionality was neither challenged nor decided at the hearing.

Defendants next object that *Rooker-Feldman* bars any claim asserting injury based on a state judgment even if the injury was not actually contested in state-court proceedings. Def. R & R Obj. at 7-8. Yet the relevant inquiry for the purpose of *Rooker-Feldman* is whether the judicial decision at Plaintiff's SORA hearing itself *caused* Plaintiff's injury; if an injury was caused prior to the state judicial action, *Rooker-Feldman* is inapplicable. *See* 📖 *Sung Cho v. City of New York*, 910 F.3d 639, 649 (2d Cir. 2018). Indeed, it is settled law that *Rooker-Feldman* does not apply if the judicial determination in question "simply ratified, acquiesced in, or left unpunished" Plaintiff's injury. 📖 *McKithen v. Brown*, 481 F.3d 89, 97-98 (2d Cir. 2007) (quoting 📖 *Hoblock*, 422 F.3d at 88). Here, Plaintiff's injury did not result from his SORA hearing, but rather from the statute itself. *See* 📖 *Spiteri v. Russo*, No. 12-cv-2780 (MKB) (RLM), 2013 WL 4806960, at \*13 (E.D.N.Y. Sept. 7, 2013) (holding *Rooker-Feldman* inapplicable to a claim challenging the plaintiff's designation as a sex offender because "[t]he issue before [the presiding judge] was Plaintiff's risk level classification, not whether he was required to register as a sex offender"). Defendants' argument that Plaintiff's injuries were caused by the hearing because SORA does not make a convicted individual's sex-offender status automatic is belied by the plain text of the statute. *See* 🚩 N.Y. Correct. Law § 168-

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 27 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

a(1) (defining "sex offender" as "any person who is convicted of any of the offenses" listed in the statute), *id.* § 168-d(1)(a) (requiring that "upon conviction of any of the offenses set forth" in SORA, "the court shall certify that the person is a sex offender" and failure to certify "shall not relieve a sex offender of the obligations imposed by this article"); *id.* § 168-*l*(8) ("A failure by a state or local agency or the board to act or by a court to render a determination within the time period specified in this article shall not affect the obligation of the sex offender to register ...."); *id.* § 168-n(2) (providing that the SORA hearing will determine the risk level of the offender); *see also* R & R at 4-5 & 5 n.5, 23 (discussing SORA's statutory requirements in greater depth).

Defendants accuse Judge Moses of "misread[ing]" New York Corrections Law section 168-*l*(8). Def. R & R Obj. at 8. In their view, that section only "provides ... that a failure of the SORA hearing court to render a decision 'within the time periods specified in this article' does not preclude a later determination by the court that registration is required." Def. R & R Obj. at 8. Defendants have apparently overlooked that section 168-*l*(8) includes both the provision identified by Judge Moses and quoted by the Court above and a *separate* clause allowing a court to later impose a risk level to an offender outside of the prescribed time period.[2] The Court therefore concludes that Plaintiff's sex offender status was automatic under SORA as a function of his conviction.

**\*6** Seeking to undermine this conclusion, Defendants also point to the fact that New York courts have been willing to entertain constitutional challenges to SORA that were initially raised in SORA hearings. Def. R & R Obj. at 8 (citing People v. Knox, 12 N.Y.3d 60, 65 (N.Y. 2009) ). But this does not alter the *Rooker-Feldman* analysis. Even if a state court may have been willing to consider a constitutional challenge to Plaintiff's designation as a sex offender on appeal from his SORA hearing, it does not change the fact that Plaintiff's sex offender status was already imposed by statute. At most then, the judicial determination in his SORA hearing "simply ratified," McKithen, 481 F.3d at 97-98, what SORA dictated—that Plaintiff be designated a sex offender because of his conviction for kidnapping a minor not related to him. As a result, Plaintiff challenges New York's SORA legislation rather than an adjudication, and in such circumstances, *Rooker-Feldman* has no application. Hachamovitch v. DeBuono, 159 F.3d 687, 694 (2d Cir. 1998).

Finally, Defendants argue that if Plaintiff is not challenging injury caused by his SORA hearing, he must be challenging his underlying conviction, which would also be barred by the *Rooker-Feldman* doctrine. Def. R & R Obj. at 9. However, the Court agrees with the Report that Plaintiff is neither challenging his underlying conviction nor asking the Court to relieve him of it—he only seeks review of a statutorily-imposed collateral consequence that even Defendants do not contend could have been raised on direct appeal from that conviction. R & R at 25 n.19.

For the forgoing reasons, the Defendants' objections to the Report are denied as to subject-matter jurisdiction, and the Report is ADOPTED in full on this issue.

### B. Defendants Waived Their *Res Judicata* and Collateral Estoppel Arguments for the Purposes of These Motions

Moving from *Rooker-Feldman* to preclusion, Defendants argue that Plaintiff's first and second claims are precluded by the prior decision in the SORA hearing under theories of both collateral estoppel and *res judicata.* Defendants did not raise either argument in their briefings before Judge Moses. Judge Moses, in her Report, addressed the distinction between *Rooker-Feldman* and preclusion doctrine in a footnote, without making a recommendation either way as to the applicability of preclusion doctrine to Plaintiff's claims. R & R at 24 n. 18. Defendants, in their objections to the Report, mentioned *res judicata* only in passing, stating that Plaintiff's claims "should still be dismissed on the alternative grounds of res judicata suggested in the R & R." Def. R & R Obj. at 9. Subsequently, the Court requested supplemental briefing on preclusion and whether Defendants had waived these arguments by failing to raise them before Judge Moses.

Defendants do not dispute that they failed to raise their collateral estoppel or *res judicata* arguments before Judge Moses. Instead, they argue that despite this failure—and their conclusory treatment of preclusion in their objections to Judge Moses' Report—these arguments have not been waived. Plaintiff, on the other hand, argues that Defendants waived these arguments by not raising them earlier and failing to object to Judge Moses' mention of preclusion with sufficient particularity. For the purposes of the instant motions alone, the Court agrees with Plaintiff. However, this decision does not bar Defendants from raising preclusion in an answer.

Courts in this circuit have taken different positions as to whether failure to raise an argument before a magistrate judge

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 28 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

waives those arguments. The Second Circuit has yet to decide this question. *Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 433 (S.D.N.Y. 2015) ("The question 'whether a party may raise a new legal argument for the first time in objections to a magistrate judge's Report has not yet been decided in this Circuit.' ") (internal brackets and ellipses omitted) (quoting *Amadasu*, 2012 WL 3930386, at *5).

**\*7** For reasons it continues to find persuasive, this Court has previously found that, as a general matter, arguments made for the first time in objection are waived. *See Tarafa v. Artus*, No. 10 CIV. 3870 (AJN), 2013 WL 3789089, at *2 (S.D.N.Y. July 18, 2013) ("[N]ew arguments and factual assertions cannot properly be raised for the first time in objections to the R & R, and indeed may not be deemed objections at all." (citing cases) ); *Watson v. Geithner*, No. 11 CIV. 9527 (AJN), 2013 WL 5441748, at *2 (S.D.N.Y. Sept. 27, 2013) (noting that "a party waives any arguments not presented to the magistrate judge"). Other courts in this circuit have taken a similar approach, noting that "[i]f the Court were to consider formally these untimely contentions, it would unduly undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Report is issued to advance additional arguments." *Abu-Nassar v. Elders Futures, Inc.*, No. 88 CIV. 7906 (PKL), 1994 WL 445638, at *4 n.2 (S.D.N.Y. Aug. 17, 1994); *see also Smith v. Hulihan*, No. 11 CV 2948 (HB), 2012 WL 4928904, at *1 (S.D.N.Y. Oct. 17, 2012); *Rosello v. Barnhart*, No. 02 CIV. 4629 (RMB), 2004 WL 2366177, at *3 (S.D.N.Y. Oct. 20, 2004); *Lewyckyj v. Colvin*, No. 3:13-CV-126 (MAD), 2014 WL 3534551, at *2 (N.D.N.Y. July 17, 2014). This is consistent with the history and purposes of the Magistrate Act. *See Anna Ready Mix, Inc. v. N.E. Pierson Const. Co.*, 747 F. Supp. 1299, 1303 (S.D. Ill. 1990) (reviewing "the legislative history of the 1976 amendments to the United States Magistrate Act, applicable precedent, and the views of commentators" and concluding that "arguments raised for the first time in objections to a magistrate's report ought to be disregarded absent compelling reasons"). This position is also consistent with the majority of circuit courts to have examined this issue—though some have indicated that district courts have discretion in the matter. [3] In a case like this, it would undermine the efficiencies offered by the Magistrate Act to permit parties to raise arguments after a full briefing on both a motion for a preliminary injunction and a motion to dismiss, after which Judge Moses issued a detailed and thorough 86-page Report.

However, the Court need not rely on that reasoning to reach its conclusion here today, since an application of the balancing test adopted by other courts in this circuit would result in the same outcome. *See Wells Fargo Bank N.A. v. Sinnot*, 2010 WL 297830, at *3-4 (D. Vt. Jan. 19, 2010); *Levy*, 103 F. Supp. 3d at 433-34. Defendants have not given any reason for their failure to raise these issues before Judge Moses and no intervening change in law has occurred. Unanswered questions remain that received little to no briefing. *See Wells Fargo*, 2010 WL 297830, at *4. Allowing Defendants to raise this new defense after several rounds of briefing in which they neglected to raise it except for a passing mention would, for the reasons given above, be an inefficient deviation from the purpose of the Magistrate Act. And given the ongoing harm to Plaintiff, fairness favors providing a prompt determination of his motion for a preliminary injunction without allowing Defendants to interpose new arguments that would result in further delay. Finally, no manifest injustice would result from deeming Defendants' arguments waived for the purposes of these motions. Considering and balancing these factors, the Court concludes that Defendants have waived preclusion. *See Amadasu*, 2012 WL 3930386, at *5-7. However, the Court only finds that Defendants have waived these arguments for the purposes of these motions and are free to raise them in an answer as affirmative defenses. *See Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 350 (1971) (*res judicata* and collateral estoppel are affirmative defenses) (citing Fed. Rules Civ. Pro. 8(c) ).

### C. Defendants' Motion to Dismiss is Granted in Part and Denied in Part

**\*8** Having addressed these threshold matters, the Court turns first to Defendants' motion to dismiss.

### 1. Defendants' Motion to Dismiss is Granted as to Plaintiff's Procedural Due Process Claim (Claim 1)

Plaintiff alleges that he was deprived of constitutionally-required procedural due process because he had no opportunity to challenge his designation as a "sex offender" in an adversarial proceeding. SAC ¶¶ 139-45. Judge Moses agreed with Plaintiff that he had a cognizable liberty interest in not being labelled as a sex offender. R & R at 29-35. However, Judge Moses found that under governing Supreme Court and Second Circuit precedent, a person who has been convicted of an offense requiring registration under SORA

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 29 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

is not entitled to any additional hearing, either *ex ante* or *ex post*, to adjudicate his obligation to register. R & R at 35-38 (citing *Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003) and *Doe v. Cuomo*, 755 F.3d 105 (2d Cir. 2014) ). Plaintiff objects only to Judge Moses's recommendation on this claim as an "alternative basis for relief" and notes that if the Court agrees with the Report that SORA as applied to Plaintiff is a substantive due process violation, "no additional process or injunctive relief is necessary." Pl. R & R Op. at 3. Nonetheless, as Plaintiff does state various specific legal objections to Judge Moses's reasoning, the Court will review it *de novo*. Defendants, for their part, challenge Judge Moses' determination that Plaintiff had a procedural liberty interest in not being labeled a sex offender. Def. R & R Obj. at 9-10. However, since that issue is unnecessary to the Court's resolution of this claim, the Court neither adopts nor rejects Judge Moses' Report on that particular question.

The Court agrees with Judge Moses' reading of the governing precedent. Under *Connecticut v. Doe*, "[p]laintiffs who assert a right to a hearing under the Due Process Clause must show that the facts they seek to establish in that hearing are relevant *under the statutory scheme.*" 538 U.S. at 8 (emphasis added); *see also Doe v. Cuomo*, 755 F.3d at 112. Plaintiff sought to distinguish these two cases on the grounds that in both the plaintiffs had been convicted of *sexual* misconduct. Pl. R & R Obj. at 7-8. However, as Judge Moses determined in her Report, this argument fails to go to the *procedural* sufficiency of process afforded, as that fact is not relevant under SORA. Instead, it implicates a *substantive* challenge to Plaintiff's designation under the law as a sex offender. R & R at 37-38. As a result, Plaintiff's claim "must ultimately be analyzed in terms of substantive, not procedural, due process." *Connecticut v. Doe*, 538 U.S. at 8 (internal quotation marks omitted). The Court therefore ADOPTS Judge Moses' Report as to the second prong of the procedural Due Process analysis and GRANTS Defendants' motion to dismiss this claim. As it is unnecessary for resolution, the Court makes no finding with respect to the Report's analysis of Plaintiff's procedural liberty interest.

### 2. Defendants' Motion to Dismiss is Denied as to Plaintiff's Substantive Due Process Claim (Claim 2)

**\*9** Plaintiff's second claim asserts that requiring him to register as a sex offender is a violation of his right to substantive due process. "To establish a substantive due process violation, a plaintiff must show both (1) that she has an interest protected by the Fourteenth Amendment, and (2) that the statute, ordinance, or regulation in question is not rationally related to a legitimate government interest." *Winston v. City of Syracuse*, 887 F.3d 553, 566 (2d Cir. 2018). Rational basis review "is highly deferential," but "it is not meant to be toothless." *Id.* at 560 (quoting *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013) ). Even under the rational basis test, a state may not "rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985).[4] When considering whether a state had a rational basis to impose a statute, the reviewing court may properly consider the "countervailing costs" to the targets of the challenged statute. *Plyler v. Doe*, 457 U.S. 202, 223-24 (1982).

In her Report, Judge Moses concludes that designating Plaintiff as a sex offender bears no rational relationship to the purposes of SORA. Reviewing the enabling legislation, Judge Moses identifies the purpose of SORA as "to combat 'the danger of recidivism posed by *sex offenders*, especially those *sexually violent* offenders who commit predatory acts characterized by repetitive and compulsive behavior,' and to assist the criminal justice system 'to identify, investigate, apprehend and prosecute *sex offenders.*' " R & R at 40 (emphasis added in Report) (quoting 1995 N.Y. Sess. Laws ch. 192, § 1). As a result, Judge Moses concludes that applying the label of sex offender to the narrow class of individuals like Plaintiff who "has received a judicial finding that he never has and near certainly never will commit a sexual offense" bears no rational relationship to that purpose. R & R at 42-46.

Defendants object to the Report on several grounds. They argue that designating Plaintiff as a sex offender could be rationally based on: (i) preventing dangerous sex offenders from slipping through the cracks, (ii) avoiding administrative costs, and (iii) protecting minors from harm more generally, not just sexual abuse. None of these arguments are persuasive.

As an initial matter, Defendants do not argue in their objections that Plaintiff has no *substantive* liberty interest. Def. R & R Obj. at 10-12. To the contrary, Defendants emphasize that Judge Moses erred by finding a procedural

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 30 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

liberty interest, rather than a substantive one. *Id.* at 10. The Court finds no clear error in the conclusion that Plaintiff has a substantive liberty interest in not being labeled a sex offender when he has committed no sexual offense. *See* Vega v. Lantz, 596 F.3d 77, 81–82 (2d Cir. 2010) ("[W]rongly classifying an inmate as a sex offender may have a stigmatizing effect which implicates a constitutional liberty interest.").

Defendants first object that the Legislature could have rationally concluded that the sex offender label should be applied in a blanket manner to various crimes involving minors, even when a sexual element is not evident, to avoid any dangerous sex offenders "slipping through the cracks." Def. R & R Obj. at 11-12; Def. Mot. to Dismiss at 9-10; *see also* People v. Knox, 12 N.Y.3d 60, 69 (2009) (finding that, along with administrative burden, "the risk that some dangerous sex offenders would escape registration" provided a rational basis for "a hard and fast rule, with no exceptions"). It is true that there may be cases, such as when the victim cannot or will not testify, when it will be administratively difficult in practice to prove that an offense was sexual in nature. As a result, it would not necessarily be irrational for the Legislature to conclude that for certain high-risk crimes toward minors, individuals should be designated as sex offenders even when it is ambiguous whether their specific offense was sexual.

**\*10** Yet even assuming it would be rational for the Legislature to designate individuals as sex offenders when there is uncertainty about whether their offense was sexual in nature, this does not satisfactorily answer Plaintiff's as-applied challenge. Plaintiff does not challenge that SORA is facially unconstitutional, nor even that it is unconstitutional as applied to all individuals who kidnapped unrelated minors. R & R at 42. Instead, the exceptionally narrow question before the Court for the purposes of these motions is whether there is a rational basis for designating someone as a sex offender solely in virtue of an offense that was undisputedly non-sexual. A case involving any suggestion or allegation of sexual misconduct—or even just ambiguity—would present a different question that need not be resolved here.

At this stage in the litigation, the lack of a sexual element to Plaintiff's offense can safely be termed conclusive. Based partly on the absence of any allegation of sexual abuse in this case, Justice Obus concluded at Plaintiff's SORA hearing that "I am satisfied that there is virtually no likelihood

that [Plaintiff] will commit a sex crime ever." R & R at 10. Justice Obus' conclusion is particularly persuasive, as he was "very familiar" with Plaintiff, having conducted the trial of Plaintiff's co-defendant and accepted Plaintiff's plea in the underlying criminal case. SORA Tr., Dkt. No. 45-1, 20:8-12. Defendants do not contest Justice Obus' conclusion. Even more importantly, Defendants conceded for the purposes of these combined motions that there was no sexual component to Plaintiff's offenses. 10/03/18 Hearing Tr. 25:22-25, 26:1-18 (Plaintiff's counsel presenting as undisputed that Plaintiff's offenses had nothing to do with sex); 32:5-11, 14-17 (Defendants' counsel conceding this for the purposes of this motion). It is on the basis of this factual record and these representations that Plaintiff's claim must be evaluated. The Court is careful to note, however, that Defendants only conceded the absence of a sexual element for the purposes of these motions. Further argument, allegations, or evidence could present a meaningfully different issue. As a result, the risk that Plaintiff is a dangerous sex offender who might slip through the cracks is not just low, it is, at this stage, non-existent.

The slipping-through-the-cracks argument is therefore insufficient to provide a rational basis for imposing extensive civil and stigmatizing burdens on Plaintiff. R & R at 42-45. To reach this conclusion, the Court need not declare it irrational for the Legislature to weigh the harms and conclude that for individuals who committed high-risk crimes that *may* have had a sexual component, the public good is better served by a blanket rule. But extending the sex offender designation to individuals for whom the absence of a sexual element is undisputed and who have been adjudicated by a state court to pose essentially no sexual risk cannot be justified as a means of protecting against *sex offenders* falling through the cracks. *See* City of Cleburne, 473 U.S. at 446 (even under rational basis review, a court will strike down "a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."). Indeed, as various state courts have concluded when the lack of a sexual element to the underlying offense was stipulated, "[a]lthough the Legislature's concern for protecting our children from sexual predators may be reasonable ... the application of this statute to a defendant *whom the State concedes* did not commit a sexual offense is not." State v. Robinson, 873 So. 2d 1205, 1215 (Fla. 2004) (emphasis added); *see also* State v. Reine, 2003-Ohio-50, ¶ 28, *cause dismissed,* 795 N.E.2d 686 (designating an individual as a sex offender "in a case in which *it has been stipulated that* his offenses were committed

without any sexual motivation or purpose" lacks rational basis (emphasis added) ). There is no more reason to classify Plaintiff as a *sex* offender at this stage than if he had been convicted of shoplifting, drug dealing, or any other crime that has no sexual element at all—indeed the label is less apt for Plaintiff, given Defendants' concession. Therefore, casting a wide net to include all grey area cases bears no rational relationship to this case, which, at this stage, presents no uncertainty at all.

 **\*11** Defendants further object that the Legislature could have rationally concluded that it needed to include *all* individuals who had committed certain high-risk crimes, to avoid the administrative costs of determining in each case whether someone's crime was sexual. *See* Knox, 12 N.Y.3d at 69. Even assuming this would be rational, in cases in which the absence of a sexual element is undisputed, no further administrative effort is required. This Court's opinion today reaches no further than the situation at hand, in which the non-sexual nature of Plaintiff's offense has been conceded. *See* Robinson, 873 So. 2d at 1215; Reine, 2003-Ohio-50, ¶ 28. An ambiguous case that would require the expenditure of administrative resources to decide could well present a distinct question. For example, if an individual contended that an evidentiary hearing was required to show that there was no sexual element to their offense, the issue of administrative resources might require a different analysis.

Defendants next argue that the Legislature "could have rationally determined that individuals convicted of kidnapping a minor constitute a potential risk to other minors, whether that risk is characterized as sexual or not, and that this risk justifies all the restrictions set forth at length in the R & R." Def. R & R Obj. at 12. However, this argument ignores that both the stated purpose of SORA and the way it is designed are focused on preventing *sexual offenses* rather than all crimes that are dangerous to minors. *See* R & R at 40 (quoting from SORA's legislative history as to SORA's purpose). The list of offenses that require designation as a sex offender do not include all crimes that involve harm to a minor, even serious, violent crimes. *See* CL § 168-a(2)(a)(i); People v. Bell, 3 Misc. 3d 773, 788 (Sup. Ct. 2003) (noting that "the conviction of Bruno Hauptman for the Lindbergh infant's murder would *not* have subjected him to classification and registration under SORA" (emphasis in original) ). And even beyond the Legislature's own statements about its purpose and SORA's design, the Court finds that Defendants' proffered explanation

is inconsistent with labeling Plaintiff (and requiring him to register) as specifically a *sex* offender. There is no rational reason for applying this intensely stigmatizing designation to an individual in Plaintiff's position. Nor do Defendants give any explanation for why the sexual element of the designation is related to protecting against non-sexual harms —indeed, nothing about the Court's decision would prevent Defendants from imposing a designation on Plaintiff that was rationally related to any non-sexual risk that he might pose to children. What it does prohibit is applying a specifically sexual stigmatizing designation and restrictions designed to prevent sexual abuse to an individual who has not committed any and who poses virtually no risk of doing so. Such an action cannot be viewed as rationally related to SORA's purpose.

Finally, the heavy costs imposed by Plaintiff's designation as a sex offender further support the conclusion that there is no rational basis for so classifying him. In conducting a rational basis analysis, a court may appropriately take into account the costs imposed by the law. Plyler, 457 U.S. at 223-24. SORA imposes significant civil burdens, as Plaintiff's case well illustrates. His life and liberty have been drastically limited in many ways, from where he can live to what speech he can engage in. SORA has also branded Plaintiff with one of the most stigmatizing labels that exists in our society, in this case doing so without a factual basis. *See, e.g.,* ACLU of NM v. City of Albuquerque, 2006-NMCA-078, ¶ 25, 139 N.M. 761, 772 ("[T]he hardship imposed on an offender convicted of kidnaping or false imprisonment to be labeled a sex offender, absent any evidence of a sexual motivation for the crime, is great."); Vega, 596 F.3d at 81-82. And labeling individuals as sex offenders when their crimes are not sexual actually risks undermining the usefulness of the registry created to effectuate SORA's purpose. *See* People v. Diaz, 150 A.D.3d 60, 66 (N.Y. App. Div.), *aff'd on other grounds*, No. 134, 2018 WL 6492716 (N.Y. Dec. 11, 2018). These significant harms to Plaintiff and the risk that labeling him as a sex offender actually undercuts public safety further support the conclusion that SORA as applied to Plaintiff lacks rational basis.

 **\*12** For all of the above stated reasons, the Court ADOPTS Judge Moses's recommendation—albeit on the additional grounds given above, which include Defendants' concession at oral argument—and Defendants' motion to dismiss this claim is DENIED.

### 3. Defendants' Motion to Dismiss is Granted in Part and Denied in Part as to Plaintiff's Vagueness Claims (Claim 3)

Plaintiff's third claim alleges that three of his parole conditions are unconstitutionally vague: Special Condition No. 4, "which excludes plaintiff from 'school grounds' – defined to include public areas within 1,000 feet of the school"; Special Condition No. 17, "which prohibits him from being 'within 300 yards of places where children congregate' "; and Special Condition No. 24, "which directs him to notify his parole officer and make certain disclosures when he 'establish[es] a relationship with a consenting adult.' " R & R at 46 (alteration in Report). Judge Moses recommends that the Court deny the motion to dismiss as to Conditions Nos. 4 and 7 and grant it as to Condition No. 24. Defendants object to the former, while Plaintiff does not object to the latter.

Under the Due Process Clause, "[a] statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56-57 (1999) ). And parole conditions are subject to review as void for vagueness. *LoFranco v. U.S. Parole Comm'n*, 986 F. Supp. 796, 808 (S.D.N.Y. 1997), *aff'd*, 175 F.3d 1008 (2d Cir. 1999). Applying this standard, the Court will address each of the challenged conditions in turn.

### a. Defendants' Motion to Dismiss Plaintiff's Claim that Special Condition No. 4 is Unconstitutionally Vague is Denied in Part and Granted in Part

Plaintiff seeks injunctive relief, but not damages, on his vagueness challenge to Special Parole Condition No. 4. This condition, which is a statutorily mandated parole condition for parolees convicted of offenses that include Plaintiff's, R & R at 6, excludes Plaintiff from "school grounds," defined to include public areas within 1,000 feet of a school, while minors are present. EL § 259-c(14); PL § 220.00(14). Judge Moses recommended that: (i) Special Condition No. 4 is not unconstitutionally vague as applied to where Plaintiff may reside, since preclearance of residences by a parole office means there is no risk of an inadvertent violation; and

(ii) this condition is unconstitutionally vague as to where Plaintiff is allowed to travel, both because it fails to provide sufficient notice *and* because it authorizes or encourages arbitrary enforcement. R & R at 49. Plaintiff did not object to the first part of Judge Moses' recommendation with sufficient specificity, Pl. R & R Obj. Resp. at 16, so it will be reviewed for clear error. *Kirk v. Burge*, 646 F. Supp. 2d 534, 537 (S.D.N.Y. 2009). Defendants raise two principal objections to the second part of Judge Moses' recommendation: first, because the condition has a knowledge requirement, there is no risk of an inadvertent violation; and second, Judge Moses improperly considered hypotheticals in an as-applied vagueness challenge, which must be confined to a plaintiff's actual conduct. These will be reviewed *de novo*.

**\*13** The Court agrees with Judge Moses that because Special Condition No. 4 requires that a proposed residence be precleared by Plaintiff's parole officer, it is not void for vagueness. This is particularly true since both the applicable statute and New York state court decisions interpreting it provide precise definitions to determine how the 1,000 feet in question are calculated. R & R at 48. Finding no error, clear or otherwise, in this portion of Judge Moses' Report, the Court adopts it in full.

Defendants object that Condition No. 4 cannot be unconstitutionally vague, because its requirement that violations be knowing precludes inadvertent violations. Yet this does not address the separate conclusion that Condition No. 4, as applied to Plaintiff, is void on the separate and independent grounds that "it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. Indeed, the Supreme Court has indicated that "the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.' " *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974) ). In the absence of such guidelines, a "criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.' " *Id.* (alteration in original) (quoting *Goguen*, 415 U.S. at 575). The 1,000-foot rule encompasses vast swaths of New York City. R & R at 50. It would also cover innocent conduct, since, as Judge Moses noted, this prohibition includes the courthouse where Plaintiff has been required to appear. R & R at 50. The knowledge requirement does not provide sufficient

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 33 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

standards to govern the conduct that may be penalized as it is reasonable to presume that "the fact that there are schools and childcare facilities throughout New York City is something everyone ... knows." *State v. Floyd Y.*, 56 Misc. 3d 271, 273 (N.Y. Sup. Ct. N.Y. Co. 2017). Therefore, unless Plaintiff remains in his shelter for much if not all of the day, he will necessarily knowingly violate the law on countless occasions. While in practice, this condition may only be enforced as to residency, Def. R & R Obj. at 14, these informal enforcement practices cannot rescue the condition from vagueness where they "would not provide a defense" to Plaintiff if he were to be arrested. *See* 📄 *City of Chicago*, 527 U.S. at 63-64. Nor is a saving construction available, given the explicit language of the statute. R & R at 51-52 (citing EL § 259-c(14) ). This mandatory condition therefore places almost limitless discretion in the hands of Plaintiff's parole officers to arrest him for traveling almost anywhere in the city that he lives, raising precisely the concerns that void-for-vagueness doctrine seeks to prevent. *See* 📄 *Kolender*, 461 U.S. at 357-58.

As the Court finds that Plaintiff has sufficiently stated a claim that the condition is void for authorizing arbitrary enforcement, it need not reach whether it is void for lack of notice.

Defendants' other objection, that Plaintiff's claim is not a proper as-applied challenge, fares no better. Defendants contend that Judge Moses erred by permitting Plaintiff to challenge Condition No. 4 on vagueness grounds based on hypothetical future enforcement when, with the exception of residency requirements, it has not been enforced again him. Defendants cite *Copeland v. Vance* for the proposition that Plaintiff may not "seek to show that the ... law is vague by positing hypothetical unfair enforcement actions in which the statute could not be constitutionally applied." 📄 893 F.3d 101, 113 (2d Cir. 2018). Yet *Copeland* made clear that prospective, as-applied challenges are possible. 📄 *Id.* at 111-13 (noting also that "a party asserting a pre-enforcement challenge obviously cannot be required to show that a prior action was invalid"). What *Copeland* required is that: "A party asserting a prospective as-applied challenge must tailor the proof to the specific conduct that she would pursue but for fear of future enforcement" and show that enforcement as to this conduct would raise vagueness concerns. 📄 *Id.* at 112-13. In *Copeland*, Plaintiffs did not offer evidence of specific conduct they wished to engage in that would trigger

vagueness concerns, instead positing hypothetical scenarios in an attempt to have the entire statute struck down. 📄 *Id.* at 113. Here, however, Plaintiff *himself* has sufficiently alleged that he would engage in specific conduct that would violate the 1,000-feet provision and in so doing raise vagueness concerns about arbitrary enforcement. SAC ¶ 61. Therefore, Plaintiff's challenge is properly framed as an as-applied challenge.

**\*14** In light of the analysis above, the Court ADOPTS Judge Moses' reasoning with respect to arbitrary enforcement, but not to lack of notice. Defendants' motion to dismiss this claim is hereby DENIED.

### b. Defendants' Motion to Dismiss Plaintiff's Claim that Special Condition No. 17 is Unconstitutionally Vague is Denied in Part and Granted in Part

Plaintiff seeks injunctive relief and damages on his vagueness challenge to Special Condition No. 17. This condition expressly prohibits Plaintiff from "enter[ing]" or "be[ing]" within 300 yards of "places where children congregate" without prior approval from his parole officer. R & R at 52-53 (alterations in Report). Judge Moses recommended that: (i) this condition is void for vagueness for both lack of notice and for allowing arbitrary enforcement; and (ii) because Plaintiff has not alleged this was enforced against him in the past, his claim for damages should be dismissed. R & R at 52-55. Defendants object on similar grounds as they did for the 1,000-foot rule: first, that there is no possibility of inadvertent violations because a knowledge requirement should be read into the condition and because the condition provides a list of examples illustrating the kinds of areas in question; and second, that Judge Moses improperly relied on hypotheticals in evaluating an as-applied challenge.

As with Condition No. 4, however, even aside from the question of whether a person of ordinary intelligence would have a reasonable opportunity to determine what conduct Condition No. 17 prohibits, the condition would still be unconstitutionally vague because it "authorizes or even encourages discriminatory enforcement." 📄 *Hill*, 530 U.S. at 732. If anything, this provision applies to a broader swath of territory than Special Condition No. 4, as it not only includes schools but also a number of other places as well, such as parks, bike trails, and pool halls. SAC Ex. C ¶ 17. Nor does it actually require the presence of a

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 34 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

minor. Judge Moses noted that, once again, the courthouse was within 300 yards of Columbus Park, R & R at 54 n.40, while Plaintiff noted that the Willow Avenue shelter, where he is currently housed, is directly across the street from a family shelter at which young children congregate. *See* SAC ¶ 80. Once again, this exceptionally broad scope places essentially total enforcement discretion in the hands of Plaintiff's parole officers, allowing them to arrest Plaintiff for a host of legitimate activity, such as stepping out of the shelter where his parole restrictions have effectively required him to remain. *See* [image] *United States v. Malenya*, 736 F.3d 554, 561 (D.C. Cir. 2013) (noting how a similar restriction gave "the probation office the power to prevent [the registered sex offender] from living almost anywhere and going to almost any place"). As applied to Plaintiff, this provision is therefore unconstitutionally vague.

As above, since the Court finds that Plaintiff has sufficiently stated a claim that the condition is void for authorizing arbitrary enforcement, it need not reach whether it is void for lack of notice.

Turning to Plaintiff's claim for damages, the Court finds no error, clear or otherwise, in Judge Moses' recommendation that this claim should be dismissed because Plaintiff failed to allege that this condition had been enforced against him in the past.

**\*15** The Court ADOPTS the Report as to the finding that this condition authorizes arbitrary enforcement and as to damages, but not as to lack of notice. Defendants' motion to dismiss this claim is DENIED as to injunctive relief and GRANTED as to money damages.

### c. Defendants' Motion to Dismiss Plaintiff's Claim that Special Condition No. 24 is Unconstitutionally Vague is Granted

Plaintiff seeks both injunctive relief and damages on his claim that Special Condition No. 24 is void for vagueness. Condition No. 24 requires Plaintiff to notify his parole officer "when I establish a relationship with a consenting adult and then shall inform the party of my prior criminal history concerning sexual abuse, in the presence of my parole officer." SAC Ex. C ¶ 24 (emphasis in original). Judge Moses found that this was not void for vagueness and recommended dismissal. R & R at 55-56. Plaintiff did not object to this ruling and therefore the Court reviews it for clear error.

Judge Moses found that a reasonable individual in Plaintiff's position would understand that this condition referred not to all relationships, but only consensual sexual relationships. R & R at 55-56. Judge Moses also noted that since Plaintiff had already disclosed his relationship to his fiancée, he "clearly understood the type of relationship the special condition targeted." R & R at 56. The Court does not find the Report to be clearly erroneous. The Court ADOPTS the Report in full on this claim, and GRANTS Defendants' motion to dismiss.

### 4. Defendants' Motion to Dismiss is Denied as to Plaintiff's Claim that Special Parole Condition No. 48 and Other Technology Restrictions Violate His First Amendment Rights (Claim 4)

Plaintiff's parole conditions place a variety of de jure and de facto limitations on his ability to access the internet, particularly social media. Under Special Condition No. 12, Plaintiff cannot "engage or participate in any online computer service that involves the exchange of electronic messages"; No. 35 states that he may not "own or possess a beeper, scanner or cell phone without permission of [his] parole officer" and that if he is given permission to possess a cell phone, it cannot be video or photo-capable; No. 39 prevents him from possessing a computer or computer-related materials without approval by his parole officer; and No. 48 which, *inter alia*, prohibits him categorically from accessing "a commercial social networking website." SAC, Ex. C at 5-10. In addition to the specific restrictions on internet use itself, Plaintiff alleges that the limitations on his access to technology have the de facto effect of barring him from accessing the internet for nearly all purposes. SAC ¶ 81-92, 162. Plaintiff argues that these conditions violate his First Amendment rights and seeks injunctive relief and damages.

Judge Moses recommended that Condition No. 48, operating in conjunction with the limitations on Plaintiff's access to technological devices, violated Plaintiff's First Amendment rights under the Supreme Court's recent decision in [image] *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017). As to Plaintiff's request for damages, Judge Moses recommended dismissal on qualified immunity grounds except as to officer Lewis-Robinson for the period after the Supreme Court's decision in *Packingham*. R & R at 63-64. Defendants object to the Report's recommendation on the merits of Plaintiff's First Amendment claim and as to whether qualified immunity precludes money damages even post-*Packingham*.

Case 9:18-cv-01472-TJM-TWD  Document 73  Filed 03/04/21  Page 35 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

Plaintiff does not object to the recommended denial of damages pre-*Packingham*. The Court will address the merits of Plaintiff's claim and the question of qualified immunity in turn.

### a. The Motion to Dismiss is Denied as to Plaintiff's First Amendment Claim

**\*16** Defendants' primary objection is that *Packingham* does not apply to parole conditions and Judge Moses erred in imposing intermediate scrutiny. Def. R & R Obj. at 17-19. The Court disagrees.

Under *Packingham*, blanket limitations on an individual's ability to access social media will receive intermediate scrutiny, even when imposed as conditions of parole. There is no indication in *Packingham* that parolees are exempted from the Court's decision. The North Carolina law challenged in *Packingham* applied to registered sex offenders generally, without distinguishing between those who had finished any period of supervised release. *Packingham*, 137 S. Ct. at 1733-34; N.C. Gen. Stat. Ann. § 14-202.5(a) (applying the prohibition to registered sex offenders).[5] In fact, the Court was clear that the distinction between those who were presently under the supervision of the criminal justice system and those who no longer were was not a basis for its holding: "the troubling fact that the law imposes severe restrictions on persons who already have served their sentence and are no longer subject to the supervision of the criminal justice system is also *not* an issue before the Court." *Id.* at 1737 (emphasis added); *see also* *United States v. Browder*, 866 F.3d 504, 511 n.26 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 693 (2018) (noting that the Court in *Packingham* did not seem to rely on the fact that the ban extended beyond the supervision of the criminal justice system). More generally, after describing the myriad ways in which the internet and social networks are part of an ongoing revolution in human communication, the Court cautioned that it would "exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium." *Packingham*, 137 S. Ct. at 1736. Indeed, the Supreme Court's decision to apply intermediate scrutiny was based on the sheer breadth of legitimate speech burdened, a concern that applies with equal force here. *Packingham*, 137 S. Ct. at 1735-37. While the Court stated that "it can be assumed

that the First Amendment permits a State to enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor" it then made clear "[s]pecific laws of that type *must be* the State's first resort to ward off the serious harm that sexual crimes inflict." *Id.* at 1737 (emphasis added). Therefore, while in some contexts parolees receive a lesser degree of constitutional protection, it would be inconsistent with *Packingham* to categorically exempt parole conditions from its reach.

Nor is the Court persuaded by Defendants' objection that *Packingham* is distinguishable because Plaintiff's parole conditions are not absolute. Def. R & R Obj. at 18-19. Condition No. 48, prohibiting access to commercial social networking websites, is not written to allow parole officers to grant individualized exceptions. And Plaintiff alleges that in practice these conditions have functioned as an almost absolute bar, with the exception of using a school computer and "only for academic purposes and for purposes related to this lawsuit." SAC ¶¶ 81-92. These limited exceptions do not satisfy the concerns about access to the "vast democratic forums of the internet" for a multiplicity of purposes that was the basis for the Supreme Court's decision. *Packingham*, 137 S. Ct. at 1735-37 (internal quotation marks omitted). Furthermore, the possibility of certain case-by-case exceptions was insufficient to save other overly broad conditions of supervised release limiting internet or technology access, even when analyzed under a more demanding standard. *See* *United States v. Sofsky*, 287 F.3d 122, 126 (2d Cir. 2002); *United States v. Peterson*, 248 F.3d 79, 81, 82-84 (2d Cir. 2001). Therefore, the possibility of case-by-case exceptions from some of these conditions does not exempt them from *Packingham*, a conclusion reinforced by the nearly blanket manner they have allegedly been applied.

**\*17** Defendants do not argue that these conditions can withstand intermediate scrutiny and the Court agrees with Judge Moses that they cannot. Under intermediate scrutiny, a law must not "burden substantially more speech than is necessary to further the government's legitimate interests." *McCullen v. Coakley*, 134 S.Ct. 2518, 2535 (2014) (internal quotation marks omitted). Plaintiff's crime did not involve the internet, social media, the exchange of electronic messages, cell phones, or computers. R & R at 62. As

applied to Plaintiff, these restrictions therefore plainly burden substantially more speech than necessary and therefore fail intermediate scrutiny.

### b. Defendants Are Entitled to Qualified Immunity on Plaintiff's First Amendment Claims

While Plaintiff has sufficiently pled a First Amendment claim on the merits, the Court must still address whether the doctrine of qualified immunity warrants dismissing Plaintiff's claim for money damages. If a defendant can show that qualified immunity applies, a claim for money damages should be dismissed as a matter of law. *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004). Qualified immunity would not, however, bar Plaintiff's request for injunctive relief. *See, e.g., Horne v. Coughlin,* 191 F.3d 244, 250 (2d Cir. 1999) (qualified immunity is not a defense to injunctive relief).

The Court finds that Plaintiff's rights were not clearly established under *Packingham* and that Defendants are therefore entitled to qualified immunity. For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly,* 137 S. Ct. 548, 551 (2017) (internal quotes omitted). Though for the reasons above the Court ultimately agrees with Plaintiff's reading of *Packingham,* it has not been established in this jurisdiction that it applies to conditions of supervised release and a number of other federal courts have indicated that it might not. *See, e.g., United States v. Rock,* 863 F.3d 827, 831 (D.C. Cir. 2017). Therefore, the constitutional question of *Packingham*'s application in this context was not beyond debate.

As to the period before *Packingham,* Plaintiff did not object to Judge Moses's conclusion that his rights before the Supreme Court's decision were not clearly established. Reviewed under the deferential clear error standard, it was not clearly erroneous for Judge Moses to conclude that—in part because Plaintiff had implicitly conceded this argument, R & R at 64 —the unlawfulness of Defendants' conduct under the First Amendment was not clearly established prior to *Packingham.* Therefore, qualified immunity bars Plaintiff's request for money damages on his First Amendment claim both before and after *Packingham.*

For these reasons, the Court ADOPTS the Report's reasoning as to the merits of Plaintiff's First Amendment claim but not as to damages. Defendants' motion to dismiss Plaintiff's First Amendment claim on the merits is DENIED, but Defendants' motion to dismiss Plaintiff's claim for money damages is GRANTED.

### 5. Defendants' Motion to Dismiss is Denied in Part as to Plaintiff's Claim of Interference with his Family Relationships (Claim 5)

Plaintiff contends that he has a fundamental right to contact with his extended family and that his parole conditions prohibiting contact with minors in his family violates his due process rights. Plaintiff seeks both injunctive relief and money damages on this claim. Under Special Condition No. 15, Plaintiff is prohibited from having any contact with children under the age of 18 without the prior approval of his parole officer. SAC, Ex. C at 6. Judge Moses agreed with Defendants that Plaintiff had no fundamental right to contact extended family members who are not his own children and with whom he never had a close or custodial relationship. R & R at 65-67. However, even though no fundamental right was at stake, Judge Moses found that the Due Process Clause still requires that parole conditions be "reasonably related to [the parolee's] prior conduct or the government's interest in his rehabilitation." R & R at 67 (alteration in Report) (quoting *Singleton v. Doe,* 210 F. Supp. 3d 359, 374 (E.D.N.Y. 2016) ). Judge Moses found that viewed on the motion to dismiss standard, Plaintiff had sufficiently alleged a claim for injunctive relief and damages as against Defendant Lewis-Robinson. Defendants object on several grounds, Plaintiff does not.

**\*18** The Court does not find any error—clear or otherwise—in Judge Moses's conclusion that Plaintiff's fundamental rights were not implicated here and adopts this portion of the Report.

Defendants object that Plaintiff only pled a violation of his fundamental rights, and therefore Judge Moses erred by proceeding to apply the lower standard of review. Def. R & R Obj. at 19-21. It is true that Plaintiff did not include Special Condition No. 15 among the conditions that he challenged in a separate section as arbitrary and capricious. SAC ¶¶ 171-73. Nonetheless, Plaintiff did plead that the way the condition is applied to him violates the Due Process Clause, *id.* ¶¶ 93-105, 164-69, which provides the level of review that Judge Moses

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 37 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

applied, *Singleton*, 210 F. Supp. 3d at 372-74. Therefore, the Court finds that Plaintiff stated a claim that the way Condition No. 15 is being applied to him violates his rights under the Due Process Clause.

As to the merits of Plaintiff's claim, Defendants object that because Plaintiff's crime involved harm to a minor, there is a rational relationship between this condition and the threat Plaintiff poses to children. Def. R & R Obj. at 19-20. Drawing all reasonable inferences in Plaintiff's favor, Plaintiff has alleged that Condition No. 15 is being applied as an absolute ban on his ever coming into contact with a minor member of his family. The Court agrees with Judge Moses that Plaintiff's kidnapping for ransom of an unrelated minor has no rational relationship to an absolute bar on his ever seeing minors to whom he is related, even in the presence of other adult family members. R & R at 68-69. Therefore, the Court rejects Defendants' objection.

Defendants also specifically object that neither form of relief sought by Plaintiff, injunctive relief and money damages, are available on this claim, warranting dismissal. Def. R & R Obj. at 20 n.3. The Court addresses each objection in turn.

Separate from their arguments about the preliminary injunction, Defendants object that Plaintiff's request for injunctive relief should be dismissed entirely, since the only relief he could ultimately receive would be an impermissibly vague injunction ordering Defendants to "follow the law." *Id.* at 20 n.3. Defendants are correct that "[u]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law." *S. C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001) (quoting *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) ). Under this standard, "an injunction must 'be specific and definite enough to apprise those within its scope of the conduct that is being proscribed.' " *Id.* at 240-41 (quoting *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) ). The purpose of this rule is "to prevent uncertainty and confusion on the part of those to whom the injunction is directed, and to be sure that the appellate court knows precisely what it is reviewing." *Id.* at 241 (internal quotation marks omitted) (quoting *Rosen v. Siegel*, 106 F.3d 28, 32 (2d Cir. 1997) ). The Court does not find that, as a matter of law, it would be impossible to tailor sufficiently specific injunctive relief to this claim. For example, an injunction requiring Plaintiff's parole officers to

consider his requests on a case-by-case basis and provide an explanation based on legitimate interests such as public safety and rehabilitation would provide sufficient notice to Defendants as to what is prohibited, and be definite enough in scope for further review.

**\*19** As to damages, the Court concludes that it was not clearly established that Defendant Lewis-Robinson's conduct was unlawful and she is therefore entitled to qualified immunity. While it is established that parole conditions may not be applied in an arbitrary and capricious manner, the qualified immunity analysis requires greater particularity. *See White v. Pauly*, 137 S. Ct. 548, 551-52 (2017). The only factually similar case to which Plaintiff points, *Doe v. Lima*, involved an individual's relationship with his son, and therefore implicated a fundamental liberty interest. 270 F. Supp. 3d 684, 704 (S.D.N.Y. 2017); *see also Doe v. Annucci*, No. 14 CIV. 2953 (PAE), 2015 WL 4393012, at *12-13 (S.D.N.Y. July 15, 2015) (same). Absent other authority, the Court agrees with *Singleton*, which found that qualified immunity applies to due process challenges to parole conditions as "[a]lthough parolees are entitled to certain limited due process rights in the conditions of their parole, those due process rights are not clearly defined." 210 F. Supp. 3d at 374. Therefore, the Court concludes that all Defendants are entitled to qualified immunity on this claim.

For the reasons given above, the Court ADOPTS the Report as to the merits of Plaintiff's claim, but not as to qualified immunity. Defendants' motion to dismiss is DENIED as to the merits of Plaintiff's claim, but GRANTED as to Plaintiff's claim for damages.

### 6. Defendants' Motion to Dismiss is Denied in Part on Plaintiff's Claim that Nine of His Parole Conditions Are Arbitrary and Capricious (Claim 6)

In Plaintiff's sixth and final claim, he alleges that a number of his parole conditions are arbitrary and capricious and that his parole officers acted arbitrarily and capriciously, in violation of the Due Process Clause. This includes officer Lewis-Robinson's alleged refusal to consider alternate proposed residences besides the shelter to which he has been assigned, the restrictions on his internet and technology use, as well as "Special Condition No. 24, governing his relationships with consenting adults; Nos. 31 and 32, which prohibit him from owning, operating, or being a passenger in a motor vehicle

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 38 of 134

without the permission of his PO; No. 14, which prohibits him from purchasing or possessing sexually explicit materials; No. 19, which prevents him from owning a pet; and No. 37, which prohibits him from renting a post office box without his PO's prior approval." R & R at 70. Plaintiff seeks injunctive relief and damages on these claims. The Court will address each of these restrictions in turn.

**\*20**  As an initial matter, the parties and Judge Moses agree as to the legal standard for evaluating such claims. [6] "[P]arolees are entitled to some form of due process in the imposition of special conditions of parole." *Pollard v. United States Parole Comm'n*, No. 15-CV-9131 (KBF), 2016 WL 3167229, at \*4 (S.D.N.Y. June 6, 2016) (citing cases). "In the Second Circuit, special restrictions on a parolee's rights are upheld where they 'are reasonably and necessarily related to the interests that the Government retains after his conditional release.' " *Muhammad v. Evans*, No. 11 CV 2113 (CM), 2014 WL 4232496, at \*9 (S.D.N.Y. Aug. 15, 2014) (quoting *Birzon v. King*, 469 F.2d 1241, 1243 (2d Cir. 1972) ). Conditions will be upheld if there is a reasonable relationship to the parolee's prior conduct or to a legitimate government interest such as rehabilitation, the prevention of recidivism and future offenses, and protection of the public. *Singleton*, 210 F. Supp. 3d at 372–74 (citing cases). On the other hand, if conditions are arbitrary and capricious, they will be invalidated. *See, e.g.*, *Boddie*, 2011 WL 1697965, at \*2 (citing cases). Defendants argue that there is effectively a heightened pleading standard for such claims, Def. Mot. to Dismiss, Dkt. No. 60, at 17, but the Court agrees with Judge Moses that the sole case on which Defendants purport to base this principle, *Trisvan v. Annucci*, 284 F. Supp. 3d 288, 304 (E.D.N.Y. 2018), is properly understood as reflecting the unusual circumstances surrounding that case, not announcing a general heightened pleading standard. R & R at 76-77, 77 n.5. The Court will apply the standard pleading requirements and the arbitrary and capricious standard to Plaintiff's various challenges.

### a. Defendants' Motion to Dismiss is Denied in Part as to Special Condition No. 4

Plaintiff challenges that Defendants are arbitrarily and capriciously requiring him to stay in the shelter to which he has been assigned. Judge Moses recommended that Defendants' motion to dismiss be denied as to the merits of Plaintiff's claim, but granted as to money damages except

with respect to Defendant Lewis-Robinson. R & R at 70-71. Defendants object as to both.

Defendants object that Judge Moses erred by finding that Plaintiff has stated a claim on the basis of a single incident alone. Def. R & R Obj. at 21-22. The Court relies on Judge Moses's thorough description of Plaintiff's allegations surrounding his request to move out of the Willow Avenue Men's Shelter and in with his fiancée's sister, Ms. Blake. R & R at 70-71. The Court agrees with Judge Moses that Plaintiff has alleged facts giving rise to a plausible claim on the merits that his residency requirements are being arbitrarily and capriciously applied in a manner that de facto confines him to the shelter for the convenience of his parole officer. R & R at 71. This objection is therefore rejected.

Here again, Defendants specifically object that neither injunctive relief nor money damages are available on this claim, warranting dismissal. The Court addresses each in turn.

Independently of their arguments about a preliminary injunction, Defendants object that any injunctive relief on this claim would be so vague as to be unenforceable and so the claim for injunctive relief should be dismissed entirely. Def. R & R Obj. at 22. As above, the Court cannot conclude that, as a matter of law, it would be impossible to tailor sufficiently specific injunctive relief on this claim. For example, Plaintiff offers that if he could establish in discovery "that Ms. Blake would be willing to house him and there is no non-arbitrary reason to deny his request to move" the Court could require Defendants to allow Plaintiff to live with Ms. Blake. Pl. R & R Obj. Resp. at 27. Therefore, the Court cannot conclude that, as a matter of law, no appropriate injunctive relief could be granted on this claim.

As to damages, the Court finds that while it is established that in general parole conditions cannot be arbitrary and capricious, neither Judge Moses nor Plaintiff identified any sufficiently similar cases to clearly establish that Defendant Lewis-Robinson's conduct with respect to alternate residences was unconstitutionally arbitrary. *See Pauly*, 137 S. Ct. at 551-52; *Singleton*, 210 F. Supp. 3d at 374. Therefore, the parole officer defendants are entitled to qualified immunity on this claim.

**\*21**  For the reasons above, the Court therefore ADOPTS the Report as to the merits of Plaintiff's claim, but not as to qualified immunity. Defendants' motion to dismiss Plaintiff's

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 39 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

claim on the merits is DENIED, but Defendants' motion to dismiss Plaintiff's claim for money damages is GRANTED.

### b. Defendants' Motion to Dismiss is Granted as to Special Condition No. 24

Special Condition No. 24 requires Plaintiff to disclose his sexual relationships to his parole officer and disclose his supposed prior history of sexual abuse to his partners. SAC, Ex. C ¶ 24. Judge Moses recommended that since this was not "reasonably related to his prior conduct or to the government's interest in his rehabilitation[,]" the motion to dismiss should be denied as to the merits of Plaintiff's claim. R & R at 74-75. However, Judge Moses recommended granting the motion to dismiss with respect to money damages, as Plaintiff had failed to sufficiently allege harm and Defendants were entitled to qualified immunity. *Id.* at 75. For the reasons given below, the Courts finds it unnecessary to address the merits of this claim, as Plaintiff has failed to show standing on his claim for injunctive relief, *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-06 (1983), and qualified immunity bars his claim for damages, *Mesa v. City of New York*, No. 09 CIV. 10464 JPO, 2013 WL 31002, at *7 (S.D.N.Y. Jan. 3, 2013) (a court is not required to address the merits of a claim before deciding that qualified immunity applies).

Though this was not raised as an objection, the Court finds that Plaintiff has failed to sufficiently allege a risk of future harm sufficient for standing to bring a claim for injunctive relief. A federal court has an obligation to confirm whether a plaintiff has standing, including raising the issue *sua sponte*. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005). "[A] plaintiff seeking injunctive relief must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent." *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004) (emphasis in original) (citing *Lyons*, 461 U.S. at 105-06). To satisfy the first prong, a Plaintiff must establish that "he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *Lyons*, 461 U.S. at 101-02 (internal quotation marks omitted). Past injury alone is insufficient to satisfy this requirement, unless it is causing continuing, present harm. *See Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998). In this

case, Plaintiff has only alleged the past harm of being required to tell his fiancée about his status and that "he was forced to disclose the sexual nature of his relationship to PO Lewis-Robinson in detail." SAC ¶¶ 121-22. Plaintiff has not alleged that either of these requirements is ongoing, nor that he plans to enter into a new relationship such that this disclosure would be triggered again. Therefore, the Court will dismiss, without prejudice, Plaintiff's request for injunctive relief on this claim for lack of standing.[7]

**\*22**  As to damages, for similar reasons as those given in the qualified immunity analyses above, there are no sufficiently similar cases to establish with sufficient particularity that Defendant Lewis-Robinson's conduct with respect to this claim was unconstitutionally arbitrary. *See Pauly*, 137 S. Ct. at 551-52; *Singleton*, 210 F. Supp. 3d at 374. Defendant parole officers are therefore entitled to qualified immunity on this claim. For this reason, the Court does not reach the question of whether Plaintiff sufficiently alleged past harm.

For the forgoing reasons, neither injunctive relief nor money damages are available on this claim, which must therefore be dismissed. The Report is ADOPTED as to qualified immunity, but not as to the merits of Plaintiff's claim or whether Plaintiff sufficiently alleged harm. Defendants' motion to dismiss this claim is hereby GRANTED in full.

### c. Defendants' Motion to Dismiss is Granted as to Special Conditions Nos. 31 and 32

Plaintiff challenges Special Conditions Nos. 31 and 32, which *inter alia*, prohibit him from obtaining a driver's license, as well as from owning, operating, or being a passenger in a motor vehicle, without permission of his Parole Officer. SAC, Ex. C ¶¶ 31-32. Judge Moses found that because Plaintiff had used a car in the commission of his crime and the conditions imposed on him were not absolute, these limitations were not arbitrary and capricious and recommended dismissal of these claims. R & R at 75-76. Plaintiff did not object to this recommendation, which will therefore be reviewed for clear error. The Court finds that Judge Moses' recommendation is not clearly erroneous. Where an individual used a vehicle in the commission of their crime, a parole condition limiting their access to such vehicles without approval is not unreasonable. *See Gerena v. Rodriguez*, 192 A.D.2d 606, 606-07 (1993). Therefore, the Court ADOPTS the Report in full as to this claim

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 40 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

and Defendants' motion to dismiss this claim is hereby GRANTED.

### d. Defendants' Motion to Dismiss is Granted as to Special Conditions Nos. 14, 19, and 37

Plaintiff challenges that prohibitions on his viewing pornography (Special Condition No. 14), owning a pet (Special Condition No. 19), or owning a post office box (Special Condition No. 37), are arbitrary and capricious. R & R at 76-78. However, Judge Moses recommended that because Plaintiff had failed to allege that any of these prohibitions were having any impact on his life, his claims should be dismissed. R & R at 78. Plaintiff did not object to this recommendation, which will therefore be reviewed for clear error.

This Court finds no clear error in Judge Moses's recommendation. Plaintiff has not pled standing sufficient for either injunctive relief or money damages. As to injunctive relief, even drawing all reasonable inferences in his favor, Plaintiff has failed to allege "he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *Lyons*, 461 U.S. at 101-02. Nor has Plaintiff pled past harm that would warrant money damages. Indeed, Plaintiff has pled no injury at all resulting from these conditions, but rather simply lists them off in his complaint. SAC ¶¶ 128-29, 173. Because Plaintiff lacks standing, these claims must be dismissed. Therefore, the Court ADOPTS the Report on this claim and Defendants' motion to dismiss Plaintiff's claims with respect to Special Conditions Nos. 14, 19, and 37 is therefore GRANTED without prejudice.

### e. Defendants Are Entitled to Qualified Immunity on Plaintiff's Claim that the Internet and Technology Restrictions Are Arbitrary and Capricious

**\*23** In addition to his First Amendment challenge, Plaintiff also challenges that the parole conditions restricting his access to the internet and technology are arbitrary and capricious. SAC ¶ 173(i)-(ii). The Report does not address this claim separately, as it considered the same issues in its First Amendment analysis. R & R at 70 n.50. Neither party objected. The Court agrees that it is not necessary to determine the merits of this claim separately. However,

whether Defendants are entitled to qualified immunity on Plaintiff's claim for damages under the Due Process Clause requires a separate analysis from the First Amendment claim.

The Court finds that Plaintiff's due process rights here were not clearly established for the purposes of qualified immunity. A right may be clearly established by either controlling authority or "a robust consensus of cases of persuasive authority." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011) (internal quotation marks omitted). Here, neither condition is met. Second Circuit decisions interpreting the somewhat more stringent statutory standard imposed on federal conditions of supervised release under 18 U.S.C. § 3553(a) and § 3563(b) have invalidated conditions restricting internet or computer access if they were not reasonably related to the purposes of sentencing or inflicted a greater deprivation of liberty than necessary. *See United States v. Sofsky*, 287 F.3d 122, 126 (2d Cir. 2002); *United States v. Peterson*, 248 F.3d 79, 82-84 (2d Cir. 2001). Yet given the different legal standard, these are not controlling authority as to the constitutional analysis of state parole conditions. A recent case in the Eastern District of New York drew on these decisions—while noting the different standards—to sustain on summary judgment a challenge to a parole condition limiting a parolee's ability to own a phone with a camera where there was no evidence that it was related to prior conduct. *Singleton*, 210 F. Supp. 3d at 375-76. However, the court in that case also found that Defendants were entitled to qualified immunity given that due process rights in this context are "not clearly defined." *Id.* at 374. Therefore, while a consensus is emerging that it is arbitrary and capricious under the Due Process Clause to impose these kinds of technology and internet restrictions without an individualized link to prior conduct or another legitimate government interest, it has not yet been sufficiently clearly established for the purposes of the qualified immunity analysis. Defendants' motion to dismiss Plaintiff's claim for damages on this claim is therefore GRANTED.

For the reasons given above, Defendants' motion to dismiss is hereby GRANTED in full as to Claim 1, Claim 3 as to residences and the consensual relationships rule, Claim 6 as to the consensual relationships rule, motor vehicles rule, pornography, pets, and P.O. boxes. Defendants' motion is also GRANTED as to money damages on all claims. Otherwise, Defendants' motion is hereby DENIED.

**D. Plaintiff is Entitled to a Preliminary Injunction on his Substantive Due Process Claim**

The Court now turns to Plaintiff's motion for a preliminary injunction. Judge Moses's Report recommended that Plaintiff is entitled to a preliminary injunction on his substantive due process claim. Defendants object on several grounds, which the Court addresses in turn.

As an initial matter, Defendants argue that even if Plaintiff has sufficiently pled a claim to survive their motion to dismiss, Plaintiff has not demonstrated a substantial likelihood of success on the merits. Def. R & R Obj. at 12. For the reasons given above in the section denying Defendants' motion to dismiss this claim, the Court disagrees and concludes that Plaintiff has established a clear likelihood of success on the merits justifying the imposition of a preliminary injunction. Defendants do not object to Judge Moses' recommendation that Plaintiff has shown irreparable harm, and the Court finds no error—clear or otherwise—in his thorough discussion of the question. R & R at 79-82.

**\*24** Defendants object to the Report's recommendation that the preliminary injunction would be in the public interest. The Court disagrees. Judge Moses is correct that it is in the public interest to grant Plaintiff's motion for preliminary injunction because he presents no "*sexual* risks that sex offender registration, and the Sex Offender Conditions, are designed to combat." R & R at 82 (emphasis in original); Pl. R & R Obj. Resp. at 28. As a result, lifting Plaintiff's designation would not just ensure compliance with the Constitution, *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citing cases), it would remedy ongoing harm to Plaintiff and increase the accuracy of SORA's designation of individuals as sex offenders, *see People v. Diaz*, 150 A.D.3d 60, 66 (N.Y. App. Div.), *aff'd on other grounds*, No. 134, 2018 WL 6492716 (N.Y. Dec. 11, 2018). And even if remedying a constitutional violation were not, standing alone, always enough to outweigh countervailing public interests, Def. R & R Obj. at 24, Defendants offer no concrete or persuasive examples of how the public interest would be harmed by the injunction. Defendants cursorily argue that the Report "(1) improperly placed the burden of proof on this issue upon defendants rather than plaintiff; (2) was not based on any evidence placed before the Court; (3) failed to offer sufficient deference to the state officials' determinations to the contrary; and (4) was factually incorrect given plaintiff's crimes of conviction." Def. R & R Obj. at 24. As noted above, Defendants at this stage have conceded that there was no sexual element to Plaintiff's offense. And the record offers no indication or allegation of a sexual element to Plaintiff's crime or of any risk of sexual misconduct, but rather a judicial determination by Justice Obus to the contrary. R & R at 10-11. Moreover, a significant number of parole conditions will remain even if Plaintiff is no longer designated as a sex offender, Pl. R & R Obj. Resp. at 28, and Defendants retain their discretion to impose conditions of parole that are reasonably related to a legitimate government interest and any non-sexual risk Plaintiff may pose. Therefore, the Court finds that Plaintiff has shown, based on the record, that it is in the public interest to grant a preliminary injunction.

Defendants also argue that the Court should only consider whether "the parole conditions imposed by the state officials ... were so arbitrary and irrational that they could not protect the public from Plaintiff in any manner, sexual or not." Def. R & R Obj. at 23. Even if this were true for Plaintiff's challenges to his specific conditions of parole, Plaintiff's Claim 2 objects to being designated as a "sex offender," and the question before the Court is thus whether that designation is rational and whether enjoining Defendants from labeling Plaintiff as such, and imposing parole conditions solely on that basis, would serve the public interest. Given that, as noted above, the injunction will allow Defendants to impose conditions based on any legitimate interests unrelated to Plaintiff's designation as a sex offender, this objection is unavailing.

Defendants also argue that the issue of parole conditions should be remanded to the Defendants to reconsider before any preliminary injunction issues. Def. R & R Obj. at 25-26. Specifically, the Defendants argue that they should have a chance to determine "whether any of the statutory parole conditions ... should still be imposed here to protect the public." *Id.* The Court concludes that no such remand is necessary. Defendants cite the Second Circuit's decision in *Schwartz v. Dolan*, 86 F.3d 315 (2d Cir. 1996), to support their argument, but that decision is importantly different from the instant case in two ways.

First, unlike in *Schwartz*, the preliminary injunction here would provide Defendants with significant flexibility to design and tailor the manner in which they will comply. In *Schwartz*, the district court "gave detailed instructions" on how a state agency was required to provide notice to public assistance recipients, which would have involved "extensive modifications to the computer systems that create

the notices." *Schwartz*, 86 F.3d at 319. By mandating a specific restructuring of the agency's operations, the district court had foreclosed the remedy the agency would have selected. *Id.* The Second Circuit held that because there were "different possible ways to remedy the violation," the agency should have had an opportunity to present its own plan for remedying the constitutional deficiencies. *Id.* Here, however, the preliminary injunction language, as crafted by Judge Moses, provides Defendants with precisely the opportunity they seek to consider whether any parole conditions are still necessary to protect the public; Defendants have ample flexibility and discretion to impose parole conditions "to the extent they deem those conditions appropriate for plaintiff in light of his *non-sexual* criminal history and characteristics." R & R at 85. And, contrary to Defendants' contentions, they are not categorically prohibited from imposing discretionary conditions that may be similar in content to the mandatory conditions so long as they are not otherwise inconsistent with the injunction. Def. R & R Obj. at 25. As a result, this injunction does not involve the kind of systemic management by a federal court of the operation of state institutions that was problematic in *Schwartz*. Nor does it foreclose Defendants' ability to select the manner to remedy the violation identified. Since this injunction already provides Defendants with the flexibility they seek, remand is unnecessary to permit Defendants to choose how they wish to comply with the Court's ruling.

**\*25** Second, *Schwartz* involved a permanent injunction, rather than the preliminary injunctive relief sought here. As is true in this case, preliminary injunctive relief is time-sensitive, which weighs against adopting procedures that will entail delays resulting in further ongoing irreparable harm. This consideration is particularly weighty here, as Plaintiff first filed his motion for a preliminary injunction over nine months ago and represents that remanding to Defendants for subsequent approval by this Court might result in the mooting of several of his claims. Pl. R & R Obj. Resp. at 29 n.11. Furthermore, with a preliminary injunction, a party will be given "an opportunity to present [their] own plan" for complying with a court's ruling, *Schwartz*, 86 F.3d at 319, before permanent injunctive relief, if any, is entered. Because Plaintiff is suffering ongoing, irreparable harm, the Court declines to require another series of submissions to the Court before entering preliminary relief.

For all of the above-stated reasons, the Court concludes that Plaintiff has satisfied his burden of demonstrating

that a preliminary injunction is warranted. The Court will ADOPT Judge Moses' recommended preliminary injunction on Claim 2. In addition, the Court agrees with the Report —and Plaintiff, Pl. R & R Obj. at 3—that the injunction recommended by Judge Moses on Claim 2 is sufficient to address Plaintiff's request for injunctive relief. R & R at 2, 85-86. Therefore, the Court finds it unnecessary to address whether Plaintiff has made a sufficient showing to warrant injunctive relief on his other surviving claims.

## V. Conclusion

For the reasons given above, the Court GRANTS Defendants' motion to dismiss as to Claim 1 in full; Claim 3 in full as to the consensual relationships rule, the residency requirement of Condition No. 4, and all claims for damages; Claim 4 as to damages; Claim 5 as to damages; Claim 6 as to damages on all claims, and for both injunctive relief and damages as to the claims regarding conditions regulating consensual relationships, motor vehicles, pornography, pets, and P.O. boxes.

The Court DENIES the motion to dismiss as to all other claims. The Court also clarifies that Defendant Acting Commissioner Annucci remains in this case in his official capacity as the Defendant for the purposes of any injunctive relief on Claims 2, 3, and 4. Pl. R & R Obj. at 9.

Finally, the Court GRANTS Plaintiff's request for a preliminary injunction on Claim 2, and hereby ADOPTS Judge Moses's well-crafted language: Defendants, together with their agents, employees, and all persons acting in concert with them, are preliminarily enjoined, pending the final resolution of this action, from enforcing, as against Plaintiff, the registration and notification provisions made applicable to designated sex offenders by SORA (CL §§ 168a-168w), or the mandatory conditions prescribed by EL §§ 259-c(14) and (15) for parolees sentenced for an offense for which registration as a sex offender is required; and are directed to rescind the discretionary provisions of the Sex Offender Conditions (Yunus Decl. Ex. C, at ECF pages 4-10) except to the extent they deem those conditions appropriate for plaintiff in light of his non-sexual criminal history and characteristics.

This resolves docket numbers 43 and 59. As this matter has been referred to Magistrate Judge Moses for general pretrial, Dkt. 15, by separate order Judge Moses may schedule a case management conference.

SO ORDERED.

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 43 of 134

**All Citations**

Not Reported in Fed. Supp., 2019 WL 168544

## Footnotes

1    The Court adopts the term "Parole Officer Defendants" employed by Judge Moses' Report. R & R at 8.

2    Section 168-*l*(8) states in relevant part: "A failure by a state or local agency or the board to act or by a court to render a determination within the time period specified in this article shall not affect the obligation of the sex offender to register or verify under this article *nor shall such failure prevent a court from making a determination regarding the sex offender's level* of notification and whether such offender is required by law to be registered for a period of twenty years or for life." N.Y. Correct. Law § 168-*l*(8) (emphasis added).

3    *See, e.g., Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived."); *Cupit v. Whitley*, 28 F.3d 532, 535 & n. 5 (5th Cir. 1994) (holding that a party had waived arguments that were only raised after the magistrate judge had issued their Report); *Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990–91 (1st Cir. 1988) ("[A]n unsuccessful party is not entitled as of right to *de novo* review by the judge of an argument never seasonably raised before the magistrate."); *Greenhow v. Sec'y of Health & Human Servs.*, 863 F.2d 633, 638 (9th Cir. 1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act. We do not believe that the Magistrates Act was intended to give litigants an opportunity to run one version of their case past the magistrate, then another past the district court."), *overruled on other grounds by United States v. Hardesty*, 977 F.2d 1347, 1348 (9th Cir. 1992) (en banc).

4    While *Cleburne* and *Plyler* involved Equal Protection Clause challenges, the Second Circuit has analogized between rational basis review in the equal protection and substantive due process contexts. *See Winston*, 887 F.3d at 562-67 (relying on its determination that a law lacked a rational basis in its analysis of an equal protection claim to find that the law also failed substantive due process review); *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 284 (2d Cir. 2015) (analyzing equal protection and substantive due process claims jointly under rational basis review).

5    *See also* Brief for Amici Curiae the Cato Institute, the American Civil Liberties Union, and the American Civil Liberties Union of North Carolina in Support of Petitioner, *Packingham v. North Carolina*, 2016 WL 8136359 (U.S.), 7 (U.S., 2016) ("North Carolina's registry law in turn applies whether or not a former offender is on parole or probation.").

6    Defendants had initially argued that state court was the only proper venue for such claims, but appear to no longer press that argument after Judge Moses correctly rejected it. R & R at 68 n.48.

7    *See Katz v. Donna Karan Co.*, L.L.C., 872 F.3d 114, 121 (2d Cir. 2017) ("[W]here a case is dismissed for lack of Article III standing, as here, that disposition cannot be entered with prejudice, and instead must be dismissed *without prejudice*.") (emphasis in original).

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4232496
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Abdel–Shaheed Farrad MUHAMMAD
(Paul Simmons), Plaintiff,
v.
EVANS, et al., Defendants.

No. 11 CV 2113(CM).
|
Signed Aug. 15, 2014.

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

McMAHON, District Judge.

**\*1** Plaintiff pro se Abdel–Shaheed Farrad Muhammad (aka, Paul Simmons) brings this civil rights action against Defendants Parole Board Chairwoman Andrea Evans ("Chairwoman Evans"), New York Department of Corrections and Community Supervision Commissioner Brian Fischer ("Commissioner Fischer"), Bureau Chief of the Bronx IV Area Parole Office Jarvis Jenkins ("BC Jenkins"), Parole Officer Deena Royce ("P.O Royce"), Senior Parole Officer John McKeon (P.O McKeon) [1], and Parole Board Member Lisa Elavich ("Board Member Elavich"). [2]

Presently before the Court is Defendants' motion to dismiss pursuant to Fed. R. Civ. P 12(b1) and 12(b)(6). Defendants' move in the alternative to dismiss Plaintiffs' complaint pursuant to Fed. R. Civ. P 56 on the grounds of qualified immunity.

Defendants' motion to dismiss is granted.

### BACKGROUND

All facts are drawn from the complaint and documents referred to in the Third Amended Complaint (Compl). [3] These facts are assumed to be true for the purposes of the present motion.

Plaintiff is currently serving a five year term of post-release supervision, following service of a five year sentence upon his plea of guilty to the crime of burglary in the second degree. He asserts claims related to conditions of his post-release supervision, as well as relating to the period during which he was held in prison.

### Plaintiff's Allegation That He Was Held in Prison Beyond His "Maximum Term"

On August 3 or 4, 2006, Plaintiff was arrested in connection with the aforementioned burglary. He was held in pre-trial confinement in the custody of New York City Department of Corrections from 2006 until November 29, 2010, when he pleaded guilty to burglary in the second degree. Judge Oliver in Bronx Supreme Court sentenced Plaintiff to a determinate sentence of five years imprisonment, *nunc pro tunc* from August 4, 2006. (Def.'s Motion to Dismiss, Declaration of Counsel, Exhibit A at 9, 11). At the sentencing hearing, Judge Oliver made a recommendation that Plaintiff be released on parole at the earliest legal date. (*Id.* at 7). That recommendation, of course, conferred no rights on Plaintiff.

Plaintiff's maximum release date—the latest date on which he could be lawfully held on his five year sentence—would have been August 3, 2011, five years after he was first incarcerated for the crime of conviction.

On November 11, 2010, shortly before Plaintiff was sentenced, Plaintiff visited the Legal Aid Office at the Manhattan Detention Center to find out about his release date. (Compl. at 4). The complaint alleges that a Legal Aid "representative" contacted the New York State Department of Correctional Services ("DOCCS") to inform DOCCS that Plaintiff had served a full five years and should be transferred immediately. [4] (Compl. at 4). Plaintiff alleges that Commissioner Fischer responded to this request by causing him to be transferred to Downstate Correctional Facility, located in Fishkill, New York, on December 10, 2010. (Compl. at 7).

**\*2** On December 14, 2010, Plaintiff alleges that he received a "Legal date computation" from DOCCS that stated that Plaintiff had served 1,539 days in prison, the "maximum term" imposed by the Bronx Supreme Court. (Compl. at 7). Five years in prison (including one leap year, 2008) is actually 1,826 days. I am not required to accept plaintiff's faulty arithmetic as true for purposes of this motion

Plaintiff was ultimately paroled on January 10, 2011, some eight months before his maximum release date. (Compl. at 7).

***Plaintiff's Allegation of Assault***

Upon his arrival at Downstate Correctional Facility on December 10, 2010, Plaintiff alleges that the prison guards in the receiving area assaulted him because he was walking too slowly; plaintiff walks with a cane, which he needs due to an unspecified "chronic medical condition." (Compl. at 7). Plaintiff alleges that the prison guards took away his cane and removed the orthopedic insoles from his shoes, which caused Plaintiff to fall several times. Eventually, he was placed in the medical ward. (Compl. at 7).

While in the medical ward, Plaintiff—who is an adherent of the Nation of Islam—alleges that he was denied "all Islamic services and ministerial consultation in spite of his numerous requests to see a Minister from his religious community." (Compl. at 7).

***Conditions of Plaintiff's Parole***

On December 15, 2010, Plaintiff received and signed a form, given to him by P.O. Royce that advised him of the general conditions on which he would be paroled. (Compl. at 7). This form indicated that any special conditions for Plaintiff's parole would be determined by the Parole Board.

On December 21, 2010, Plaintiff received notice of special conditions of his parole. The special conditions here at issue stated: "I will notify my P.O. of all intimate relationships," and "I will not reside with any intimate partner without the prior written permission of [sic] the P.O." (Defts' Motion to Dismiss, Declaration of Lisa Elovich, Exhibit A, at 1).

On or about December 22, 2010, Plaintiff alleges that he met with P.O. Royce, who explained to Plaintiff that the special conditions of his parole prevented him from marrying or living with a female without first receiving written permission from his parole officer. (Compl. at 7). Plaintiff alleges that P.O. Royce stated that these special conditions could be imposed on Plaintiff because her supervisor, P.O. McKeon, and "someone else" from the Parole Board had approved them. (Compl. at 7).

Plaintiff signed the notice indicating that he was aware of the special parole conditions on January 6, 2011. He was released on January 10, 2011. (Compl. at 7).

Once released, Plaintiff was under supervision of the Manhattan II Division of Parole and was assigned to parole officer Fernandez, who is not named as a defendant in this action. (Compl. at 7)

Plaintiff resided in Ward's Island shelter during the period of January 10, 2011 to May 26, 2011, and again from April 12, 2012 to October 8, 2012. (Compl. at 7). While a resident at Ward's Island Shelter, Plaintiff alleges that his religious freedom was restricted because he was prevented from attending religious services, religious study, and assembly of worship.

**\*3** Despite Plaintiff's special parole conditions, Plaintiff married Sally L. Thomas Simmons without first receiving the parole officer's permission. (Compl. at 8). On or about April 16, 2012, Plaintiff alleges that BC Jenkins ordered that Plaintiff Muhammad not be allowed to live or visit with his wife, Sally Simmons. (Compl. at 8).

***Claims Brought By Plaintiff***

Plaintiff alleges claims pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 1983, and 42 U.S.C. § 1985 for violation of his First, Eighth, and Fourteenth amendment rights. He contends that: (1) he was assaulted at Downstate Correctional facility when prison guards removed his shoe insoles and cane; (2) he was denied access to Islamic ministry while in the medical ward at Downstate Correctional Facility; (3) he was held for thirty days beyond his conditional release date; (4) he was subjected to special parole conditions relating to his relationships, marriage, and/or cohabitation that violated his right to marry and his religion. Plaintiff further alleges that all named defendants conspired to violate Plaintiff's civil rights.

Defendants move to dismiss the complaint for failure to state a claim on which relief may be granted and for summary judgment on the ground of qualified immunity.

## DISCUSSION

### I. Standard

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cargo*

*Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 44 (2d Cir.2003). However, to survive a motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiffs obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (internal quotations, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570; *Iqbal,* 129 S.Ct. at 1950–51.

Although the Court notes that Plaintiff is no stranger to litigation in this Court, *see Muhammad v. Catletti,* No. 00 Civ. 2525, 2000 WL 1641246, at *1 n. 1 (S.D.N.Y.Oct.31, 2000) (collecting cases), "[a] document filed *pro se* is [nonetheless] to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)). A court must interpret *pro se* filings "to raise the strongest arguments that they suggest." *Harris v. Westchester Cnty. Medical Ctr.,* No. 08 Civ. 1128, 2011 WL 2637429, at *3 (S.D.N.Y. July 6, 2011) (quoting *Triestman v. Fed. Bureau of Prisons,* 470 U.S. 471, 475 (2d Cir.2006)).

**II.   New York State Correction Law § 24 Bars This Court From Entertaining Any State Law Claims**

**\*4**  To the extent Plaintiff alleges any state law claims, they are dismissed pursuant to Section 24 of the New York State Correction Law.

Section 24 of the New York State Correction Law provides in pertinent part:

(1) No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee;

(2) Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

"The Second Circuit has held that the immunity from suit in state court provided to [DOCCS] employees by § 24 extends to suits for tort claims based on state law against [DOCCS] employees in federal court." *Brown v. Dep't of Corr. Servs.,* No. 09 Civ. 949, 2011 WL 2182775, at *9 (W.D.N.Y. June 2, 2011) (citing *Baker v. Coughlin,* 77 F.3d 12, 14 (2d Cir.1996)). "By its plain terms, § 24 governs the substantive rights of [DOCCS] officers by conferring upon them an immunity from liability for activities that fall within the scope of the statute." *Baker,* 77 F.3d at 15. "Accordingly, where state claims would have been dismissed pursuant to § 24 by a New York court, the district court must also dismiss such claims." *Brown,* 2011 WL 2182775, at *9 (citing Baker, 77 F.3d at 16).

Nothing in Plaintiff's complaint suggests that any of the Defendants were acting outside the scope of their employment. Nor does Plaintiff specify whether he brings his New York State constitutional claims against Defendants in their official capacities, their personal capacities, or both. In the end, it is entirely irrelevant.

To the extent Plaintiff seeks monetary damages from Defendants in their personal capacities, Plaintiff's New York State constitutional claims are dismissed pursuant to N.Y. Correct. Law § 24(1) because Plaintiff does not have standing to bring them. To the extent Plaintiff seeks monetary damages from Defendants in their official capacities, Plaintiff's New

York State constitutional claims are dismissed without prejudice pursuant to ⚑ *N.Y. Correct. Law § 24(2);* Plaintiff may assert any such claims in the New York Court of Claims.

## III. The Eleventh Amendment Bars Claims For Damages Against Defendants In Their Official Capacities

Plaintiff fails to allege whether he brings his 🔖 Section 1983 claims against Defendants in their official capacities, their individual capacities, or both. However, to the extent Plaintiff seeks monetary damages from Defendants in their official capacities, Plaintiff's 🔖 Section 1983 claims are barred by the Eleventh Amendment. 🔖 *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, (1989); ⚠ *Huminski v. Corsones,* 386 F.3d 116, 133 (2d Cir.2004).

## IV. Plaintiff's Conspiracy Claim Is Dismissed

 **\*5** Plaintiff alleges that "during all times mentioned in the complaint" defendants "separately and in concert" were in a conspiracy "to violate the civil rights of ... plaintiff[ ]" and engaged in acts or omissions that were a "deprivation of plaintiff's constitutional rights." (Compl. at 6).

A conspiracy claim under 🔖 42 U.S.C. § 1985 does not "apply to all tortious, conspiratorial interferences with the rights of others." 🔖 *Griffin v. Breckenridge,* 403 U.S. 88, 101 (1971). A plaintiff must plead that defendants undertook a conspiracy "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws." *Jews for Jesus, Inc. v. Jewish Community Relations,* 968 F.2d 286, 290 (2d Cir.1992). Furthermore, "a plaintiff 'must allege some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.' " 🔖 *Gagliard v. Village of Pawling,* 18 F.3d 188, 194(2d Cir.1994) (quoting 🔖 *Griffin,* 403 U.S. at 102); *see also* 🔖 *Jews for Jesus,* 968 F.2d at 290–91.

In evaluating conspiracy claims under the 🔖 Rule 12(b)(6) standard, complaints "containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights

are properly dismissed." ⚑ *Dwares v. City of New* York, 985 F.2d at 100 (2d Cir.1993). Although *pro se* plaintiffs are entitled to liberal pleading standards, they "cannot completely avoid the pleading requirements of the Federal Rules of Civil Procedure." *Murphy v. Sr. Investigator Neuberger,* No. 94 Civ. 7421, 1996 WL 442797, at \*7 (S.D.N.Y. Aug. 6, 1996) (citing 🔖 *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). Thus, a *pro se* plaintiff must make "an effort to provide some 'details of time and place and the alleged effect of the conspiracy.' " *Id.* (quoting 2A *Moore's Federal Practice* ¶ 8.17[6], at 8–109 to 8–110 (2d ed.1992)).

Plaintiff's conclusory statement that Defendants conspired to violate his constitutional rights is devoid of the specificity required to survive a motion to dismiss. Plaintiff's complaint fails to adequately allege that defendants conspired to act premised on class-based animus that is necessary to establish the required element of "invidious discriminatory motive." *See* 🔖 *Griffin,* 403 U.S. at 102. Plaintiff does not plead any facts "supporting a meeting of the minds such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Web v.* 🔖 *Goord,* 340 F.3d 105, 110 (2d Cir, 2003); ⚑ *Dwares,* 985 F.2d at 100. Plaintiff does not define the time frame or actions of the alleged conspiracy, apart from stating that Defendants conspired with each other "during all times mentioned in the complaint." (Compl. at 6). Plaintiff's single, conclusory statement that defendants conspired to deprive him of his rights is insufficient to plead a claim for conspiracy as a matter of law.

 **\*6** We are now on Plaintiff's Third Amended Complaint in this action. I see no reason to continue to give plaintiff opportunities to plead his claims correctly. The 🔖 § 1985 conspiracy claim is dismissed with prejudice.

## V. Plaintiff's Assertion That He was Held Past His Conditional Release Date Fails to State a Claim on Which Relief May Be Granted and Is Dismissed

Plaintiff alleges that this was a violation of his Fourteenth Amendment Due Process rights because he was held ninety-two days beyond what he calls his "date of release." (Compl. at 4).

Plaintiff was sentenced to a determinate term of five years' incarceration, commencing August 4, 2006. His maximum release date was five years later, or August 4, 2011. He

was released from prison eight months shy of his maximum release day, on January 11, 2011. He thus fails as a matter of fact to state a claim that he was held beyond his maximum release date.

However, Plaintiff's claim is that his constitutional rights were violated because he was held beyond his "conditional release date"—that is, his maximum release date less his accumulated good time. He claims a constitutional entitlement to have been released at the earliest possible date, consistent with his accumulated good time. For purposes of this motion to dismiss, I will accept as true plaintiff's claim that his release date came after the earliest date at which he could have been released consistent with his accumulation of good time.

The Attorney General argues that plaintiff fails to state a claim because he has no constitutionally recognized right to release prior to his maximum release date. "Under the Due Process Clause, an inmate has a liberty interest in being released upon the expiration of his *maximum term of imprisonment."*

*Calhoun v. N.Y. State Div. of Parole Officers,* 999 F.2d 647, 653 (2d Cir.1993) (citing *Green v. McCall,* 822 F.2d 284, 287–90 (2d Cir.1987) (emphasis added)). A prisoner only has a liberty interest in being paroled prior to his maximum release date when the state parole statute creates a legitimate expectation of release. *Graziano v. Pataki,* 689 F.3d 110, 114 (2d Cir.2012); *see also Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7(1979). The Attorney General argues that, under New York law, the statutory scheme creates no such expectation, *Graziano,* 589 F.3d at 114, because it is entirely within the discretion of the Parole Board to determine whether and when a prisoner is eligible for parole. *See* N.Y. Exec. Law § 259–c.1.; *Barna v. Travis,* 239 F.3d 169, 171 (2d Cir.2001)).

The Attorney General also moves for dismissal of this claim on the ground of qualified immunity. Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. *See Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2080 (2011). Courts may grant qualified immunity on the ground that a purported right was not "clearly established" by prior case law, without resolving the often more difficult question whether the purported right exists at all." *Pearson v. Callahan,* 555 U.S. 223, 236 (2009). To be clearly

established, a right must be sufficiently clear that every "reasonable official would [have understood] that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd,* at 2083. This "clearly established" standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can " 'reasonably ... anticipate when their conduct may give rise to liability for damages.' " *Anderson v. Creighton,* at 639 (quoting *Davis v. Scherer,* 468 U.S. 183, 195 (1984)).

**\*7** Here, the allegation is that plaintiff had accumulated enough good time credits to be released on his conditional release date but was held beyond that date (although not beyond his maximum release date). The Attorney General argues that even if plaintiff had a property or liberty interest in being allowed to take advantage of all the good time he had earned, his right to release on his conditional release date was not an "established" right for qualified immunity purposes. Whether New York State inmates who have accrued the requisite good time credits possess a liberty interest in conditional release is viewed by the Second Circuit as a "thorny" and unsettled question. *Doe v. Smith,* 221 F.3d 137 (2d Cir.2000). In *Matter of Hyman v. NYS Division of Parole,* 22 A.D.3d 224 (1st Dept.2005), the Appellate Division, First Department held that there is "no federal or state constitutional right to be released" on an inmate's conditional release date.

The Attorney General's argument is appealing. The fact is, however, that this claim can be dismissed on a much simpler ground: Muhammad has failed to sue the right people, and the people he has sued do not need the protection of qualified immunity because they were not the people who "held" plaintiff beyond what should have been his release date.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (quoting *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006)). Indeed, "A complaint based on a violation under § 1983 that does not allege the personal involvement of a defendant fails as a matter of law." *Gusler v. City of Long Beach,*

823 F.Supp.2d 98, 139 (E.D.N.Y.2011) (citing *Rosa R. v. Connelly,* 889 F.2d 435, 437 (2d Cir.1989); *Alfaro Motors. Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

The defendants in this case are the Commissioner of the Department of Corrections, the Chairwoman of the New York States Parole Board, several parole officers, and the Bureau Chief of the Bronx IV Department of Parole. None of those individuals was personally involved in holding the plaintiff past his release date. The proper defendant on such a claim would have been his jailers—the *wardens* of the facility or facilities at which he was being held when he was entitled to be released, those facilities being the Manhattan House of Detention and Downstate Correctional Facility. Neither warden has been named as a defendant. Not a single fact alleged would establish the personal involvement of ANY of the named defendants in any decision to keep plaintiff incarcerated past his conditional release date. Therefore, without regard to whether plaintiff states a claim or whether the correct defendants would be entitled to qualified immunity, the claim that plaintiff was unconstitutionally held past his release date must be dismissed. I will not allow plaintiff to amend his complaint yet again to name new defendants—besides, the statute of limitations expired at the latest in January 2014, more than seven months ago. Therefore, the claim is dismissed with prejudice and without leave to amend yet again.

## VI. Plaintiff's § 1983 Claim that Parole Restrictions on His Ability to Marry Violated His Constitutional Rights

### A. Plaintiff Fails to State a Claim on Which Relief May Be Granted

**\*8** On January 10, 2011, Plaintiff was released from prison on parole subject to special conditions. These special parole conditions included that Plaintiff agreed he would: (1) notify my P.O. of all intimate relationships; and (2) not reside with any intimate partner without the prior written permission of the P.O. (DEF Motion to Dismiss, Declaration of Lisa Elovich, Exhibit A). Plaintiff was aware of and signed a form acknowledging these special conditions before he was released from prison on January 10, 2011. (Compl. at 7). Plaintiff alleges that the special parole conditions on his ability to marry and enter intimate relationships violated his First and Fourteenth Amendment rights.

The first thing to note is that the only defendants against whom this claim can be asserted, consistent with the "personal involvement" doctrine, are defendant Lisa Elovich (who imposed the conditions) and Bureau Chief Jenkins of Bronx IV Dept. of corrections and Community Supervision (who was responsible for seeing to plaintiff's parole supervision). The other named defendants are not alleged to have had any personal involvement in the imposition or enforcement of these conditions.

Plaintiff argues that the special condition unconstitutionally abridges his freedom to marry in violation of the Fourteenth Amendment to the U.S. Constitution.

"Parolees are, of course, not without constitutional rights." *United States ex rel. Sperling v. Fitzpatrick,* 426 F.2d 1161, 1164 (2d Cir.1970). Furthermore, "the decision to marry is a fundamental right." *Turner v. Safley,* 482 U.S. 78, 95 (1987). However, parolees are subject to "restrictions not applicable to other citizens." *Morrissey v. Brewer,* 408 U.S. 471, 482 (1972); *accord LoFranco v. United States Parole Comm'n,* 986 F.Supp. 796, 804 (S.D.N.Y.1996) ("As a condition of release on parole, however, the Parole Commission may restrict a parolee's access to otherwise lawful activities.").

In *Turner,* the Supreme Court formulated a standard of review for prisoners' constitutional claims: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 95. The *Turner* court concluded that a prisoner's right to marry while incarcerated was not immune from all regulation; rather, that right is immune from regulation that bears no "valid, rational connection ... [to] the legitimate governmental interest put forward to justify it." *Id.* at 89. Although the regulation at issue in *Turner* was invalidated, the Court made clear that "[t]he right to marry, like many other rights, is subject to substantial restrictions as a result of incarceration." *Id.* at 95.

While *Turner* addressed the Government's authority to restrict the rights of incarcerated persons, that authority extends largely to parolees. *Morrissey v. Brewer,* 408 U.S. 471, 473 (1972) ("[P]arole is an established variation on imprisonment of convicted criminals."). *Morrissey* held that parole conditions "restrict [parolees'] activities substantially beyond the ordinary restrictions imposed by law on an

individual citizen." *Id.* at 478. "Typically," the Supreme Court noted, parolees "must seek permission from their parole officers before engaging in specified activities, such as ... *marrying." Id.* (emphasis added).

**\*9** *Turner* provides that prisoners' constitutional right to marry is subject to regulation that is rationally connected to a governmental interest. *Morrissey* provides that parole is a variation of imprisonment; accordingly, like prison conditions, parole conditions may restrict substantially parolees' activities.

In the Second Circuit, special restrictions on a parolee's rights are upheld where they "are reasonably and necessarily related to the interests that the Government retains after his conditional release." *Birzon v. King,* 469 F.2d 1241, 1243 (2d Cir.1972). *Birzon* regarded as "frivolous" the appellant's argument that a parolee's condition prohibiting him from associating with persons having a criminal record violated his First Amendment freedom of association. *Id.* The Government's "interest" in the parole context is clear: "when a convict is conditionally released on parole, the Government retains a substantial interest in insuring that its rehabilitative goal is not frustrated and that the *public is protected* from further criminal acts by the parolee." *Id.* (emphasis added).

Applying the principles of *Turner, Morrissey,* and *Birzon,* the Court finds that the restrictions imposed on Plaintiff were on their face reasonably and necessarily related to the Government's interest in protecting the public from further criminal acts by the parolee and in supervising his activities in an area where he was a repeat offender.

Plaintiff has a history of domestic violence.[5] Protective orders were issued against Plaintiff on behalf of multiple women, one of whom, Mary Ogarro, was his former wife. (*Id.* at 4). These orders were in effect at the time the Parole Board determined the special conditions of Plaintiff's parole. On October 28, 2005, Plaintiff was convicted on a plea of guilty to Attempted Assault in the Third Degree for charges of domestic violence against his ex-fiance, Margaret Alexander. (*Id.*) The October 28 conviction stemmed from Plaintiff's arrest and charge with Assault in the Third Degree with Intent to Cause Physical Injury, Stalking in the Fourth Degree (causing fear of material harm to health, safety or property), and Harassment in the Second Degree (physical contact). (*Id.*)

Significantly, the Division of Parole did not prohibit plaintiff from marrying or living with an intimate partner altogether.

The exact conditions of his parole (of which the court may take cognizance, since plaintiff relied on them in bringing his complaint) were as follows:

1. Plaintiff could not associate in any way or communicate by any means with Margaret Alexander without the permission of his parole officer. Ms. Alexander had obtained no fewer than three orders of protection against plaintiff, one of which was not due to expire for two years after plaintiff's release date, and plaintiff had previously been convicted of a domestic violence offense in which Ms. Alexander was the victim.

   **\*10** 2. Plaintiff was required to participate in domestic violence counseling as directed by his parole officer.

3. Plaintiff was required to notify his parole officer of all intimate relationships.

4. Plaintiff could not reside with any intimate partner without the prior written permission of the parole officer.

(Elovich Decl. Ex. A).

Plaintiff was required to abide by these four conditions because he—by virtue of his history with Ms. Alexander (and with his former wife, Mary Ongarro, who also obtained an order of protection against plaintiff)—was deemed to present a risk of committing acts of domestic violence, per the New York State Division of Parole "Domestic Violence Manual (Policy and Procedures Manual, Item 9401.07, Elovich Decl. Ex. C). The conditions imposed upon him are all conditions suggested by the Domestic Violence Manual for the purpose of protecting members of the public and allowing the parole officer to monitor parolees who have a history of domestic violence.[6] They did not unconstitutionally prohibit the plaintiff from marrying, as he alleges; they did make his decision to marry the business of his parole officer, which —as the Supreme Court held in *Turner*—is anything but unconstitutional.

Because the conditions of parole imposed on plaintiff are of the exact same type that the Supreme Court in *Turner* had no difficulty finding constitutional, he fails to state a claim on which relief may be granted.

*B. The Defendant Parole Officers Are Qualifiedly Immune*
In the alternative, and even if the plaintiff has stated a claim on which relief could be granted, the defendant Lisa Elovich (who imposed the parole conditions on plaintiff) and any

parole officer who enforced those conditions are cloaked with qualified immunity.

The standard for obtaining dismissal on the ground of qualified immunity is set forth above. For our purposes, the important aspects of the doctrine are that it protects "all but the plainly incompetent" state agents and that it cloaks a person with immunity unless "clearly established law" renders the state agent's actions unlawful. Neither condition pertains here.

First, it cannot be said that no reasonable parole officer would have thought it inappropriate or unconstitutional to impose the conditions that were imposed by Ms. Elovich. The State Board of Parole had published policies and procedures that specifically called for the imposition of such conditions on anyone who, like plaintiff, had a history of domestic violence (and plaintiff had an extensive history of domestic violence-type incidents, including a conviction for attempted assault on his fiancee). It cannot be said that every single parole officer in New York would have thought it unreasonable to follow the policies and procedures promulgated by the State Parole Board.

Of course, even policies and procedures cannot immunize patently unconstitutional directives, but no court whose opinions bind this court—not the United States Supreme Court and not the United States Court of Appeals for the Second Circuit—has ever held, squarely or even implicitly, that it violate the constitution and laws of the United States to impose such conditions on parolees who have a history of domestic violence. As a result, the conditions of parole that Ms. Elovich imposed on Mr. Muhammad cannot be said to violate "settled law" as that term is understood in qualified immunity analysis.

 **\*11** Finally, as already noted, the conditions imposed did not create a complete bar to Mr. Muhammad's having an intimate relationship with a woman or marrying her; they simply insured that he could not engage in such behavior without his parole officer's knowledge and permission. That being so, the parole officers could reasonably have understood that the condition passed constitutional muster, notwithstanding the fact that everyone, even parolees, have a constitutional right to marry.

In sum, whether plaintiff managed to state a claim against them or not, the individual Parole Defendants who were involved in either imposing (Elovich) or enforcing (Jenkins) the domestic violence related conditions of parole supervision

are entitled to judgment dismissing this claim because they are qualifiedly immune.

For the above reasons, this claim is dismissed with prejudice. To the extent that this disposes of duplicative claims asserted by plaintiff in the action entitled *Muhammad v. Jenkins,* 12 Civ. 8525, those duplicative claims are dismissed in BOTH actions.

## VII. Plaintiff's Eighth Amendment Claim Is Dismissed.

Plaintiff alleges that his Eighth Amendment rights were violated when he was assaulted at Downstate Correction Facility by two unidentified prison guards, who removed his shoe insoles and cane causing him to collapse several times.

To demonstrate an Eighth Amendment violation, a prisoner must show both that (1) his injury was "sufficiently serious," and (2) prison officials acted with "deliberate indifference" to his safety. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).

To the extent Plaintiff asserts Eighth Amendment claims for the alleged assault at Downstate Correctional Facility against named defendants P.O. Royce, P.O. McKeon, Board Member Elavich, and BC Jenkins, his claims must be dismissed. P.O. Royce, P.O. McKeon, Board Member Elavich, and BC Jenkins are employees of the New York State Division of Parole. There is no allegation that any parole officer assaulted or injured plaintiff and the Division of Parole is not responsible for the conditions or officers' behavior in New York State Correctional facilities.

To the extent Plaintiff asserts Eighth Amendment claims against Defendants Commissioner Fischer and Chairwoman Evans, employees of the New York State Department of Corrections and Community Supervision, these claims are also dismissed, because plaintiff fails to allege that they were personally involved in the alleged assault.

The personal involvement of a supervisory defendant may be shown by evidence that the defendant:

  (1) participated directly in the alleged constitutional violation,

  (2) after being informed of the violation through a report or appeal, failed to remedy the wrong,

(3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom,

(4) was grossly negligent in supervising subordinates who committed the wrongful acts, or

**\*12** (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

Plaintiff has failed to sufficiently plead any facts to support the supervisory Defendants' personal involvement in the alleged assault; indeed, he has not pleaded any fact that would, if proved, give rise to any inference that they were aware of the alleged assault. Accordingly, Commissioner Fischer's and Chairwoman Evans's motion to dismiss is granted for Plaintiff's § 1983 claim for violation of his Eighth Amendment rights.

Plaintiff has had more than ample time to name the individuals who allegedly assaulted him by removing his insoles and taking away his cane. These events necessarily took place more than three years ago, since plaintiff was released from Downstate in January 2011. Therefore, this claim is dismissed in its entirety, with prejudice.

**VIII. Plaintiff's § 1983 Claim for Violation of his First Amendment Religious Exercise Rights Is Dismissed**
Finally, Plaintiff alleges that his First Amendment rights to Free Exercise were violated when he was denied "all Islamic services and ministerial consultation" (Compl. at 7) while he was in the medical ward at Downstate Correctional Facility recovering from the injuries incurred from the alleged assault.

Plaintiff's allegation is insufficient as a matter of law because he fails to allege the duration he spent in the medical ward or the period of time when he was denied access to Islamic services.

Plaintiff is not entitled to Islamic services at every moment, of every day in prison. While "[c]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison" *Bell v. Wolfish,* 441 U.S. 520, 545(1979), "[l]awful incarceration brings about the

necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285(1948); see also *Pell v. Procunier,* 417 U.S. 817, 822 (1974); *Wolff v. McDonnell,* 418 U .S. 539, 555 (1974). Some limitations on the freedoms of the First Amendment must be expected in the prison context due to the needs of the penal institution, including valid objectives such as deterrence of crime, rehabilitation of prisoners, and institutional security. *See Overton v. Bazzetta,* 539 U.S. 126, 131 (2003); *Pell v. Procunier,* 417 U.S. 817, 822–23 (1974); *Procunier v. Martinez,* 416 U.S. 396, 412 (1974).

Appropriate deference must be given to the professional judgment of prison officials' when analyzing challenges to prison restrictions that are alleged to inhibit First Amendment interests. *See Overton,* 529 U.S. at 132; *Bell v. Wolfish,* 441 U.S. 520, 547(1979). A regulation that impinges on inmates' constitutional rights will be valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89 (1987).

**\*13** Here, Plaintiff fails plead with sufficient specificity how long he was in the medical unit, so there is no way to assess from the complaint whether he lacked access to Islamic services for a sufficiently long period to render the moratorium on access to religious services facially unreasonable. Therefore, Plaintiff's claim is dismissed— and with prejudice, since once again, we are on the Third Amended Complaint and plaintiff has not yet gotten it right.

Additionally, it does not appear to this court that any of the defendants named in this complaint can be sued on this claim. No facts are alleged to indicate that Commissioner Fischer or Chairwoman Evans had any personal involvement in any lack of Islamic chaplaincy services to individuals who were in the medical unit at Downstate and the rest of the defendants—all involved in the parole system—could not possibly have been involved either in placing plaintiff in the infirmary or in scheduling (or not scheduling) Islamic services in the infirmary. Therefore, this claim is dismissed for lack of personal involvement as against all named defendants.

**IX. Plaintiff Sally L Thomas–Simmons's Claim for Relief is Dismissed**

In his third amended complaint, a new plaintiff—Muhammad's wife, Sally L Thomas–Simmons—is added. Her claim—asserted not by her, and not by an attorney, but by her husband—is that she was deprived of her marital rights by virtue of the parole conditions unlawfully imposed on her husband.

As noted above, Muhammad's conditions of parole were not unlawful, so Mrs. Thomas–Simmons can plead no viable claim. However, her complaint must be dismissed because she has neither paid any filing fee nor requested *in forma pauperis* status. The fact that her husband had already filed a complaint arising out of the same facts does not allow Mrs. Thomas Simmons to assert claims in his action; she herself must pay a filing fee, and must either appear on her own behalf (which she does not do) or by counsel (not by her husband, who is not a lawyer). *McCray v. County of Dutchess,* 10 Civ. 3930 (S.D.N.Y.2011).

Mrs. Thomas–Simmons' claim is dismissed.

## CONCLUSION

For the above reasons, the Third Amended Complaint is dismissed in its entirety as to both plaintiffs, with prejudice and without leave to replead.

This constitutes the decision and order of the court. The Clerk of the Court is directed to remove all pending motions in this action from the court's list of active motions, and to close this case.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 4232496

## Footnotes

1    Defendant P.O. McKeon passed away on November 15, 2011. All claims against P.O. McKeon are dismissed.

2    Claims brought by Sally L. Thomas–Simmons, Muhammad's wife, have been withdrawn. (Pl. Reply to Defts. Motion to Dismiss, at 3).

3    Documents that Plaintiff referenced in the complaint may be reviewed for the purpose of this motion to dismiss, as "the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." *New York Life Ins. Co. v. U.S.,* 724 F.3d 256, 258 n. 1 (2d Cir.2013) (quoting *Subaru Distribs. Corp. v. Subaru of Am., Inc.,* 425 F.3d 119, 122 (2d Cir.2005)).

4    In the complaint, Plaintiff Muhammad does not identify the name of the Legal Aid representative who notified DOCCS. However, in his response to Defendants' Motion to Dismiss, Plaintiff Muhammad identifies he spoke with Legal Aid representative Nadine Johnson at The Manhattan Detention Center. (Pl.'s Opp. To DEF's Motion to Dismiss, at 1).

5    The following information can be considered on this motion to dismiss because it is all a matter of official court records, of which this court may take judicial notice. Fed.R.Evid. 201(b)(2).

6    Because plaintiff urges that the conditions of his parole were unconstitutional, the exact text of those conditions, as well as any policies or procedures pursuant to which they were imposed can be considered by the court on this motion to dismiss for failure to state a claim.

**End of Document**                                © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 4393012
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

John DOE and Jane Doe, Individually and on
behalf of M.S. an Infant, as Next Friends, Plaintiffs,
v.

Anthony ANNUCCI, Acting Commissioner of the
New York State Department of Corrections and
Community Supervision; Joseph Lima, Bureau Chief
of the Manhattan VI Area Office of the New York
State Division of Parole; Parole Officer Emily Scott;
Parole Officer Simon Valerio; Parole Officer Rebecca
Rodriguez; Parole Officer Rennie Rodriguez;
Senior Parole Officer Richard; ROsado; and Senior
Parole Officer James Cappiello, Defendants.

No. 14 Civ. 2953(PAE).
|
Signed July 15, 2015.

*OPINION & ORDER*

PAUL A. ENGELMAYER, District Judge.

**\*1** Plaintiff John Doe was convicted of sexual offenses
against a teenage girl and served more than eight years in
prison. After Doe was released on parole, Doe's wife, Jane
Doe, gave birth to a son, M .S. In the years that followed,
the Department of Corrections and Community Supervision
("DOCCS") applied one of Doe's special parole conditions
to bar him, during two distinct time periods, from having any
contact with his infant son. These periods totaled more than
one year.

John Doe, Jane Doe, and M.S. bring suit against eight state
personnel associated with DOCCS, claiming that DOCCS's
actions violated their rights to substantive due process,
intimate association, and procedural due process, and that
each individual defendant personally participated in these
actions. Seven of the eight defendants now move to dismiss,
asserting mootness, immunity, and failure to state a claim.
For the following reasons, the motions to dismiss are granted
as to defendants Rebecca and Rennie Rodriguez for lack of
personal involvement in the alleged constitutional violations,
but are denied as to all other defendants.

**I. Background**

**A. Factual Background** [1]
John Doe, age 50, resides in the Bronx, New York. FAC ¶¶ 10,
22. He works for a company that provides foliage for special
events and film shoots. *Id.* ¶ 34.

In the early 2000s, Doe lived with his then-wife, Beverly
Martin; their four children, who are now between the ages of
15 and 28; and Martin's niece, now 26. *Id.* ¶¶ 22, 24. Doe
was accused of engaging in oral and vaginal sex with Martin's
niece in 2002 and 2003, when she was 13 and 14 years old.
*Id.* ¶ 24. On May 11, 2005, a jury convicted Doe of one count
of seconddegree rape, one count of second-degree criminal
sexual acts, and one count of endangering the welfare of a
child. *Id.* Doe maintains his innocence; his conviction is still
on appeal. *Id.*

On November 9, 2005, Doe and Martin divorced. *Id.* ¶ 25.
On September 22, 2007, while incarcerated, Doe married Jane
Doe, a woman he had known for 25 years. *Id.*

On November 2, 2011, after serving more than eight years
in prison, Doe was released on parole supervision. *Id.* ¶¶ 24,
27. He will be on parole until March 2, 2016. *Id.* ¶ 28. Upon
release, Doe moved into an apartment with his wife, Jane Doe.
*See id.* 37.

The conditions of Doe's parole include that he "will have no
contact with any person under the age of eighteen, without
the written permission of the supervising parole officer." *Id.*
¶ 29, Exs. B–C. To obtain permission to have contact with his
youngest daughter, L.S., who was 12 years old at the time of
his release, Doe filed a petition in Bronx Family Court. *Id.* ¶
31, Ex. D. Martin, L.S.'s mother, consented to this request. *Id.*
On February 1, 2012, the Bronx Family Court granted Doe's
petition and authorized unsupervised visitation with L.S. *Id.*

In September 2012, Jane Doe gave birth to a son, M.S. *Id.* ¶
36. Soon after, John Doe successfully completed substance-
abuse and sex-offender treatment programs at the New York
Center for Addiction Treatment Services ("NYCATS"), as
required by DOCCS. *Id.* ¶¶ 32–33. His attendance rate in
that program was 100%; the Assistant Director found that he
presented a low risk of recidivism; and, upon completion, he
was invited to be a peer mentor. *Id.* ¶¶ 33, 39.

**\*2** Notwithstanding those facts, on October 4, 2012, DOCCS Parole Officers Emily Scott, Richard Rosado, and James Cappiello informed Doe that he was not permitted to reside with minor children, was therefore required to move out of his family's apartment immediately, and was not allowed to have any contact with his month-old son, M.S., until such visitation had been approved by the family court and by Officer Scott. *Id.* ¶¶ 37–38, Ex. E. That day, Doe moved into a homeless shelter. *Id.* ¶ 38.

On October 5, 2012, Doe filed a petition for visitation with M.S. in Bronx Family Court. *Id.* ¶ 40, Ex. F. Jane Doe consented to the petition. *Id.* However, on March 12, 2013, the Bronx Family Court dismissed Doe's petition without prejudice because "the conditions of [his parole] indicate that he is not to live in the same home as a child under the age of 18." *Id.* ¶ 41, Ex. F.

On January 24, 2013, Scott called Mary Osborne, Deputy Director of the Sex Offender Management Unit, to discuss Doe's parole conditions. *Id.* ¶ 44. Osborne recommended that John and Jane Doe both be evaluated by NYCATS, and that Scott discuss the results with Capiello and Bureau Chief Joseph Lima. *Id.* On January 29 and February 2, 2013, a NYCATS social worker met with Doe "to assess his suitability to return to the home of his wife." *Id.* ¶ 45, Ex. G. The social worker recommended that Doe "be permitted to reside with his wife," explaining that "[c]ohabitation with a partner of the opposite sex" is "conducive to the principles of relapse prevention" because it is "a protective factor for those who commit sexual offenses" and ensures that Doe has "someone who can offer support if needed." *Id.*

On February 7, 2013, based on the social worker's recommendation and on Doe's "extremely low risk of reoffending," Scott notified Doe that he could return to his family's apartment. *Id.* ¶ 46. While living there, Doe "was an active husband and father" and "complied with all of his parole conditions." *Id.* ¶¶ 47–48.

In June and July 2013, Rosado instructed Scott to review Doe's case and confirm that he was permitted to reside with his family. *Id.* ¶¶ 51–52. On August 6, 2013, Lima, in a change of course, instructed Rosado to ensure that Doe left his family's apartment. *Id.* 53. On August 22, 2013, Scott notified Doe that he was not authorized to reside with his son, M.S., who was then 11 months old, and "would have to move back to a homeless shelter." *Id.* ¶ 54. On September 5, 2013, another officer informed Doe that he would be arrested

for a parole violation if he did not move out of his family's apartment immediately. *Id.* ¶ 55. Doe returned to the homeless shelter that day. *Id.* Doe was later permitted to move into a studio apartment. *Id.* ¶ 73. To enable the family to manage rent for two apartments, however, Jane Doe and M.S. moved into a one-bedroom apartment with Jane Doe's mother. *See id.* ¶¶ 73–74.

**\*3** On October 2, 2013, in response to a letter from an attorney representing Doe, Lima commenced an investigation to address Doe's request to have contact with M.S. *Id.* 61–62. Pursuant to a Protocol that DOCCS adopted in August 2013,[2] the agency had 45 days to complete the investigation. *Id.* ¶ 62, Ex. H. The officers involved in the investigation included Lima, Rosado, Scott, Rennie Rodriguez, Rebecca Rodriguez, and Simon Valerio, who was assigned to be Doe's primary parole officer in September 2013. *See id.* ¶¶ 56, 63–72. In support of Doe's request to return to his family's apartment, Jane Doe "express [ed] her strong desire to live with her husband" and told the officers that she "fe[lt] completely safe with [Doe] residing with their son." *Id.* ¶ 72. Martin also provided both oral and written statements expressing no objection to Doe's living with M.S., and L.S. told the officers that "she has never had a problem with her father." *Id* . Further, a clinical evaluation based on extensive psychological testing reported that Doe "did not make the criteria for pedophilia" and presented "a low or very low risk of sexual recidivism." *Id.* ¶ 75, Ex. J. The clinician therefore recommended that Doe be allowed to reside with his wife and infant child. *Id.* ¶ 77. The sex-offense victim, however, asked Officer Rebecca Rodriguez why Doe should "live happy and comfortable when he took something from [her] that [she] can't get back." *Id.* ¶ 72.

On February 21, 2014, following a lengthy and unexplained delay, Lima issued a oneparagraph order denying Doe's request to have contact with M.S. *See id.* ¶¶ 78–82, Exs. L–M. Noting that "[t]he victim's perspective is always important," the determination observed that Doe's "crimes occurred within the family constellation" and stated that Doe "was extremely manipulative and engaged in behaviors that involved extensive grooming, intimidation and coercion of the 13 year old victim." *Id.* ¶ 82. Lima's determination also expressed doubt as to whether Doe "has shown true progress in treatment" and concern about Doe's "daughter who is the same age as the victim in the instant offense." *Id.* Lima therefore concluded that authorizing any contact between Doe and M.S. would present "an unreasonable risk" and "would not be in the best interest of the child." *Id.* ¶¶ 82–83.

On April 3, 2014, Doe notified William Hogan, a Regional Director of DOCCS, of his intention to appeal Lima's decision. *Id.* ¶ 85. Pursuant to the Protocol, Hogan scheduled a parental case conference with John and Jane Doe for May 5, 2014. *Id.* ¶ 86.

On April 25, 2014, the Does filed the lawsuit now pending before this Court. *See* Dkt. 1. The Does also sought emergency relief, Dkt. 6–9; that application was the subject of a series of hearings before this Court, and the Court expressed an interest in obtaining Hogan's decision before ruling on the Does' application, *see* Dkt. 48, at 4–5.

 **\*4** On May 22, 2014, Hogan issued an order reversing Lima's decision and "allow[ing][Doe] contact with [M.S.]." FAC ¶ 87, Ex. O. The order stated that it "may result in possible reunification with his son in the marital household," but that Doe "is still subject to the original condition of his release." *Id.* Ex. O. Further, Hogan stated that the "decision does not preclude any future decision to bar [Doe's] contact with his son based on emerging issues, conditions or circumstances which would indicate to a parole officer that he is likely to or has sexually reoffended any child." *Id.*

In response to an email from Doe's counsel, Hogan later clarified that his decision did not define the "nature and type of contact" Doe could have with M.S. *Id.* ¶ 88, Ex. P.

On June 4, 2014, Doe's parole officer modified his parole conditions to "allow [ ] unrestricted contact" between Doe and his minor children, M.S. and L.S. *Id.* ¶ 89, Ex. Q. Since then, John Doe has resided with Jane Doe and M.S. without incident. *Id.*

### B. Procedural History

On April 25, 2014, plaintiffs commenced this case by filing a complaint, anonymously and under seal, in this District. *See* Dkt. 1–5. On May 2, 2014, plaintiffs moved for a temporary restraining order and preliminary injunction. Dkt. 6–9. That motion was withdrawn after DOCCS authorized contact between Doe and M.S. on May 22, 2014, *see* Dkt. 45, and revised Doe's parole conditions to allow unrestricted contact on June 4, 2014, *see* Dkt. 52, 56–58.

On June 26 and August 15, 2014, defendants Rosado and Scott each filed an answer to the complaint. Dkt. 68, 94. On July 2 and July 30, 2014, the remaining defendants filed motions to dismiss. Dkt. 73, 82, 86.

On September 4, 2014, plaintiffs, with leave of the Court, filed the FAC. Dkt. 100. The FAC asserts three claims: violation of the Does' substantive due process rights, *see* FAC ¶¶ 90–97, freedom of association, *see id.* ¶¶ 98–104, and procedural due process, *see id.* ¶¶ 105–12. It seeks relief including a declaration that the "restriction on John Doe's contact with M.S. was unconstitutional," a "permanent injunction barring enforcement of the challenged parole condition as applied to John Doe," monetary damages, and attorneys' fees and costs. *Id.* at 30. As defendants, the FAC names Anthony Annucci, the Acting Commissioner of DOCCS; Lima, Bureau Chief of the Manhattan VI Area Office of the New York State Division of Parole; and Parole Officers Cappiello, Rebecca Rodriguez, Rennie Rodriguez, Rosado, Scott, and Valerio. *Id.* ¶¶ 13–21. Shortly thereafter, on September 8, 2014, plaintiffs voluntarily dismissed their claims against Flogan, Milza Mercedes, Tina Stanford, and Terrence Tracy, who had been named as defendants in the original complaint. *See* Dkt. 104.

Of the eight defendants named in the FAC, seven moved to dismiss in four separate motions, and one, Scott, filed an answer.

 **\*5** Specifically, on September 18, 2014, Annucci filed a motion to dismiss, Dkt. 112, and a supporting memorandum of law, Dkt. 114 ("Annucci Br."). The same day, Rosado separately moved to dismiss. Dkt. 116, 124 ("Rosado Br."). Also on September 18, 2014, Lima, Rebecca Rodriguez, Rennie Rodriguez, and Valerio (collectively, the "Lima defendants") jointly moved to dismiss. Dkt. 119, 121 ("Lima Br."). Around the same time, on September 26, 2014, Scott filed her answer. Dkt. 127. On October 2, 2014, plaintiffs filed a memorandum of law in opposition to the three motions to dismiss that had been filed on behalf of six defendants. Dkt. 130 ("Doe Br."). On October 9, 2014, Annucci and the Lima defendants submitted their replies. Dkt. 131 ("Annucci Reply Br."), 133 ("Lima Reply Br.").

On December 23, 2014, after receiving multiple extensions of time, Cappiello filed a motion to dismiss, Dkt. 141, and a supporting memorandum of law, Dkt. 143 ("Cappiello Br."). Finally, on January 20, 2015, plaintiffs filed their opposition to Cappiello's motion. Dkt. 145.

## II. Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to

relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly,* 550 U.S. at 558. Although a district court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.,* 741 F.3d 365, 368 (2d Cir.2014), that tenet "is inapplicable to legal conclusions," *Iqbal,* 556 U.S. at 678.

### III. Discussion

The four motions to dismiss assert a total of seven bases on which the moving defendants argue that the Court should dismiss the FAC: (1) mootness, (2) absolute immunity, (3) qualified immunity, (4) sovereign immunity,[3] (5) preclusion, (6) abstention, and (7) failure to state a claim. The Court addresses these claims in turn.

### A. Mootness

All moving defendants argue that this case is moot because plaintiffs challenge a restriction on Doe's contact with M.S. that is no longer in effect. Defendants acknowledge that Doe was twice barred from living with his family or visiting his son: between October 4, 2012 and February 7, 2013, and again between September 5, 2013 and May 22, 2014–for a total of more than one year. *See* FAC ¶¶ 37–38, 46, 55, 87. Defendants argue, however, that plaintiffs' claims were rendered moot on May 22, 2014, when DOCCS issued an order authorizing Doe to have contact with M.S., *id.* ¶ 87, and/or on June 4, 2014, when Doe's parole officer modified his parole conditions to allow unrestricted contact between Doe and M.S., *id.* ¶ 89.

**\*6** "It has long been settled that a federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Dean v. Blumenthal,* 577 F.3d 60, 64 (2d Cir.2009) (quoting *Church of Scientology of Cal. v. United States,* 506 U.S. 9, 12 (1992)). Accordingly, "[t]he requisite dispute must persist throughout the litigation." *Russman v. Bd. of Educ. of*

*Enlarged City Sch. Dist. of City of Watervliet,* 260 F.3d 114, 118 (2d Cir.2001). "If the dispute should dissolve at any time due to a change in circumstances, the case becomes moot," and the Court must dismiss the suit for lack of subject matter jurisdiction. *Id.* at 118–19.

However, "[t]he voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox v. Serv. Emps. Int'l Union, Local 1000,* 132 S.Ct. 2277, 2287 (2012); *see also Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez,* 561 U.S. 661, 724 n. 3 (2010) (Alito, J., dissenting) (collecting cases). Rather, "[v]oluntary cessation does not moot a case or controversy unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' " *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,* 551 U.S. 701, 719 (2007) (quoting *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 189 (2000)) (second alteration in original).

Concretely, voluntary cessation of a challenged activity renders a case moot only "if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Clear Channel Outdoor, Inc. v. City of New York,* 594 F.3d 94, 110 (2d Cir.2010) (quoting *Campbell v. Greisberger,* 80 F.3d 703, 706 (2d Cir.1996)). This is a "formidable burden." *Seidemann v. Bowen,* 499 F.3d 119, 128 (2d Cir.2007) (quoting *N.Y. Pub. Interest Research Grp. v. Whitman,* 321 F.3d 316, 327 (2d Cir.2003)).

Here, the pleadings and materials cognizable on a motion to dismiss do not indicate that DOCCS's decision to permit Doe to have contact with M.S. is "unconditional and irrevocable." *Already, LLC v. Nike, Inc.,* 133 S.Ct. 721, 728 (2013). Quite to the contrary, in the May 22, 2014 order authorizing such contact, Regional Director Hogan stated that his "decision does not preclude any future decision to bar [Doe's] contact with his son based on emerging issues, conditions or circumstances which would indicate to a parole officer that he is likely to or has sexually reoffended any child." FAC Ex. O. Hogan's order also failed to define the

"nature and type of contact" Doe and M.S. are permitted to have. *Id.* Ex. P. The parole officers thus retain substantial discretion over Doe's contact with his son. Doe's parole conditions were later modified to permit unrestricted contact with M.S., *id.* ¶ 89, but the order that did so contains no representations or assurances about future modifications, *id.* Ex. Q.

**\*7** It is plausible that the parole officers will later exercise their discretion to prevent Doe from living with or visiting M.S. As pled, DOCCS has changed course no fewer than four times, and has twice forbidden Doe from having any contact with his infant son: First, after allowing Doe to have unsupervised visits with his 12–year–old daughter and overseeing his successful completion of a sex-offender treatment program, parole officers abruptly required Doe to move out of his family's apartment and forbade all contact with M.S. FAC ¶¶ 31–33, 37–38. Second, after separating Doe from M.S. for months, the officers abruptly allowed Doe to resume contact with M.S. and return to his family's apartment. *See id.* ¶ 46. Third, after Doe had lived with his wife and son without incident for nearly seven months, the officers inexplicably required him to vacate the marital home and once again cease contact with M.S. *Id.* ¶¶ 54–55. After a four-month investigation, Bureau Chief Lima affirmed the no-contact order. *Id.* ¶¶ 78–82, Exs. L–M. Based on the crimes Doe committed against a teenage girl more than a decade earlier, personal doubts as to whether Doe "ha[d] shown true progress in treatment," and concerns about Doe's 12–year–old daughter, Lima stated, in a one-paragraph determination, that "it would not be in the best interest of the child" to authorize contact between Doe and M.S. *Id.* ¶ 82, Ex. L. Fourth, after another eight months of separation and the filing of this lawsuit, and after proceedings for emergency relief had commenced before this Court, Regional Director Hogan issued a two-page order reversing Lima's decision and "allow [ing][Doe] contact with [M.S.]." *Id.* ¶ 87, Ex. O.

To be sure, DOCCS has now permitted Doe to live with M.S. since May 22, 2014, a period of more than a year. But that period has coincided with the pendency of this lawsuit, which may have served to deter DOCCS from reversing course and reinstating terms that would separate Doe from his son. Further, because "the [defendants] continue[ ] to defend the legality of [their actions], it is not clear why the[y] would necessarily refrain from [resuming such actions] in the future." *Knox, 132 S.Ct. at 2287.* Until Doe is released from parole in March 2016, he faces the risk of another reversal from the DOCCS. The defendants therefore have not

demonstrated that "there is no reasonable expectation that the alleged violation will recur," and the case is not moot. *Clear Channel Outdoor, Inc., 594 F.3d at 110.*

Furthermore, even if discovery reveals that DOCCS is precluded from changing course yet again, Doe will retain a claim for damages for past injuries. And as the Second Circuit has repeatedly held, a defendant's "withdrawal of [a] challenged policy does not render moot [a plaintiff's] requested relief for past constitutional violations." *Dean, 577 F.3d at 66* (citing, *inter alia, Stokes v. Village of Wurtsboro, 818 F.2d 4, 6 (2d Cir.1987)* ("Claims for damages or other monetary relief automatically avoid mootness, so long as the claim remains viable.")). And even if the "actual damages are speculative, '[i]t is clear that nominal damages are available in actions alleging violations of constitutionally protected rights.' " *Id.* (quoting *Fox v. Bd. of Trs. of State Univ. of N.Y., 42 F.3d 135, 141 (2d Cir.1994)*). The Court therefore rejects defendants' claims of mootness.

### B. Absolute Immunity

**\*8** Six moving defendants (all but Annucci) argue that they are entitled to absolute immunity. They contend that determining special parole conditions is a quasi-judicial, adjudicatory function. The Court holds otherwise.

"A limited number of officials are entitled to absolute immunity from § 1983 damages liability for their official acts." *Scotto v.. Almenas, 143 F.3d 105, 110 (2d Cir.1998).* "However, because absolute immunity 'detracts from section 1983's broadly remedial purpose,' " *id.* (quoting *Spear v. Town of W. Hartford, 954 F.2d 63, 66 (2d Cir.1992)*), " '[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties," ' *id.* (quoting *Burns v. Reed, 500 U.S. 478, 486 (1991)*) (alteration in original); *Dorman v. Higgins, 821 F.2d 133, 136 (2d Cir.1987)* (citing *Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)*) ("Absolute immunity is rarely granted; qualified immunity is the norm."). "Absolute immunity is proper only in those rare circumstances where the official is able to demonstrate that the application of absolute immunity to the circumstances presented is required by public policy." *Scotto, 143 F.3d at 110.*

In resolving whether an official is entitled to absolute immunity, the Court must consider two factors: "the need for absolute immunity in order to permit the effective performance of the function, and the existence of safeguards against improper performance." *Dorman,* 821 F.2d at 136. "[A]bsolute immunity protects officials in their adjudicative or prosecutorial functions only." *Farrell v. Burke,* No. 97 Civ. 5708(DAB), 1998 WL 751695, at *4 (S.D.N.Y. Oct. 28, 1998) (citing *Scotto,* 143 F.3d at 110); *see also Dorman,* 821 F.2d at 136 ("Functions most apt to be accorded absolute, rather than qualified, immunity are those integrally related to the judicial process."). But absolute immunity "does not protect those same officials in the performance of administrative or investigative functions." *Farrell,* 1998 WL 751695, at *4. This distinction reflects a " 'functional approach' "; "the level of immunity 'flows not from rank or title or location within the Government, but from the nature of the [official's] responsibilities.' " *Scotto,* 143 F.3d at 110 (quoting *Cleavinger v. Saxrter,* 474 U.S. 193, 201 (1985)).

Applying these principles, the Second Circuit, and several other courts of appeals, have held that "a parole board official is absolutely immune from liability for damages when he 'decide[s] to grant, deny, or revoke parole," because this task is functionally comparable to that of a judge." *Scotto,* 143 F.3d at 111 (quoting *Sellars v. Procunier,* 641 F.2d 1295, 1303 (9th Cir.1981)) (alteration in original); *see also Montero v. Travis,* 171 F.3d 757, 761 (2d Cir.1999) (collecting cases); *Davis v. N.Y. State Div. of Parole,* No. 07 Civ. 5544(NRB), 2008 WL 3891524, at *12 (S.D.N.Y. Aug. 20, 2008); *LaBounty v. Coombe,* No. 95 Civ. 5592(MBM), 1999 WL 177438, at *5 (S.D.N.Y. Mar. 30, 1999), *aff'd,* 208 F.3d 203 (2d Cir.2000). For similar reasons, courts in this District have held that the imposition of special parole conditions can be an adjudicative act that merits absolute immunity. *See Farrell,* 1998 WL 751695, at *4; *Stewart v. Smallwood,* No. 92 Civ. 4043(SS), 1993 WL 77381, at *1 (S.D.N.Y. Mar. 15, 1993) (collecting cases).

**\*9** By contrast, the Second Circuit has twice held that "a New York State parole officer who had recommended that a warrant be issued for a specific parole violation, but did not otherwise 'prosecute' the parole revocation, was not entitled to absolute immunity." *Taylor v. Sullivan,* 166 F.3d 1201, 1201 (2d Cir.1998) (unpublished opinion). The Circuit reasoned that such actions are not "integrally related to the judicial process." *Scotto,* 143 F.3d at 111 (quoting *Dorman,* 821 F.2d at 136). Nor did the officer "have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought." *Id.* at 112 (quoting *Butz v. Economou,* 438 U.S. 478, 515(1978)).

Here, the parole officers are clearly not entitled to absolute immunity for the allegedly wrongful actions they took in the course of *implementing* the decisions to separate Doe from M.S. *See Farrell,* 1998 WL 751695, at *4. The more difficult question is whether the officers should be accorded absolute immunity for *making* those decisions. The parties have not identified, and the Court has not found, any cases from this Circuit that resolve whether parole officers are entitled to absolute immunity for discretionary decisions applying parole conditions. For the following four reasons, the Court's considered judgment is that they are not.

First, the application of parole conditions is not "integrally related to the judicial process." *Dorman,* 821 F.2d at 136. As to this point, the Ninth Circuit's reasoning in *Thornton v. Brown,* 757 F.3d 834 (9th Cir.2013), is persuasive. The Ninth Circuit distinguished there between the *imposition* of parole conditions and the *enforcement* of such conditions. The imposition of parole conditions is " 'integrally related to an official's decision to grant or revoke parole,' which is a 'quasi-judicial' function' " entitled to absolute immunity. *Id.* at 840 (quoting *Swift v. California,* 384 F.3d 1184, 1189 (9th Cir.2004)). And, as noted, the Second Circuit similarly affords absolute immunity to a decision "to grant, deny, or revoke parole." *Scotto,* 143 F.3d at 111 (citation omitted). On the other hand, the Ninth Circuit reasoned, "the manner in which [parole officers] implement[ ][a] condition" is "an element of their supervisory function" and therefore merits only qualified immunity. *Thornton,* 757 F.3d at 840 (citing *Anderson v. Boyd,* 714 F.2d 906, 910 (9th Cir.1983)). This conclusion accords with Second Circuit precedent holding that certain supervisory functions—including investigating parole violations and recommending revocation of parole—receive only qualified, not absolute, immunity. *See Scotto,* 143 F.3d at 112–13.

Here, the series of decisions regarding Doe's contact with M.S. had no relation to the decision to grant his parole, but were in the nature of applying a preexisting condition, and the officers were not acting "as an arm of the court." *Dorman, 821 F.2d at 137.* Because these actions were supervisory, not judicial or quasi-judicial, the officers are not entitled to absolute immunity.

**\*10** Second, assessing the policy considerations the Second Circuit has identified as relevant, absolute immunity is not necessary for "the effective performance of the function" at issue. *Id.* at 136. The decision in *Robison v. Via, 821 F.2d 913 (2d Cir.1987),* although arising in a different factual context, is instructive. At issue there was a decision by an assistant state attorney and a state trooper to remove two children from their parents' custody based on a report of sexual abuse. *Id.* at 915. The Second Circuit rejected the claim that the "investigation of alleged child abuse is a function so sensitive as to require a total shield from judicial review." *Id.* at 919. Although recognizing that such investigation "is obviously vital to interests of the child and of society as a whole," the Court concluded that the officials' ability to investigate complaints of abuse would not be undermined "by according them qualified rather than absolute immunity." *Id.* at 920.

The parole officers here were forced to engage in a similarly difficult balancing of Doe's fundamental right to have contact with his own young child and the need to protect M.S. from abuse. However, there is no indication that the officers' duties "cannot be performed properly unless all scrutiny is denied." *Id.* at 919. Indeed, tellingly, no moving defendant argues that a grant of absolute immunity is essential to properly supervising parolees and applying parole conditions.

Third, at least as pled, there are not adequate alternative "safeguards against improper performance" of the duties in question. *Dorman, 821 F.2d at 136.* As a point of contrast, the Second Circuit has held that "federal probation officers [are] to be accorded absolute immunity in connection with their preparation and presentation of presentence reports," in significant part because "the presentence report is subject to a number of procedural safeguards"; these include the parties' opportunity to object to inaccuracies in the report and to appeal a sentence to a federal appellate court. *Id.* at 138.

Here, by contrast, Doe alleges that the decisions to terminate his contact with his son were not made pursuant to a formal adversarial process that affords such opportunities. Indeed, as pled, Doe did not receive notice that the officers were deciding whether to terminate his contact with M.S ., *see* FAC ¶¶ 37, 53–55; was not afforded an opportunity to be heard, *see id.;* and was unable to appeal the decision to an independent tribunal, *see id.* ¶¶ 40–41, Ex. F (alleging that Bronx Family Court deferred to the existing parole conditions and dismissed Doe's petition for visitation without ruling on its merits).[4] Moreover, although the appeal to Regional Director Hogan led to a favorable outcome, Hogan's decision was issued while an application for emergency relief was pending with this Court; it is by no means clear that Doe's bid for review would otherwise have received a comparably fresh review. *See* FAC ¶¶ 85–88, Ex. O. In light of these procedural shortcomings, the important fundamental rights at stake "strongly [favor] the granting of only a qualified immunity, in which the objective reasonableness of a removal of the child from the parents' custody would be subject to judicial review." *Robison, 821 F.2d at 920.*

**\*11** Fourth, extending absolute immunity to parole officers applying parole conditions would significantly expand the scope of such immunity. Like many convicted sex offenders, Doe is subject to several dozen parole conditions, more than 30 of which vest the parole officers with discretion similar to that at issue here. FAC Ex. B–C. In addition to the power to decide whether Doe may have contact with any person under age 18, a parole officer has authority to grant or deny permission for Doe to own a camera, computer, scanner, or cell phone; possess "any children's products" or photos of minors; rent a post office box; obtain a driver's license; "rent, operate or be a passenger in any vehicle"; travel outside of New York City; visit an arcade, bowling alley, beach, or swimming pool; or have visitors at his approved residence. *See id.* Particularly given the presumption against absolute immunity, *see, e.g., Scotto, 143 F.3d at 110,* there are sound reasons not to give parole officers discretion, unreviewable in a subsequent court action, over so many aspects of a parolee's life.

Finally, as a practical matter, the Court notes that absolute immunity does not bar suits for injunctive or declaratory relief. *Shmueli v. City of New York, 424 F.3d 231, 239 (2d Cir.2005)* (citing, *inter alia, Pulliam v. Allen, 466 U.S. 522, 536–37 (1984)*). Accordingly, Doe's claims for such relief would persist regardless of its resolution of the immunity

claim, and the affected defendants would remain parties to this case.

### C. Qualified Immunity

The same six defendants alternatively claim that they are entitled to qualified immunity. They argue, in essence, that in deciding to terminate Doe's parental rights, they engaged in a difficult balancing between Doe's parental rights and his family's need for protection, and that their ensuing decisions, erroneous or not, were reasonable under the law and made in good faith.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes,* 135 S.Ct. 2042, 2044 (2015) (quoting *Reichle v. Howards,* 132 S.Ct. 2088, 2093 (2012)); *see also, e.g., City & County of San Francisco v. Sheehan,* 135 S.Ct. 1765, 1774 (2015); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lore v. City of Syracuse,* 670 F.3d 127, 162 (2d Cir.2012) (quoting *Saucier v. Katz,* 533 U.S. 194, 202 (2001)). Accordingly, for an action to lie, "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor,* 135 S.Ct. at 2044 (quoting *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2083 (2011)). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.' " *Sheehan,* 135 S.Ct. at 1774 (quoting *al-Kidd,* 131 S.Ct. at 2085) (alteration in original).

**\*12** Significant here, defendants pursue qualified immunity on a motion to dismiss. And "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004). Specifically, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those

that defeat the immunity defense." *Id.* "[T]he motion may be granted only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.' " *Id.* (quoting *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1494 (2d Cir.1992)). The defendants therefore face a "formidable hurdle." *Id.* at 434.

As to the decisions made here for which the defendants seek immunity, at the time the defendants acted, "[i]t [wa]s well-established that a parent's interest in maintaining a relationship with his or her child is protected by the Due Process Clause of the Fourteenth Amendment." *United States v. Myers,* 426 F.3d 117, 125 (2d Cir.2005). Indeed, the Supreme Court had described "the interest of parents in the care, custody, and control of their children" as "the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville,* 530 U.S. 57, 65 (2000) (plurality opinion); *see also, e.g., Quilloin v. Walcott,* 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected"); *Santosky v. Kramer,* 455 U.S. 745, 753 (1982) ( "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents."). Further, it was established that "[c]hildren have a parallel constitutionally protected liberty interest in not being dislocated from the emotional attachments that derive from the intimacy of daily family association." *Southerland v. City of New York,* 680 F.3d 127, 142 (2d Cir.2012) (quoting *Kia P. v. McIntyre,* 235 F.3d 749, 759 (2d Cir.2000)); *see also Duchesne v.. Sugarman,* 566 F.2d 817, 825 (2d Cir.1977) ("Th[e] right to the preservation of family integrity encompasses the reciprocal rights of both parent and children.").

In two previous cases, the Second Circuit has applied these well-established principles to analogous parole conditions. First, in *United States v. Myers,* 426 F.3d 117 (2d Cir.2005), the defendant faced a "special condition prohibiting him from spending time alone with his child absent advance authorization from the U.S. Probation Office." *Id.* at 120. Writing for the panel, then-Judge Sotomayor noted that the "conditions of supervised release must 'involve[ ] no greater deprivation of liberty than is

reasonably necessary." ' *Id.* at 124 (quoting 18 U.S.C. § 3583(d)) (alteration in original). Where "the liberty interest at stake is fundamental, a deprivation of that liberty is 'reasonably necessary' only if the deprivation is narrowly tailored to serve a compelling government interest." *Id.* at 126 (citing *Washington v. Glucksberg,* 521 U.S. 702, 721 (1997)). On the record before the Circuit, however, the panel could not resolve whether the challenged parole condition satisfied strict scrutiny. *Id.* at 127–30. The Circuit thus remanded to the district court to balance "the intended purpose of the challenged condition" against the defendant's interest, if any, "as the parent of a child in foster care born out of wedlock." *Id.*

**\*13** Second, in *United States v. McGeoch,* 546 F. App'x 44 (2d Cir.2013) (summary order), the parole conditions imposed at sentencing provided that, upon release, the defendant "shall not have any direct contact ... with a person under the age of 18 unless it is supervised by a person approved of by the probation officer." *Id.* at 46. This broadly worded condition, by its terms, would restrict the defendant's contact with his sons, who were to be 12 and 14 on the anticipated date of his release. *Id.* at 47–48. Significant here, the Second Circuit, applying extant precedent, held that "[a] condition of supervised release that prevents a father from seeing his children outside the presence of an approved monitor is a severe one subject to careful scrutiny." *Id.* at 48. "Absent an individualized inquiry into whether [the defendant's] sexual proclivities pose a threat to his sons," the "imposition of a harsh condition of supervised release that either prohibits interaction with his children or makes such interaction subject to supervision by a person approved of by the probation officer violates [his] due process rights." *Id.* at 49. Because the district court had not "articulate[d] why such a severe intrusion on the fundamental right to familial association was necessary under the circumstances," the Second Circuit remanded. *Id.*

To be sure, these two cases involved the imposition of parole conditions by a district court judge rather than application of such conditions by parole officers, but they are germane to the reasonableness of the defendants' actions here because denial of qualified immunity "do[es] not require a case directly on point." *Taylor,* 135 S.Ct. at 2044 (quoting *al-Kidd,* 131 S.Ct. at 2083). It is sufficient that "existing precedent ...

have placed the statutory or constitutional question beyond debate." *Id.*

Here, it is beyond dispute that both Doe and M.S. had a fundamental liberty interest in their familial relationship, and so constraints imposed by parole officers were required to have been "narrowly tailored to serve a compelling government interest." *Myers,* 426 F.3d at 126. Although the state has a compelling interest in preventing child abuse, a reasonable parole officer could not conclude that the deprivation of literally all contact between Doe and M.S., absent factual justification, was a narrowly tailored restriction. And on the facts pled, such justification was lacking. Doe had successfully completed sex offender treatment, FAC ¶¶ 26, 32–33; presented an extremely low risk of recidivism, *id.* ¶¶ 39, 46, 75–77; had unsupervised visits with his teenage daughter, *id.* 31, 72; and lived with his son without incident for significant periods of time, *id.* ¶¶ 46, 72, 89. To be sure, Bureau Chief Lima, in explaining his determination, expressed concerns about Doe's past sexual offense against a teenage girl. *See id.* ¶ 82. But it does not follow that Doe's "sexual proclivities pose a threat to his son[ ]," *McGeoch,* 546 F. App'x at 49; on the contrary, a clinical evaluation found that he "did not make the criteria for pedophilia" and was "exclusively heterosexual." *Id.* ¶ 75. Accordingly, considering the facts pled, the balance of interests favored either family reunification or, at the least, an intermediate step such as supervised visitation. Viewing the pleadings in the light most favorable to the plaintiffs, the denial of all contact between Doe and his newborn and later infant son therefore violated clearly established law. [5]

**\*14** Further, on the facts pled, it was unreasonable for a parole officer to deprive Doe of all contact with his son without any process. As the Supreme Court has long instructed, "[t]he essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.' " *Mathews v. Eldridge,* 424 U.S. 319, 348–49 (1976) (quoting *Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring)). Under the familiar *Mathews* test:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335 (citing *Goldberg v. Kelly,* 397 U.S. 254, 263–71 (1970)).

As of the time the defendants here acted, the Second Circuit, "in a substantial line of cases, ha[d] addressed the standards by which a state actor is measured for due process purposes when he or she removes a child from a parent's custody in the interests of the safety of the child." *Kia P.,* 235 F.3d at 759. As to the first *Mathews* factor, the Second Circuit had recognized "the very great importance of the private liberty interest ... of a parent in the companionship, care, custody and management of his or her child." *Duchesne,* 566 F.2d at 828 n. 26 (citation omitted); *see also, e.g., Rivera v. Marcus,* 696 F.2d 1016, 1027 (2d Cir.1982) ("[Plaintiffs] seek protection from state action which threatens the integrity and stability of their familial relationship. This important interest has consistently been recognized and afforded farreaching due process protection."). And it had observed that "the 'fact specific' nature of the determination of the fitness of a parent presents a grave risk of erroneous deprivation when the action of the state is not promptly reviewed." *Duchesne,* 566 F.2d at 828 n. 26. In light of these factors, even if a parent and child must be separated on an "emergency basis," the Second Circuit had held, "the state has the duty to initiate a 'prompt' post-deprivation hearing." *Kia P.,* 235 F.3d at 754, 760 (citation omitted).

Measured against these standards, the facts pled support a claim that the defendants' decision to deny Doe access to his son was unreasonable—and a clear violation of procedural due process. As alleged in the FAC, the parole officers first informed Doe that he was not allowed to have any contact with M.S. on October 4, 2012. FAC ¶¶ 37–38. Before that

date, Doe had not received any notice that DOCCS was considering making such a decision, nor was he given a pre- or post-deprivation opportunity to be heard. *See id.* On August 22, 2013, after authorizing family reunification for some months, the officers again told Doe that he could not reside or have contact with his infant son, M.S. *Id.* 54. Although DOCCS commenced an investigation shortly after Doe moved out of his family's apartment, Doe did not receive an opportunity to be heard until May 5, 2014, months after he was separated from M.S. *Id.* ¶ 86. To be sure, at this early stage, the Court cannot resolve precisely what procedures were required in this context, and the facts established in discovery or at trial may diverge materially from those pled. But, as alleged, the procedural safeguards available to Doe —or, more accurately, the lack thereof—were sufficiently plainly unconstitutional as to counsel against a finding of qualified immunity.

**\*15** Finally, again as a practical matter, qualified immunity, like absolute immunity, "only bars monetary damages-it does not bar declaratory or injunctive relief." *Robinson v. New York,* 486 F. App'x 905, 907 (2d Cir.2012) (summary order) (citing *Adler v. Pataki,* 185 F.3d 35, 48 (2d Cir.1999)). Therefore, a grant of qualified immunity would not result in any defendant's dismissal from this case, but only from the portion of plaintiffs' claims directed at money damages.

### D. Sovereign Immunity

Annucci, who is sued only in his official capacity, argues that the Court must dismiss all claims against him on the basis of sovereign immunity.

The Eleventh Amendment bars suits in federal courts against states and state officials acting in their official capacities by their own citizens, citizens of another state, and foreign sovereigns. *City of Shelton v. Hughes,* 578 F. App'x 53, 54–55 (2d Cir.2014) (summary order) (citing, *inter alia, W. Mohegan Tribe & Nation v. Orange County,* 395 F.3d 18, 20 (2d Cir.2004)). However, "[u]nder the well-known exception to this rule first set forth in *Ex parte Young,* 209 U.S. 123 (1908), a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment —for prospective, injunctive relief from violations of federal law." *State Emps. Bargaining Agent Coal. v. Rowland,* 494 F.3d 71, 95 (2d Cir.2007). "[I]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry

into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Va. Office for Prot. & Advocacy v. Stewart,* 131 S.Ct. 1632, 1639 (2011) (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 645 (2002)) (second alteration in original).

Doe's requests for monetary and declaratory relief are retrospective. His claim for injunctive relief against Annucci, by contrast, is prospective-Doe seeks to bar certain future applications of the special parole condition. Doe's claim for injunctive relief therefore falls within the *Young* exception so long as the complaint alleges an "ongoing violation of federal law." *Stewart,* 131 S.Ct. at 1639; *see also Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 281 (1997) ("An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction .").

The violation alleged here cannot be properly characterized as "ongoing" if that term requires a continuous violation. That is because Doe presently lives with his family and is permitted to have unrestricted contact with his minor children. FAC ¶ 89. But the alleged violation can be construed as "ongoing" in that, until Doe is released from parole in March 2016, the parole officers appear to be able, at any time, to reverse course and terminate Doe's contact with M.S. *See* pp. 10–12, *supra.* Accordingly, the decisive legal question as to Annucci's bid for sovereign immunity is whether the possibility of a future violation suffices to render that violation "ongoing."

**\*16** Neither the Supreme Court nor the Second Circuit has squarely addressed this question. But other courts of appeals have held that the challenged action need not literally "be in progress" to defeat a claim of sovereign immunity; rather, "where there is a threat of future enforcement that may be remedied by prospective relief, the ongoing and continuous requirement has been satisfied." *Summit Med. Assocs., P.C. v. Pryor,* 180 F.3d 1326, 1338 (11th Cir.1999); *see also* Charles Alan Wright et al., 13D Fed. Prac. & Proc. § 3566, at 292 (3d ed. 2008) ("[T]he best explanation of *Ex parte Young* and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution and laws.") (quoted in *Burgio & Campofelice, Inc. v. N.Y. State Dep't of Labor,* 107 F.3d 1000, 1006 (2d Cir.1997)); *Waste Mgmt. Holdings, Inc. v. Gilmore,* 252 F.3d 316, 330

(4th Cir.2001) ("The requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent."); *Vickery v. Jones,* 100 F.3d 1334, 1346 (7th Cir.1996) ("[T]he *Young* exception permits relief against state officials only when there is an ongoing or threatened violation of federal law."); *Han v. U.S. Dep't of Justice,* 45 F .3d 333, 338 (9th Cir.1995) (Eleventh Amendment bars suits where "[t]here is no allegation that the state defendants are likely to approve third party agreements in the future or that plaintiffs otherwise face a threat of harm from the state defendants' future actions."). Consistent with these cases, the Second Circuit has stated that "alleged injuries stemming only from past conduct *with no plausible threat of future violations* ... do not fall within the *Young* exception to Eleventh Amendment immunity." *Clark v. DiNapoli,* 510 F. App'x 49, 51 (2d Cir.2013) (summary order) (emphasis added).

This conclusion is, furthermore, consistent with the Supreme Court's admonition that *Young* distinguishes between cases "in which the relief against the state official directly ends the violation of federal law as opposed to cases in which that relief is intended indirectly to encourage compliance with federal law through deterrence or directly to meet third-party interests such as compensation." *Papasan v. Allain,* 478 U.S. 265, 277–78 (1986); *see also Green v. Mansour,* 474 U.S. 64, 68 (1985) ("Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law. But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.") (citation omitted). In other words, the requirements that a complaint allege an "ongoing violation" and seek "prospective relief," although sometimes enumerated as separate elements, *see, e.g., In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir.2007), are closely interrelated. And the nature of the relief requested can shed light on whether the violation is ongoing. *See Rowland,* 494 F.3d at 96 ("[I]t is relevant—in considering the existence *vel non* of an ongoing violation—to ask whether the claimed remedy is still available."); *Summit Med. Assocs.,* 180 F.3d at 1338 ("[T]he ongoing and continuous requirement merely distinguishes between cases where the relief sought is prospective in nature, *i.e.,* designed to prevent injury that will occur in the future, and cases where relief is retrospective.").

**\*17** Here, as noted, the requested injunctive relief is prospective. It does not relate to conduct that occurred in the past. *Cf. Nat'l R.R. Passenger Corp. v. McDonald, 779 F.3d 97, 102 (2d Cir.2015)* ("[T]akings are not an 'ongoing violation' of federal law.... What Amtrak considers an 'ongoing violation'—New York's entry onto and use of the land—is not even a violation of the law, because New York has legal title to it."). Nor is it an attempt to obtain "compensation for past injuries." *Eng v. Coughlin, 858 F.2d 889, 896 (2d Cir.1988); cf. Ward v. Thomas, 207 F.3d 114, 122 (2d Cir.2000)* ("[T]he ongoing ability of the subclass to recover for past underpayment does not change the retrospective nature of such relief."). Rather, anticipating the "threat of future enforcement," it aims to "prevent injury that will occur in the future." *Summit Med. Assocs., 180 F.3d at 1338.*

The Court therefore holds that the FAC states a claim for an ongoing violation, such that, as pled, sovereign immunity does not bar Doe's claim for injunctive relief against Annucci.

Related, the Court notes that the parties dispute whether the June 4, 2014 modifications to Doe's parole conditions were final and irrevocable. Drawing all reasonable inferences in favor of the plaintiffs, as the Court must at this stage, the Court concludes that, much as they hope not to, plaintiffs could face adverse changes to Doe's parole conditions in the future. The possibility that DOCCS may again reverse course and impose a new separation order, to the detriment of Doe and his family, is particularly plausible given DOCCS's history, as pled, of arbitrarily enforcing, and changing, Doe's parole conditions. *See* pp. 10–12, *supra.* That said, if discovery reveals that the parole condition granting Doe unrestricted access to M.S. cannot be altered—that there is "no plausible threat of future violations," *Clark, 510 F. App'x at 51*—the factual underpinning of this holding will no longer apply, and the Court would then invite Annucci to move for summary judgment on the basis of sovereign immunity.

### E. Preclusion

Federal courts recognize two types of preclusion: claim preclusion and issue preclusion. Under the doctrine of res judicata, also known as claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Flaherty v. Lang, 199 F.3d 607,*

612 (2d Cir.1999) (quoting *Rivet v. Regions Bank of La., 522 U.S. 470, 476 (1998)*) (emphasis omitted). Res judicata bars a later action when three conditions are met: "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 499 (2d Cir.2014)* (quoting *Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 285 (2d Cir.2000)*) (alteration in original). Collateral estoppel, or issue preclusion, applies when an issue raised in a subsequent suit was "actually and necessarily determined" in a prior litigation; this precludes a party from relitigating the same issue based on a different cause of action. *Montana v. United States, 440 U.S. 147, 153 (1979).* To determine whether a party is collaterally estopped from raising an issue, a court considers whether "(1) the identical issue was raised in a previous proceeding; (2) the issue was 'actually litigated and decided' in the previous proceeding; (3) the party had a 'full and fair opportunity' to litigate the issue; (4) the resolution of the issue was 'necessary to support a valid and final judgment on the merits.' " *Interoceanica Corp. v. Sound Pilots, Inc., 107 F.3d 86, 91 (2d Cir.1997)* (quoting *Cent. Hudson Gas & Elec. v. Empresa Naviera Santa S.A., 56 F.3d 359, 368 (2d Cir.1995)*).

**\*18** Annucci argues that Doe's claims are barred by claim preclusion and issue preclusion because Doe "is a member of the class in *Doe v. Overfield,*" a class-action lawsuit filed in the Western District of New York. Annucci Br. 18. That is factually wrong. The complaint in *Overfield* defined the class as "all parents who are now or will be in the future on parole for a criminal offense *unrelated to sexual misconduct,* and who are prohibited by defendants from contact with their children, when both parents of these children support parental contact." No. 08 Civ. 6294, Dkt. 70, at ¶ 35 (emphasis added). Because Doe was convicted of rape and criminal sexual acts, FAC ¶ 24, he is, by definition, not "on parole for a criminal offense unrelated to sexual misconduct" and is therefore not a member of the *Overfield* class. Further, the *Overfield* class plainly does not include Jane Doe and M.S., who are also named as plaintiffs in this case. Annucci's motion to dismiss based on a claim of preclusion is therefore unavailing.

### F. Abstention

Following the decision in *Younger v. Harris,* 401 U.S. 37 (1971), federal courts may not enjoin "state criminal prosecutions," "civil enforcement proceedings," and "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Commc'ns, Inc. v. Jacobs,* 134 S.Ct. 584, 588 (2013) (quoting *New Orleans Pub. Serv., Inc. ("NOPSI") v. Council of City of New Orleans,* 491 U.S. 350, 367–68 (1989)). *Younger* abstention, however, is merited only in "exceptional" circumstances. *Id.* "[F]ederal courts ordinarily should entertain and resolve on the merits an action within the scope of a jurisdictional grant, and should not 'refus[e] to decide a case in deference to the States.' " *Id.* (quoting *NOPSI,* 491 U.S. at 368).

Here, there is simply no ongoing state proceeding. Doe's criminal prosecution concluded in May 2005, FAC ¶ 24, and his administrative appeal was resolved shortly after Doe's suit was filed in this Court in April 2014, *id.* ¶ 87. Annucci may be correct that Doe could have brought his claims through an Article 78 proceeding in state court, *see* Annucci Br. 17–18, but the availability of that alternative forum does not provide a basis for dismissing or staying Doe's claims here.

*See, e.g., Zinermon v. Burch,* 494 U.S. 113, 124 (1990) (" 'The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.' Thus, overlapping state remedies are generally irrelevant to the question of the existence of a cause of action under § 1983.") (citation omitted); *Patsy v. Bd. of Regents of State of Fla.,* 457 U.S. 496, 516 (1982) ("[E]xhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983.").

### G. Failure to State a Claim

**\*19** For the reasons discussed in Section III.C, *supra,* the Court holds that the FAC states a claim for violations of plaintiffs' substantive and procedural due process rights. The remaining question is whether the FAC adequately alleges the personal involvement of each moving defendant in those violations, so as to state a claim against that individual.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (quoting

*Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006)). "A defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983 in several ways." *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). A defendant is "personally involved" if he "directly participated in the infraction." *Id.* (collecting cases). "Direct participation" means "personal participation by one who has knowledge of the facts that rendered the conduct illegal." *Provost v. City of Newburgh,* 262 F.3d 146, 155 (2d Cir.2001) (citing *Gaston v. Coughlin,* 249 F.3d 156, 165–66 (2d Cir.2001)). The personal involvement requirement is also satisfied where a parole officer is alleged to have "actually enforced" a parole condition, such as by arresting the parolee for a violation. *Farrell,* 449 F.3d at 484.

### 1. Defendant Lima

As pled, Bureau Chief Lima was the primary driving force behind the constitutional violations. On August 6, 2013, "Lima instructed Senior Parole Officer Rosado to ensure that Mr. Doe immediately left [his family's] residence." FAC ¶ 53. Subordinate parole officers then carried out Lima's orders. *Id.* 54–55. Next, on October 2, 2013, Lima commenced an investigation regarding Doe's request to have contact with his son. *Id.* 62. On at least one occasion, October 7, 2013, Lima met with parole officers to discuss the investigation and give them instructions. *Id.* ¶ 63. Finally, on February 21, 2014, "Lima issued a one-paragraph determination denying Mr. Doe's request for contact with M.S." *Id* . ¶ 82, Ex. L.

These factual allegations, taken as true, are amply sufficient to establish that Lima was personally involved in the alleged constitutional deprivations.

### 2. Defendants Cappiello, Rosado, and Valerio

Like Lima, Senior Parole Officers Cappiello and Rosado were central participants in the constitutional violations alleged here. On October 4, 2012, they "told Mr. Doe that, despite his completion of the NYCATS program, his release conditions barred him from residing with children under the age of 18, and that he therefore needed to move out of his family's apartment immediately." *Id.* ¶ 37. Whether Cappiello and Rosado made the decision to enforce Doe's parole condition in this manner or simply enforced a decision made by someone else, this allegation adequately pleads that these two

officers were personally involved in the alleged constitutional violation. *See* *Farrell,* 449 F.3d at 484.

 **\*20** In addition, the FAC alleges that Officer Cappiello directed Doe to inform the Bronx Family Court of his parole condition, *id.* ¶ 41; and "oversaw" Scott's supervision of Doe from October 2012 to April 2013, during which time Cappiello periodically met with Scott "to discuss Mr. Doe's case, including his living situation," *id.* 42, 49. Based on these allegations, the Court can reasonably infer that Cappiello "contributed to" the decision to keep Doe and M.S. separated from October 2012 to February 2013, and the decision to again deprive Doe of contact with M.S. in August 2013. *See* *Barnes v. Ross,* 926 F.Supp.2d 499, 508 (S.D.N.Y.2013) ("[Defendant] was aware of, and contributed to, [the alleged constitutional violation]. This direct, personal involvement is sufficient to allege personal involvement.").

Further, the FAC alleges that by mid–2013, Officer Rosado "had taken over supervision of Mr. Doe['s] case" from Cappiello. *Id.* ¶ 51. In that capacity, on June 17, 2013, Rosado "instructed Scott to review the case to confirm that Mr. Doe was properly residing with his family." *Id.* On August 6, 2013, "Rosado informed Bureau Chief Lima that Mr. Doe was residing with his wife and child" and received instructions "to ensure that Mr. Doe immediately left the residence." *Id.* ¶ 53. Rosado also "oversaw the investigation," met with Valerio to "determin[e] whether the [parental contact] request should be approved," and "issued a report to [Lima] summarizing the results of the investigation." FAC ¶¶ 71, 79–80. In light of these allegations, Rosado was, even more than Cappiello, actively personally involved in the alleged constitutional violations.

As to Officer Valerio, the FAC alleges that he replaced Scott as Doe's primary parole officer on September 10, 2013. FAC 156. At that time, Doe was barred from living with his family or having any contact with M.S. *See id.* ¶¶ 53–55. In his capacity as Doe's parole officer, Valerio had significant authority, including to approve Doe's request "to reside alone in a studio apartment." *Id.* ¶ 73. He also participated in the investigation. *Id.* ¶¶ 68–72. And, critically, he met with Rosado on December 9, 2013 to "determin[e] whether the [parental contact] request should be approved." *Id.* ¶ 79. Accordingly, as alleged, Valerio had power over Doe's living situation and was one of the relevant decision makers assessing the no-contact order; he was therefore personally involved in the constitutional violations.

### 3. Defendants Rennie Rodriguez and Rebecca Rodriguez

In contrast to the other parole officers, Officers Rennie and Rebecca Rodriguez were involved only in the investigation. *See id* . ¶¶ 17–18, 71–72. Concretely, they contacted and interviewed witnesses, searched for and reviewed records, and received information. *See id.*

72. But the FAC does not allege that the investigation itself was somehow improper. Nor does it allege that Rennie or Rebecca Rodriguez made a recommendation regarding Doe's contact with M.S., participated in a meeting in which a decision as to that issue was made, enforced the decision to separate Doe and M.S., or otherwise contributed to the constitutional violations. Accordingly, Rennie Rodriguez and Rebecca Rodriguez were not personally involved in the violations alleged. *Compare* *Barnes, 926* F.Supp.2d at 508 (finding personal involvement where defendant "was aware of, and contributed to" the allegedly unconstitutional treatment), *and* *Pugh v. Goord,* 571 F.Supp.2d 477, 514–15 (S.D.N.Y.2008) (finding personal involvement where defendant "was consulted" and "espoused views" that led to the creation of the allegedly unconstitutional policy), *with* *Vogelfang v. Capra,* 889 F.Supp.2d 489, 503 (S.D.N.Y.2012) (finding no personal involvement where defendants were not "involve[d] in any event which constituted a violation of [plaintiff's] rights"), *and* *Odom v. Calero,* No. 06 Civ. 15527(LAK)(GWG), 2008 WL 2735868, at \* 6–7 (S.D.N.Y. July 10, 2008) (finding no personal involvement where defendant reviewed an administrative determination). The claims against these two defendants therefore must be dismissed.

### 4. Defendant Annucci

 **\*21** Defendant Annucci is sued only in his official capacity, as Acting Commissioner of DOCCS, and plaintiffs seek only injunctive relief against him. Accordingly, plaintiffs are not required to establish that Annucci was personally involved in the alleged constitutional violations. *See* *Farid,* 593 F.3d at 249 ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to *an award of damages* under § 1983.") (citation omitted) (emphasis added). Instead, the relevant question is whether Annucci "has the authority to perform the required act." *Zappulla v. Fischer,* No. 11 Civ. 6733(JMF), 2013 WL 1387033, at \*10 (S.D.N.Y. Apr. 5, 2013) (quoting *Briscoe v. Rice,* No. 11

Civ. 578(JFB)(ETB), 2012 WL 253874, at *4 (E.D.N.Y. Jan. 27, 2012)). As the "head" and "chief executive officer" of DOCCS, N.Y. Corr. Law §§ (1)-(2), Annucci has authority to enforce an injunction issued against that Department.

Annucci objects that the New York State Board of Parole is independent from DOCCS. *See* 🟨 N.Y. Exec. Law §§ 259–b, 🚩 259–c. This argument is unavailing. Plaintiffs do not challenge the imposition of the special parole condition by the Board of Parole; rather, they challenge the application and enforcement of that condition by the individual parole officers discussed above. Annucci thus "has the authority to perform the required act," 🟨 *Zappulla,* 2013 WL 1387033, at *10, namely, to prevent the unconstitutional implementation of a parole condition by the parole officers who work under him.

## CONCLUSION

For the foregoing reasons, the motions to dismiss are granted as to Rennie Rodriguez and Rebecca Rodriguez, and denied as to all other defendants. The Clerk of Court is respectfully directed to terminate Rennie Rodriguez and Rebecca Rodriguez as defendants in this case, and to terminate the motions pending at docket numbers 112, 116, 119, and 141. An order as to next steps in this case will issue shortly.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4393012

---

## Footnotes

1    These facts are drawn from the First Amended Complaint and the exhibits attached thereto.
     Dkt. 100 ("FAC"). In resolving the motions to dismiss, the Court assumes all well-pled facts to be true and
     draws all reasonable inferences in favor of the plaintiffs. *See* 🟨 *Koch v. Christie's Int'l PLC,* 699 F.3d 141,
     145 (2d Cir.2012).

2    DOCCS created the Protocol during settlement negotiations in *Doe v. Overfield,* No. 08 Civ. 6294, a class-
     action lawsuit filed in the Western District of New York. *Id.* ¶ 58. As explained at page 30, *infra,* the plaintiffs
     here were not members of that class.

3    Defendant Annucci is sued only in his official capacity and relies on a sovereign immunity defense. The other
     six moving defendants are sued in both official and individual capacities; they assert absolute and qualified
     immunity defenses.

4    On paper, the Protocol created in 2013 appears to address some of these shortcomings. *See id.* ¶¶ 57–60,
     Ex. H. In Doe's case, however, as alleged, DOCCS did not comply with the Protocol.
     *See id.* ¶¶ 78–82.

5    Defendants argue that Doe has "no inherent constitutional right to parole," Annucci Br. 21, or to "be[ ] free
     from special conditions of release," Rosado Br. 9, Lima Br. 9, Capiello Br. 9. But that argument misses the
     point. As defendants concede, parole conditions must be "reasonably related to past conduct," "not arbitrary
     and capricious," and "designed to deter recidivism and prevent further offenses." *Id.; see also* 🟨 *Boddie v.
     N.Y. State Div. of Parole,* 285 F.Supp.2d 421, 428 (S.D.N.Y.2003). As pled in the FAC, the application of
     Doe's parole conditions to deny him access to his son was arbitrary and cannot satisfy this standard.

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 69 of 134

Robinson v. New York, Not Reported in Fed. Supp. (2010)

2010 WL 11507493
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

David ROBINSON, Jr., Plaintiff,
v.
NEW YORK State; George Alexander, Chairman,
New York State Division of Parole; Michael Fork,
Bureau Chief; Ms. Benjamin, Senior Parole Officer;
Mr. Fernandez, Parole Officer, Defendants.

1:09-cv-0455 (GLS\RFT)
|
Signed 03/26/2010

**Attorneys and Law Firms**

David Robinson, Jr., 47 S. Montgomery Street, Valley Stream, NY 11580, pro se.

FOR THE DEFENDANTS: HON. ANDREW M. CUOMO, New York State Attorney General, OF COUNSEL: C. HARRIS DAGUE, Assistant Attorney General, Albany Office, The Capitol, Albany, NY 12224.

<u>**MEMORANDUM-DECISION AND ORDER**</u>

Gary L. Sharpe, District Court Judge

**I. <u>Introduction</u>**

**\*1** Pro se plaintiff David Robinson, Jr. brings this action under 42 U.S.C. §§ 1983, 1985, 1986, 1987, and 1988, alleging that the imposition of parole conditions by defendants, New York State, George Alexander, Michael Fork, Ms. Benjamin, and Mr. Fernandez, violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. (Compl., Dkt. No. 1.) Pending are defendants' motion for judgment on the pleadings, (Dkt. No. 28), and Robinson's motion for summary judgment, (Dkt. No. 36). For the reasons that follow, defendants' motion is granted in part and denied in part, and Robinson's summary judgment motion is denied.

**II. <u>Background</u>**

**A. <u>Facts</u>**

On May 13, 2005, plaintiff David Robinson, Jr. was sentenced to a five-year determinate term and a concurrent one-year determinate term of incarceration pursuant to a conviction for criminal possession of a weapon in the second degree, N.Y. PENAL LAW § 265.03, and assault in the third degree, N.Y. PENAL LAW § 120.00. (See Compl. ¶ 10, Dkt. No. 1.) Robinson was additionally sentenced by the trial court to a five-year period of post-release supervision. (See id.) On October 24, 2008, Robinson was released on parole from the custody of the New York State Department of Correctional Services (DOCS). (See Pl. Ex., Dkt. No. 1:1.)

Upon his release, Robinson began serving his five-year term of post-release supervision under the supervision of the New York State Division of Parole. (See id.) Robinson's release to parole supervision was subject to various conditions requiring him to regularly report to his parole officer, submit to home visits and searches, abide by a curfew, undergo drug testing, stay away from certain individuals, and refrain from owning, possessing, or purchasing any deadly weapon. (See id.; see also Compl. ¶ 13, Dkt. No. 1.) In acknowledgment of these conditions, Robinson signed a Certificate of Release to Parole Supervision on October 21, 2008. (See Pl. Ex., Dkt. No. 1:1.)

On March 19, 2009, Robinson met with his parole officer, defendant Jeffrey Fernandez of the Queens III Area Office of the Division of Parole, who imposed additional conditions on Robinson's release. (See Compl. ¶ 14, Dkt. No. 1.) These "special conditions" required Robinson to obtain Fernandez's permission before he could obtain or acquire a driver's license, purchase, rent, or operate a motor vehicle, or possess or operate a computer with access to the internet. (See id.; see also Pl. Ex., Dkt. No. 1:1.) Robinson alleges that he initially refused to submit to these conditions but was "accosted, threatened" by Fernandez and defendant Ms. Benjamin, a senior parole officer, who allegedly told Robinson that the conditions were exclusive to Queens III parolees. (Compl. ¶ 14, Dkt. No. 1.) Robinson ultimately agreed to these conditions and signed a Special Conditions of Release to Parole Supervision form. (See Pl. Ex., Dkt. No. 1:1.) During the March 19 meeting, Fernandez also searched Robinson and confiscated his New York State driver's license. (See id.)

**B. <u>Procedural History</u>**

**\*2** On September 19, 2008, Robinson filed a notice of request with defendant George Alexander, Chairman of the Division of Parole, and subsequently filed a grievance with the Division of Parole on March 26, 2009. (See id.) In

both the notice and the grievance, Robinson claimed that his parole conditions were unconstitutionally and unlawfully imposed on him. Shortly thereafter, on April 16, 2009, Robinson commenced the present action under 42 U.S.C. §§ 1983, 1985, 1986, 1987, and 1988,[1] alleging that defendants, New York State, George Alexander, Michael Fork, Ms. Benjamin, and Mr. Fernandez, violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by imposing conditions on his release to parole supervision. (*See generally* Compl., Dkt. No. 1.) Specifically, Robinson claims that the defendants acted individually and in concert to impose and execute the release conditions in violation of: (1) the Double Jeopardy Clause of the Fifth Amendment; (2) the Confrontation Clause of the Sixth Amendment; (3) the Eighth Amendment right to be free from cruel and unusual punishment; (4) the Equal Protection Clause of the Fourteenth Amendment; and (5) substantive and procedural due process.[2] (*See id.* at ¶¶ 14, 26-28, 30, 35, 39-46.) Robinson additionally contends that the authority of the Division of Parole to impose conditions on parole derives from an unlawful delegation of power. (*See id.* at ¶¶ 15, 18-25, 30.) As a result, Robinson seeks compensatory and punitive damages, fees and costs, and several declarations and injunctions. (*See id.* at ¶¶ 38, 47-62.)

Defendants moved for judgment on the pleadings, (*see* Dkt. No. 28), to which Robinson cross-moved for summary judgment, (*see* Dkt. No. 36).

### III. Standards of Review

#### A. Judgment on the Pleadings

In deciding a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), the court applies the same standard as is used in deciding a motion to dismiss pursuant to Rule 12(b)(6). *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994). Rule 12(b)(6) provides that a cause of action shall be dismissed if a complaint fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In ruling on a Rule 12(b) (6) motion, the court's task is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *AmBase Corp. v. City Investing Co. Liquidating Trust*, 326 F.3d 63, 72 (2d Cir. 2003) (internal quotation marks and

citation omitted). Therefore, in reviewing a motion to dismiss, a court "must accept the facts alleged in the complaint as true and construe all reasonable inferences in [the plaintiff's] favor." *Fowlkes v. Adamec*, 432 F.3d 90, 95 (2d Cir. 2005) (citation omitted). As relevant to the current motion, "courts must construe pro se pleadings broadly, and interpret them to raise the strongest arguments that they suggest," especially where civil rights violations are alleged. *See Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (internal quotation marks, citations, and italics omitted).

"To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks and citations omitted). Rather, the claim must be "plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, ––– U.S. ––––, 129 S.Ct. 1937, 1949 (2009) (citation omitted). Thus, the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, but "does not impose a probability requirement," *Twombly*, 550 U.S. at 556.

#### B. Summary Judgment

**\*3** Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (citing FED. R. CIV. P. 56(c)); *see also Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). In considering a motion for summary judgment, the court must "view the evidence in the light most favorable to the non-moving party

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 71 of 134

Robinson v. New York, Not Reported in Fed. Supp. (2010)

and draw all reasonable inferences in its favor...." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted). The initial burden is on the moving party to inform the court of the basis for its motion, and identify those portions of the pleadings, affidavits, and discovery and disclosure materials on file that it believes "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also SEC v. Kern*, 425 F.3d 143, 147 (2d Cir. 2005). "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988) (citation omitted). And while the court remains obliged to read a pro se movant's supporting papers liberally and "interpret them to raise the strongest arguments that they suggest," *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

## IV. Discussion

### A. Parole Conditions: Background and Framework

Parole is an "established variation on imprisonment of convicted criminals," *Morrissey v. Brewer*, 408 U.S 471, 477 (1972), which is part of a " 'continuum' of state-imposed punishments," *Samson v. California*, 547 U.S. 843, 850 (2006) (citing *United States v. Knights*, 534 U.S. 112, 119 (2001)). "[T]he practice of releasing prisoners on parole before the end of their sentences has become an integral part of the penological system." *Morrissey*, 408 U.S. at 477 (citation omitted). The twofold purpose behind parole is "to help individuals reintegrate into society as constructive individuals as soon as they are able ... [while] alleviat[ing] the costs to society of keeping an individual in prison." *Id.*

"There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). "The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Morrissey*, 408 U.S. at 477. To

ensure the security and effectiveness of release, "those who are allowed to leave prison early are subjected to specified conditions for the duration of their terms ... [which] restrict their activities substantially beyond the ordinary restrictions imposed by law on an individual citizen." *Id.* at 478. "The enforcement leverage that supports the parole conditions derives from the authority to return the parolee to prison to serve out the balance of his sentence if he fails to abide by the rules." *Id.* at 478-79.

In general, "the State is willing to extend parole only because it is able to condition it upon compliance with certain requirements." *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 365 (1998); *see also United States v. Reyes*, 283 F.3d 446, 461 (2d Cir. 2002) ("[S]upervised release, ... in contrast to probation, is meted out in addition to, not in lieu of, incarceration." (internal quotation marks and citation omitted)). "[T]o insure that the state-created parole system serves the public-interest purposes of rehabilitation and deterrence, the state may be specific or general in defining the conditions for release and the factors that should be considered by the parole authority." *Greenholtz*, 442 U.S. at 7-8. And while the restrictions placed on a parolee's liberty are not unqualified, parolees "have severely diminished [liberty] expectations...." *Samson*, 547 U.S. at 852; *see also United States v. Newton*, 369 F.3d 659, 665 (2d Cir. 2004) ("[P]arolees enjoy even less of the average citizen's absolute liberty than do probationers." (internal quotation marks and citation omitted)). Thus, a parolee "possess[es] fewer constitutional rights" than ordinary citizens. *United States v. Polito*, 583 F.2d 48, 54 (2d Cir. 1978). Typically, "[s]upervision is not directly by the court but by an administrative agency, which is sometimes an arm of the court and sometimes of the executive." *Morrissey*, 408 U.S. at 480. New York has established a comprehensive system for granting parole, according to which the Division of Parole is charged with the duty and discretion of setting conditions for an inmate on parole release. *See* N.Y. EXEC. LAW §§ 259-c, 259-g, 259-i(2); N.Y. PENAL LAW § 70.40; N.Y. COMP. CODES R. & REGS. tit. 9, §§ 8003.2, 8003.3. Under New York Executive Law, "[a]ny action by the board or by a hearing officer ... shall be deemed a judicial function and shall not be reviewable if done in accordance with law." N.Y. EXEC. LAW § 259-i(5); *see also Bell v. Oswald*, 305

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 72 of 134

Robinson v. New York, Not Reported in Fed. Supp. (2010)

F. Supp. 878, 879 (S.D.N.Y. 1969) ("[T]he Parole Board's action ... is not reviewable unless its action contravenes statutory requirements or the New York State or United States Constitutions." (citations omitted)). Accordingly, the Board of Parole's authority "to impose special conditions upon the release of an inmate is not subject to the supervision of a court, but ... is, instead, 'under active *administrative* supervision of trained officials whose discretionary determination' is absolute and beyond review in the courts as long as no positive statutory requirement is violated." *M.G. v. Travis*, 236 A.D.2d 163, 167 (1st Dep't 1997) (quoting *Briguglio v. N.Y. State Bd. of Parole*, 24 N.Y.2d 21, 28 (N.Y. 1969)), *leave denied*, 91 N.Y. 2d 814 (N.Y. 1998). And pursuant to its rule-making authority, *see* N.Y. EXEC. LAW § 259-c(11), the Board of Parole authorizes parole officers, among others, to impose conditions on a parolee. *See* N.Y. COMP. CODES R. & REGS. tit. 9, § 8003.1(b) ("The releasee is expected to comply faithfully with all conditions specified in writing at the time of his release and with all other conditions and instructions ... given him by ... a parole officer."); *see also New York ex rel. Frisbie v. Hammock*, 112 A.D.2d 721, 721 (4th Dep't 1985). However, while the Board must set forth in writing its reasons for denying parole, *see* N.Y. EXEC. LAW § 259-i(2), there is no analog requiring that the Board or a parole officer provide the basis for imposing special conditions. Thus, the imposition of conditions— whether imposed prior to or subsequent to release, by the parole board or a field parole officer—must be upheld as long as they are reasonably related to a parolee's past conduct, are not arbitrary and capricious, and are designed to deter recidivism and prevent further offenses. *See Travis*, 236 A.D.2d at 167; *see also Gerena v. Rodriguez*, 192 A.D.2d 606, 607 (2d Dep't 1993) (reversing trial court's order directing Division of Parole to delete special conditions imposed on parolee because the parole office's determination was "made in the lawful exercise of official discretion" and the court "erred in substituting its view of the [parolee]'s case for that of the ... parole officer and his supervisor").

**B. Delegation of Judicial Authority**

**\*4** States are not constrained by Article III of the Constitution of the United States. *See* *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989). Thus, while it is indisputable that under our federal constitutional system the authority to try offenses and impose punishment rests in the judiciary, *see* *Ex Parte United States*, 242 U.S. 27, 41 (1916), it is equally undeniable that the manner

in which "power shall be distributed by a state among its governmental organs is commonly, if not always, a question for the state itself," *Highland Farms Dairy v. Agnew*, 300 U.S. 608, 612 (1937). Therefore, insofar as Robinson alleges an unconstitutional delegation of judicial authority under Article III of the United States Constitution, it is dismissed for failure to state a claim upon which relief can be granted.

In the alternative, any claims brought under the New York State Constitution are similarly subject to dismissal. The New York Court of Appeals has expressly recognized that the State Legislature—and not the courts—is empowered to determine whether and to what extent the Division of Parole has authority to, among other things, set conditions of a parolee's release. *See Briguglio*, 24 N.Y.2d at 28-29 (interpreting section 212 of the New York Correction Law, the applicable statute at the time, to find that the Board of Parole's discretion is absolute and beyond court review as long as it does not violate a positive statutory requirement); *see also Hines v. State Bd. of Parole*, 293 N.Y. 254, 257 (N.Y. 1944) (same). Thus, under the New York Constitution, the discretionary authority granted to the Division of Parole under N.Y. EXEC. LAW § 259-c and N.Y. PENAL LAW § 70.40 is not susceptible to an attack for improper delegation of authority. *See Travis*, 236 A.D.2d at 167-68; *see also Doe v. Simon*, 221 F.3d 137, 139 (2d Cir. 2000) ("It is undisputed that under New York law the Board of Parole is entitled to impose conditions on the conditional release of an inmate...."). Accordingly, Robinson's claims based on an unlawful delegation of judicial authority are dismissed in their entirety.

**C. Double Jeopardy**

Under the Double Jeopardy Clause of the Fifth Amendment, no person may be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V, cl. 2. The Supreme Court has interpreted this Clause to prevent "both successive punishment and successive prosecution." *United States v. Dixon*, 509 U.S. 688, 704 (1993). There is no question, however, that imposition of parole conditions —like the decision to deny or revoke parole—does not implicate the Double Jeopardy Clause because they are not additional to but rather are part of the original sentence. *See United States v. McNeil*, 415 F.3d 273, 277 (2d Cir. 2005) ("Supervised release is not an enhancement of the original sentence."); *Kell v. U.S. Parole Comm'n*, 26 F.3d 1016, 1020 (10th Cir. 1994) ("Parole determinations are not viewed

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 73 of 134

Robinson v. New York, Not Reported in Fed. Supp. (2010)

as criminal punishment subject to the Double Jeopardy Clause." (citation omitted)); *cf. United States v. Pettus*, 303 F.3d 480, 487 (2d Cir. 2002) ("[A] violation of the conditions of supervised release does not constitute a new crime, and the revocation of supervised release is not properly considered a new punishment."); *New York v. Vasquez*, 89 N.Y.2d 521, 532-33 (N.Y. 1997) ("Disciplinary sanctions imposed upon [inmates] ... aimed at exclusively deterring conduct within the prison setting ... do not constitute criminal punishment triggering double jeopardy protections."). More importantly, because parole conditions are remedial in nature and are aimed at facilitating parolees' reintegration into society while protecting the community and deterring recidivism, they do not trigger double jeopardy concerns. *See McNeil*, 415 F.3d at 277 ("[T]he supervised release scheme serves purposes distinct from the goals of the original punishment."); *see also Travis*, 236 A.D.2d at 166-67 ("[T]he promulgation of conditions for inmates who have been released before the expiration of their sentences does not constitute a violation of [the Double Jeopardy Clause].... [I]t is not even implicated, since we are *not* dealing with punishment at all, but prevention and deterrence."); *Pettus*, 303 F.3d at 486 ("[Supervised release] is primarily intended to protect the public from further crimes by easing the re-entry of a convicted defendant into society...."). [3] Accordingly, any claim asserted by Robinson that is premised on the Fifth Amendment's prohibition of double punishment is dismissed.

## D. Sixth Amendment Rights

**\*5** The Sixth Amendment applies to "all criminal prosecutions." U.S. CONST. IV, amend. VI, cl. 1. However, because determinations made regarding the imposition of parole conditions are not part of a criminal or quasi-criminal prosecution, Robinson's claim based on the Sixth Amendment, or the Confrontation Clause specifically, is dismissed. *See Morrissey*, 408 U.S. at 480; *see also McNeil*, 415 F.3d at 276-77; *United States v. Work*, 409 F.3d 484, 491 (1st Cir. 2005); *see, e.g.*, *Cusamano v. Alexander*, No. 1:08-CV-781, 2009 WL 4724606, at \*5 (N.D.N.Y. Dec. 8, 2009); *Bell*, 305 F. Supp. at 879-80.

## E. Cruel and Unusual Punishment

To maintain a claim for cruel and unusual punishment under the Eighth Amendment, a plaintiff must make two showings: "one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's

effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009). Under the subjective prong, the plaintiff must allege facts demonstrating that the defendant's actions "had the necessary level of culpability, shown by actions characterized by 'wantonness,' in light of the particular circumstances surrounding the challenged conduct." *Id.* (internal quotation marks and citation omitted). Wantonness normally turns on whether the actions were taken in good faith or maliciously. *See Hudson v. McMillian*, 503 U.S. 1, 6 (1992). Second, the objective component "focuses on the harm done, in light of 'contemporary standards of decency.' " *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8). In other words, the alleged misconduct must be objectively "harmful enough" to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991).

Robinson has failed to allege facts to satisfy either the subjective or objective elements of an Eighth Amendment claim. There is nothing in the complaint to suggest that the imposition of prerelease and special conditions by defendants, and the execution and enforcement thereof, may have been wanton, malicious, or in bad faith. Moreover, Robinson has not adequately alleged that by being required to report to the parole office, submit to drug testing, a curfew, and home visits, surrender his driver's license, and not operate an internet-accessible computer or a motor vehicle without permission, he suffered a harm sufficient to establish a constitutional violation. Therefore, because Robinson has failed to allege a "deprivation[ ] denying the minimal civilized measure of life's necessities ... sufficiently grave to form the basis of an Eighth Amendment violation," *Wilson*, 501 U.S. at 298 (internal quotation marks and citation omitted), his claim for cruel and unusual punishment is dismissed.

## F. Due Process

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey*, 408 U.S. at 481. "Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983). "Whether any procedural protections are due depends on the extent to which an individual will be condemned to suffer grievous loss." *Morrissey*, 408 U.S. at 481 (internal quotation marks and citation omitted). This assessment turns

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 74 of 134

Robinson v. New York, Not Reported in Fed. Supp. (2010)

on both the weight of the interest and "whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." *Id.* (citation omitted). If due process does apply, the court must determine the "precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 895 (1961).

**\*6** A parolee has "diminished due process rights during supervised release." *United States v. Cabot*, 325 F.3d 384, 385 (2d Cir. 2003) (per curiam) (citations omitted). Conditional release, like supervised release under the federal framework, which operates under a similar set of legal standards, "requires a defendant to alter his or her behavior, but compared to imprisonment, the conditions ... impose a very minor infringement on a defendant's liberty." *United States v. Crea*, 968 F. Supp. 826, 829 (E.D.N.Y. 1997). For instance, a condition seeking to prevent a parolee from associating with other felons is not susceptible to a challenge under the First Amendment right of freedom of association even though it precludes otherwise legal activities. *United States v. Bolinger*, 940 F.2d 478, 480 (9th Cir. 1991) (citation omitted); *see also Birzon v. King*, 469 F.2d 1241, 1242-42 (2d Cir. 1972). Or where a parole officer performs a suspicionless search pursuant to a parole condition and in accordance with state requirements, the parolee has no legitimate expectation of privacy if he has submitted in writing to a clear and unambiguous search condition. *See Samson*, 547 U.S. at 852. However, where the condition is not related to the parolee's criminal history or to the State's interests, it may be prone to tailoring or invalidation. *See, e.g., United States v. Bello*, 310 F.3d 56, 61-62 (2d Cir. 2002) (finding condition prohibiting parolee from watching television not reasonably related to offense of using stolen credit cards where condition was designed to force "deprivation and self-reflection"); *United States v. Peterson*, 248 F.3d 79, 82-83 (2d Cir. 2001) (finding condition prohibiting parolee from owning a computer and accessing the internet not reasonably related to nature of offense of bank larceny and where criminal history of incest had no connection to computers or the internet); *United States v. Loy*, 237 F.3d 251, 267 (3d Cir. 2001) (vacating condition prohibiting parolee from possessing all forms of pornography on due process grounds for vagueness and for chilling his First Amendment rights); *United States v. Abrar*, 58 F.3d

43, 46 (2d Cir. 1995) (finding condition requiring repayment of personal debts not reasonably related to nature of offense of falsifying immigration documents); *United States v. Prendergast*, 979 F.2d 1289, 1292-93 (8th Cir. 1992) (finding condition requiring parolee convicted of wire fraud to abstain from consuming alcohol not reasonably related to goals of rehabilitation and protection where no "evidence indicating that [parolee] suffer[ed] from alcoholism or that the use of alcohol in any way contributed to the commission of the offense"); *see also Peterson*, 248 F.3d at 83 ("Although a defendant might use the telephone to commit fraud, this would not justify a condition of probation that includes an absolute bar on the use of telephones."). Thus, courts must "carefully scrutinize unusual and severe conditions...." *United States v. Cutler*, 58 F.3d 825, 838 (2d Cir. 1995) (internal quotation marks and citation omitted).

Here, it is undeniable that the State has several compelling interests in imposing effective and adequate parole conditions, particularly based on the significant risk it assumes in releasing inmates on parole. The parolee has been found guilty of a crime against the people which "justifies imposing extensive restrictions on [his] liberty." *Morrissey*, 408 U.S. at 483. Moreover, there is no question that the State has the discretion to place conditions on parole release and that a parolee is not entitled to a hearing before the imposition of those conditions. *See Travis*, 236 A.D.2d at 167; *see also Menechino v. Oswald*, 430 F.2d 403, 409-10 (2d Cir. 1970). And all parties have a vital interest in preserving an apparatus that is both robust and efficient, for "[i]f parole determinations are encumbered by procedures that states regard as burdensome and unwarranted, they may abandon or curtail parole." *Greenholtz*, 1 U.S. at 13; *see also Zurak v. Regan*, 550 F.2d 86, 95 (2d Cir. 1977) ("Unlike a parole revocation proceeding, the procedures used in the conditional release program are not adversary in nature; rather, both the Board and the inmate have an interest in obtaining the inmate's release.").

Insofar as Robinson is alleging a protected liberty interest to be free from special conditions of parole, such an "interest" is not protected and is therefore not a sufficient basis for a Fourteenth Amendment due process violation.

*See McCloud v. Kane*, 491 F. Supp.2d 312, 317 (E.D.N.Y. 2007). Nonetheless, giving Robinson's complaint a liberal construction, the court concludes that Robinson has sufficiently alleged a due process claim regarding the

substance of the special conditions at issue here and the basis for their imposition. *See, e.g.,* 📑 *Boddie v. N.Y. State Div. of Parole,* 285 F. Supp.2d 421, 428-29 (S.D.N.Y. 2003). Accordingly, at this preliminary stage, the court denies defendants' motion for judgment on the pleadings as to Robinson's due process claim. And Robinson's motion for summary judgment on his due process claim is likewise denied.

### G. Equal Protection

"To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination ... [and] that the disparity in treatment cannot survive the appropriate level of scrutiny...." 📑 *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir. 2005). Where a disparate classification neither implicates fundamental rights nor proceeds along suspect lines, the classification is afforded a "strong presumption of validity ... [which] cannot run afoul of the Equal Protections Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." 📑 *Heller v. Doe,* 509 U.S. 312, 319-20 (1993) (citations omitted); *see also* 📑 *Romer v. Evans,* 517 U.S. 620, 631 (1996). "Parolees do not constitute a suspect or quasi-suspect class, requiring heightened scrutiny for the purpose of equal protection analysis." *Bratton v. N.Y. State Div. of Parole,* No. 05-CV-950, 2008 WL 1766744, at *11 (N.D.N.Y. April 14, 2008). Thus, in the context of parole, disparate treatment is evaluated under rational basis review, whether a plaintiff alleges that as a member of a subclass of parolees he has been treated disparately from the general class, *see Lee v. Governor of State of N.Y.,* 87 F.3d 55, 60 (2d Cir. 1996); 🚩 *Baker v. Cuomo,* 58 F.3d 814, 820 (2d Cir. 1995), *vacated on other grounds,* 📑 *Baker v. Pataki,* 85 F.3d 919 (2d Cir. 1996), or alleges that, as a "class of one," he has "been intentionally treated differently from others similarly situated," 📑 *Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir. 2005), *overruled on other grounds, Appel v. Spiridon,* 531 F.3d 138 (2d Cir. 2008). The rational basis test is satisfied where:

> *7 [T]here is a plausible policy reason for the classification, the ... facts on which the classification is

apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

📑 *Nordlinger v. Hahn,* 505 U.S. 1, 11 (1992) (internal citations omitted). Consequently, the rational basis review test sets a "minimal threshold." *Collier v. Barnhart,* 473 F.3d 444, 449 (2d Cir. 2007).

Upon a liberal reading of the complaint, Robinson's allegations that as a parolee under the supervision of the Queens III Office he has been unreasonably treated differently from other similarly situated parolees, (*see* Compl. ¶ 14, Dkt. No. 1), are sufficient to withstand defendants' motion. Therefore, because Robinson has sufficiently alleged an equal protection violation, and because the court is not presently in a position to evaluate whether the special conditions imposed upon him are rationally related to his offenses, his criminal history, and the State's interests, the court denies defendants' motion for judgment on the pleadings of Robinson's equal protection claim. *Cf. Gordon v. Alexander,* 592 F. Supp.2d 644, 653 n.57 (S.D.N.Y. 2009) ("It is worth noting that an arbitrary or irrational decision to [impose conditions on] a particular category of [parolees]—such as those whose names begin with the letter S—would not survive even rational basis review under the Equal Protection Clause."). In addition, insofar as Robinson moves for summary judgment on his equal protection claim, that motion is denied.

### H. New York Executive Law

At this point in the proceedings, the court is unable to conclude that defendants acted in accordance with their statutory obligations under 🚩 N.Y. EXEC. LAW §§ 259-c and 📑 259-i to impose special conditions that were reasonably related to Robinson's past conduct and to do so in a manner that was not arbitrary and capricious. Therefore, defendants' motion for judgment on the pleadings is denied as to this claim.

### I. Conspiracy

To maintain an action for conspiracy under 📑 42 U.S.C. § 1983, "a plaintiff must demonstrate that a defendant

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 76 of 134

Robinson v. New York, Not Reported in Fed. Supp. (2010)

acted in a wilful manner, culminating in an agreement, understanding or 'meeting of the minds,' that violated the plaintiff's rights ... secured by the Constitution or the federal courts." *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995) (internal quotation marks and citation omitted); *see also Duvall v. Sharp*, 905 F.2d 1188, 1189 (8th Cir. 1990) ("To plead conspiracy, a complaint must allege specific facts suggesting that there was a mutual understanding among the conspirators to take actions directed toward an unconstitutional end." (citation omitted)). "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983).

Here, aside from a series of conclusory and general allegations that the defendants conspired to unconstitutionally impose parole conditions, Robinson has failed to plead any facts demonstrating that any of the defendants entered into an agreement or reached an understanding to willfully deprive Robinson of his constitutionally protected rights. *See, e.g.,* *Duff v. Coughlin*, 794 F. Supp. 521, 525 (S.D.N.Y. 1992). Nor has Robinson alleged facts sufficient to enable the court to infer a conspiracy. Therefore, Robinson's claims of conspiracy are dismissed. For like reasons, Robinson's claims under 42 U.S.C. § 1985, and derivatively under § 1986, are dismissed. *See Dacey v. Dorsey*, 568 F.2d 275, 277 (2d Cir. 1978); *see also Levy v. City of New York*, 726 F. Supp. 1446, 1454-55 (S.D.N.Y. 1989).

### J. Applicable Immunity Defenses

#### 1. Eleventh Amendment Immunity

**\*8** Liability pursuant to § 1983 attaches solely to municipalities, and not to the State or its individual officers.[4] Therefore, to the extent that Robinson asserts claims for damages under §§ 1983, 1985, 1986, 1987, and 1988 against New York State and the individual defendants in their official capacities, those claims are dismissed. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733-36 (1989); *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 509 (2d Cir. 2006); *Gowins v. Greiner*, No. 01 Civ. 6933, 2002 WL 1770772, at *3 (S.D.N.Y. July 31, 2002). However, because the Eleventh Amendment "does not

preclude suits against state officers in their official capacity for prospective injunctive relief to prevent a continuing violation of federal law," defendants' motion is denied to the extent Robinson's claims for injunctive relief are asserted against defendants Alexander, Fork, Benjamin, and Fernandez. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 287 (2d Cir. 2003); *see also Ex parte Young*, 209 U.S. 123 (1908). Still, Robinson's claims against New York State are dismissed in their entirety. *See Santiago v. N.Y. State Dep't Corr. Servs.*, 945 F.2d 25, 32 (2d Cir. 1991) (holding *Ex parte Young* applies only to state official, not state or state agency).

#### 2. Qualified Immunity

The defense of qualified immunity "strike[s] a fair balance between (1) the need to provide a realistic avenue for vindication of constitutional guarantees, and (2) the need to protect public officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Lee v. Sandberg*, 136 F.3d 94, 101 (2d Cir. 1997) (internal quotation marks and citation omitted). Where an official engages in duties that are administrative in nature, he or she may be entitled to qualified immunity if the "conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stewart v. Lattanzi*, 832 F.2d 12, 13 (per curiam) (internal quotation marks and citation omitted); *see also Morrissey*, 408 U.S. at 478 (describing parole officers' duties as largely administrative). Even if an official violates a clearly established statutory or constitutional right, "qualified immunity is nonetheless a defense if the officers' unlawful actions were *objectively reasonable* as measured by reference to clearly established law, and the information the officers possessed." *Lee, 136 F.3d at 101* (internal quotation marks and citations omitted). In evaluating whether a particular right was clearly established when the defendants acted, a court should consider three factors: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable official would have understood that his or her acts were unlawful." *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991).

**\*9** Here, while the individual defendants may ultimately be entitled to qualified immunity on Robinson's remaining claims, the court is unable at this time to evaluate whether

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 77 of 134

Robinson v. New York, Not Reported in Fed. Supp. (2010)

their actions were objectively reasonable under clearly established law.

### V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for judgment on the pleadings (Dkt. No. 28) is **GRANTED** in part as follows:

1. Robinson's claims for unconstitutional delegation of judicial authority are **DISMISSED**;

2. Robinson's Fifth, Sixth, Eighth, Ninth, and Tenth Amendment claims are **DISMISSED**;

3. Robinson's claims under 18 U.S.C. §§ 241, 242, 371, and 1503, and N.Y. PENAL LAW § 105.15 are **DISMISSED**;

4. Robinson's claims of conspiracy under 42 U.S.C. §§ 1983 and 1985 are **DISMISSED**;

5. Robinson's claims under 42 U.S.C. §§ 1986 and 1987 are **DISMISSED**;

6. Robinson's claims against New York State are **DISMISSED** in their entirety; and

7. Robinson's claims for money damages against George Alexander, Michael Fork, Ms. Benjamin, and Mr. Fernandez in their official capacities are **DISMISSED**; and it is further

**ORDERED** that defendants' motion for judgment on the pleadings is **DENIED** in part as to Robinson's claims under the Fourteenth Amendment Equal Protection and Due Process Clauses and New York Executive Law; and it is further

**ORDERED** that Robinson's motion for summary judgment (Dkt. No. 36) is **DENIED**; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2010 WL 11507493

### Footnotes

1   Robinson also asserts claims based on alleged violations of the federal criminal code, 18 U.S.C. §§ 241, 242, 371, and 1503. However, "these claims are not cognizable, as federal criminal statutes do not provide private causes of action." *Sheehy v. Brown*, 335 Fed. Appx. 102, 104 (2d Cir. 2009) (unpublished) (citation omitted). These claims, along with Robinson's claim under 42 U.S.C. § 1987, must therefore be dismissed. And because a private cause of action under N.Y. PENAL LAW § 105.15 was not intended to apply to the present circumstances, Robinson's claim under that section of the New York Penal Law is also dismissed.

    *See Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 325 (N.Y. 1983).

2   While Robinson additionally relies on the Ninth and Tenth Amendments of the United States Constitution, the court is at a loss as to what exactly his claims could be, due to the dearth of legal or factual support contained in his submissions. Accordingly, any claims Robinson alleges under the Ninth and Tenth Amendments are dismissed. *See Jenkins v. Comm'r*, 483 F.3d 90, 92 (2d Cir. 2007) ("The Ninth Amendment is not an independent source of individual rights...."); *Padavan v. United States*, 82 F.3d 23, 29 (2d Cir. 1996) ("The purpose of the Tenth Amendment is to limit Congress from usurping power that was reserved to the states.").

3   *Cf. United States v. Hernandez-Fundora*, 58 F.3d 802, 806 (2d Cir. 1995) ("Punitive interests and remedial interests ... are nowhere so tightly intertwined as in the prison setting, where the government's

Robinson v. New York, Not Reported in Fed. Supp. (2010)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 78 of 134

remedial interest is to maintain order and to prevent violent altercations.... [T]he mere fact that a sanction imposed by prison officials has a punitive component does not mean that the sanction constitutes 'punishment' for double jeopardy purposes.").

4    While the court has already addressed and dismissed Robinson's state law claims, an additional basis for dismissal exists under New York State's sovereign immunity, which bars state constitutional claims against the state, its agencies, or against its employees in their official capacity, regardless of the relief sought. *See* *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105-06 (1984) (finding sovereign immunity bars federal courts from adjudicating state claims against the state), *overruled in part on other grounds*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989); *Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591, 604 (2d Cir. 1988); *Diamond v. Pataki*, No. 03 Civ. 4642, 2007 WL 485962, at *7 (S.D.N.Y. Feb. 14, 2007). As such, any remaining state constitutional claims are dismissed.

---

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 79 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Equan YUNUS, Sr., aka Damon Vincent, Plaintiff,
v.
J. Lewis ROBINSON, et al., Defendants

17-CV-5839 (AJN) (BCM)
|
Signed 06/29/2018

**Attorneys and Law Firms**

David Benjamin Berman, Emery Celli Brinckerhoff & Abady
LLP, New York, NY, for Plaintiff.

Amanda Shoffel, Daniel A. Schulze, New York State Office
of the Attorney, New York, NY, for Defendants.

**REPORT AND RECOMMENDATION
TO THE HON. ALISON J. NATHAN**

BARBARA MOSES, United States Magistrate Judge

 **\*1** Plaintiff in this action is a registered sex offender who,
insofar as the record reveals, has never committed any sexual
misconduct. After pleading guilty in 2002 to two counts of
kidnapping, plaintiff learned that he would be required to
register as a sex offender for a minimum of 20 years, because
one of his victims was under the age of 17 at the time of
the crime, rendering it a "sex offense," and plaintiff a "sex
offender," as those terms are defined in New York's Sex
Offender Registration Act (SORA), N.Y. Correct. Law
(CL) § 168-a, et seq. Prior to plaintiff's release on parole
in 2016, a state court judge found that there was "virtually
no likelihood that [he] will commit a sex crime ever," and
classified him as a level one (low risk) offender. Since then,
notwithstanding his low risk classification, plaintiff has been
denied permission to move out of the men's shelter where
he was placed by his parole officer and remains subject to
a variety of other restrictive conditions, including some that
are required by New York's sex offender laws and others
that are not made mandatory by statute but are nonetheless
—he alleges—applied indiscriminately to all registered sex
offenders without regard for their individual circumstances.

Plaintiff brings this action pursuant to 42 U.S.C. § 1983,
claiming that his designation as a sex offender violates
his procedural and substantive due process rights and that
certain of his parole conditions are unconstitutionally vague,
violate his free speech rights, interfere with his right to
intimate family relations, or were imposed in an arbitrary and
capricious manner not reasonably related to his past conduct.

Now before me for report and recommendation are (a)
defendants' motion to dismiss all of plaintiff's claims with
prejudice, made pursuant to Fed. R. Civ. P. 12(b)(6)
and 12(b)(1) (Dkt. No. 59), and (b) plaintiff's motion for a
preliminary injunction, made pursuant to Fed. R. Civ. P. 65(a)
(Dkt. No. 43). Defendants contend that the Second Amended
Complaint (SAC) (Dkt. No. 54) fails to state any claim upon
which relief may be granted and that certain of plaintiff's
claims are barred by the *Rooker-Feldman* doctrine. Plaintiff
contends that this Court should issue a mandatory injunction
relieving him of his "sex offender designation" and freeing
him from a number of the parole conditions to which he is
currently subject.

For the reasons that follow I respectfully recommend that
defendants' motion to dismiss be granted with respect to
plaintiff's First Claim for Relief, as well as portions of
the Third, Fourth, Fifth, and Sixth Claims for Relief, and
otherwise denied. I further recommend that plaintiff's motion
for a preliminary injunction be granted to the extent that
defendants be enjoined from subjecting plaintiff to the
registration and notification provisions applicable to "sex
offenders" under SORA or the mandatory parole conditions
prescribed for registered sex offenders, and that they rescind
any discretionary parole conditions imposed on him solely by
virtue of his designation as a "sex offender." In the alternative,
I recommend that certain specific parole conditions be
rescinded.

**I. OVERVIEW OF APPLICABLE LAWS AND
REGULATIONS**

 **A. Sex Offender Registration Act**
 **\*2** SORA was enacted in 1995 to protect the public from
"the danger of recidivism posed by sex offenders," 1995
N.Y. Sess. Laws ch. 192, § 1 (effective Jan. 21, 1996). The
Legislature also noted that the statute would bring New York
into conformity with the federal Jacob Wetterling Act, passed
as part of the Violent Crime Control and Law Enforcement
Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796, 2038

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 80 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

(Sept. 13, 1994), which "conditioned certain federal funding on states' enactment of legislation requiring the registration of sexually violent offenders and people who committed crimes against children." *People v. Knox*, 12 N.Y.3d 60, 67, 875 N.Y.S.2d 828, 832 (2009). Under SORA, a "sex offender" is anyone convicted of a "sex offense" or "sexually violent offense" as those terms are defined in the statute. CL § 168-a(1). Kidnapping in the first or second degree, in violation of N.Y. Penal Law (PL) § 135.25 or § 135.20, is a "sex offense" whenever the victim of the kidnapping "is less than seventeen years old and the offender is not the parent of the victim." CL § 168-a(2)(a)(i). [1] In *Knox*, the New York Court of Appeals upheld the constitutionality of this provision against a substantive due process challenge brought by appellants who—like plaintiff Yunus—were convicted of kidnapping or related crimes with no proof of "any sexual act or sexual motive." 12 N.Y.3d at 64, 875 N.Y.S.2d at 830. Upon conviction of a "sex offense," the court "shall certify that the person is a sex offender." CL § 168-d(1)(a).

Under SORA, all sex offenders must register with the New York State Division of Criminal Justice Services (Division). Among the consequences of sex offender registration are:

> [T]he registrant's name, address, photograph and fingerprints remain on file with the Division; the registrant must verify his address annually to the Division, and must appear periodically at a law enforcement agency to provide a current photograph; local law enforcement agencies are notified when a registrant moves into their jurisdiction; and any caller inquiring about a named individual will be told if that person is a registered sex offender.

*Knox*, 12 N.Y.3d at 65, 875 N.Y.S. 2d at 831 (citations omitted).

Failure to register as required is a felony under state law and, under certain circumstances, a felony under federal law. *See* CL § 168-t; 18 U.S.C. § 2250(a).

Before a sex offender is released or paroled from prison, the Board of Examiners of Sex Offenders (Board) must assess "the risk of a repeat offense by such sex offender and the threat posed to the public safety," CL § 168-*l*(5), and make a recommendation to the sentencing court, based on "the degree of the risk of re-offense." *Id.* § 168-*l*(6). [2] The court must then hold a "SORA hearing" to classify the person as a level one, level two, or level three sex offender. *Id.* § 168-n(2); *Francis*, 30 N.Y.3d at 744, 71 N.Y.S. 3d at 399. Level one offenders, for whom "the risk of a repeat offense is low," must register annually for 20 years. CL §§ 168-*l*(6)(a),168-h(1). Level two (moderate risk) and level three (high risk) offenders must register for life. *Id.* §§ 168-*l*(6)(b), 168-*l*(6)(c), 168-h(2). Law enforcement officials may disseminate "relevant information" about a registered sex offender "to any entity with vulnerable populations related to the nature of the offense committed by such sex offender." *Id.* § 168-*l*(6)(a),(b),(c). [3] Only level two and level three offenders are pictured in the on-line Sex Offender Registry maintained by the Division. *Id.* §§ 168-*l*(6)(b), 168-*l*(6)(c), 168-q. However, information about level one offenders is available to members of the public by calling a toll-free number maintained by the Division. *Id.* § 168-p(1).

**\*3** The court is not required to accept the Board's recommendation as to the appropriate risk classification of a sex offender. *See* CL § 168-n(2); *Francis*, 30 N.Y.3d at 744, 71 N.Y.S. 3d at 744 (the SORA court has "the ultimate responsibility of designating the offender's risk level"). However, departures from the Board's recommendations are "the exception, not the rule." *People v. Johnson*, 11 N.Y.3d 416, 421, 872 N.Y.S.2d 379, 382 (2008) (affirming level two classification where appellant "never asked" the sentencing court "to use its discretion to depart from the Board's recommendation").

There is no provision in the statute for the SORA court to consider whether the "sex offender" coming before it is in fact a sex offender. In most cases—including this one—persons convicted of crimes defined as sex offenses by the New York Legislature become sex offenders automatically, by operation of law, upon conviction. CL § 168-d(1)(a). [4]

After the initial SORA hearing, either the sex offender or the district attorney may petition the court for "an order modifying the level of notification." CL §§ 168-o(2), (3). However, there is no provision in the statute for a sex offender to challenge his designation as such. Nor, under current law, is

there any statutory avenue for a level one sex offender to seek relief from the registration requirement at any time during the 20 years he is required to register. *See* Doe v. Cuomo, 755 F.3d 105, 112-13 (2d Cir. 2014). [5]

### B. New York Executive Law

**\*4** Registration aside, sex offenders on parole are subject to a number of conditions not ordinarily imposed on other parolees. All level three sex offenders, and all sex offenders whose victims were under the age of 18 (regardless of risk level), *must* be prohibited from:

> using the internet to access pornographic material, access a commercial social networking website, communicate with other individuals or groups for the purpose of promoting sexual relations with persons under the age of eighteen, and communicate with a person under the age of eighteen when such offender is over the age of eighteen, provided that the board may permit an offender to use the internet to communicate with a person under the age of eighteen when such offender is the parent of a minor child and is not otherwise prohibited from communicating with such child.

N.Y. Exec. Law (EL) § 259-c(15). This prohibition applies regardless of the nature of the underlying crime, and regardless of whether the internet played any role in that crime.

In addition, pursuant to New York's Sexual Assault Reform Act (SARA), 2000 N.Y. Sess. Laws ch. 1, § 8 (effective Feb. 1, 2001), parolees convicted of certain offenses (including kidnapping) who are level three sex offenders, or whose victims were under the age of 18 (regardless of risk level), *must* be prohibited from "knowingly entering into or upon any school grounds, as that term is defined in [PL § 220.00(14) ], or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen while one or more of such persons under the age of eighteen are present," EL § 259-c(14), unless the parolee is a student,

an employee, or family member of a student at the school and has the "written authorization of his or her parole officer and the superintendent or chief administrator of such facility, institution or grounds." *Id.* The term "school grounds," as defined in PL § 220.00(14), was expanded in 2005 to include "any area accessible to the public located within one thousand feet of the real property boundary line" of the school. *Id.* § 220.14(b). Thus, a parolee subject to EL § 259-c(14) "is unable to reside within 1,000 feet of a school." *People v. Diack*, 24 N.Y.3d 674, 682, 3 N.Y.S.3d 296, 302 (2015).

The 1,000-foot rule does not appear to be vigorously enforced outside of the housing context, *see Diack*, 24 N.Y.3d at 682, 24 N.Y.S.3d at 302 (noting trial court decisions that "have interpreted section 220.00(14) as creating a residency restriction"), and as a practical matter may be impossible to enforce as written, particularly in dense urban areas. *See State v. Floyd Y.*, 56 Misc. 3d 271, 273, 50 N.Y.S.3d 848, 849 (N.Y. Sup. Ct. N.Y. Co. 2017) ("since most 'publicly accessible areas' [in New York City] are within 1,000 feet of some kind of school or child care institution," law enforcement agencies have "focused on prohibiting residences which violate the 1,000 foot rule"). By its express terms, however, EL § 259-c(14) places a parolee at risk of being reincarcerated for knowingly "entering into or upon" any publicly-accessible area within 1,000 feet of the property line of a school. *See Williams v. Dep't of Corr. & Community Supervision*, 136 A.D.3d 147, 149, 24 N.Y.S.3d 18, 20 (1st Dep't 2016), *appeal dismissed*, 29 N.Y.3d 990, 53 N.Y.S.3d 257 (2017) ("In accordance with SARA, the granting of petitioner's parole was subject to mandatory conditions that restrict both the location of his residency and his knowing travel to no closer than 1000 feet of school grounds."); *see also Floyd Y.*, 56 Misc. 3d at 273, 50 N.Y.S.3d at 849 (interpreting EL § 259-c(14) as a residency restriction "is clearly not in conformity with the statute's language").

### C. Special Parole Conditions

**\*5** Beyond the conditions made mandatory by the Executive Law, a paroled sex offender, like every other parolee in New York, is required to comply with a set of standard release conditions, *see* 9 N.Y.C.R.R. § 8003.2, and must "fully comply with the instructions of his parole officer and obey such special additional written conditions as he, a member of the Board of Parole or an authorized representative of the Division of Parole, may impose." *Id. § 8003.2(l* ). The only regulatory limit upon the "special conditions" is that "[t]he

releasee shall be provided with a written copy of each special condition imposed." *Id.* § 8003.3.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on August 1, 2017, by filing a hand-written *pro se* Complaint (Dkt. No. 2) naming as defendants Andrew Cuomo, the Governor of New York; Anthony J. Annucci, the Acting Commissioner of the New York Department of Corrections and Community Supervision (DOCCS); and Parole Officers (POs) Joan Lewis-Robinson, Derek Jones, Rodney Smith, Denise Grannum, and Yolanda Vasquez (collectively the Parole Officer Defendants).[6] On January 22, 2018, plaintiff filed a *pro se* preliminary injunction motion (Dkt. No. 25), and on February 13, 2018, in response to defendants' initial motion to dismiss (Dkt. No. 22), he filed an Amended Complaint. (Dkt. No. 33.)

Thereafter, *pro bono* counsel appeared on plaintiff's behalf. Through counsel, plaintiff filed his revised preliminary injunction motion, followed by his SAC, to which defendants responded with their revised motion to dismiss. These are the motions now before the Court.[7]

Your Honor referred this action to me for general pretrial management (Dkt. No. 15) and for report and recommendation on the pending motions. (Dkt. No. 62.) I heard oral argument on the motions on May 8, 2018, *see* Tr. of May 8, 2018 Hr'g (Oral Arg. Tr.) (Dkt. No. 77), and now submit my report and recommendation (Report).

## III. FACTS

The facts concerning plaintiff's crime, his plea, his SORA hearing, and his parole conditions are largely undisputed. On April 10, 2002, plaintiff (then known as Damon Vincent) pleaded guilty in New York State Supreme Court, New York County, to two counts of "kidnapping for ransom," for which he was sentenced to 18 years in prison. SAC ¶ 22; Yunus Decl. (Dkt. No. 45) ¶ 1.[8] One of the victims was a boy less than 17 years old who was not plaintiff's child. SAC ¶ 24. There was no "sexual component" to the crime, SAC ¶ 23; Yunus Decl. ¶ 3. Nor has plaintiff ever committed, or been accused of, any sexual misconduct. SAC ¶¶ 3, 29; Yunus Decl. ¶ 6. However, the district attorney later told the SORA judge (and plaintiff did not deny) that plaintiff abducted his 14-year-old kidnapping victim at gunpoint, drove him to Philadelphia in handcuffs, held him hostage in a closet, and "finally only

returned him when he received money and drugs." Yunus Decl. Ex. A (SORA Tr.) (Dkt. No. 45-1), at 8:20-9:2.

**\*6**  After exhausting his options on direct appeal, making an unsuccessful motion to vacate the judgment under N.Y. C.P.L. § 440.10, and filing an unsuccessful *habeas corpus* petition in this Court,[9] plaintiff served fifteen and a half years in prison, during which time he completed substance abuse programs and took college courses. SAC ¶¶ 26-28; Yunus Decl. ¶ 4; SORA Tr. at 3:11-22. Insofar as the record discloses, none of the claims made in this § 1983 action were raised or litigated on appeal or in plaintiff's prior lawsuits.

### A. Plaintiff's SORA Hearing

On June 24, 2016, in anticipation of plaintiff's release to parole, he appeared before Justice Michael Obus—the same judge who sentenced him—for a "sex offender assessment proceeding" pursuant to CL § 168-n(2); Yunus Decl. ¶ 7; *see also* SAC ¶ 30; SORA Tr. at 2:15-16. The district attorney acknowledged that "there was not a sexual offense in this case," SORA Tr. 8:11, but asked the court to classify plaintiff as a level two offender—as recommended by the Board—in light of the violent nature of the underlying kidnapping, the use of a weapon, plaintiff's prior criminal record, and his substance abuse history. SORA Tr. at 8:9-16:7. Plaintiff, through counsel, argued for a downward departure to level one, arguing among other things that "a level one designation is really the only appropriate designation in a case like this, where [there] is no sexual misconduct." *Id.* at 18:17-19. Ruling from the bench, Justice Obus granted the downward departure, stating:

> Under the circumstances presented here, I am satisfied that there is virtually no likelihood that [plaintiff] will commit a sex crime ever.
>
> Recognizing that a level one assessment will still involve substantial oversight of [plaintiff] ... I believe that a level one assessment is more than sufficient for the purpose of these proceedings.
>
> So I will grant the downward departure, notwithstanding the seriousness of this case, to a level one assessment. And I will simply mark the papers accordingly, so that [plaintiff] would have an order. And the People will have an order if they wish to seek review.

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 83 of 134

*Id.* at 22:14-23:1. Neither party appealed Justice Obus's SORA assessment.

### B. Plaintiff's Parole Conditions

Plaintiff was released to parole on July 14, 2016. SAC ¶ 39; Yunus Decl. ¶ 9. His "supervision maximum," meaning the expiration of his parole supervision, is February 13, 2019. Yunus Decl. Ex. B (Dkt. No. 45-2), at ECF page 2. Upon his release, plaintiff was informed that he was subject to numerous restrictions, including those set forth in EL 🚩 § 259-c(14), prohibiting him from knowingly entering into or upon any "school grounds," defined to include any publicly-accessible area within 1,000 feet of a school. *Id.* at ECF pages 2-3. Plaintiff was initially directed to reside at the Redemption Center in Brooklyn, *Id.* at ECF page 4, where he was given a 9:00 p.m. to 7:00 a.m. curfew. *Id.* He was further instructed that he could "not reside at any residence that has not been approved by [his] PO." *Id.* He cannot leave New York City, even temporarily, without the prior approval of his PO. *Id.*

**\*7** On July 19, 2016, PO Smith assigned plaintiff "forty-eight of the most restrictive special conditions of parole," printed on a six-page document entitled "Special Conditions of Release to Community Supervision for Sex Offenders." SAC ¶ 41; Yunus Decl. ¶ 9 &. Ex. B at ECF pages 5-11. [10] Smith told plaintiff that he gives "all sex offenders" the same restrictions. SAC ¶ 42; Yunus Decl. ¶ 9. As relevant here, the Sex Offender Conditions include Special Condition No. 4, which incorporates the "1,000-foot rule" required by EL 🚩 § 259-c(14), and Special Condition No. 17, which separately prohibits plaintiff from being "within 300 yards of places where children congregate, such as toy stores, parks, pet stores, schools, playgrounds, video galleries, malls, bike trails, skating rinks, amusement parks, bowling parks, bowling alleys, pool halls, etc., without the prior approval of [his] parole officer."

Special Condition No. 15 prohibits plaintiff from having any "contact with any children under the age of eighteen (18)," including family members, unless he has prior approval from his PO and "a responsible adult over the age of twenty-one (21) is present." Nos. 18, 19, and 20 bar him from possessing children's toys or clothes, keeping puppies or kittens, or having children's names, addresses, or photographs in his possession.

Other provisions of the Sex Offender Conditions restrict plaintiff's access to telephones, computers, and the internet. Special Condition No. 35 prohibits him from owning a cell phone without permission of his PO, and specifies that even with permission he may not "possess one that is video or photo-capable." No. 39 states that he may possess "only one computer and/or laptop," at his residence, and only if approved in advance by his PO. No. 39 requires plaintiff to obtain permission to use any "services that provide access to the internet, or any public or private computer network." No. 12 prohibits him from engaging in any computer service that "involves the exchange of electronic messages," which would seem to prohibit email communication. A separate provision, Special Condition No. 48, prohibits him from using the internet to "access a commercial social networking site." As written, Nos. 12 and 48 appear to be absolute.

Special Condition No. 24 requires plaintiff to notify his PO when he "establish[es] a relationship with a consenting adult." He must also "inform the party of [his] prior criminal history concerning sexual abuse, in the presence of [his] parole officer." Further, plaintiff must inform his PO "**HOW** and **WHEN** this person can be contacted" and must provide contact information for the "consenting adult." (All emphases in the original.)

Plaintiff's ability to travel within New York City is restricted as well. Special Condition No. 32 states that he may not own or operate a motor vehicle, may not possess or apply for a driver's license, and may not "rent operate, or be a passenger in any vehicle" without the prior approval of his PO.

In the fall of 2016, plaintiff's supervision was transferred to PO Vasquez, and then to PO Lewis-Robinson, his current supervisor. SAC ¶¶ 44-50; Yunus Decl. ¶ 10. Both of these POs "enforced the same restrictive conditions of parole originally enforced by PO Smith," telling him that all sex offenders were treated alike, regardless of their risk level. SAC ¶¶ 46, 52; Yunus Decl. ¶ 11. In October 2016, plaintiff was given an updated set of written parole conditions, including another copy of the six-page, 48-item Sex Offender Conditions. Yunus Decl. ¶ 11 & Ex. C (Dkt. No. 45-3), at ECF pages 4-10. At this point, some of plaintiff's parole conditions were made even more restrictive. For example, his curfew (Special Condition No. 30) was expanded, requiring him to be inside between 8:00 p.m. and 8:00 a.m. According to plaintiff, PO Lewis-Robinson told him that she changed the curfew "because I am a sex offender." SAC ¶¶ 106-07; Yunus Decl. ¶¶ 41-42. According to PO Lewis-Robinson, she changed

the curfew because plaintiff had been moved from the Redemption Center in Brooklyn to the Willow Avenue Men's Shelter in the Bronx, where "all shelter residents" have the same curfew. Lewis-Robinson Decl. ¶ 25. At the same time, Lewis-Robinson added a new special condition, prohibiting plaintiff from engaging in "Internet enabled gaming activities to include Pokemon Go." *Id.* Ex. F (Dkt. No. 56-6).

**\*8** Other conditions, however, were seemingly made less restrictive. For example, Special Conditions No. 6-10, concerning compliance with "sex offender treatment," were marked "N/A" in the document given to plaintiff in October 2016, presumably meaning that he is not required to attend such treatment. *See* Yunus Decl. Ex. C, at ECF page 5. No. 38, requiring the parolee to cooperate with GPS monitoring, was also marked "N/A." *Id.* at ECF page 8.

### C. Modification of Parole Conditions

Many of the Sex Offender Conditions, as noted above, are not absolute; they bar the conduct described therein only if the parolee has failed to obtain the advance permission of his PO. The parties dispute the extent to which PO Lewis-Robinson has been willing to provide the necessary permissions, particularly with regard to the conditions that most significantly impact plaintiff's life, which he identifies as the restrictions on where he may live, the limits on his phone, computer, and internet use, and the rules prohibiting him from seeing his minor nieces and cousins.

### 1. Residence Restrictions

Plaintiff has made several efforts to move out of the shelter system. In July and August of 2016, he sought permission to move to the residence of his fiancée or his uncle, but PO Vasquez "rejected both addresses, stating they were within 1,000 feet of a school." SAC ¶ 65; Yunus Decl. ¶ 18. She did not explain how she had measured the distance, or why plaintiff's own calculations, assisted by Google Maps, were incorrect. SAC ¶¶ 66-7; Yunus Decl. ¶ 18. In November 2016 plaintiff submitted the same addresses to PO Lewis-Robinson, who also rejected them as non-compliant with the 1,000-foot rule. SAC ¶ 70; Yunus Decl. ¶ 19.

PO Lewis-Robinson explains that DOCCS uses software called the Critical Infrastructure Response Information System (CIRIS) to determine whether a proposed address is within 1,000 feet of a school, and that the first two addresses

proposed by plaintiff were too close to multiple schools. Lewis-Robinson Decl. ¶¶ 8-13 & Exs. A-B.

Beginning in December 2016, plaintiff requested permission to move to the residence of his fiancée's sister-in-law, Lisa Blake. SAC ¶¶ 72-77; Yunus Decl. ¶¶ 20-25. Ms. Blake's address was "SARA-compliant," Lewis-Robinson Decl. ¶ 14, but plaintiff was not given permission to move. According to plaintiff, his PO ignored the request for months before finally contacting Ms. Blake in the fall of 2017, only to "reject[ ] my proposed move on the ground that Ms. Blake was being 'uncooperative,' " SAC ¶¶ 74-77; Yunus Decl. ¶¶ 20-25, simply because she was unavailable for an appointment on the date that Lewis-Robinson suggested. Yunus Decl. ¶¶ 24-25. According to PO Lewis-Robinson, however, Ms. Blake "refused to permit a site inspection of the property." Lewis-Robinson Decl. ¶ 18. [11]

Ms. Blake largely supports plaintiff's version of these events, attesting that she did not hear from PO Lewis-Robinson until September 2017 and that after an appointment was arranged for September 20, 2017, it was PO Lewis-Robinson who "cancelled" it "without any explanation." Declaration of Lisa Blake dated April 30, 2017 (Dkt. No. 72), ¶¶ 3-11. PO Lewis-Robinson then ignored Ms. Blake's efforts to reschedule the appointment. *Id.* ¶ 12.

**\*9** Plaintiff complains that his forced residence at the Willow Avenue Men's Shelter, together with his 8:00 p.m. to 8:00 a.m. curfew, interferes with his ability to find employment. SAC ¶¶ 106-118. In particular, he attests that he could not accept a full-time job at Access-A-Ride, which would have required him to leave the shelter residence at 7:00 a.m. Yunus Decl. ¶ 44. He has therefore been relegated to lower-paying part-time or seasonal jobs. *Id.* ¶ 46. PO Lewis-Robinson counters that she has approved numerous requests to adjust plaintiff's curfew, for example, permitting him return as late as 10:30 p.m. on days when he has evening classes at the Borough of Manhattan Community College (BMCC). Lewis-Robinson Decl. ¶ 26-27 & Exs. H-I. She also approved requests from plaintiff to participate in an internship at the Fortune Society and to work at H&R Block. *Id.* ¶¶ 28-29 & Ex. J.

### 2. Cellphone, Computer, and Internet Restrictions.

As noted above, Special Condition No. 35 states that plaintiff may not own a cell phone without permission of his PO.

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 85 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Even if given permission, may not "possess one that is video or photo-capable." Similarly, No. 39 requires him to obtain the permission of his PO to possess or use a computer or to access the internet, while No. 48 prohibits him—even with PO permission—from accessing any "commercial social networking website."

On May 21, 2017, plaintiff was "found to be in possession of an unapproved smart phone and a personal laptop." Lewis-Robinson Reply Decl. (Dkt. No. 73-1) ¶ 12. As a result, plaintiff was incarcerated on a parole violation until July 26, 2017. *Id.* ¶ 14. Thereafter, Lewis-Robinson gave plaintiff permission to possess a smartphone, to use the computers at BMCC "for work and school related use," and to create a LinkedIn account. Lewis-Robinson Decl. ¶¶ 22-24. However, she never allowed him to possess a personal computer or to access social media generally (the LinkedIn account, he says, was part of a marketing class), and he is "rarely able" to use the BMCC computers because his curfew requires him to leave campus as soon as his classes end. SAC ¶¶ 81-92; Yunus Decl. ¶ 31.

On April 11, 2018, plaintiff was once again charged with a parole violation, this time on the allegation that he refused to participate in a mental health evaluation. *See* Pl. Ltr. dated April 13, 2018 (Dkt. No. 57); Oral Arg. Tr. at 4:10-13. Plaintiff prevailed at his preliminary hearing and was released. Oral Arg. Tr. at 4:1-4, 42:1-3. Shortly thereafter, however, his PO rescinded his authorization to possess a smartphone. Yunus Reply Decl. (Dkt. No. 71), ¶¶ 14-15 & Ex. A. According to plaintiff, his PO told him that he would be locked up if she "sees me with any phone, not just a smart phone." *Id.* ¶ 16. According to PO Lewis-Robinson, plaintiff is still "allowed to possess a cellular phone as long as it does not possess video or picture capabilities." Lewis-Robinson Reply Decl. ¶ 29. [12] She adds that he has not yet submitted a request for a compliant phone. *Id.*

### 3. Restrictions on Contact with Minor Family Members

The parties agree that Special Condition No. 15 prohibits plaintiff from having any contact with children under eighteen, including his own "nieces, nephews, and cousins." Lewis-Robinson Decl. ¶ 21. Plaintiff has two nieces, but—due to his parole restrictions—has never met one of them, and has not seen the other since he has been on parole. SAC ¶¶ 94-98; Yunus Decl. ¶ 35. Because he cannot have contact with

his nieces, it is also difficult for plaintiff to see their mothers, who are his sisters. SAC ¶ 99; Yunus Decl. ¶ 36.

**\*10** Plaintiff is close to his uncle, who is his closest living relative on his mother's side of the family, and in 2017 he requested permission to attend his uncle's Thanksgiving dinner. SAC ¶¶ 100-04; Yunus Decl. ¶¶ 37-39. His PO told him that he could go but "would be 'locked up' if there were any children there." SAC ¶ 104-05; Yunus Decl. ¶ 39. Plaintiff's uncle lives with his wife and minor grandchildren (plaintiff's cousins). SAC ¶ 101; Yunus Decl. ¶ 37. Since "there would obviously be children" present at Thanksgiving, Yunus was not able to celebrate the holiday with his family. Yunus Decl. ¶ 40. PO Lewis-Robinson does not deny these events.

### 4. Plaintiff's Pre-Litigation Efforts to Obtain Relief

Plaintiff alleges in general terms that he frequently protested his parole restrictions to his POs and their supervisors—defendants Jones, Young, and Grannum—without success. *See, e.g.*, SAC ¶¶ 46-47 (Vasquez and her supervisor, Grannum, told plaintiff that they "did not care" if his parole conditions related to his prior conduct and refused to modify them); *Id.* ¶¶ 52-53 (Lewis-Robinson likewise told plaintiff that all sex offenders get the same special conditions, and that she "was not interested in his prior conduct"); *Id.* ¶ 54 (Lewis-Robinson's supervisors Jones and Young told plaintiff that he would remain subject to whatever conditions Lewis-Robinson imposed). *See also* Yunus Decl. ¶ 12 (all three supervisors told plaintiff that his parole conditions were "at the discretion of [his] parole officer"). At one point, after plaintiff submitted a "written complaint" to Senior PO Young, Young suggested that plaintiff "get relief in court" if he had a problem with his parole conditions. SAC ¶ 136; Yunus Decl. ¶ 12.

## IV. PLAINTIFF'S CLAIMS

In his First Claim for Relief, plaintiff alleges that his designation as a sex offender violates his Fourteenth Amendment right to procedural due process because he had no opportunity to challenge that designation in an adversarial hearing. SAC ¶¶ 139-45. In his Second Claim, plaintiff challenges the same designation on substantive due process grounds, asserting that requiring him to register as a sex offender bears no rational relationship to any legitimate legislative purpose. *Id.* ¶¶ 146-51. Both of these claims are

asserted only against Acting Commissioner Annucci in his official capacity, and both seek only prospective injunctive relief.

Plaintiff's Third and Fourth Claims, brought against all defendants, challenge specific conditions of his parole and seek both damages and injunctive relief. The Third Claim alleges that Special Conditions No. 4 (prohibiting him from knowingly entering into or upon any "school grounds," defined to include any area accessible to the public and within 1,000 feet of the school's property line) and No. 17 (prohibiting him from entering or being within 300 yards of "places where children congregate") are void for vagueness, as is Special Condition No. 24, which mandates various disclosures when plaintiff enters into a "relationship" with a "consenting adult." SAC ¶¶ 152-58. The Fourth Claim contends that the ban on social media (Special Condition No. 48), along with related restrictions on plaintiff's cellphone and computer access, violate his rights under the First Amendment. *Id.* ¶¶ 159-63.

 **\*11**  The Fifth Claim, brought against defendants Lewis-Robinson, Young, and Jones, alleges that the refusal of these defendants to permit plaintiff to see his own nieces and minor cousins interferes with his private family relationships in violation of the Due Process Clause. SAC ¶¶ 164-69. This claim also seeks both damages and injunctive relief.

Finally, in his Sixth Claim for Relief, plaintiff alleges that the Parole Officer Defendants refused to "consider alternative proposed residences in good faith," thereby effectively creating an "arbitrary" requirement that he remain in a DOCCS-designated homeless shelter. SAC ¶¶ 171-172. In addition, the Sixth Claim alleges that nine of plaintiff's parole conditions (some of which he previously challenged on other grounds) violate the Due Process Clause because they are "arbitrary" and "unrelated" to his crime of conviction or any of his prior conduct. *Id.* ¶ 173. The challenged Special Conditions are Nos. 35 and 39 (limiting his access to cellphones and computers), No. 24 (governing his relationships with consenting adults), Nos. 31 and 32 (restricting his ability to own, drive, or ride in automobiles), No. 22 (preventing him from possessing photo or video equipment), No. 14 (prohibiting him from reading or viewing sexually explicit materials), No. 19 (barring him from pet ownership) and No. 37 (prohibiting him from renting a post office box). *Id.* ¶¶ 173-75. Once again, plaintiff seeks both damages and injunctive relief.

Plaintiff's preliminary injunction motion is only slightly narrower than his complaint. He principally seeks an order relieving him of his sex offender designation altogether. *See* Pl. Not. of Mot. for Prelim. Inj. at 1. In the alternative (or perhaps in an abundance of caution, fearing that some of the same Special Conditions would be re-imposed even if he is no longer considered a sex offender), plaintiff asks this Court to lift the "vague residency requirements" that prevent him from moving in with his fiancée; permit him to use cellphones and computers; allow him to visit minor family members; lift the obligation that he disclose his "relationships" to his PO (and disclose his nonexistent history of "sexual abuse" to his partners); and "tailor" the automobile ban. *Id.* at 1-2.

## V. ANALYSIS

### A. Subject-Matter Jurisdiction

Before considering the merits of plaintiff's due process claims, I must consider whether this Court is divested of jurisdiction to do so by the *Rooker-Feldman* doctrine, which bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). [13] According to defendants, plaintiff's "challenges to his sex offender registration and associated parole conditions" are barred by *Rooker-Feldman* because the injuries of which he complains flow from the 2016 state court judgment classifying him a level one offender. Def. MTD Mem. at 5-6. Plaintiff's "avenue for review of that determination," they say, "was through an appeal or an Article 78 petition in state court, with federal review through an eventual petition for certiorari to the United States Supreme Court, not through this collateral challenge to the state court's determination." *Id.* at 6. [14]

 **\*12**  Defendants misconceive the reach of the doctrine on which they rely. Following *Exxon-Mobil*—which reminded the lower federal courts that *Rooker-Feldman* occupies a "narrow ground," 544 U.S. at 284—the Second Circuit held in *Hoblock v. Albany Cty. Bd. of Elections* that the doctrine deprives the federal courts of subject-matter jurisdiction only in "suits that are, in substance, appeals from state court judgments." 422 F.3d 77, 84 (2d Cir. 2005). *Hoblock* laid out four requirements that must be met before a federal court may dismiss an action under the *Rooker-Feldman* doctrine:

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 87 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[ ] of injuries caused by [a] state-court judgment[.]" Third, the plaintiff must "invit[e] district court review and rejection of [that] judgment[ ]." Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced"—i.e., *Rooker–Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation.

*Id.* at 85 (quoting *Exxon-Mobil, 544 U.S. at 284*) (alterations in the original); *accord McKithen v. Brown, 481 F.3d 89, 97 (2d Cir. 2007); Spiteri, 2013 WL 4806960, at \*12* (holding that *Rooker-Feldman* did not bar plaintiff's federal challenge to his designation as a sex offender in New York after being convicted in California of unlawful sex acts on a minor).

In my view, the present action is clearly not—in either form or substance—an appeal from the outcome of plaintiff's 2016 SORA hearing, which classified plaintiff as a level one sex offender. First, and perhaps most obviously, plaintiff did not lose at his SORA hearing. *See Hoblock, 422 F.3d at 85* ("First, the federal-court plaintiff must have lost in state court."). Throughout that hearing plaintiff consistently sought a level one classification—the lowest available—which his counsel characterized as "the only appropriate designation here." SORA Tr. at 5:19-22. *See also id.* at 6:21-8:5 (arguing that since nothing in the record indicates a "likelihood of sexual recidivism," which is "the issue and purpose in this case," plaintiff "should, therefore, be designated a level one"); *Id.* at 18:17-19 (arguing that "a level one designation is really the only appropriate designation in a case like this, where there is no sexual misconduct"). The district attorney disagreed, urging the court to assess plaintiff as a level two offender in accordance with the recommendation of the Board, *Id.* 8:9-10:20, and arguing vigorously against any "downward departure in this case." *Id.* at 16:3-4. Justice Obus rejected that argument, held that "there is virtually no likelihood that [plaintiff] will commit a sex crime ever," and "grant[ed] the downward departure, notwithstanding the seriousness of this case, to a level one assessment." *Id.* at 22:14-24. Plaintiff therefore cannot be characterized as "state court loser." *Exxon Mobil, 544 U.S. at 281.* [15]

**\*13** Second, the injuries of which plaintiff complains were not "caused by" the decision at his SORA hearing. *See*

*Exxon-Mobil, 544 U.S. at 284*; *Hoblock, 422 F.3d at 87* (Plaintiffs "are not subject to the *Rooker–Feldman* bar unless they *complain of an injury* caused by a state judgment. Indeed, this is the core requirement from which the others derive.") (emphasis in the original). As defendants implicitly acknowledge, plaintiff became a "sex offender," by operation of law, long before his classification hearing. *See* Def. MTD Mem. at 3 ("Because Plaintiff pled guilty to the crime of kidnapping a victim under the age of 17 who was not his child, he was *statutorily* classified as a sex offender.") (emphasis added); *see also* CL § 168-d(1)(a) (upon conviction, the court "shall certify that the person is a sex offender"). The purpose of the hearing was simply to determine "the level of notification" to be given to the public of that status. CL § 168-n(2); *see also Spiteri, 2013 WL 4806960, at \*13* (holding *Rooker-Feldman* inapplicable because "the issue" at Spiteri's SORA hearing "was Plaintiff's risk level classification, not whether he was required to register as a sex offender"). [16] CL 168-*l*(8) makes this point crystal clear: even if the court fails to hold a SORA hearing or "render a determination" as to the offender's risk level, that failure "shall not affect the obligation of the sex offender to register."

As the Second Circuit explained in *McKithen*, "a party is not complaining of an injury 'caused by' a state-court judgment when the exact injury of which the party complains in federal court existed *prior* in time to the state-court proceedings, and so could not have been 'caused by' those proceedings." *481 F.3d at 97-98* (emphasis in the original). Here, the injury of which plaintiff complains—his designation as a sex offender—occurred prior to, and independently of, his 2016 SORA hearing, such that this action cannot be barred by *Rooker-Feldman.*

For similar reasons, the present suit cannot fairly be characterized as seeking "review and rejection" of the judgment entered at plaintiff's SORA hearing. *Exxon-Mobil, 544 U.S. at 284*; *Hoblock, 422 F.3d at 85.* At that hearing, plaintiff neither requested nor obtained a ruling as to the constitutionality of the statute under which he was classified. [17] He requested exactly what he got—a level one classification—and he makes no argument here that he should be re-classified. Nor does he contend that the state court erred in any other way. *Cf. Zuneska, 2013 WL 431826, at \*4* (dismissing federal action where the state court "denied Plaintiff's request to be relieved from the registration

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 88 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

requirements of SORA" and he then filed a federal complaint attacking the state court's "holding that that [SORA] does not provide for de-classification"). Rather, he challenges "the statutory premise Justice Obus was bound by—that Plaintiff must register as a sex offender." Pl. Prelim. Inj. Reply Mem. (Dkt. No. 70) at 3. Such a challenge "attacks an alleged defect of state ... legislation rather than adjudication," *Hachamovitch v. DeBuono*, 159 F.3d 687, 694 (2d Cir. 1998), and thus does not come within the bar of *Rooker-Feldman*. [18]

**\*14** Having failed to establish three of the four requirements for application of the *Rooker-Feldman* doctrine, defendants have not persuaded me that the Court lacks subject-matter jurisdiction. I therefore recommend, respectfully, that Your Honor proceed to the merits of plaintiffs' claims. [19]

### B. Legal Standards

A civil action may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) if the well-pleaded factual allegations contained in the plaintiff's complaint, accepted as true, fail to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ); *Irrera v. Humpherys*, 859 F.3d 196, 198 (2d Cir. 2017). A claim is facially plausible when its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The non-conclusory factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. If the plaintiff has not "nudged his claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

In this case, all of plaintiff's claims are brought pursuant to 42 U.S.C. § 1983, which requires a plaintiff to establish "(1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law." *Doe v. Lima*, 270 F. Supp. 3d 684, 710 (S.D.N.Y. 2017) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988), and *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155-56 (1978) ), *appeal filed sub nom. ABC v. DEF*, 17-3155 (2d Cir. Oct. 2, 2017). All of the defendants

named herein "are state officials employed by DOCCS," Def. MTD Mem. at 22, and there is no dispute but that they were all acting under color of state law. Before a state official may be held liable in damages, however, the plaintiff must show that she was acting in her individual capacity—that is, performing discretionary functions—and was "personally involved in the deprivation of the federal right." *Lima*, 270 F. Supp. 3d at 712; *accord Farrell v. Burke*, 2004 WL 2813175, at \*6 (S.D.N.Y. Dec. 8, 2004) (collecting cases).

**\*15** "Even if an individual is personally involved in a constitutional violation, he may be protected by the doctrine of qualified immunity, which shields government officials from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Christian v. Warden of O.B.C.C.*, 2018 WL 1441401, at \*2 (S.D.N.Y. Mar. 22, 2018) (quoting *Hassell v. Fischer*, 879 F.3d 41, 46 n.7 (2d Cir. 2018) ). *See also Lima*, 270 F. Supp. 3d at 710 (a state official is entitled to qualified immunity "unless the facts show '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of challenged conduct' ") (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) ). When litigating qualified immunity under Rule 12(b)(6), however, a defendant "must accept the more stringent standard applicable to this procedural route," meaning that "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Doe v. Annucci*, 2015 WL 4393012, at \*12 (S.D.N.Y. July 15, 2015) (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) ).

The Eleventh Amendment bars claims for monetary relief against the State of New York, and therefore—by extension— bars damages claims against state employees in their official capacities. *See Washpon v. Parr*, 2007 WL 541964, at \*1 (S.D.N.Y. 2007) ("the Eleventh Amendment bar "extends to actions for damages brought against state officials in their official capacities"). A private plaintiff may, however, sue such officials for declaratory or injunctive relief where the underlying claim is based on an ongoing violation of federal law. *See Ex Parte Young*, 209 U.S. 123 (1908); *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (under *Young*, "a plaintiff may sue a

state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law"). A parole condition may be challenged as "ongoing" not only when it is currently in effect but also when it is "plausible" that the condition will be re-imposed. *Doe v. Annucci*, 2015 WL 4393012, at *15-17 (holding that sex offender parolee who was wrongfully deprived of contact with his infant son could maintain a claim for injunctive relief even though the offending parole conditions were modified, permitting plaintiff to live with his family, before he filed suit).

"Qualified immunity does not bar declaratory and injunctive relief." *Singleton v. Doe*, 210 F. Supp. 3d 359, 371 (E.D.N.Y. 2016) (granting summary judgment against plaintiff's claims for damages arising out of his designation as a "discretionary sex offender" but denying summary judgment "as to Plaintiff's claim seeking injunctive relief from the same"); *accord Allen v. Coughlin*, 64 F.3d 77, 81 (2d Cir. 1995). However, a plaintiff seeking a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) must do more than survive a motion to dismiss. He must present evidence showing "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) ). In this case, plaintiff seeks a mandatory injunction; that is, an injunction which alters rather than preserves the status quo. *N. Am. Soccer League*, 883 F.3d at 37. "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.' " *Id.* (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (internal quotation marks omitted) ).

**\*16** In the sections that follow, I first consider, as to each Claim for Relief, whether it plausibly alleges a violation of plaintiff's constitutional rights and, if so, whether plaintiff has adequately stated a claim for damages, injunctive relief, or both. If I conclude that plaintiff has pleaded a cognizable claim for injunctive relief, I next consider whether he has shown a "clear or substantial likelihood of success on the merits" as to that claim, as required for the mandatory

injunctive relief he seeks. Once each Claim for Relief has been analyzed in this fashion, I address the remaining factors relevant to plaintiff's preliminary injunctive motion in Part V(I) of this Report, *infra.*

### C. First Claim—Procedural Due Process

In his First Claim for Relief, plaintiff contends that he was deprived of procedural due process because he had no opportunity to challenge his designation as a "sex offender" in an adversarial proceeding. SAC ¶¶ 139-45. Procedural due process claims "are to be examined 'in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.' " *Doe v. Pataki*, 3 F. Supp. 2d 456, 466 (S.D.N.Y. 1998) (quoting *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted) ). Here, both elements are contested. For the reasons that follow I conclude that plaintiff possesses a cognizable liberty interest in not being required to register as a sex offender. However, clear Supreme Court and Second Circuit precedent compel me to conclude that, having been convicted of an offense requiring registration under state law, plaintiff is not entitled to any further process.

### 1. Plaintiff's Liberty Interest

Because "reputation alone" is not a liberty or property interest "by itself sufficient to invoke the procedural protections of the Due Process Clause," *Paul v. Davis*, 424 U.S. 693, 701 (1976), procedural due process claims involving sex offender registration are ordinarily analyzed under the "stigma plus" doctrine, which requires a showing of reputational injury "plus" some additional, "tangible burden." *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994). *See, e.g., Doe v. Pataki*, 3 F. Supp. 2d at 457 (holding, in action challenging certain provisions of SORA on procedural due process grounds, that the test is "whether plaintiffs have established damage to reputation and impairment of some additional interest").

The reputational prong of the test requires a showing that the challenged government action "will result in stigma, that is, in 'public opprobrium' and damage to [plaintiff's] reputation." *Valmonte*, 18 F.3d at 999-1000 ("[t]here is no dispute" that

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 90 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Valmonte's inclusion on the New York State Central Register of Child Abuse and Maltreatment "potentially damages her reputation by branding her as a child abuser"); *see also Pisani v. Westchester Cty. Health Care Corp.*, 424 F. Supp. 2d 710, 718 (S.D.N.Y. 2006) (plaintiff must prove "the utterance of a statement about him that is injurious to his reputation, that is capable of being proved false, and that he or she claims is false") (internal quotations and citations omitted).

The "plus" prong requires a showing of some concrete, state-imposed burden beyond the "intangible deleterious effect that flows from a bad reputation." *Valmonte*, 18 F.3d at 1001 (holding that inclusion on the Central Register placed a "tangible burden" on plaintiff because child care providers were prohibited by law from hiring persons listed on the Central Register without providing a written explanation of the reason); *Pisani*, 424 F. Supp. 2d at 718 (plaintiff must demonstrate "some tangible and material state-imposed burden ... in addition to the stigmatizing statement") (quoting *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) ).

**\*17** More than 20 years ago, in *Doe v. Pataki*, the Hon. Denny J. Chin had no difficulty in concluding that a class of probationers and parolees, challenging their prospective inclusion on New York's sex offender registry, had "a protected liberty interest that entitled them to procedural due process." 3 F. Supp. 2d at 468.[20] The reputational prong was met because inclusion in the sex offender registry "will likely result in their being branded as convicted sex offenders who may strike again and who therefore pose a danger to the community." *Id.* at 467. As Judge Chin observed, the public identification of an individual as a "sex offender" "is likely to carry with it shame, humiliation, ostracism, loss of employment and decreased opportunities for employment, perhaps even physical violence, and a multitude of other adverse consequences. Thus, there is no genuine dispute that the dissemination of the information contemplated by [SORA] to the community at large is potentially harmful to plaintiffs' personal reputations." *Id.* at 468. The "plus" factor prong was also met, Judge Chin held, because registration "place[s] a 'tangible burden' on plaintiffs, potentially for the rest of their lives." *Id.*

Since *Doe v. Pataki* was decided in 1998, both the tangible burdens and the reputational damage that come with sex offender registration have, if anything, intensified. Over that period the Legislature has steadily increased the

legal restrictions applicable to registered sex offenders. For example, level one offenders were originally required to register for ten years, during which period they could petition for de-registration. *See* 1995 N.Y. Sess. Laws ch. 192, § 2. But under today's version of SORA, level one offenders must register for 20 years, with no opportunity for relief. CL §§ 168-h(1), 168-o. Similarly, when New York first created its sex offender registry there were no mandatory parole conditions prescribed for individuals required to register. But under today's version of SARA, certain sex offenders on parole or conditional release—including plaintiff Yunus—may not live or knowingly travel within 1,000 feet of a school or similar facility. EL 259-c(14); *Williams v. DOCCS*, 136 A.D.3d at 149, 24 N.Y.S.3d at 20. Thus, as the Appellate Division noted last year in *People v. Diaz*, even a convicted child murderer has a reputational interest in avoiding a "sex offender" designation, which "often results in the offender being subject to social ostracism and abuse, and impedes the person's ability to access schooling, employment, housing, and many other areas." 150 A.D.3d 60, 66, 50 N.Y.S.3d 388, 392 (1st Dep't), *leave to appeal granted*, 29 N.Y.3d 914, 63 N.Y.S.3d 4 (2017).[21]

**\*18** Defendants do not dispute the "tangible burdens" that plaintiff bears under SORA and SARA. Instead, relying on *Vega v. Lantz*, 596 F.3d 77, 82 (2d Cir. 2010), they argue that registration as a sex offender cannot harm his reputation because he *is* a sex offender, having been convicted of an offense defined as such by SORA. *See* Def. MTD Mem. at 7 ("there is no liberty interest implicated when a plaintiff has <u>correctly</u> been required to register as a sex offender under the pertinent state law"); Def. Prelim. Inj. Opp. Mem. at 11 ("the purportedly defamatory statement that plaintiff was convicted of an offense that is designated under SORA to require registration as a sex offender with attendant restrictions is <u>true</u>") (emphases in the original).

While it is of course true, in a tautological sense, that plaintiff was convicted of an offense that is defined as a sex offense under SORA, that syllogism, standing alone, cannot be a defense to the "liberty" element of his procedural due process claim. First, the argument is entirely circular. Using the same logic, the State of New York could define shoplifting as a sex offense, and then argue that requiring shoplifters to register as sex offenders does not implicate any protected liberty interest because they *are* sex offenders.

Second, the defamatory "statement" to which plaintiff objects is that he is a *sex* offender, and is therefore likely to be *sexually* dangerous, not the sanitized assertion that he "was convicted of an offense that is designated under SORA to require registration." Def. Prelim. Inj. Opp. Mem. at 11.

*See* *Knox*, 12 N.Y.3d at 66-67, 875 N.Y.S.3d at 831-32 (defendants convicted of non-sexual kidnapping offenses "have a constitutionally-protected liberty interest ... in not being required to register under an incorrect label"). Our Circuit made an analogous point in 🚩 *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 49 (2d Cir. 2001) (*Dep't of Pub. Safety* ), *rev'd on other grounds sub nom.* *Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003) (*Conn. v. Doe* ), which held—as relevant here—that a convicted sex offender challenging Connecticut's registration law had a cognizable liberty interest at stake, notwithstanding his conviction, because the registry "implies that each person listed is more likely than the average person to be currently dangerous," which "stigmatizes every person listed on the registry. And the plaintiff claims that, as to him, it is false."

*See also* 🔖 *Vega v. Lantz*, 596 F.3d at 81-82 (although the Supreme Court reversed *Dep't of Pub. Safety* on other grounds, "it continues to be the case that wrongly classifying an inmate as a sex offender may have a stigmatizing effect which implicates a constitutional liberty interest").[22]

Outside of the Second Circuit, numerous courts have recognized that the "sex offender" label has such a powerful visceral impact that even an incarcerated felon has "a liberty interest in not being branded a sex offender." 🔖 *Kirby v. Siegelman*, 195 F.3d 1285, 1291 (11th Cir. 1999) (holding that inmate convicted of attempted murder "has a right to due process before the state declares him to be a sex offender");

*see also* 🔖 *Chambers v. Colorado Dep't of Corr.*, 205 F.3d 1237, 1242, 1243 (10th Cir. 2000) (holding that the sex offender label is "replete with inchoate stigmatization" and enjoining Colorado from categorizing inmate as sex offender without affording him "a hearing to challenge the label");

🔖 *Neal v. Shimoda*, 131 F.3d 818, 829 (9th Cir. 1997) ("We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender").

**\*19** *Vega v. Lantz* is not to the contrary. While serving a prison sentence for assault and kidnapping, Vega was given a "Sexual Offense Treatment Needs" (SOTN) score of "3," meant for individuals with a "current conviction, pending charge, or known history of sexual offenses involving physical contacts with the victim(s)." 🔖 596 F.3d at 80. Relying solely on the fact that he had been acquitted at trial of sexual assault in the first degree, Vega argued that his SOTN score barred him from certain prison jobs "without due process." 🔖 *Id.* at 80, 81. The Second Circuit rejected the claim because Vega "did not allege falsity" of the reputation-tarnishing statement. 🔖 *Id.* at 82. That is, Vega did not deny either the facts of the crime for which he was convicted or their sexual component: after an escalating pattern of violence against his teenaged girlfriend, he locked her a bedroom, "entered the bedroom, stabbed the victim, beat her and cut her nipple off of her right breast before forcing her to swallow it." 🔖 *Id.* at 79. Not only was this undisputed conduct sufficient to meet the technical requirements for a SOTN score of "3" under the prison's classification manual (a "sexual offense" involving "physical conduct"); it was surely sufficient to earn Vega the label of "sex offender." *See* 🔖 *id.* at 83 ("If Vega had not been convicted of amputating a part of a sixteen year old girl's body that is classified as a sexual organ under Connecticut law, this may well have presented a different case.").

The present action is "a different case." Plaintiff does not deny that he "was convicted of an offense that is designated under SORA to require registration," Def. Prelim. Inj. Opp. Mem. at 11, but he does deny that he is a "sex offender" as that term is commonly understood, *see* SAC ¶ 10 (plaintiff "has never committed sexual misconduct"). Thus, he squarely alleges that his designation as a sex offender is both false and injurious, *Pisani*, 424 F. Supp. 2d at 718. This case is more like 🚩 *Dep't of Pub. Safety*, 271 F.3d at 49, in which the plaintiff admitted that he was convicted of a registrable offense but was stigmatized by the implication that he was "currently dangerous," which he denied. *See also Valmonte*, 18 F.2d at 1000-04 (plaintiff met the technical requirements for inclusion on the Central Register of Child Abuse and Maltreatment, but was stigmatized because the listing "brand[ed] her as a child abuser," which she denied).[23]

The courts, like the prison officials sued in *Vega v. Lantz*, are "under no constitutional obligation to blind themselves to reality." 🔖 596 F.3d at 84. In this case, the reality—alleged by plaintiff and undisputed by the State of New York—is

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 92 of 134

that plaintiff has never been convicted of, charged with, or engaged in any sexual misconduct, but has nonetheless been branded a sex offender. Under these facts, in my view, plaintiff has adequately alleged a constitutionally protected liberty interest.

### 2. Sufficiency of Process

The second step of the procedural due process analysis asks whether the procedures by which plaintiff was deprived of his liberty interest were "constitutionally sufficient.' " *Doe v. Pataki,* 3 F. Supp. 2d at 466. The parties agree that plaintiff has already had "two separate full-blown adversarial proceedings in court," Def. Prelim. Inj. Opp. Mem. at 12: his criminal prosecution, which ended in his 2002 kidnapping plea, and his 2016 SORA hearing, which ended in his level one classification. They disagree as to whether any further process is due.

Defendants rely on *Conn. v. Doe,* 538 U.S. at 7-9, and *Doe v. Cuomo,* 755 F.3d 105 (2d Cir. 2014), both of which held that a person who has been convicted of an offense requiring registration under SORA is not entitled to any additional hearing, either *ex ante* (in *Conn. v. Doe* ) or *ex post* (in *Doe v. Cuomo* ), to adjudicate his obligation to register. These cases, defendants contend, require me to conclude that once plaintiff was convicted of a registrable offense—here, kidnapping an unrelated minor—"[t]here is no inquiry left to be made and no reason to require elaborate procedures to make it." *Doe v. Cuomo,* 755 F.3d at 113. I agree.

 **\*20**  In *Conn. v. Doe,* the respondent was a "convicted sex offender" who challenged Connecticut's sex offender registration statute on procedural due process grounds, arguing that he was entitled to a pre-deprivation hearing to determine whether he was "currently dangerous." 538 U.S. at 5-6. The Court assumed, *arguendo,* that sex offender registration deprived respondent of a liberty interest, but rejected his claim because state law did not require that the offender be "dangerous" before he could be made to register, *Id.* at 7 ("the law's requirements turn on an offender's conviction alone"), and "due process does not entitle him to a hearing to establish a fact that is not material under the Connecticut statute." *Id.* The Court held, in essence, that respondent's *procedural* due process rights were circumscribed by the express terms of the statutory test for

sex offender registration. "Unless respondent can show that a *substantive* rule of law is defective (conflicting with a provision of the Constitution), any hearing on dangerousness is a bootless exercise." *Id.* at 7-8 (emphasis in the original). Since the respondent did not raise any substantive due process challenge, the Court did not consider whether a state could constitutionally require sex offenders to register without any individualized dangerousness determination. *Id.* at 8.

A decade later, our Circuit applied the same rule in *Doe v. Cuomo,* brought by a New York resident who pled guilty in 1999 to a single misdemeanor count of attempted possession of child pornography. 755 F.3d at 108. Appellant Doe was sentenced to a term of probation and classified as a level one offender. After nearly 12 years on the sex offender registry, Doe sought relief in federal court pursuant to § 1983, arguing (among other things) that he had a procedural due process right to a hearing "to show that he was not a danger to the community." *Id.* at 113. Relying on *Conn. v. Doe,* the Second Circuit rejected that claim, because in New York, as in Connecticut, actual dangerousness is irrelevant to sex offender registration:

> Although Doe contends that the State did not afford constitutionally adequate procedures in applying SORA to him, there was no fact that would require a protective *procedure* to determine. New York State has concluded—as it was constitutionally entitled to do—that the mere fact of conviction of certain sex offenses justifies the imposition of SORA's registration, notification, and other restrictions.

*Id.* (emphasis in the original).

Plaintiff distinguishes both of these cases on the ground that the offenders who filed them were convicted of sex crimes—that is, crimes that were "inherently sexual," Pl. Prelim. Inj. Reply Mem. at 2—whereas he, having never been convicted of or even charged with sexual misconduct, should be afforded an opportunity to argue that he is "not a sex offender at all." *Id.* In the *procedural* due process context,

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 93 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

however, this is a distinction without a difference. "Plaintiffs who assert a right to a hearing under the Due Process Clause must show that the facts they seek to establish in that hearing are relevant under the statutory scheme." *Conn. v. Doe*, 538 U.S. at 8. The fact that plaintiff Yunus seeks to establish —that there was no sexual component to his crimes—is not "relevant under the statutory scheme," *id.*, because New York has concluded that everyone convicted of kidnapping an unrelated minor must register as a sex offender. *See* CL §§ 168-a(1), 168-a(2)(a)(i). Plaintiff admittedly kidnapped an unrelated minor. Since "[a]ll of the facts necessary to conclude that SORA restrictions apply to [Yunus] are ... known and unchallenged, *Doe v. Cuomo*, 755 F.3d at 113, "[t]here is no inquiry left to be made." *Id.*

Moreover, no principle of *procedural* due process prevents New York from applying SORA to those who, like plaintiff, kidnapped unrelated minors but did not sexually assault them. *See Conn. v. Doe*, 538 U.S. at 8. "Unless [plaintiff] can show that a *substantive* rule of law is defective," any hearing on whether there was a sexual component to his crime would be "a bootless exercise." *Id.* at 7 (emphasis in the original). In short, plaintiff's claim " 'must ultimately be analyzed' in terms of substantive, not procedural, due process." *Id.* (quoting *Michael H. v. Gerald D.*, 491 U.S. 110, 121 (1989) (plurality opinion) ).

**\*21** Since plaintiff's procedural due process claim cannot withstand the logic of *Conn. v. Doe* and *Doe v. Cuomo*, I respectfully recommend that his First Claim for Relief be dismissed.

### D. Second Claim—Substantive Due Process

Neither the Supreme Court nor the Second Circuit has addressed the substantive due process issue presented in this action, which is whether New York may constitutionally include, among those required to register as sex offenders, a person who was convicted of kidnapping an unrelated minor but has never engaged in any actual or attempted sexual misconduct. The parties agree that since freedom from sex offender registration is not a "fundamental right," as that term is used in constitutional analysis, this Court must apply the "rational basis" test, which does not ask whether the statute is wise, nor even whether it is substantially related to an important governmental objective, but only whether it is "rationally related to a legitimate government interest."

*Winston v. City of Syracuse*, 887 F.3d 553, 566 (2d Cir. 2018) (holding that city could not constitutionally terminate water service to tenants whose landlords failed to pay their water bills).

Although "[t]his form of review is highly deferential," *Winston*, 887 F.3d at 560, "it is not meant to be toothless." *Id.* (quoting *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013) ). Even under the rational basis test, a state may not "rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) (invalidating city zoning ordinance that required special use permit to operate group home for the mentally retarded); *see also Diaz*, 150 A.D.3d at 65-66, 50 N.Y.S.3d at 392 (applying rational basis review and concluding that a convicted child murderer whose crime had no sexual component could not be required to register as a sex offender under SORA because "the connection between defendant's crime and the legislative purpose behind SORA is too attenuated").

Defendants urge this Court to adopt the reasoning of *Knox*, which held that New York may constitutionally treat all child kidnappers as "sex offenders," whether or not there was any sexual component to their crimes. *See* Def. MTD Mem. at 9-10; Def. Prelim. Inj. Opp. Mem. at 14-15; Def. MTD Reply Mem. at 3-4. The parties agree, however, that a federal district court is not bound by the decision of a state court on a matter of federal constitutional law. *See* Pl. Prelim. Inj. Mem. at 13 (Dkt. No. 44); Def. Prelim. Inj. Opp. Mem. at 14; *United States v. Diaz*, 854 F.3d 197, 208 (2d Cir. 2017). Outside of New York, the state courts are split on the precise question presented here,[24] and neither side cited any federal precedent.[25] After carefully considering the arguments on both sides in light of the standards set by the Second Circuit —most recently in *Winston*, 887 F.3d at 566—I conclude that plaintiff "plausibly alleges a violation of substantive due process," *id.*, and that no additional fact-finding is required to determine whether he is entitled to preliminary injunctive relief.

**\*22** The purpose of SORA, as articulated in its enabling legislation, is to combat "the danger of recidivism posed by *sex offenders*, especially those *sexually violent* offenders

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 94 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

who commit predatory acts characterized by repetitive and compulsive behavior," and to assist the criminal justice system "to identify, investigate, apprehend and prosecute *sex offenders*." 1995 N.Y. Sess. Laws ch. 192, § 1; *see also* 2006 N.Y. Sess. Laws ch. 1, § 1 (increasing length of registration periods to provide "better tracking and monitoring of *sex offenders*") (emphases added). [26] The question for this Court, therefore, is whether the statute is unconstitutional as applied to a person who—although convicted of a serious crime against a minor—did not engage or attempt to engage in the conduct that the statute was intended to combat.

In *Knox*, the Court of Appeals held that there is a rational connection between the purpose of SORA and the inclusion of certain non-sexual kidnappings as "sex offenses" requiring registration, because "a great many cases of kidnapping or unlawful imprisonment of children are indeed sex offenses." 12 N.Y.3d at 68. *Knox* cited, *inter alia*, a 2002 study reporting that in "46% of the nonfamily abductions studied, the perpetrator had sexually assaulted the child," *id.*, [27] and reasoned that the Legislature "could rationally have found that the statistics understate the problem. It could have found that sexual assault occurs in many cases where there is no direct evidence of it—in cases where the victim is killed, or remains missing, or is unable or unwilling to recount his or her ordeal." *Id.* The court recognized that blanket rule enacted by the Legislature would inevitably sweep in some for whom the term "sex offender" was "unmerited," *Id.* at 69, but concluded that the "administrative burden" of identifying those individuals, together with "the risk that some dangerous sex offenders would escape registration," justified "a hard and fast rule, with no exceptions," particularly since "defendants are suffering no worse injustice than being called 'sex offenders' instead of 'child predators,' " which would arguably be accurate. *Id.* The Illinois and Wisconsin courts articulated similar rationales for their own states' "hard and fast" registration rules. *See* *Johnson*, 225 Ill. 2d at 586 (citing the same 2002 study and reasoning that "[o]ur General Assembly, like New York's legislature, recognized that aggravated kidnapping can be a precursor to sex offenses"); *Smith*, 323 Wis. 2d at 402 (citing *Johnson* and reasoning that the legislature could have "rationally concluded that child abductions are often precursors to sexual offenses").

**\*23** In *Robinson*, however, the Florida high court rejected a virtually identical argument, [28] explaining that the statistical linkage between child kidnapping and sex offending might satisfy the rational basis test in a facial challenge to the law but could not defeat an as-applied challenge brought by a plaintiff whose crime, though serious, [29] was concededly non-sexual:

> [W]e assume, without deciding, that the Act's designation of child kidnappers as sexual predators is rationally related to the legislative purpose of protecting children from sexual predators. Although the Legislature's concern for protecting our children from sexual predators may be reasonable, however, the application of this statute to a defendant whom the State concedes did not commit a sexual offense is not. Robinson's designation as a sexual predator can fulfill none of the statute's purposes. The State conceded he did not commit a sexual offense, and he left the infant child at a doctor's office a few blocks from where he and his companion appropriated the car. Thus, no question remains about whether Robinson possibly could have committed a sexual act on the child. No rational relationship exists between the statute's purpose of protecting the public from known sexual predators and Robinson's designation as one.

*Robinson*, 873 So. 2d at 1215. Yunus, like Robinson, does not claim that that SORA is unconstitutional on its face, nor even as applied to kidnappers whose convictions rest on ambiguous facts. Rather, he makes the "narrow" argument, *see* id. at 1217, that SORA is unconstitutional as applied to a person "who has received a judicial finding that he never has and near certainly never will commit a sexual offense." Pl. Prelim. Inj. Mem. at 12.

Plaintiff also argues, with some force, that the *Knox* court failed to appreciate the costs of sex offender registration, particularly when it dismissed as relatively trivial the "injustice" of being inaccurately called a "sex offender" as opposed to some other, more accurate label. *See* Pl. Prelim. Inj. Mem. at 14 ("this reasoning ignores the power of the

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 95 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

term 'sex offender' "). The Supreme Court has recognized that even rational basis review must take into account the "countervailing costs" to the targets of the challenged statute.

*Plyler v. Doe*, 457 U.S. 202, 223-24 (1982) (striking Texas statute that effectively barred undocumented alien children from public schools, even though no fundamental right or suspect class could be identified, in part due to the "lifetime hardship" and "stigma of illiteracy" that would "mark them for the rest of their lives"). The Court has also recognized that forced registration as a sex offender is a particularly harsh consequence of a criminal conviction, characterizing it as "state-sponsored condemnation" of selected criminal conduct, *Lawrence v. Texas*, 539 U.S. 558, 575-76 (2003), which in turn has a "consequential" impact on the designated offender's liberty interests. *Id.* at 576-77 (holding Texas sodomy statute unconstitutional after noting, among other things, that a person convicted under the statute would be required to register as a sex offender, and thus that the "stigma" of the conviction "is not trivial"). *See also* *Robinson*, 873 So. 2d at 1213 ("the Act imposes more than a stigma"); *ACLU of New Mexico*, 139 N.M. at 772, 137 P.3d at 1226 (invalidating "no exceptions" sex offender registration requirement because, among other things, "the hardship imposed on an offender convicted of kidnaping or false imprisonment to be labeled a sex offender, absent any evidence of a sexual motivation for the crime, is great"); *Diaz*, 150 A.D.3d at 66, 50 N.Y.S. 3d at 392 (implicitly critiquing *Knox* for downplaying "the harm caused to the individual who is forced to register," particularly where "he or she has committed a crime that has no sexual component").

**\*24** Not only do registered sex offenders face the profound stigma of the label itself, as discussed in Part V(C)(1) of this Report, *supra*; even if they are no longer on parole or supervised release, registration subjects them to a long list of filing requirements, [30] employment prohibitions, both *de jure* and *de facto*, [31] residency restrictions, [32] and other civil disabilities. [33] In addition, sex offender registration triggers a host of expanded criminal risks, including state and federal felony penalties for failure to register, *see* CL § 168-t (making failure to register a Class E felony for the first offense and a Class D felony for a second or subsequent offense); 18 U.S.C. § 2250(a) (mandating a federal prison term of up to ten years for a knowing failure to register as required under state law), and enhanced federal penalties for certain offenses committed while on a sex offender registry. *See, e.g.*, 18

U.S.C. § 2260A (prescribing a mandatory minimum of ten years in prison for defendants who commit certain crimes against minors while "being required by Federal or other law to register as a sex offender").

**\*25** Given the potentially devastating consequences of compelled sex offender registration, I cannot conclude that due process is satisfied by a statistical showing that 46% of the kidnappers placed on the sex offender registry—a group which does not include the plaintiff at bar—deserve to be there. *See* *City of Cleburne*, 473 U.S. at 446-47 (even under rational basis test, state may not "rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational"); *Diaz*, 150 A.D.3d at 65-66, 50 N.Y.S.3d at 392 (the relationship between murder and sex offending was "too attenuated" to require a child murderer whose crime concededly had no sexual component to register under SORA). Nor can I conclude that the "administrative burden" of determining which kidnappers are sex offenders, *Knox*, 12 N.Y.3d at 69, makes it rational for the State of New York to subject plaintiff Yunus to 20 years of public opprobrium, housing and employment barriers, exacting filing requirements, and heightened criminal risk after *conceding* that—for him—the term is "unmerited." *Id. See* *Winston*, 887 F.3d at 565 (city cannot "rationally" compel tenants to pay their landlords' water bills). I therefore conclude that plaintiff has plausibly alleged a violation of his substantive due process rights and recommend, respectfully, that defendants' motion to dismiss be denied as to the Second Claim for Relief. [34] Since there is no dispute as to the non-sexual nature of plaintiff's underlying crimes, I also conclude that plaintiff has demonstrated "a clear or substantial likelihood of success on the merits," *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d at 294, requiring me to consider (in Part V(I) of this Report, *infra* ) whether preliminary injunctive relief is warranted.

### E. Third Claim—Vagueness

In his Third Claim for Relief, asserted against all defendants, Plaintiff contends that three of his parole conditions are unconstitutionally vague. SAC ¶¶ 152-58; *see also* Pl. Prelim. Inj. Mem. at 15-19. Special Condition No. 4, which excludes plaintiff from "school grounds"—defined to include public areas within 1,000 feet of the school—is unenforceable, according to plaintiff, because EL § 259-c(14), which mandates this condition, "provides little explanation as to

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 96 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

how 1,000 feet should be measured," making it "nearly impossible for even the most resourceful parolee to accurately assess his limitations without more guidance as to what falls within a restricted area." *Id.* at 17. Similarly, plaintiff argues that Special Condition No. 17, which prohibits him from being "within 300 yards of places where children congregate," is unconstitutionally vague as written and is not saved by the list of examples provided ("toy stores, parks, pet stores, schools, playgrounds, video galleries, malls, bike trails, skating rinks, amusement parks, bowling parks, bowling alleys, pool halls, etc."), because the list contains so many "dissimilar" establishments that "it is impossible to discern what threshold of child attendance constitutes a place where children 'congregate.' " Pl. Prelim. Inj. Mem. at 18-19. Finally, plaintiff objects to Special Condition No. 24, which directs him to notify his parole officer and make certain disclosures when he "establish[es] a relationship with a consenting adult," because "it is impossible to know what is meant" by the word "relationship." Pl. Prelim. Inj. Mem. at 24, 25. Plaintiff has persuaded me that the first two conditions are unconstitutionally vague. Defendants have persuaded me that the third condition is not.

"A special condition of parole that is so vague that a person of common knowledge must guess at its meaning will be struck down as void for vagueness." *LoFranco v. U.S. Parole Comm'n*, 986 F. Supp. 796, 808 (S.D.N.Y. 1997), *aff'd*, 175 F.3d 1008 (2d Cir. 1999). Parole conditions must be "sufficiently clear to inform [the defendant] of what conduct will result in his being returned to prison." *Id.* (internal quotation marks omitted). This is the same standard used to determine whether criminal statutes are unconstitutionally vague. *See Copeland v. Vance*, —— F.3d ——, 2018 WL 3076907, at *3 (2d Cir. June 22, 2018) ("In any vagueness case ... the challenger can prevail by showing that the statute either 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or 'authorizes or even encourages arbitrary and discriminatory enforcement.' ") (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000) ). "Simply stated, parolees must know what actions a special condition prohibits in order to avoid due process violations." *LoFranco*, 986 F. Supp. at 808, 811 (upholding a prohibition on associating with the Hell's Angels but striking, as unduly vague, a prohibition on associating with other "outlaw motorcycle gangs").

### 1. The 1,000-Foot Rule

**\*26** Plaintiff relies heavily on *Doe v. Snyder*, 101 F. Supp. 3d 672 (E.D. Mich. 2015), which invalidated a portion of Michigan's Sex Offender Registration Act making it a crime for registered sex offenders to work, "loiter," or reside within a "school safety zone," defined as "the area that lies 1,000 feet or less from school property." *Id.* at 682. The Michigan statute provided "no guidance as to whether the 1,000 feet distance should be measured 'point to point' or 'property-line to property line' nor whether it should be measured 'as the crow flies or as people actually travel.' " *Id.* at 683. Moreover, although the Michigan State Police were developing a software program "to precisely determine the geographic exclusion zones," it was not yet operational; consequently, "neither the registrants nor law enforcement have the necessary data to determine the zones even if there were a consensus about how they should be measured." *Id.* at 684. "Accordingly, due to SORA's vagueness, registrants are forced to choose between limiting where they reside, work, and loiter to a greater extent than is required by law or risk violating SORA." *Id.* at 684-85. *See also Doe v. Strange*, 2016 WL 1079153, at *2 (M.D. Ala. Mar. 18, 2016) (enjoining enforcement of an Alabama statute barring registered sex offenders from establishing or maintaining a residence "or other living accommodation" within 2,000 feet of a school, childcare facility, or resident camp). [35]

New York's 1,000-foot rule does not suffer from the same infirmities as the Michigan statute at issue in *Doe v. Snyder*. Special Condition No. 4 uses the term "school grounds" as defined in PL § 220.00(14), which in turn specifies that "school grounds" include a 1,000-foot buffer zone measured from "the real property boundary line comprising any such school." Just as clearly, the New York courts have held that the 1,000-foot distance is to be measured "by a straight-line or 'as the crow flies' method, and not as measured along the route a pedestrian would be required to travel, including detours around obstructions." *People v. Robbins*, 10 A.D.3d 570, 571, 782 N.Y.S.2d 80, 81 (1st Dep't 2004), *aff'd*, 5 N.Y.3d 556, 807 N.Y.S.2d 7 (2005). Moreover, unlike the Michigan State Police, New York parole officers not only agree on how to measure the distance but use the CIRIS software program, which allows them to "precisely determine" whether a proposed residence is SARA-compliant. *See* Lewis-Robinson Decl. ¶¶ 8-13 & Exs. A-B.

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 97 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

It is no doubt inconvenient for plaintiff—and for other parolees seeking SARA-compliant housing—that Google Maps and other publicly-available programs do not provide the same level of precision as CIRIS. The problem is compounded by the fact that "[i]n dense urban areas like New York City, a vast proportion of the housing stock is located within 1,000 feet of a school." *Floyd Y.*, 56 Misc. 3d 271 at 274, 50 N.Y.S.3d at 850; *see also* *Williams*, 136 A.D.3d at 150, 24 N.Y.S.3d at 21 ("most of Manhattan" is within 1,000 feet of a school); *Devine v. Annucci*, 45 Misc. 3d 1001, 1006 (Sup. Ct. Kings Co. 2014) ("large swaths of New York City," including a "very substantial portion of Brooklyn," are within 1,000 feet of a school), *rev'd*, 150 A.D.3d 1104, 56 N.Y.S.3d 149 (2d Dep't 2017). But this does not make Special Condition No. 4 unconstitutionally vague—at least not if it merely constitutes a "residency restriction," which is how defendants describe it. *See* Def. MTD Mem. at 11; Def. Prelim Inj. Opp. Mem. at 17.

Like many other parolees (whether or not designated sex offenders), plaintiff must "reside at the address [his] PO has on record for [him]" and "discuss any proposed changes in [his] residence ... with [his] Parole Officer" *before* he moves. *See* Yunus Decl. Ex. B, at ECF page 4, ¶ 2 & Ex. C, at ECF page 2, ¶ 3. Thus, unlike the plaintiffs in *Doe v. Snyder*—who were all "Tier III" offenders, no longer on parole but required to stay out of "school safety zones" for life, 101 F. Supp. 3d at 678—plaintiff is in no danger of inadvertently moving into a non-compliant residence. *Cf. LoFranco*, 986 F. Supp. at 808 ("The 'essential purpose of the "void for vagueness" doctrine is to warn individuals of the criminal consequences of their conduct.' ") (quoting *Jordan v. De George*, 341 U.S. 223, 230 (1951) ). Moreover, he will be free from Special Condition No. 4 once he is no longer subject to parole supervision. For these reasons, if New York's 1,000-foot rule merely restricted where a parolee could reside, it would not be unconstitutionally vague. By the same token, the Parole Officer Defendants cannot be made liable in damages for their past conduct in relation to the 1,000-foot rule. Since the rule was mandated by statute for registered sex offenders whose victims were minors, they had no choice but to impose it upon plaintiff. Nor did they violate his due process rights by refusing to permit him to reside in an apartment that they objectively determined to be within the proscribed buffer zone.

**\*27** But this does not end the inquiry, because Special Condition No. 4 is not simply a residency restriction, and plaintiff seeks prospective injunctive relief against its enforcement. "That a statute was lawfully applied to one set of facts does not necessarily prove that it may lawfully be applied to a different set of facts." *Copeland*, 2018 WL 3076907, at \*5 (explaining that a plaintiff bringing a "prospective, as-applied challenge" on vagueness grounds need not show that prior enforcement actions were invalid). As mandated by EL § 259-c(14), the challenged condition prohibits plaintiff from "knowingly enter[ing] into or upon school grounds," defined to include all publicly-accessible areas within 1,000 feet of the school's property line, at least "while one or more ... persons under the age of 18 are present." By its terms, this condition puts plaintiff at risk of parole revocation for working, shopping, or even walking down the sidewalk if he knows there is a preschool, elementary school, middle school, or high school in session within 1,000 feet of his route. *See Williams*, 136 A.D.3d at 149, 24 N.Y.S.3d at 20 (SARA "prohibits sex offender parolees from residing *or traveling* near schools") (emphasis added). [36] Moreover, "the fact that there are schools and childcare facilities throughout New York City is something everyone ... knows." *Floyd Y.*, 56 Misc. 3d at 273, 50 N.Y.S.3d at 849. [37] Thus, Special Condition No. 4 presents both of the risks that trigger the vagueness doctrine: making it difficult if not impossible for a parolee to know what conduct is prohibited, *see LoFranco*, 986 F. Supp. at 808, [38] and encouraging "arbitrary and discriminatory application," *Id.* at 810 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ), by "defin[ing] as a rule violator any respondent who happens to be present on most sidewalks, streets, restaurants, stores, parking lots, parked vehicles and parks in New York City during school hours." *Floyd Y.*, 56 Misc. 3d at 276, 50 N.Y.S.3d at 851.

It is tempting, in a case like this, to construe the restriction narrowly, in order to avoid constitutional doubt. That is what the Eighth Circuit did in *Weems v. Little Rock Police Dep't*, 453 F.3d 1010 (8th Cir. 2006), when faced with a challenge to an Arkansas law that made it a crime for certain sex offenders to "reside within two thousand feet (2,000') of the property" on which any school or daycare facility is located. 453 F.3d at 1013. The court rejected the suggestion that the term "reside" also prohibited offenders from "working or studying within 2000 feet of a school or daycare center," and upheld

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 98 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

the constitutionality of the 2,000-foot rule as so limited. *Id. at 1016* ("[W]e see no good reason to create more difficult constitutional questions by adopting a broad construction that the State itself eschews.").

In New York, however, the statute does not even use the term "reside." Instead, employing unmistakably broad language, it instructs the Board of Parole to "require, as a mandatory condition of [the offender's release on parole], that such sentenced offender shall refrain from knowingly *entering into or upon* any school grounds." EL § 259-c(14) (emphasis added). The Supreme Court recently reminded the lower federal courts that the doctrine of constitutional avoidance, under which "a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems," has no application unless the statute "is found to be susceptible of more than one construction." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836, 842 (2018) (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005) ). If an interpretation that would avoid constitutional doubt is "implausible," the court may not rely upon it to sidestep the difficulty. *Jennings*, 138 S. Ct. at 842-43 ("That is not how the canon of constitutional avoidance works. Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases. Instead, the canon permits a court to 'choos[e] between competing *plausible* interpretations of a statutory text.' ") (quoting *Clark*, 543 U.S. at 381) (emphasis added). *See also* *Grayned*, 408 U.S. at 110 (noting, in the context of a vagueness challenge, that "it is not within our power to construe and narrow state laws"). Consequently, this Court cannot rewrite EL § 259-c(14), nor interpret Special Condition No. 4 as nothing more than a residency restriction.

**\*28** Having determined that Special Condition No. 4 is too vague to enforce as written, and is not susceptible of a plausible competing interpretation that would cure the deficiency, I also conclude that plaintiff has demonstrated a clear or substantial likelihood of success on the merits as to that claim. I therefore recommend, respectfully, that defendants' motion to dismiss the Third Claim for Relief be denied insofar as plaintiff seeks injunctive relief against the prohibition on "entering" any publically-accessible area within 1,000 feet of a school's property line.[39]

### 2. The 300-Yard Rule

Special Condition No. 17, which is not mandated by any statute, is even more problematic. First, it too goes well beyond regulating where plaintiff may reside, expressly prohibiting plaintiff from "enter[ing]" or "be[ing]" within 300 yards of "places where children congregate" unless he has the prior approval of his PO. Second, the rule provides no guidance as to how, or from what point, the distance should be measured. Nor does it reveal whether the no-go rule is in effect at all times, or only when children are in fact "congregating" in a qualifying "place." Fourth, and most significantly, the 300-yard rule applies not only to schools and childcare facilities but also to other places "where children congregate," making it extraordinarily difficult for a parolee, a parole officer, or any other "person of ordinary intelligence," *Copeland*, 2018 WL 3076907, at *3, to identify the "places" to which the parolee must give a 300-yard berth.

Significantly, Special Condition No. 17 is not limited to places where children are "likely" to congregate, *cf.* *United States v. MacMillen*, 544 F.3d 71, 74 (2d Cir. 2008), or even places "primarily" used by children, *cf.* *United States v. Dupes*, 513 F.3d 338, 342 (2d Cir. 2008). Any place where children might conceivably congregate could be deemed off-limits, along with a 300-yard buffer zone on all sides. The examples given exacerbate rather than alleviate this difficulty: they include places designed for children (such as "toy stores" and "playgrounds"), places that attract both adults and children (such as "parks" and "malls"), and places that the hypothetical "person of common knowledge," *LoFranco*, 986 F. Supp. at 808, might think of as decidedly adult-oriented (such as "pool halls"). Unsurprisingly, given these uncertainties, defendants do not claim to have any software that will tell them whether a given location is or is not compliant with Special Condition No. 17. *See* Lewis-Robinson Decl. ¶ 9 (CIRIS draws a straight line "from the proposed residence to the property line at the edge of the parcel of any schools within 1,000 feet").

The parole condition at issue here is therefore distinguishable from the restriction upheld in *MacMillen*, where the sentencing judge prohibited a defendant from entering places "where children are *likely* to congregate" *544 F.3d at 74* (emphasis added), and provided a set of relatively consistent

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 99 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

examples ("schools, daycare facilities, playgrounds, theme parks, arcades, recreational facilities, and recreation parks"), all of which actually were places where children were likely to congregate. *Id.* It is also distinguishable from the condition at issue in *Dupes,* which required the defendant to stay more than one hundred feet from places "*primarily* used by children," such as "schoolyards, playgrounds and arcades." 513 F.3d at 342 (emphasis added).

**\*29** In *United States v. Peterson,* 248 F.3d 79, 86 (2d Cir. 2001), the Second Circuit rejected a condition prohibiting the defendant from "being on any school grounds, child care center, playground, park, recreational facility or in any area in which children are likely to congregate." This language, the court noted, left it unclear whether defendant would be barred from "visiting Yellowstone National Park or joining an adult gym." *Id.* The 300-yard rule at issue here is, in my view, even less clear. Moreover, the depth of the buffer zone imposed by Special Condition No. 17 (900 feet, compared to 100 feet in *Dupes* and no buffer zone at all in *MacMillen* or *Peterson* ), combined with the wide range of public and private establishments that might trigger the rule and the inability of either a parolee or his PO to accurately measure the edge of the 300-yard no-go zone, make it virtually impossible for a parolee in New York City to go anywhere at all without risking re-incarceration for a parole violation.[40]

For these reasons, I conclude that plaintiff has plausibly alleged that Special Condition No. 17 is unconstitutionally vague and that he has demonstrated a clear or substantial likelihood of success on the merits as to that claim. I therefore recommend, respectfully, that defendants' motion to dismiss the Third Claim for Relief be denied insofar as plaintiff seeks prospective relief against the 300-yard rule. However, plaintiff does not allege that this rule has been enforced against him in the past. Nor, in light of *MacMillen* and *Dupes,* can he plausibly allege that this condition violated "clearly established" legal rights "of which a reasonable person" supervising his parole would have known. *Christian,* 2018 WL 1441401, at \*2. The motion to dismiss should therefore be granted insofar as plaintiff seeks damages from any of the Parole Officer Defendants in connection with Special Condition No. 17.

### 3. The Relationship Rule

In *United States v. Reeves,* the Second Circuit considered a condition of supervised release that required the releasee to "notify the Probation Department when he establishes a significant romantic relationship and ... inform the other party of his prior criminal history concerning his sex offenses." 591 F.3d 77, 80 (2d Cir. 2010). The court concluded that the condition was too vague to be enforced because "people of common intelligence (or, for that matter, of high intelligence) would find it impossible to agree on the proper application of a release condition triggered by entry into a 'significant romantic relationship.' " *Id.* at 81. The court criticized both limiting terms, noting that "[w]hat makes a relationship 'romantic,' let alone 'significant' in its romantic depth, can be the subject of endless debate that varies across generations, regions, and genders." *Id.* Therefore, the court explained, "the supervised release condition has no objective baseline." The court agreed that Reeves's "continued freedom during supervised release should not hinge on the accuracy of his prediction of whether a given probation officer, prosecutor, or judge would conclude that a relationship was significant or romantic." *Id.*; *accord United States v. Orozco,* 371 F. App'x 188, 189 (2d Cir. 2010).

Plaintiff argues that Special Condition No. 24 is even more amorphous in its description of what triggers the reporting requirement: "a relationship" with "a consenting adult." Since the word "relationship" is not limited in any way, plaintiff contends, no "objective baseline" is provided to assist him in determining what type of human interaction requires disclosure. Defendants counter that the required objectivity is found in the phrase "consenting adult," which makes it clear that a reportable relationship is a sexual relationship, and that since plaintiff has already disclosed his relationship with his fiancée, he "clearly understood the type of relationship the special condition targeted." *See* Def. MTD Mem. at 12-13 (noting that the dictionary definition of "consenting adult" is "[a]n adult who willing agrees to engage in a sexual act.").[41]

**\*30** I agree. A parolee of ordinary intelligence reading Special Condition No. 24 (particularly in context, among other conditions "for sex offenders") would no doubt conclude, as Yunus did, that the reporting requirement extended to his fiancée but not to the various non-sexual relationships in his life. *See State v. Maddox,* 2011 WL 4979925, at \*2 (Vt. Jan. 27, 2011) (distinguishing *Reeves* and holding that a condition requiring a probationer to report "a dating or romantic relationship" was not unconstitutionally vague). I therefore recommend, respectfully, that defendants'

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 100 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

motion to dismiss the Third Claim for Relief be granted as to the relationship rule.

#### F. Fourth Claim—First Amendment

In his Fourth Claim for Relief, asserted against all defendants, plaintiff challenges the various special parole conditions that restrict his access to computers, cellphones, and social media. He principally contends that Special Condition No. 48, which is a "mandatory parole condition that he not access 'any commercial social networking site,' " violates the First Amendment. SAC ¶ 161. He also alleges that he is prohibited from possessing a smartphone or a computer, *Id.* ¶ 162, which exacerbates the deprivation of his constitutional rights because "a cell phone and computer are the only means by which [he] can access social media." *Id.* Plaintiff seeks preliminary and permanent injunctive relief lifting all of his cellphone, computer, and internet restrictions, arguing that they are "unconstitutional abridgements of Mr. Yunus's First Amendment rights and, in any event, are baseless in light of his prior conduct." Pl. Prelim. Inj. Mem. at 20.

Last year, in *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), the Supreme Court held that registered sex offenders cannot be routinely or categorically barred from social media, even where—as in the North Carolina statute at issue there—the prohibition extends only to websites that could be used by minors. *Id.* at 1734. The Court began its analysis by acknowledging that online social networking is both a ubiquitous feature of modern civil society, *Id.* at 1735 ("[s]even in ten American adults use at least one internet social networking service") and the modern equivalent of the town square. *Id.* at 1737 (such services are, for many citizens, "the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge"). Because North Carolina's ban was "content neutral," the Court applied "intermediate scrutiny," under which a law that burdens speech must be 'narrowly tailored to serve a significant governmental interest' " and "must not 'burden substantially more speech than is necessary to further the government's legitimate interests.' " *Id.* at 1736 (quoting *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014) ). Under this test, a state may "enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor." *Packingham*, 137 S. Ct. at 1737. The state may not, however, "suppress lawful speech as the means to suppress unlawful speech," which was "what North Carolina has done here." *Id.* at 1738 (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) ).

Even before *Packingham*, courts in this Circuit looked with disfavor on broad cellphone, computer, and internet restrictions for sex offenders on parole or supervised release, generally requiring an individualized showing that a particular restriction "relates to [the offender's] prior conduct." *Singleton*, 210 F. Supp. 3d at 376. [42] Following *Packingham*, state and federal cases around the country have invalidated a variety of broad-based internet or social media restrictions imposed on sex offenders simply because they are sex offenders. To survive a constitutional challenge, any such restriction must be narrowly tailored to the history or known proclivities of the individual parolee, supervised releasee, or registered offender. *See, e.g., Doe v. Kentucky*, 283 F. Supp. 3d 608, 613 (E.D. Ky. 2017) (holding that statute prohibiting registered sex offender from accessing all social media websites that could be used by minors was not sufficiently "tailored" to pass constitutional muster, notwithstanding Doe's conviction for possessing child pornography, and enjoining defendants from enforcing the statute "not only against Mr. Doe, but altogether"); *Mutter v. Ross*, 240 W.Va. 336, 811 S.E.2d 866, 873 (2018) (noting that "*Packingham* made no exception for parolees" and invalidating special condition of parole preventing sex offender from accessing the internet where he had no "history of using the internet to engage in criminal behavior"). *Cf. United States v. Rock*, 863 F.3d 827, 830-32 (D.C. Cir. 2017) (upholding supervised release condition prohibiting sex offender from possessing a computer or going online without prior approval because Rock pleaded guilty to "distributing" child pornography "over the internet," such that as to him the restriction was "narrowly tailored" and not "arbitrary").

**\*31** Plaintiff Yunus has never been charged with any internet-related criminal conduct, sexual or otherwise. Yet Special Conditions No. 12 (no participation in "any online computer service that involves the exchange of electronic messages"), No. 35 (no beeper, scanner, or cellphone without PO permission, and no "video or photo-capable" phone), No. 39 (no computer, laptop, or "computer related materials," no "services that provide access to the internet," and no "public

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 101 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

or private computer network" without PO permission), and No. 48 (no "commercial social networking"), which all appear to be standard in New York for "sex offenders," significantly restrict his ability to possess, use, or access a computer, a cellphone, any other device capable of connecting to the internet, and largely block him not only from social networking sites but from the internet itself. Moreover, the prohibition on accessing any "commercial social networking website" is made mandatory for all covered parolees by EL 🚩 § 259-c(15). That is presumably why Special Condition No. 48, as written, is absolute, admitting no exceptions.

EL 🚩 § 259-c(15) also defines the term "commercial social networking website" broadly,[43] to include not only child- or teen-oriented sites but also mainstream adult sites such as Facebook (2.2 billion active users), YouTube (1.8 billion), Instagram (800 million), Twitter (336 million), and LinkedIn (106 million).[44] As a result, plaintiff and other covered parolees are forbidden from logging in to the public Facebook page maintained by DOCCS (@NYSDOCCS) or from following the official Twitter account maintained by the President of the United States (@realDonaldTrump). *See* 🏷️ *Knight First Amendment Inst. at Columbia Univ. v. Trump,* 2018 WL 2327290, at \*1, \* 15, \*20 (S.D.N.Y. May 23, 2018) (holding, among other things, that "the President's tweets from @realDonaldTrump ... are official records," that Twitter "is a designated public forum," and that "the blocking of the plaintiffs [from the President's Twitter account] based on their political speech constitutes viewpoint discrimination that violates the First Amendment").

For the reasons explained in Part V(E)(1) of this Report, *supra,* I am not free to ignore the mandatory language of EL 🚩 § 259-c(15) and Special Condition No. 48. Yet defendants do just that, arguing that "there is no such blanket prohibition," Def. Prelim. Inj. Opp. Mem. at 20, because plaintiff "has sought, and received permission to use the social media site LinkedIn" and "has not requested to use any other social media." Def. MTD Reply Mem. at 6. Defendants also note that plaintiff "has access to a computer and social media for academic purposes," and assert that he "is allowed to possess a cellular phone as long as it does not have video or picture capabilities." *Id.*

**\*32** Defendants overstate the facts. Plaintiff has never been permitted to possess a computer or laptop of his own for any purpose. He has been intermittently permitted to possess

a cellphone, but at various times (including the present) he has been told that he may not have a "smart phone," that is, an ordinary modern phone capable of connecting to the internet. *See* Yunus Decl. ¶ 29; Yunus Reply Decl. ¶¶ 14-19 & Ex. A (Dkt. No. 71-1) (notice confirming that plaintiff's "previous authorization to possess a smart phone has been rescinded"). If plaintiff violates any of these conditions he can be returned to prison. This has already occurred once: as PO Lewis-Robinson attests, plaintiff was found guilty of a parole violation and re-incarcerated for several months in 2017 (prior to *Packingham* ) because he was "found to be in possession of an unapproved smart phone and personal laptop." Lewis-Robinson Reply Decl. ¶¶ 12-13.

To be sure, plaintiff is allowed to use the computers at BMCC (when he is on campus), but only "for academic purposes" and to communicate with his lawyers. Yunus Decl. ¶ 30; Lewis-Robinson Decl. ¶ 23. He was also permitted to access LinkedIn (notwithstanding the mandatory nature of the social networking prohibition), but only "as part of a project for a marketing class" at BMCC. Yunus Reply Decl. ¶ 18. Plaintiff remains barred from accessing any other social media site, *Id.* ¶¶ 17, 19, and now that he has no smart phone he is unable to connect to the internet at all, except during the limited time he spends on the BMCC campus (and then only for limited purposes). Yunus Decl. ¶ 31. The record thus reveals that while defendants have not barred plaintiff entirely from the internet, they have significantly restricted his online access through a variety of overlapping parole conditions, and but for a single exception—a LinkedIn account created for a college course—have barred him completely from social media in accordance with the mandate of EL 🚩 § 259-c(15). That mandate, in my view, cannot survive *Packingham.*[45]

Moreover, defendants make no effort to link *any* of the cellphone, computer, camera, social media, or other internet restrictions at issue here to plaintiff's criminal history, and consequently fail to demonstrate that they are "narrowly tailored," as the Constitution requires, to combat any identifiable danger that plaintiff would present if permitted to step into the modern equivalent of the town square. 🏷️ *Packingham,* 137 S. Ct. at 1737. That is because the record discloses no such danger. Plaintiff did not use the internet (or a camera) to commit his crimes. Nor has he engaged in any other internet-enabled misconduct. To the contrary: plaintiff asserts—and defendants do not contest— that he has never been accused of sexual misconduct of any sort, online or otherwise. He thus presents none of the risks

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 102 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

that led the Legislature to prescribe the social media ban in 2008. *See* 2008 N.Y. Sess. Laws ch. 67, § 1 (effective April 28, 2008) (enacting mandatory social media ban for certain sex offenders on parole in order to protect children against "sexual predators" who stalk the internet anonymously "while attempting to engage children in illicit activity").

**\*33** Since defendants have offered nothing but plaintiff's status as a sex offender to justify the sweeping restrictions they have imposed on his access to cellphones, computers, social media, and the internet generally—and since nothing in the record before me suggests that any better justification exists—I conclude not only that plaintiff has plausibly alleged a violation of his First Amendment rights but also that he has demonstrated a clear and substantial right to relief. I therefore recommend, respectfully, that defendants' motion to dismiss the Fourth Claim for Relief be denied insofar as it seeks prospective injunctive relief.

Insofar as the Fourth Claim seeks damages against the Parole Officer Defendants in their individual capacities, I must consider (a) whether plaintiff has plausibly alleged that they personally participated in the alleged deprivation of his constitutional rights, and (b) if so, whether they are nonetheless entitled to qualified immunity. *See Christian,* 2018 WL 1441401, at \*2. Plaintiff alleges generally that all three of his POs—Smith, Vasquez and Lewis-Robinson—imposed the Sex Offender Conditions on him without regard to the specifics of his case. *See* SAC ¶¶ 41-42 (Smith), 45-46 (Vasquez), 51-53 (Lewis-Robinson). However, he does not allege that he ever discussed the social media ban or related restrictions with Smith or Vasquez (or their supervisors), much less that he asked any of them for a computer, a smart phone, internet access, or access to social media. Moreover, as noted above, Condition No. 48 is required by statute. Thus, plaintiff has failed to plausibly allege that these defendants are liable to him in their individual capacities for violating his First Amendment rights.

PO Lewis-Robinson was personally involved in the alleged deprivation. Plaintiff alleges that it is Lewis-Robinson who has permitted him to use a cellphone "only for his education and to communicate with counsel," *Id.* ¶¶ 85-86; who has not allowed him to use any computers other than those at BMCC—also for limited purposes, *Id.* ¶¶ 87-89; and who has forbidden any "non-academic use of the internet or social media." *Id.* ¶ 88. Moreover, it is undisputed that (after the SAC was filed) Lewis-Robinson rescinded her previous authorization for plaintiff to use a smart phone, Yunus Reply

Decl. ¶¶ 14-16 & Ex. A; Lewis-Robinson Reply Decl. ¶ 29, and that she has never allowed plaintiff to access any social media other than LinkedIn, which she permitted during the spring 2016 and fall 2017 semesters as part of a class project. Yunus Reply Decl. ¶¶ 18-19.

Notwithstanding her hands-on involvement in the challenged parole restrictions, I conclude that Lewis-Robinson cannot be made personally liable for any First Amendment deprivations that plaintiff suffered at her hands prior to June 19, 2017, when *Packingham* was decided. "The doctrine of qualified immunity protects government officials from suit if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) ). Prior to *Packingham,* it was not "clearly established" that a social media ban would violate the constitutional rights of parolees such as plaintiff—who implicitly concedes as much, arguing only that "[t]he Supreme Court's unmistakable holding [in *Packingham*] made it unreasonable for the Defendants to rely on this state's statutory requirement when prescribing conditions of parole." Pl. MTD Opp. Mem. at 24. I therefore recommend, respectfully, that insofar as the Fourth Claim seeks damages from the Parole Officer Defendants, it be dismissed except as to defendant Lewis-Robinson's conduct after June 19, 2017.

### G. Fifth Claim—Interference with Familial Relations

**\*34** As noted above, Special Condition No. 15 prohibits plaintiff from having any contact with children under the age of 18 without the prior approval of his PO. Plaintiff does not challenge this condition on its face. Instead, he alleges that defendants Lewis-Robinson, Young, and Jones violated his "right to come together with members of his family" by refusing to make any exceptions to the no-contact-with-minors rule, even for holiday gatherings at which plaintiff's minor nieces and cousins were present along with multiple adults. SAC ¶¶ 166-67.[46] Plaintiff argues that he has a fundamental right to contact with extended family members; that parole conditions that "interfere with these protected family relationships must satisfy strict scrutiny," Pl. Prelim. Inj. Mem. at 22-23; and that a "blanket ban on contact with minors" cannot satisfy that test because it would have been "crystal clear to any fair-minded viewer that Mr. Yunus poses no threat to minors within his own family." *Id.* at 23. Defendants counter that plaintiff has no "fundamental" right

to contact with extended family members who are not his own children and with whom he has never had a custodial relationship. *See* Def. Prelim. Inj. Opp. Mem. at 20.

Defendants are correct. "It is well established that a *parent's* interest in maintaining a relationship with *his or her child* is protected by the Due Process Clause of the Fourteenth Amendment." *United States v. Myers*, 426 F.3d 117, 125 (2d Cir. 2005) (emphasis added) (citing *Wilkinson v. Russell*, 182 F.3d 89, 103-04 (2d Cir. 1999) ); *see also United States v. McGeoch*, 546 F. App'x 44, 48 (2d Cir. 2013) (summary order) ("A condition of supervised release that prevents a father from seeing his children outside the presence of an approved monitor is a severe one subject to careful scrutiny."). But even among biological parents, the degree of protection varies in accordance with the nature of the parent-child bond. As the Second Circuit explained in *Myers*, "[s]ome measure of due process protection" extends to a non-custodial parent who has demonstrated a "commitment to the responsibilities of parenthood." 426 F.3d at 128 (quoting *Lehr v. Robertson*, 463 U.S. 248, 261 (1983) (internal quotation marks omitted) ). However, the *Myers* court stopped short of extending the same solicitude to a supervised releasee who wished to see his son but had never been the boy's custodian and presented "no evidence" in support of his claim that he played "an active role in the life of his son" before he was incarcerated. *Myers*, 426 F.3d. at 128 (remanding for additional fact-finding). *Cf. Lima*, 270 F. Supp. 3d at 701-03 (applying strict scrutiny where state parole officers expelled sex offender parolee from his marital home after his wife gave birth to a son, without conducting any individualized inquiry into whether parolee was a danger to the infant).

Outside of the context of parole or supervised release, the courts have extended due process protection to quasi-parental custodial relationships beyond the nuclear family. *See, e.g., Moore v. City of E. Cleveland*, 431 U.S. 494 (1977) (invalidating housing ordinance making it a crime for a grandmother to live in the same dwelling unit with two grandsons who were cousins rather than brothers); *Rivera v. Marcus*, 696 F.2d 1016, 1024-25 (2d Cir. 1982) (holding that a half-sister who had been raising her younger half-siblings as a foster parent had a compelling liberty interest in "preserving the

integrity and stability of her family," such that Connecticut could not remove the children from her home without an adequate pre-deprivation hearing); *Bellet v. City of Buffalo*, 2009 WL 2930464, at *4-5 (W.D.N.Y. Sept. 11, 2009) (holding that a grandfather who "was his grandson's primary caregiver for approximately seven years" raised a triable issue of fact as to "whether he possessed a protected liberty interest" in "preserving the family unit he established with the grandson"). But these cases are of limited assistance to plaintiff Yunus, who has never had a custodial or other quasi-parental relationship with his minor nieces and cousins. Nor does he cite any authority for the proposition that he has a fundamental right to visit them simply because he is related to them. [47] Moreover, while the no-contact-with-minors rule undoubtedly burdens plaintiff's relationship with his parents —his sisters and uncle—it does not bar him from seeing his adult relatives, nor prevent them from "com[ing] together" with plaintiff "for mutual sustenance." *Moore*, 431 U.S. at 505. I therefore cannot find that defendants interfered with a fundamental right when they refused to make any exceptions to Special Condition No. 15.

**\*35** This does not necessarily end the inquiry. The Due Process Clause requires that the parole conditions imposed by the State of New York or its agents be "reasonably related to [the parolee's] prior conduct or to the government's interest in his rehabilitation." *Singleton*, 210 F. Supp. 3d at 374. Because parolees indisputably "possess fewer constitutional rights" than ordinary citizens, *United States v. Polito*, 583 F.2d 48, 54 (2d Cir. 1978), including "diminished due process rights." *Robinson v. New York*, 2010 WL 11507493, at *6 (N.D.N.Y. Mar. 26, 2010) (quoting *United States v. Cabot*, 325 F.3d 384, 385 (2d Cir. 2003) ), this standard is highly deferential, particularly in the absence of any identifiable fundamental right. *See Walker v. Mattingly*, 2012 WL 1160772, at *6 (W.D.N.Y. Apr. 5, 2012) (the decision of a state parole board or parole office "is not subject to judicial review in the absence of a showing that the board or its agents acted in an arbitrary and capricious manner") (quoting *Pena v. Travis*, 2002 WL 31886175, at *9 (S.D.N.Y. Dec. 27, 2002) ); *Robinson v. New York*, 2010 WL 11507493, at *3 (N.D.N.Y. Mar. 26, 2010) ("the imposition of conditions —whether imposed prior to or subsequent to release, by the parole board or a field parole officer—must be upheld as long as they are reasonably related to a parolee's past conduct, are not arbitrary and capricious, and are designed to deter recidivism and prevent further offenses."). Nonetheless, a

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 104 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

parolee may seek judicial intervention—including "tailoring or invalidation"—where "the condition is not related to the parolee's criminal history or to the State's interests." *Robinson*, 2010 WL 11507493, at *6. This "limited due process right," which entitles a parolee to "conduct of parole that are reasonably related to his prior conduct or to the government's interest in his rehabilitation," *Singleton*, 210 F. Supp. 3d at 374, may be enforced in federal court. [48]

As recently noted by the Hon. Paul A. Engelmayer when reviewing the same parole condition at issue here, Special Condition No. 15 "expressly authorized parole authorities to give written permission" for plaintiff to have contact with minors, and thus "anticipated" that requests for such contact could be made and would be considered rationally rather than denied capriciously. *Lima*, 270 F. Supp. 3d at 703. In this case, it appears that no such rational consideration took place when plaintiff requested permission to attend his uncle's Thanksgiving dinner in 2017. Plaintiff alleges that PO Lewis-Robinson told him "he would go to prison if there were children there." SAC ¶ 104. *See also* Yunus Decl. ¶ 39 (Lewis-Robinson told plaintiff that he would be " 'locked up' if there were any children there"). Defendant Lewis-Robinson does not deny these events. Nor does she assert that she gave any thought to whether plaintiff's request to attend his uncle's Thanksgiving dinner presented any risks to the minor children expected to be present there. [49]

Given the modest nature of the proposal and the extremely low-risk setting—a single family dinner with multiple adults present—I conclude that plaintiff has raised a plausible (if narrow) claim that his current parole officer, acting in her individual capacity, abused her discretion and violated his due process rights by refusing even to consider his request to attend his uncle's Thanksgiving dinner in 2017. Because plaintiff is entitled to "all reasonable inferences from the facts alleged," including "those that defeat the immunity defense," *Doe v. Annucci*, 2015 WL 4393012, at *12, I do not recommend that the claim against Lewis-Robinson be dismissed, at this stage, on qualified immunity grounds. I therefore recommend, respectfully, that insofar as the Fifth Claim for Relief seeks damages, it be dismissed as to all defendants except PO Lewis-Robinson.

**\*36** Similarly, insofar as the Fifth Claim seeks injunctive relief, it should not be dismissed on the pleadings, because plaintiff has plausibly alleged facts suggesting that—notwithstanding the permissive language of Condition No. 15

—his POs view it as an absolute bar and will never permit him to see his minor relatives. However, there is no *evidence* that plaintiff specifically requested permission to see his minor nieces and cousins more than once. Thus, I cannot conclude that plaintiff has demonstrated a clear and substantial right to relief as to his Fifth Claim, which must await further factual development before any consideration of the remedies, if any, to which plaintiff may be entitled.

### H. Sixth Claim—Arbitrary and Capricious

In his Sixth Claim for Relief, plaintiff alleges that the Parole Officer Defendants acted arbitrarily and capriciously when they "refused to consider alternative proposed residences in good faith," thereby effectively "creating a condition of parole that Mr. Yunus must live at a DOCCS-designated homeless shelter." SAC ¶ 172. In addition, plaintiff uses his Sixth Claim to challenge a number of his parole conditions as arbitrary and capricious, including Special Condition No. 24, governing his relationships with consenting adults; Nos. 31 and 32, which prohibit him from owning, operating, or being a passenger in a motor vehicle without the permission of his PO; No. 14, which prohibits him from purchasing or possessing sexually explicit materials; No. 19, which prevents him from owning a pet; and No. 37, which prohibits him from renting a post office box without his PO's prior approval. SAC ¶ 173. [50] In his preliminary injunction motion, however, plaintiff requests equitable relief only as to the "relationship" restriction, arguing that it is "wholly unrelated" to his prior criminal conduct, Pl. Prelim. Inj. Mem. at 25, and the automobile restriction, arguing that it should be "invalidated or tailored" because "his single bad act using a motor vehicle" cannot justify a broad rule "preventing him from setting foot in a motor vehicle." *Id.* I address each component of the Sixth Claim for Relief in turn.

### 1. Alternative Proposed Residences

Plaintiff requested permission to move out of the Willow Avenue Men's Shelter three times. The first two addresses he proposed were within 1,000 feet of at least one school, and for that reason were not SARA-compliant. At the time he proposed those addresses, plaintiff was a registered sex offender and therefore subject to EL § 259-c(14), which in turn made Special Condition No. 4 (the 1,000-foot rule) mandatory. Since the statute gave the Parole Officer Defendants no discretion to exercise, they cannot be held individually liable for "refusing to consider" those

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 105 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

proposed residences "in good faith." SAC ¶ 172. I therefore recommend, respectfully, that the Sixth Claim for Relief be dismissed to the extent it seeks damages stemming from the Parole Officer Defendants' denial of plaintiff's first two requests to move.

The third address that plaintiff proposed—Ms. Blake's apartment—was SARA-compliant, but PO Lewis-Robinson nonetheless denied him permission to move on the ground that Ms. Blake was "uncooperative." SAC ¶ 77. In fact, plaintiff alleges, this was pretext; the real reason for the denial was simply that it was more convenient for his PO to keep all of her parolees together in the shelter. SAC ¶¶ 72-78. The Sixth Claim for Relief therefore raises the question whether PO Lewis-Robinson acted so arbitrarily as to violate plaintiff's rights under the Due Process Clause. Defendants' moving brief in support of their motion to dismiss does not discuss this portion of the Sixth Claim for Relief. *See* Def. MTD Mem. at 16-17. Because I find that the well-pleaded facts set out in the SAC plausibly make out the elements of a cognizable damages claim against defendant Lewis-Robinson (the only named defendant personally involved in the discretionary denial of plaintiff's third request to move out of a homeless shelter), I recommend, respectfully, that defendants' motion to dismiss be denied as to this aspect of plaintiff's Sixth Claim for Relief. It should also be denied insofar as plaintiff seeks prospective injunctive relief against what he describes as a de facto parole condition requiring him to remain in a DOCCS-designated homeless shelter for the convenience of his parole officers.

**\*37** I now turn to the evidence relevant to plaintiff's request for preliminary injunctive relief. Citing PO Lewis-Robinson's two declarations, defendants argue vigorously that plaintiff's proposal to move in with Ms. Blake was "properly rejected" because "neither plaintiff nor Ms. Blake have been willing to provide the most basic details about the housing arrangement." Def. Prelim Inj. Opp. Mem. at 19; *see also* Def. MTD Reply Mem. at 6 (arguing that Lewis-Robinson took appropriate steps to consider plaintiff's request to move until Blake "became uncooperative and the address was rejected on September 16, 2017"). The declarations themselves, however, fail to substantiate defendants' position.

After initially submitting an incorrect address for Ms. Blake's apartment—which defendants do not characterize as anything more than an innocent mistake—plaintiff complied with all of his PO's requests, including obtaining two letters from Ms. Blake confirming her offer and outlining the financial

terms of his proposed tenancy. This is undisputed. *See* Lewis-Robinson Reply Decl. ¶¶ 5-9, 15-16; Blake Decl. ¶¶ 4-6. In addition, the parties agree that either plaintiff or Ms. Blake provided DOCCS with a copy of her lease. *See* Lewis-Robinson Reply Decl. ¶ 19 (attesting that plaintiff gave the lease to PO Morillo); Blake Decl. ¶ 13 (attesting that Ms. Blake provided the lease to PO Lewis-Robinson). Moreover, PO Lewis-Robinson's broad assertion that Ms. Blake "refused to permit a site inspection of the property," Lewis-Robinson Decl. ¶ 18, is undercut by the more detailed account that Ms. Blake provides in her reply declaration. PO Lewis-Robinson concedes that Ms. Blake agreed to meet for an interview on Wednesday, September 20, 2017, at "the Bronx II area office." Lewis-Robinson Reply Decl. ¶ 21. Four days before the appointment—on Saturday evening, September 16—plaintiff's PO telephoned Ms. Blake to see "if she was available the following evening," that is, Sunday evening, September 17. *Id.* ¶ 26. Ms. Blake objected to moving the interview forward on short notice, speaking in "an aggressive tone" and stating, "You're calling me 24 hours in advance to set up an interview for tomorrow, I'm not even home." *Id.* ¶¶ 26-27. Ms. Blake did not cancel the originally-scheduled date on September 20 (just three days later). She did not refuse to permit a site inspection. There is no evidence that PO Lewis-Robinson ever asked her (or plaintiff) for additional "details about the housing arrangement," Def. Prelim Inj. Opp. Mem. at 19, much less that they refused to provide any requested information.

Nonetheless, after the Saturday evening telephone call, Lewis-Robinson spoke to her supervisor, Senior PO Medina, who "rejected the proposed residence" based on "the uncooperative nature of Ms. Blake and my inability to confirm the information provided by Plaintiff about the housing arrangements." Lewis-Robinson Decl. ¶ 28. Thereafter, PO Lewis-Robinson (not Ms. Blake) cancelled the September 20 appointment. *See* Blake Decl. ¶ 10. Moreover, Ms. Blake attests—and PO Robinson does not deny—that she made phone calls and sent text messages in an effort to reschedule the appointment, but never heard another word from plaintiff's PO. *Id.* ¶ 12.

The parties' declarations thus tend to support plaintiff's allegation that PO Lewis-Robinson and her supervisor, Senior PO Medina (who is not a defendant herein) were looking for a reason to say no to plaintiff's third request to move out of the shelter system. Had the homeowner actually refused to permit a site visit—or otherwise refused to cooperate with reasonable requests for information—that could well furnish a rational

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 106 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

reason to reject her apartment as a residence for a parolee.[52] In this case, however, the evidence shows that Ms. Blake provided all of the information requested, and stood ready and willing to meet with PO Lewis-Robinson on September 20, 2017, as they had agreed. At worst (and assuming the truth of PO Lewis-Robinson's reply declaration), Ms. Blake was guilty of reacting impolitely, during a single phone conversation on a Saturday evening, when she was asked on short notice to move that appointment up to the following Sunday evening. In my view, it would be arbitrary and capricious for a parole officer to refuse a parolee's request to move into otherwise-appropriate, SARA-compliant housing on this basis alone.

**\*38** That said, plaintiff has only made one request to move into SARA-compliant housing, and Ms. Blake's declaration is silent as to whether she is still willing to have plaintiff reside in her apartment. I am reluctant to conclude, on the basis of a single incident, that PO Lewis-Robinson (or any other defendant) has effectively imposed an unwritten rule confining plaintiff to a DOCCS-approved homeless shelter. Moreover, the relief he seeks with respect to this aspect of the Sixth Claim for relief—that his POs "be enjoined to perform a good faith assessment of any proposed residency Mr. Yunus submits going forward," Pl. Prelim. Inj. Mem. at 20—would itself be vague to the point of unenforceability. *See* Fed. R. Civ. P. 65(d)(1) (injunction must "state its terms specifically" and "describe in reasonable detail ... the act or acts restrained or required"). I therefore cannot conclude that plaintiff has demonstrated a clear and substantial likelihood of success on this issue.

### 2. Relationships

I have previously concluded that Special Condition No. 24, requiring plaintiff to disclose sexual relationships to his PO —and disclose his supposed history of "sexual abuse" to his partners, in his PO's presence—is not unconstitutionally vague. As applied to a parolee who has no history of sexual abuse, however, the rule (which by its terms is absolute, admitting no exceptions) is not "reasonably related to his prior conduct or to the government's interest in his rehabilitation," *Singleton*, 210 F. Supp. 3d at 374, and for this reason is arbitrary and capricious. I therefore recommend, respectfully, that defendants' motion to dismiss the Sixth Claim for Relief be denied insofar as it seeks prospective injunctive relief against Special Condition No. 24.

Defendants do not dispute any of the facts relevant to this challenge, and do not make any effort to tie the relationship rule to plaintiff's criminal history or conduct. Instead, PO Lewis-Robinson suggests that she has never enforced the rule, *see* Lewis-Robinson Decl. ¶ 30, and defendants' argument goes straight to irreparable harm, insisting that plaintiff has suffered none because "he has already informed his fiancée of his 'sex offender' status." Def. Prelim. Inj. Opp. Mem. at 22. I therefore conclude that plaintiff has demonstrated a clear and substantial likelihood of success on the merits as to the unconstitutionality of Special Condition No. 24 as applied to him.

Insofar as plaintiff seeks money damages for the imposition of Special Condition No. 24, however, I reach a different conclusion. Plaintiff's injury allegations are thin at best, *see* SAC ¶ 121 (alleging that when plaintiff disclosed his sex offender status to his fiancée it caused a "strain on his relationship"), as is the causal connection between those injuries and any specific condition of his parole.[54] Nor can I conclude, on the sparse facts alleged, either that Condition No. 24 violated "clearly established" constitutional rights or that that a reasonable parole officer assigned to supervise plaintiff would have understood its infirmity. *Gonzalez*, 728 F.3d at 154. I therefore recommend, respectfully, that the Sixth Claim be dismissed insofar as it seeks money damages against any of the Parole Officer Defendants named therein.

### 3. Motor Vehicles

As plaintiff concedes, he used a motor vehicle to commit the kidnappings to which he pleaded guilty in 2002. *See* Pl. Prelim. Inj. Mem. at 25; *see also* SORA Tr. at 8:20-9:2; *Vincent v. Smith*, 2010 WL 23324, at *3. Consequently, there is a rational connection—wholly independent of his designation as a sex offender—between plaintiff's criminal history and Special Conditions No. 31 and 32, which prevent him from obtaining a driver's license or owning, driving, or being a passenger in a motor vehicle without the permission of his PO.

**\*39** Moreover, these conditions are not absolute, and it is undisputed that PO Lewis-Robinson has permitted plaintiff to be a passenger in cars, including his fiancée's car. *See* Lewis-Robinson Decl. ¶ 30; Def. MTD Opp. Mem. at 21 (conceding that plaintiff "has sometimes been allowed to ride in vehicles"). Plaintiff does not allege that he ever asked for

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 107 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

permission to engage in any of the other activities regulated by Special Conditions No. 31 and 32, much less that such requests were denied in an arbitrary or capricious manner. I therefore conclude that the Parole Officer Defendants did not act arbitrarily and capriciously in imposing these conditions, nor in administering them, and have not threatened arbitrary or capricious enforcement in the future. For these reasons, I respectfully recommend that the Sixth Claim for Relief be dismissed to the extent it seeks either damages or injunctive relief in connection with Special Conditions No. 31 and 32.

### 4. Pornography, Pets, Post Office Boxes

Defendants make no effort to connect Special Condition No. 14 (no sexually explicit materials), No. 19 (no pets) or No. 37 (no post office boxes) to plaintiff's "past conduct and future chances of recidivism." *See* Def. MTD Mem. at 16. Nor do they argue that these conditions are "designed to deter recidivism and prevent further offenses." *Robinson*, 2010 WL 11507493, at *5. Instead, they insist that it is plaintiff's burden to prove the opposite; that is, that he must establish the *lack* of a rational relationship between these parole conditions and his criminal history by "describ[ing] in detail the facts underlying his crime of conviction as found at trial" and "explain[ing] why the parole conditions are unreasonable or unnecessary despite the actions for which he was convicted." *Id.* at 17

(quoting *Trisvan v. Annucci*, 284 F. Supp. 3d 288, 304 (E.D.N.Y. 2018) ).

I disagree. In this case, unlike *Trisvan*, plaintiff did not stand trial and thus could not describe the facts "found at trial." More fundamentally, there is no heightened pleading standard applicable to § 1983 actions challenging parole conditions. This case is governed by Fed. R. Civ. P. 8(a)(3), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief," and by *Iqbal*, which requires the plaintiff to "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. at 678. Thus, while a plaintiff who claims that his parole conditions are arbitrary and capricious must provide enough information concerning his underlying crimes to plausibly allege that those conditions are not "reasonably related to his prior conduct," *Singleton*, 210 F. Supp. 3d at 374; *accord Robinson*, 2010 WL 11507493, at *5, he need not ordinarily provide the degree of "detail" demanded by the *Trisvan* court. [55] Nor is the pleader required

to anticipate and refute all conceivable penalogical purposes for a given condition.

**\*40**  Plaintiff Yunus has adequately disclosed his criminal past, for pleading purposes, by naming the crimes to which he pled guilty, SAC ¶¶ 22-24, and by attaching the complete transcript of his SORA hearing, during which the district attorney described the kidnappings in detail (based on the "grand jury minutes and the plea minutes") and summarized plaintiff's prior criminal record. SORA Tr. at 8:17-10:8. Plaintiff has also adequately explained why (in his view) Special Conditions No. 14, 19, and 37 are not reasonably related to his prior conduct: his crimes had no "sexual component," SAC ¶ 23, making the ban on sexually explicit materials arbitrary, and he has never been charged with any crimes "related to" pornography, pets, or post office boxes. SAC ¶ 173. In my view, nothing more is required.

However, plaintiff has alleged no injury whatsoever—past or prospective—in connection with these conditions, which insofar as the record reflects have had no impact on his life. He does not allege, for example, that he ever wanted a pet. Nor does he—must less establish through competent evidence—that he ever asked for a pet, much less that his PO unreasonably denied such request in reliance on Special Condition No. 19. The same is true with respect to Nos. 14 and 37. This Court does not sit to decide abstract questions concerning arguably irrational parole conditions that have produced no identifiable injury and do not threaten to produce such injury in the future. *See* *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (a plaintiff seeking prospective injunctive relief must have suffered an "injury in fact"). I therefore recommend, respectfully, that defendants' motion to dismiss be granted with respect to the portion of the Sixth Claim for Relief challenging Special Conditions No. 14, 19, and 37.

### I. Preliminary Injunctive Relief

Having found that plaintiff has shown a clear or substantial likelihood of success on the merits as to his substantive due process claim, I must now consider whether he has also shown (a) irreparable harm, and (b) that a preliminary injunction —in this case, a preliminary injunction directing that his designation as a sex offender be set aside and that he no longer be required to comply with SORA or with the special parole conditions imposed as a result of his sex offender status— is in the public interest. *N. Am. Soccer League*, 883 F.3d at 37. I must then repeat the same analysis for the individual

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 108 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

parole conditions as to which he has met the heightened merits standard required for mandatory injunctive relief. [56]

### 1. Registration under SORA

Proof of "irreparable harm" requires "an injury that is not remote or speculative but actual [or] imminent and for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs., Inc. v. Saban Entm't Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (internal quotation marks and citation omitted). Plaintiff bears the burden of showing that "irreparable harm is likely in the absence of an injunction." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008).

Ordinarily, as plaintiff notes, *see* Pl. Prelim. Inj. Mem. at 26, and as defendants concede, *see* Def. Prelim Inj. Opp. Mem. at 8, the ongoing deprivation of a constitutional right is *proof enough* of irreparable harm. *See, e.g.,* *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("it is the alleged violation of a constitutional right that triggers a finding of irreparable harm"). Moreover, there is no question here but that plaintiff's designation as a sex offender has already caused him to suffer harm for which money damages cannot compensate, and will continue to do so as long as he is designated a "sex offender" under SORA. In addition to the registration requirements themselves, plaintiff has suffered and will continue to suffer from the attendant civil disabilities and criminal risks discussed in Part V(D) of this Report, together with the profound reputational injury flowing from being publicly labeled as a sex offender. *See, e.g.,* Yunus Decl. ¶ 13 (plaintiff was stigmatized after PO Vasquez told "everyone I came into contact with, including other persons at the shelter and administrators at my college, that I am a sex offender").

**\*41** Moreover, it is plaintiff's sex offender designation that triggered EL § 259-c(15), subjecting him to a mandatory parole condition that would not otherwise burden a parolee with his criminal history. The evidence also supports plaintiff's contention that the discretionary parole conditions at issue in this action were imposed upon him by the Parole Officer Defendants as a direct result of his designation as a sex offender under SORA. *See id.* ¶ 9 (PO Smith "informed me that he gives all sex offenders the same restrictions"); *Id.* ¶ 11 (POs Vasquez and Lewis-Robinson also told plaintiff that "all sex offenders are given the same prohibitive restrictions");

Ex. C at ECF pages 4-10 (6-page, 48-item list of special conditions "for Sex Offenders"). [57]

Defendants urge the Court to reject plaintiff's irreparable harm showing on the ground that his "one and a half year delay" in seeking a preliminary injunction is "all-but conclusive evidence that there is no irreparable harm warranting the extraordinary relief sought." Def. Prelim. Inj. Opp. Mem. at 9 (citing *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) ). I decline the invitation.

**\*42** In non-constitutional cases, a delay in seeking injunctive relief "undermines" the claim that the harm alleged is irreparable, and may be grounds for denying such relief on an emergency basis. *See, e.g., KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, 2012 WL 1521060, at \*4 (S.D.N.Y. Apr. 30, 2012) (denying preliminary injunction to remedy alleged bullying and harassment of child at school where child's parents "affirmatively rejected a number of options offered by the school district to remedy the violation, thus rendering the alleged harm to be speculative," and "delayed bringing their action for injunctive relief for nearly 6 months, thus negating the existence of imminent harm"). However, delay alone is rarely (if ever) fatal where a parolee or supervised releasee mounts a constitutional challenge to the conditions imposed on him. As explained in *Hardy v. Fischer*, "Ongoing unlawful deprivations of liberty and the threat of unlawful detention and reimprisonment would violate plaintiffs' constitutional rights and therefore constitute quintessential irreparable harm." 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010). *Hardy* rejected the same delay argument that defendants make here, holding that former prisoners challenging their conditions of post-release supervision (PRS) adequately demonstrated irreparable harm notwithstanding their delay in bringing that challenge:

> The possibility that plaintiffs already have suffered injuries by being subjected to allegedly illegal PRS does not eliminate the irreparable nature of any injuries that they will suffer in the future without injunctive relief, and the Court does not find that any delay in filing this lawsuit justifies the denial of interim relief from an ongoing alleged constitutional violation.

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 109 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

*Id.* For the same reasons, I conclude that plaintiff's failure to file this action the moment he was paroled does not negative the requisite irreparable injury. I also note that plaintiff never simply ignored the harm of which he now complains. Rather, he made repeated efforts to obtain relief from the Sex Offender Conditions from his POs and their supervisors before turning to litigation, which he originally filed *pro se. See* Yunus Decl. ¶¶ 12, 14, 32; Yunus Reply Decl. ¶¶ 20-22.

Finally, I conclude that the injunction sought is in the public interest. Plaintiff is concededly a sex offender in name only. But for the "administrative burden" of sorting ordinary kidnappers from "dangerous sex offenders," *Knox,* 12 N.Y.3d at 69, he would never have been swept in by the "blanket rule" for kidnappers contained within CL § 168-a(2)(a)(i). *Id.* Defendants' argument that "SORA and the challenged parole conditions" are designed to "protect[ ] the public, and particularly children, from violent criminals such as plaintiff," Def. Prelim. Inj. Opp. Mem. at 10, misses the point: SORA is unconstitutional, as to plaintiff, because he indisputably does *not* present the *sexual* risks that sex offender registration, and the Sex Offender Conditions, are designed to combat. To be sure, he presents significant risks, but they are the ordinary risks arising from paroling a prisoner with a (non-sexual) history of violent crime. These risks can and will be addressed through the ordinary parole conditions assigned to similar parolees.[58] Defendants' fears for "the potential harm to innocent children and the public," *id.,* thus do not require plaintiff to remain registered as a sex offender under SORA or subject to parole conditions designed to ameliorate the risk of future sex offending, which, insofar as the record discloses, is simply not among the risks presented by this plaintiff. *See* SORA Tr. at 22:14-16 ("Under the circumstances presented here, I am satisfied that there is virtually no likelihood that [plaintiff] will commit a sex crime ever.").

#### 2. Individual Parole Conditions

For substantially the same reasons discussed above, I conclude that plaintiff has adequately demonstrated that he faces continuing irreparable harm so long as he is at risk of parole revocation for simply entering or being within 1,000 feet of a school (Special Condition No. 4) or within 300 yards of "places where children congregate" (Special Condition No. 17), and so long as he is barred from the "modern town square" of social media by a constellation of parole

conditions (Special Conditions No. 12, 35, 39, and 48) which not only prohibit him from accessing social networking sites like Facebook and Twitter, but make it difficult for him to go online at all—or to use smart phones, home computers, email, or the other ordinary tools of modern communication. Because plaintiff has no history of sexual misconduct (with children or adults), much less a history of electronic stalking, distribution of pornography, or other internet-enabled sex offenses, he does not fall into the very narrow class of offenders for whom the public interest demands that the First Amendment take a back seat to public safety.

**\*43** However, I cannot conclude that plaintiff is suffering or will suffer irreparable harm as a result of Special Condition No. 24. He has already introduced his fiancée to his parole officer and has told his fiancée about his criminal history, and he does not allege that he has formed or anticipates forming new sexual relationships during the remaining term of his parole supervision. Thus, even though Condition No. 24 (like many of the Sex Offender Conditions) bears no obvious relationship to plaintiff's individual history and characteristics, once it is properly understood to apply only to sexual relationships, it poses only a theoretical possibility of harm to plaintiff.

### VI. CONCLUSION

For the reasons set forth above, I respectfully RECOMMEND that Your Honor GRANT defendants' motion to dismiss the Second Amended Complaint IN PART, and dismiss the following Claims for Relief pursuant to Rule 12(b)(6):

The First Claim, in its entirety;

The Third Claim, to the extent it alleges that Special Condition No. 24 (the "consenting adult" rule) is void for vagueness;

The Third Claim, to the extent it seeks damages against any of the Parole Officer Defendants for their past enforcement of any of the parole conditions challenged in that claim as void for vagueness;

The Fourth Claim, to the extent it seeks damages against the Parole Officer Defendants other than PO Lewis-Robinson for their past enforcement of the cellphone, computer, and social media restrictions contained in Special Conditions No. 12, 22, 35, 39, and 48;

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 110 of 134

The Fourth Claim, to the extent it seeks damages against PO Lewis-Robinson arising from her conduct prior to the decision in *Packingham*;

The Fifth Claim, to the extent it seeks damages against the Parole Officer Defendants other than PO Lewis-Robinson for their past enforcement of Special Condition No. 15 (no contact with minors);

The Sixth Claim, to the extent it seeks damages against any of the Parole Officer Defendants for their past conduct in denying plaintiffs' requests to move in with his fiancée and his uncle;

The Sixth Claim, to the extent it seeks damages against the Parole Officer Defendants other than PO Lewis-Robinson in connection with the denial of plaintiffs' request to move in with Ms. Blake;

The Sixth Claim, to the extent it seeks damages against any of the Parole Officer Defendants for their past enforcement of Special Condition No. 24;

The Sixth Claim, to the extent it seeks either damages or injunctive relief in connection with Special Conditions No. 31 and 32 (motor vehicles), No. 14 (sexually explicit materials), No. 19 (pets) or No. 37 (Post Office boxes).

If Your Honor agrees with my recommendations as to the motion to dismiss, only one of the Parole Officer Defendants —PO Lewis-Robinson—will remain in the case, and only as to the Fourth, Fifth and Sixth Claims for Relief.

Because plaintiff has already amended his complaint twice (the second time with the assistance of counsel, after reviewing defendants' initial motion to dismiss), and because he does not seek leave to replead, I FURTHER RECOMMEND that any dismissal be WITH PREJUDICE.

I FURTHER RECOMMEND that Your Honor GRANT plaintiff's preliminary injunction motion IN PART, and that defendants, together with their agents, employees, and all persons acting in concert with them:

Be preliminarily enjoined, pending the final resolution of this action, from enforcing, as against plaintiff, the registration and notification provisions made applicable to designated sex offenders by SORA (CL §§ 168a-168w), or the mandatory conditions prescribed by EL 🚩 §§ 259-

c(14) and (15) for parolees sentenced for an offense for which registration as a sex offender is required; and

**\*44** Be directed to rescind the discretionary provisions of the Sex Offender Conditions (Yunus Decl. Ex. C, at ECF pages 4-10) except to the extent they deem those conditions appropriate for plaintiff in light of his *non-sexual* criminal history and characteristics.

If and to the extent Your Honor determines to dismiss the Second Claim for Relief, or determines for other reasons not to issue the preliminary restraints outlined above, I FURTHER RECOMMEND that defendants, together with their agents, employees, and all persons acting in concert with them be preliminarily enjoined, pending the final resolution of this action, from enforcing, as against plaintiff:

Special Condition No. 4 (the 1,000-foot rule), to the extent it functions as more than a residency restriction;

Special Condition No. 12 (prohibiting access to online computer services that "involve the exchange of electronic messages") to the extent it prohibits him from accessing email services or social media websites;

Special Condition No. 17 (the 300-yard rule);

Special Condition No. 22 (prohibiting possession of photographic or video equipment), to the extent it prevents plaintiff from possessing an ordinary smartphone with camera function;

Special Condition No. 35 (restricting beepers, scanners, and cellphones, and prohibiting camera-equipped phones) to the extent it prevents plaintiff from possessing an ordinary smartphone with camera function;

Special Condition No. 39 (restricting computer ownership and usage), to the extent it requires prior PO approval to possess or use a computer, a computer network, or an internet browser); or

Special Condition No. 48 (prohibiting access to any "commercial social networking website") to the extent it prohibits plaintiff from accessing mainstream social media. [59]

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3455408

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 111 of 134

## Footnotes

1    SORA has been amended many times over the past two decades, and the list of crimes defined as "sex offenses" has grown over that period. Since its original enactment, however, SORA has included both first-degree and second-degree kidnapping as "sex offenses" if the victim was less than 17 years old. *See* 1995 N.Y. Sess. Laws ch. 192, § 2.

2    The Board makes its recommendations using an "assessment instrument" under which points are assessed for various factors believed to correlate with a higher risk of sexual recidivism. *See generally People v. Francis,* 30 N.Y.3d 737, 744, 71 N.Y.S. 3d 394, 399 (2018).

3    Disclosable information includes the registrant's name and photograph, "exact address, background information including the offender's crime of conviction, mode of operation, type of victim targeted, the name and address of any institution of higher education at which the sex offender is enrolled, attends, is employed or resides and the description of special conditions imposed on the offender." CL § 168-*1*(6)(a).

4    In some cases, the court in which the offender is convicted must hold an additional hearing to determine the age of the victim before concluding that the crime of conviction meets the definition of a sex offense. For example, patronizing a prostitute in the third degree, in violation of PL § 230.04, is a "sex offense" under

SORA if "the person patronized is in fact less than seventeen years of age." CL 🚩 § 168-a(2)(i). When a defendant is convicted under PL § 230.04, the court is required to hold a separate hearing, at which the state must prove the victim's age by clear and convincing evidence, before that defendant is certified as a sex offender. CL § 168-d(b). No such hearing is required in kidnapping cases.

5    When SORA was first enacted in 1996, CL § 168-o permitted any registered sex offender to petition the sentencing court to "be relieved of any further duty to register." In 1999, that provision was revised by 1999 N.Y. Sess. Laws 1999 ch. 453, § 18 (effective January 1, 2000), which among other things specified, in what became CL § 168-o(1), that a sex offender must have been registered "for a minimum period of ten years" before he may petition for relief. As a practical matter, this eliminated the petition right for level one and level two sex offenders, who at that time were only required to register for ten years, but preserved it for level three offenders, who—in the absence of judicial relief—were required to register for life. The statute was amended again by 2002 N.Y. Sess. Laws ch. 11, § 22 (effective March 11, 2002), which expressly limited the petition right to level three offenders, and only if they had been registered for a minimum of 13 years. Most recently, in 2006, in 2006 N.Y. Sess. Laws 2006, ch. 1, § 3 (effective January 18, 2006), the Legislature increased the registration period for level one sex offenders from 10 to 20 years, increased the registration period for level two offenders from ten years to life, and further revised CL § 168-o(1) to eliminate the de-registration (or "de-classification") petition right for all sex offenders other than level two offenders who had been registered for a minimum of 30 years.

6    All defendants have been served. (Dkt. Nos. 8-13, 34, 68.) However, plaintiff advises the Court that he is "no longer pursuing his claims" against Governor Cuomo because "the relevant injunctive relief he seeks can be obtained from Defendant Annucci." Def. MTD Opp. Mem. (Dkt. No 69), at 1. Upon submission of an appropriate notice or stipulation of dismissal, I respectfully recommend that Governor Cuomo be dismissed from this action and that the caption be amended accordingly.

7    On April 18, 2018, I dismissed the parties' earlier motions as moot. (Dkt. No. 61.)

8    According to defendant Lewis-Robinson, plaintiff's current PO, plaintiff was convicted of "kidnapping in the first degree." Lewis-Robinson Decl. (Dkt. No. 56), ¶ 4. According to the New York Appellate Division, however, he was convicted of kidnapping in the second degree in violation of PL § 135.20. *People v. Vincent,* 15 A.D.3d 311, 789 N.Y.S.2d 883 (1st Dep't 2005).

9    *See Vincent v. Smith,* 2010 WL 23324, at *3-4 (S.D.N.Y. Jan. 5, 2010). In each of these proceedings plaintiff argued, unsuccessfully, that PL § 135.20 was unconstitutional as applied to him because Congress had

occupied the field of interstate kidnapping with the passage of the Federal Kidnapping Act, 🔖 18 U.S.C. §

Case 9:18-cv-01472-TJM-TWD   Document 73   Filed 03/04/21   Page 112 of 134

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

1201. *See Smith*, 2010 WL 23324, at *2-4 (describing the appeal and the 📙 § 440.10 motion in detail, and ultimately denying plaintiff's *habeas* petition).

10    For ease of reference, this Report will refer to the "Special Conditions of Release to Community Supervision for Sex Offenders" (collectively the Sex Offender Conditions) by number, as "Special Condition No. ___."

11    In her declaration, PO Lewis-Robinson also notes that Ms. Blake's lease states that no unrelated persons are permitted to reside at the property. Lewis-Robinson Decl. ¶ 19. However, as defendants conceded at oral argument, this issue was not raised in 2017 and was not a basis for her denial of plaintiff's request to move. *See* Oral Arg. Tr. at 62:1-11.

12    According to the Merriam-Webster Online Dictionary, a "smartphone" is a cell phone equipped with "additional software functions" such as "e-mail or an internet browser." *See* https://www.merriam-webster.com/dictionary/smartphone (last visited June 29, 2018). However, defendants read plaintiff's most recent parole condition as permitting an internet-enabled phone but prohibiting one that can take photos or videos. *See also* Oral Arg. Tr. at 42:3-11 (agreeing that the "smartphone" restriction refers to whether the phone has "[a] camera or video"). According to counsel, the new restriction was imposed because, during the April 2018 parole violation hearing, non-sexual pictures of minors were found on plaintiff's prior phone. *Id.* at 44:8-23.

13    *See* 📙 *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); 📙 *District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983).*

14    I understand defendants to argue that the *Rooker-Feldman* doctrine bars plaintiff's First and Second Claims for Relief, which challenge his designation as a sex offender on procedural and substantive due process grounds, respectively. *Cf.* Def. Prelim. Inj. Opp. Mem. (Dkt. No. 55), at 13-14 (seemingly raising *Rooker-Feldman* as a bar to plaintiff's substantive due process claim only); Def. MTD Reply Mem. (Dkt. No. 73), at 3 (arguing that plaintiff's "substantive" due process claim fails under *Rooker-Feldman* ). I do not understand defendants to rely on *Rooker-Feldman* with respect to plaintiff's claims challenging the Parole Officer Defendants' post-designation decisions imposing (or refusing to lift) various parole conditions not made mandatory by statute. Nor could they colorably press such an argument. It is well-settled that the *Rooker-Feldman* doctrine does not bar "judicial review of executive action, including determinations made by a state administrative agency" such as DOCCS. 📙 *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 644 n.3 (2002); *see also* 📙 *Spiteri v. Russo*, 2013 WL 4806960, at *13 (E.D.N.Y. Sept. 7, 2013) (*Rooker-Feldman* does not apply to decisions of the Board of Examiners of Sex Offenders), *aff'd sub nom. Spiteri v. Camacho*, 622 F. App'x 9 (2d Cir. 2015).

15    For this reason alone, the case at bar is distinguishable from 📙 *Zuneska v. Cuomo*, 2013 WL 431826 (E.D.N.Y. Feb. 1, 2013), in which a level one sex offender petitioned a New York County Court to "declassify" him, lost that case (because, as noted *supra* at n.5, SORA contains no avenue for a level one offender to file such a petition), and then filed a federal suit in which he argued that the state court erred in holding that "New York State does not allow for the de-classification of a registrant as a matter of law." 📙 2013 WL 431826, at *2. Noting that the County Court decision "was a loss" for Zuneska, *Id.* at *4, the district went on to consider the remaining *Hoblock* factors and ultimately concluded that Zuneska was "attempting to ... re-construe a state court appeal as a federal cause of action." *Id.* at *5.

16    Elsewhere in its analysis, the *Spiteri* court relied on *Rooker-Feldman* to dismiss a narrow subset of plaintiff's claims challenging various evidentiary and procedural rulings made during his SORA hearing, including defendants' failure to grant him a continuance to seek exculpatory evidence. 📙 2013 WL 4806960, at *19-20. Plaintiff here makes no comparable claims.

17    To the contrary: although plaintiff's counsel expressly referenced *People v. Knox* at the outset of his presentation, he did so not to challenge its holding but to acknowledge, candidly, that "the Court of Appeals did uphold this provision." SORA Tr. at 6:9-12. Counsel then argued, relying in part on *Knox* itself, that "a level one is all but required" where the offense was not itself sexual. *Id.*; *see also id.* at 17:18-22 (*Knox* "support[s]

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 113 of 134

our position" as to classification); *Id.* at 18:15-19 (*Knox* "indicate[s] that ... a level one designation is really the only appropriate designation in a case like this, where there is no sexual misconduct").

18    It may well be, as defendants urged at oral argument, *see* Oral Arg. Tr. at 55:1-13, that plaintiff *could have* used his SORA hearing to make (and lose) a due process challenge to his designation as a sex offender, which *would have* permitted him to appeal that issue (unsuccessfully) through the state courts. *See, e.g., People v. Citron*, 13 Misc. 3d 833, 834 n.2, 827 N.Y.S.2d 445, 447 n.2 (N.Y. Sup. Ct. Bronx Co. 2006) (holding in consolidated proceedings, some of which "arose in the context of an original SORA determination," that the statute was not unconstitutional as applied to convicted kidnappers who did not sexually assault their victims),

*aff'd,* 46 A.D.3d 353, 848 N.Y.S.2d 616 (1st Dep't 2007), *aff'd sub nom. People v. Knox,* 12 N.Y.3d 60, 875 N.Y.S.2d 828 (2009). Had he done so, however, plaintiff would be barred from making the same challenge here as a matter of claim or issue preclusion—which must be asserted as an affirmative defense—not by the *Rooker-Feldman* doctrine. "*Exxon Mobil* teaches that the narrow *Rooker-Feldman* inquiry is distinct from the question whether claim preclusion (res judicata) or issue preclusion (collateral estoppel) will defeat a federal

plaintiff's suit." *Hoblock,* 422 F.3d at 92. If a plaintiff seeks redress for a pre-existing injury in state court,

and if that court "cho[oses] not to remedy the injury," *Id.* at 88, *res judicata* may bar plaintiff's subsequent effort to litigate the same or a similar claim in federal court, but *Rooker-Feldman* does not. *Id.*

19    In one of their briefs, defendants argue, in the alternative, that plaintiff's injuries flow "directly" from "his conviction of a crime designated a sex offense under state law," which this Court would need to "review and reject" in order to award any relief. Def. MTD Mem. at 6-7. I disagree. To be sure, plaintiff was the "loser" in his criminal case, and his conviction was a necessary predicate to his designation as a sex offender. But this action does not challenge that conviction. Plaintiff does not deny that he is guilty of kidnapping, and does not ask this Court to relieve him of his criminal conviction. The procedural due process question here is whether, having been convicted only of non-sexual conduct, plaintiff was entitled to a further hearing before being designated a sex offender. The substantive due process question is whether, having committed only non-sexual crimes, he may constitutionally be designated a sex offender. It is not clear whether or how either of

those questions could have been raised on direct appeal from his criminal conviction. *See People v. Griffin,* 171 Misc. 2d 145, 151-52 & n.3, 652 N.Y.S.2d 922, 926 & n.3 (Sup. Ct. N.Y. Co. 1996) (rejecting incarcerated sex offender's challenge to various provisions of SORA as unripe because he had not yet completed his prison sentence, had his SORA hearing, or been required to register). In this case, they were not, and in any event are not barred by *Rooker-Feldman.*

20    Judge Chin ultimately held that SORA (as originally enacted) provided inadequate procedures for determining

sex offender risk levels. 3 F. Supp. 2d at 472-73. Consequently, the court entered an injunction preventing New York from classifying class members "at higher than risk level one" until the state provided each sex offender with (among other things) notice of the risk level recommended by the Board, followed by an adversary court hearing at which the offender could challenge the recommendation with the assistance

of counsel. *Id.* at 478-79. Plaintiff Yunus had the benefit of these improved procedures at his SORA hearing.

21    In 1989, Diaz shot and killed his 13-year-old half-sister, in Virginia, during an argument over drugs. He was convicted of first-degree murder and sentenced to 40 years in prison. Decades later, he was released from prison, whereupon he was required to register under Virginia's Sex Offender and Crimes Against Minors Registry Act, Va. Code Ann. §§ 9.1-900, *et seq.* Diaz then moved to New York, where the Board of Examiners

of Sex Offenders required him to register as a sex offender pursuant to CL § 168-a(2)(ii), which generally requires registration in New York if the offender was "required to register as a sex offender in the jurisdiction in which the conviction occurred." The Appellate Division ultimately held that because his underlying crime had "no sexual component," and because his Virginia registration was "under a broader statute that covers

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 114 of 134

both sex crimes and crimes against minors," Diaz could not be required to register as a "sex offender" in New York. 150 A.D.3d at 62-66, 50 N.Y.S.3d at 389-93.

22    Since the Second Circuit has expressly reaffirmed this aspect of *Doe v. Dep't of Pub. Safety*, I am not persuaded by defendants' assertion that there is a "split" among the district courts within our Circuit as to whether sex offender designations "implicate a liberty interest." Def. Prelim. Inj. Mem. at 11. If there is such a split, it results from a misapprehension of controlling law.

23    Valmonte met the technical requirements for listing on the Central Register because she slapped her eleven-year daughter on the face, which led to a "child abuse hotline" complaint and "child protective proceedings," which were ultimately dismissed on the condition that the Valmonte family receive counseling. 18 F.3d at 997.

24    The Illinois and Wisconsin Supreme Courts have upheld the constitutionality of their states' sex offender registration statutes as applied to persons convicted of kidnapping unrelated minors, regardless of whether the criminal conduct was sexually motivated or included any sexual component. *People v. Johnson*, 225 Ill. 2d 573, 592, 870 N.E.2d 415, 426 (2007); *State v. Smith*, 323 Wis. 2d 377, 389-90, 780 N.W.2d 90, 96 (2010). The Florida and New Mexico Supreme Courts, applying the same rational relationship test, have held similar laws unconstitutional as applied to convicted kidnappers who did not commit any sexual misconduct. *State v. Robinson*, 873 So. 2d 1205, 1217 (Fla. 2004); *Am. Civ. Liberties Union of N.M. v City of Albuquerque*, 139 N.M. 761, 772, 137 P.3d 1215, 1226 (2006).

25    The Court has identified one federal case addressing the question presented here. In *Cox v. Commonwealth of Kentucky*, 2010 WL 3909236, at *1, *6 (W.D. Ky. Sept. 30, 2010), the district court dismissed a *pro se* complaint filed in 2010 by a woman who was convicted in 1986 of kidnapping a minor "for the purpose of having an infant child." The Commonwealth allegedly conceded at her trial that there was "no evidence that she committed a sexual offense." *Id.* at *1. By the time the plaintiff completed her sentence, Kentucky law required lifetime registration for any person convicted of kidnapping a victim under the age of 18. *Id.* at *2. The *Cox* court reasoned that the legislature's "inclusion of kidnapping even where not sexually-motivated is rationally related to the Kentucky General Assembly's stated purpose of protecting minors from crime and potential sexual assaults," and consequently held that requiring plaintiff to register as a sex offender did not violate her substantive due process rights. *Id.* at *6.

26    Both state and federal courts routinely acknowledge these purposes. *See, e.g., People v. Mingo*, 12 N.Y.3d 563, 574, 883 N.Y.S.2d 154, 161 (2009) (the "purpose underlying SORA" is to protect the public from "sex offenders"); *Diaz*, 150 A.D.2d at 65, 50 N.Y.S.3d at 391 (the "legislative purpose" of SORA is "protecting the public from sex offenders"); *Doe v. Pataki*, 481 F.3d 69, 70 (2d Cir. 2007) (SORA aims to protect the public from "sex offenders" by notifying vulnerable populations of "the presence of sex offenders in their communities," and to enhance the ability to "investigate and prosecute sex offenses"). In *Knox*, the Court of Appeals described the "governmental interest advanced by SORA" somewhat differently—but without citation—as the protection of the community against "people who have *shown themselves capable of* committing sex crimes." 12 N.Y.3d at 67 (emphasis added). To the extent this formulation means something different from "people who have committed sex crimes," it appears to go beyond the purpose articulated by the Legislature or previously understood by the courts.

27    *See* David Finkelhor *et al., Nonfamily Abducted Children: National Estimates and Characteristics* at 10 (Crimes Against Children Research Center 2002), available at https://scholars.unh.edu/cgi/viewcontent.cgi? referer=https://scholar.google.com/&httpsredir=1&article=1016&context=ccrc. (last visited June 29, 2018).

28    "The State argues that the Act meets rational-basis review because the Legislature rationally could have concluded that the inclusion of all defendants convicted of kidnapping or false imprisonment of a minor not their child is justified given that a high percentage of such crimes are committed for some sexual purpose. The State also argues that the Legislature rationally could have concluded that the difficulty in confirming whether an abducted child has been sexually exploited or whether the perpetrator had a sexual motive justifies

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 115 of 134

the inclusion of all persons convicted of kidnapping or false imprisonment of a minor not their child. The State notes that because of a child victim's trauma, fear, or infancy, the child may be unwilling or unable to confirm whether sexual exploitation occurred. Further, the State urges that the very nature of the crimes of kidnapping and false imprisonment makes it difficult to prove sexual exploitation or motivation because the child is removed from public view." *Robinson*, 873 So. 2d at 1215.

29    Robinson was convicted of carjacking and kidnapping after he stole a car with a baby in the back seat. 873 So. 2d at 1208.

30    After their initial registration, level one sex offenders must verify by mail every year, CL §§ 168-f(1), 168-f(2)(a), and appear in person every three years to be photographed. CL § 168-f(2)(b-3). In addition, they must update their registration (and pay a fee) within ten days of any change in address, internet identifiers or accounts, or enrollment, attendance, employment or residence at any institution of higher education. CL § 168-f(4). If a registered sex offender leaves New York to reside, work, or attend school in another jurisdiction, he is required by federal law (and in all likelihood by state law as well) to register, and "keep his registration current" in each such jurisdiction. 34 U.S.C. § 20913(a). He is also required to keep his registration current in New York. *See Doe v. O'Donnell*, 86 A.D.3d 238, 924 N.Y.S.2d 684 (2011) (holding that petitioner, originally registered as a level two offender in New York, remained subject to its lifetime registration requirement after moving to Virginia, registering there, and successfully petitioning a Virginia court for deregistration); *see also* Samantha R. Millar, *Doe v. O'Donnell and New York's Sex Offender Registration Act: The Problem of Continued Registration Under SORA after Leaving the State*, 38 Cardozo L. Rev. 337 (2016).

31    *See, e.g.*, EL§ 168-v (registered sex offenders may not work on ice cream trucks); *Woe v. Spitzer*, 571 F. Supp. 2d 382, 388 (E.D.N.Y. 2008) ("it is not a great leap" to assume that certain employers "consult the SORA registry" before making hiring decisions and thereafter decline to hire registered sex offenders).

32    In *Diack*, 24 N.Y.3d at 686-87, the New York Court of Appeals invalidated Nassau County's Local Law 4, which prohibited all registered sex offenders (even if no longer on parole or post-release supervision) from residing within 1,000 feet of a school. The court based its decision on supremacy grounds, holding that "the State's comprehensive and detailed statutory and regulatory framework for the identification, regulation and monitoring of registered sex offenders prohibits the enactment of a residency restriction law such as Local Law 4." *Id.* at 677. Within New York, similar city, county and town laws (of which there were many, *see, e.g.*, *Wallace v. State of New York*, 40 F. Supp. 3d 278 (E.D.N.Y. 2014) ) presumably may no longer be enforced. Outside of New York, however, comparable statutes and ordinances "remain on the books across the country," presenting a registered sex offender with a bewildering array of overlapping and sometimes inconsistent restrictions on where he may live, work, and travel. *See* Lori McPherson, *The Sex Offender Registration and Notification Act (SORNA) at 10 Years: History, Implementation, and the Future*, 64 Drake L. Rev. 741, 786 nn. 257, 262 (2016).

33    Although level one offenders are not included in New York's statewide online registry, certain counties and municipalities continue to place the names, photographs, and license plate numbers of level one offenders on the internet. *See, e.g.*, Orange County, New York, *Sex Offender Listing*, https://www.orangecountygov.com/977/Sex-Offender-Listing (last visited June 29, 2018). Other states put the names and photographs of all registered offenders online—which in turn makes them searchable nationwide through the federal National Sex Offender Public Website. *See* 34 U.S.C. § 20922; https://www.nsopw.gov/en-US/Home/About (last visited June 29, 2018). Thus, once a level one offender leaves New York City to reside, work, or attend school, he may lose the relative anonymity of his level one status.

34    Defendants' claim that plaintiff cannot prevail on his substantive due process claim without a determination "that both the New York State Legislature and the United States Congress acted irrationally," Def. MTD Mem. at 10, is considerably overstated. As the Court of Appeals noted in *Knox*, the federal Jacob Wetterling Act required states to include "kidnapping and unlawful imprisonment of children by nonparents as among the

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 116 of 134

crimes requiring registration," on pain of losing federal funding, but "does not require attaching the label 'sex offender' to the perpetrators of these crimes. That was the New York Legislature's choice." 12 N.Y.3d at 68.

35    The primary problem with the Alabama statute was the definition of "residence." *See Strange,* 2016 WL 1079153, at *9 ("ASORCNA defines 'residence' in a circular manner, failing to specifically identify the point at which a sex offender 'resides' within a zone of exclusion such that he is subject to prosecution."). Plaintiff here raises no comparable challenge.

36    *Williams* upheld the 1,000-foot rule against an *ex post facto* and substantive due process challenge. Neither *Williams* nor any other New York case cited by the parties considered whether the rule is unconstitutionally vague.

37    By way of example only, the public entrance of the Daniel Patrick Moynihan United States Courthouse, where plaintiff Yunus has been required to appear several times in connection with this action, is within 1,000 feet of at least two elementary schools.

38    While a parolee may be required to seek permission from his PO before moving his residence—thus giving the officer an opportunity to research the proposed location via CIRIS—it would be absurd to expect a parolee to submit his daily route to his PO for this purpose, and equally absurd to ask an officer with a caseload of 25 to 30 sex offenders, *see* Lewis-Robinson Decl. ¶ 6, to pre-authorize every step taken by every offender to ensure their compliance with the 1,000-foot rule.

39    Plaintiff does not seek damages from the Parole Officer Defendants in connection with the 1,000-foot rule. *See* Pl. MTD Opp. Mem. (Dkt. No. 69) at 23-24 (acknowledging that "qualified immunity would apply to mandatory conditions tied to" his sex offender designation).

40    By way of example only, the Daniel Patrick Moynihan United States Courthouse is within 300 yards of Columbus Park, where children frequently congregate to play. Plaintiff also notes that the Willow Avenue shelter, where he and other registered sex offenders are housed, is directly across the street from a family shelter at which young children congregate. *See* Yunus Decl. ¶ 28.

41    *See also* Merriam-Webster Online Dictionary, *Consenting Adult*, https://www.merriam-webster.com/ dictionary/consenting% 20adult (last visited June 29, 2018) (defining term as "an adult who has consented to have sex").

42    The plaintiff in *Singleton* was a "discretionary sex offender" who challenged, among other things, the same ban on camera-equipped cellphones that was imposed on plaintiff Yunus as Special Condition No. 35. 210 F. Supp. 3d at 376. The court denied defendants' motion to dismiss that challenge, noting that plaintiff's prior sexual misconduct did not involve cellphones or cameras and concluding that the condition improperly "functions as an overbroad ban on an item simply because Plaintiff *could* use its functions to commit a future lewd act." *Id.* (emphasis added). *See also United States v. Peterson,* 248 F.3d at 82-83 (rejecting government's argument that "a computer with Internet access offers the *possibility* of abusive use for illegitimate purposes" and striking "broad restrictions on Peterson's computer ownership and internet access" that were not "reasonably related" to his actual criminal history) (emphasis added) (quoting 18 U.S.C. § 3563(b) ); *United States v. Sofsky,* 287 F.3d 122, 126 (2d Cir. 2002) (quoting *Peterson,* 248 F.3d at 83) ("We appreciate the Government's point that permitting Sofsky access to a computer and the Internet after serving his ten-year sentence can facilitate continuation of his electronic receipt of child pornography, but we are more persuaded by the observation in *Peterson* that '[a]lthough a defendant might use the telephone to commit fraud, this would not justify a condition of probation that includes an absolute bar on the use of telephones.' "); *Cf. United States v. Johnson,* 446 F.3d 272, 274-75 (2d Cir. 2006) (upholding broad ban on internet access as a condition of supervised release for a convicted sex offender who "used the Internet to conduct sexually-explicit conversations with minors, and to lure several of them to meetings").

43    "As used in this subdivision, a 'commercial social networking website' shall mean any business, organization or other entity operating a website that permits persons under eighteen years of age to be registered users for the purpose of establishing personal relationships with other users, where such persons under eighteen years of age may: (i) create web pages or profiles that provide information about themselves where such web

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 117 of 134

pages or profiles are available to the public or to other users; (ii) engage in direct or real time communication with other users, such as a chat room or instant messenger; and (iii) communicate with persons over eighteen years of age." EL 🚩 § 259-c(15). A proviso explains that, "for purposes of this subdivision, a commercial social networking website shall not include a website that permits users to engage in such other activities as are not enumerated herein." *Id.* It is not clear whether this proviso exempts otherwise-qualifying websites from the categorical ban simply because they also permit their users to engage in non-enumerated activities, such as (for example) posting photos or videos.

44    *See* Priit Kallas, *Top 15 Most Popular Social Networking Sites and Apps [May 2018]*, Dreamgrow (May 22, 2018) https://www.dreamgrow.com/top-15-most-popular-social-networking-sites/ (last visited June 29, 2018). In percentage terms, 73% of all American adults now use YouTube, followed by Facebook (68%), Instagram (35%), LinkedIn (25%) and Twitter (24%). *See* Aaron Smith & Monica Anderson, *Social Media Use in 2018*, Pew Research Center, http://www.pewinternet.org/2018/03/01/social-media-use-in-2018/ (last visited June 29, 2018). "The typical (median) American reports that they use three of the eight major platforms that the Center measured in this survey." *Id.*

45    Even if EC § 259-c(15) permitted individual parole officers to make case-by-case exceptions on request, that would not save an "otherwise overly broad restriction" on plaintiff's First Amendment rights. *United States v. Maxson*, 281 F. Supp. 3d 594, 600 (D. Md. 2017) ("the fact that Defendant may use the Internet if he obtains prior written approval from his probation officer cannot salvage this otherwise overly broad restriction"); *see also Mutter v. Ross*, 811 S.E.2d at 873 n.38 (rejecting defendants' argument that "the special condition of Mr. Ross's parole does not run afoul of *Packingham* because it allowed Mr. Ross to access the internet *after* obtaining permission from his parole officer") (emphasis in the original); 🏳️ *United States v. LaCoste*, 821 F.3d 1187, 1192 (9th Cir. 2016) ("When a total ban on Internet access cannot be justified ... a proviso for probation-officer approval does not cure the problem.").

46    In addition to his nieces and cousins, plaintiff has a son of his own who is an adult. Neither Special Condition No. 15 nor any of plaintiff's other parole conditions bar him from contact with his son. *See* Oral Arg. Tr. at 23:18-23.

47    At oral argument, plaintiff pointed out that he had no ability to establish a close pre-parole relationship with his nieces and cousins. *See* Oral Arg. Tr. at 23:15-24:11 ("He's been in jail since 2002 and hasn't been allowed to [see his minor nieces and cousins] since he's come out."). This assertion, while no doubt accurate, is not particularly relevant to the due process analysis, which—except in cases involving parents and their own children—turns on the actual relationship between the extended family members, not the relationship that the plaintiff wishes to develop. Moreover, both the parent-child cases and the extended-family cases frequently stress the interests of the children themselves in maintaining the stability of established custodial arrangements or emotional bonds. *See, e.g.,* 🏳️ *Rivera*, 696 F.2d at 1026 ("The Ross children surely possess a liberty interest in maintaining ... the family environment that they have known since birth."); 🏳️ *Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000) ("children have a ... constitutionally protected liberty interest in not being dislocated from the emotional attachments that derive from the intimacy of daily [family] association.") (alteration in the original) (internal quotation marks and citations omitted). Plaintiff's minor nieces and cousins have no comparable interests at stake.

48    Defendants suggest otherwise, arguing that challenges to state-imposed parole conditions should be brought in state court. *See, e.g.,* Def. MTD Mem. at 16 ("[T]his Court should not supplant the jurisdiction of state courts which provide the proper avenue of relief to challenge state parole conditions,"). In support of that contention, defendants cite 🏳️ *Maldonado v. Fischer*, 2013 WL 5487429 (W.D.N.Y. Sept. 30, 2013), which (they say) "directed plaintiff to file an Article 78 proceeding if he wishes to contest his special condition." Def. MTD Mem. at 16-17. In fact, *Maldonado* reaffirmed the availability of a federal forum for claims such as these. After dismissing Maldonado's challenges to various parole conditions as moot (because his parole had been revoked following a new felony conviction) the court advised him that should he once again be granted parole,

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 118 of 134

"and should parole officials impose similar conditions, plaintiff may seek review of those conditions through an article 78 petition *or another action in this Court.*" *Maldonado*, 2018 WL 5497429 at *4 (emphasis added).

49    To the contrary: in her declaration, PO Lewis-Robinson asserts flatly that plaintiff "is not permitted to visit with members of his family who are minors—most specifically, his nieces, nephews, and cousins." Lewis-Robinson Decl. ¶ 21.

50    Additionally, the Sixth Claim for Relief challenges the restrictions on plaintiff's cellphone, computer, camera, and internet access as arbitrary and capricious. SAC ¶ 173(i)-(ii). Since I considered the same issues in Part V(F) of this Report (in the context of plaintiff's First Amendment challenge), I will not repeat that analysis here.

52    Similarly, a PO could rationally reject an apartment that the parolee could not possibly afford. In this case, Ms. Blake originally proposed to charge plaintiff $400 per month in rent. Blake Decl. ¶ 5; Lewis-Robinson Decl. ¶ 16. However, when Ms. Blake learned that plaintiff did not have a full-time job she offered to permit him to reside in her apartment "free of charge." Blake Decl. ¶ 6; Lewis-Robinson Decl. ¶ 17. There is nothing inherently suspicious in such an offer, particularly when made by a relative of plaintiff's fiancée. Moreover, although Lewis-Robinson states that she "inquired as to why he was permitted to live at the property rent-free," Lewis-Robinson Decl. ¶ 17, she does not allege that she received an unsatisfactory answer. The no-rent offer therefore cannot have furnished a rational reason to refuse plaintiff's request.

54    It is implausible that a recently-released parolee, who is required to register as a sex offender, would have kept that fact from his fiancée in the absence of Special Condition No. 24.

55    *Trisvan* was an unusual case. Plaintiff was convicted of manslaughter after a trial at which he was identified as the "second shooter" in a gang-related killing. 284 F. Supp. 3d at 294; *see also Trisvan v. Ercole*, 2015 WL 419685, at *2-3 (E.D.N.Y. Jan. 30, 2015) (recounting crime in detail and dismissing Trisvan's petition for habeas corpus). Years later, proceeding *pro se*, he challenged virtually all of his parole conditions as unconstitutional (including standard conditions such as those prohibiting him from possessing firearms and associating with felons) without making any effort to explain why—if at all—those conditions were unreasonable or unnecessary in his case. *Trisvan*, 284 F. Supp. 3d at 294. After being given two opportunities to amend his pleading for this purpose, *Id.* at 295, plaintiff filed a Third Amended Complaint which once again "fail[ed] to present any factual allegations explaining how or why the release conditions are not reasonably or necessarily related to legitimate state interests in light of the crime and conduct underlying his conviction." *Id.* at 297. Instead, plaintiff "continue[d] to argue that any condition that abridges a constitutional right is *per se* unreasonable." *Id.* Against this backdrop, the court gave Trisvan "one last opportunity" to amend, *Id.* at 304, instructing him to "describe in detail the facts underlying his crime of conviction as found at trial and also, more importantly, explain why the parole conditions are unreasonable or unnecessary despite the actions for which he was convicted." *Id.* In context, the *Trisvan* court's admonition is properly read not as an announcement of a new pleading requirement for cases challenging parole conditions but rather as an effort to assist a particular *pro se* plaintiff in focusing on—and pleading facts relevant to—the arbitrary and capricious standard governing his challenge.

56    Those conditions are: No. 4 (the 1,000-foot rule), to the extent it is more than a residency restriction; No. 17 (the 300-yard rule); Nos. 12, 22, 39, and 48 (the cellphone, computer, camera, and internet restrictions), to the extent they bar plaintiff from the "modern town square"; and No. 24 (the "consenting adult" rule).

57    Defendants' reliance on a 2007 district court decision from Connecticut for the proposition that "the classification alone does not constitute irreparable harm for the purposes of a preliminary injunction," *see* Def. Prelim. Opp. Mem. at 8 (quoting *Vega v. Lantz*, 2007 WL 3025285, at *3 (D. Conn. Oct. 16, 2007) ) is misplaced. Vega was serving a 60-year prison sentence when he filed suit to challenge his internal prison classification as a sex offender. He was not required to register under SORA, did not bear the civil consequences and criminal risks flowing from the registration requirement, and was not (nor ever likely to be) subject to mandatory "sex offender" parole conditions. Moreover, the district court's irreparable harm analysis rested directly on its conclusion that case law in our Circuit—as of 2007—did not establish that a prison

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 119 of 134

inmate had any protectable liberty interest in "the classification of inmates by the Connecticut DOC." *Vega,* 2007 WL 3025285, at *2. As discussed in detail in Part V(C)(1) of this Report, *supra,* it is now beyond dispute in this Circuit that a parolee has a protectable liberty interest in not being designated a sex offender under SORA. *See* ⚠ *Doe v. Pataki,* 3 F. Supp. 2d at 468 (holding that a class of parolees and probationers had "a protected liberty interest that entitled them to procedural due process"); 🚩 *Dep't of Pub. Safety,* 271 F.3d at 49 (holding that a convicted sex offender had a cognizable liberty interest at stake, notwithstanding his conviction, because the registry "implies that each person listed is more likely than the average person to be currently dangerous," which "stigmatizes every person listed on the registry"). Even as to prison inmates, the Second Circuit has now confirmed—in an appeal from a later decision by the same trial court—that "wrongly classifying an inmate as a sex offender may have a stigmatizing effect which implicates a constitutional liberty interest." *Vega v. Lantz,* 596 F.3d at 81-82. Similarly, defendants' contention that "the alleged harm is caused by the already publicly available information concerning the criminal conviction, not the need to register as a sex offender," Def. Prelim Inj. Opp. Mem. at 8, is demonstrably untrue. The publicly-available information concerning plaintiff's conviction for kidnapping in the second degree does not brand him as a sex offender, restrict his job and housing choices, put him at risk whenever he walks within a few blocks of a school, or prevent him from following the President of the United States on Twitter.

58    Plaintiff does not seek to be free of parole altogether, nor to be relieved from parole conditions that do not presuppose that he is a "sex offender."

59    Nothing in this Report is intended to prevent plaintiff's parole officers from requiring plaintiff to disclose his phone, computer and internet passwords or otherwise monitoring his usage, if such restrictions are reasonably related to his past conduct and designed to deter recidivism and prevent further offenses. *See, e.g., Mutter,* 811 S.E. 2d at 873; *Maxson,* 281 F. Supp. 3d at 600-01.

---

**End of Document**                           © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 4274226
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Eugene SCOTT, Plaintiff,
v.
Robert ROSENBERGER, Parole Officer; and Gary
Morgiewicz, Senior Parole Officer, Defendants.

No. 19-CV-1769 (CS)
|
Signed 07/24/2020

**Attorneys and Law Firms**

Eugene Scott, Scranton, Pennsylvania, Pro Se Plaintiff

Brendan M. Horan, Assistant New York Attorney General,
New York, New York, Counsel for Defendants

**OPINION & ORDER**

Seibel, J.

**\*1** Before the Court is the motion to dismiss of Defendants
Robert Rosenberger and Gary Morgiewicz (collectively,
"Defendants"). (Doc. 23.) For the reasons set forth below,
Defendants' motion is GRANTED IN PART and DENIED IN
PART.

**I. BACKGROUND**
I accept as true the facts, but not the conclusions, set forth in
Plaintiff Eugene Scott's Complaint. (Doc. 2 ("Compl.").)

**A. Facts**
On April 10, 2012, Plaintiff was sentenced to a term of ten
years' probation after pleading guilty to a "Criminal Sexual
Act involving his six year old cousin at his residence." (*Id.*
¶ 6.)[1] Plaintiff alleges he was sentenced as a "youthful
offender." (*Id.*)

On an unspecified date, Plaintiff violated his probation in
an unspecified manner, and on December 9, 2015, he was
sentenced to one and one-third to four years' imprisonment
(*Id.* ¶ 7.)

On January 10, 2019, Plaintiff was released from prison
and placed under the care of Defendant Rosenberger, a
parole officer with the New York State Department of
Corrections and Community Supervision ("DOCCS"). (*Id.*
¶ 8.) Rosenberger's supervisor was Defendant Morgiewicz.
(*Id.* ¶ 4.) Plaintiff alleges that Rosenberger and Morgiewicz
"decided to supervise Plaintiff as a discretionary sex
offender." (*Id.* ¶ 18.)

Rosenberger gave Plaintiff a list of several special conditions
of parole that were to be imposed. (*Id.* ¶ 9.)

> The conditions read: I will not be in
> contact with children under the age
> of 18 unless I have permission[;] I
> will not purchase or possess a camera
> or related photography equipment,
> or a video camera or related
> equipment without permission[;] if
> given permission to obtain a driver's
> license I will drive only to and
> from work[;] I will not rent, own,
> use, posses, purchase, or have control
> of any computer, computer-related
> material, and/or internet unless I obtain
> written permission[;] I will not rent,
> operate, or be a passenger in any
> vehicle without permission.

(*Id.*) Rosenberger also told Plaintiff that Plaintiff had
to "inform" Rosenberger "of all relationships formed by
Plaintiff sexual or not." (*Id.* ¶ 21.) Plaintiff asked Rosenberger
why "so many special conditions were being re-imposed
when they were already removed when his parole conditions
were amended by a parole commissioner the previous
June." (*Id.* ¶ 10.) Plaintiff also told Rosenberger that the
conditions restricting his access to vehicles, computers, the
internet, and camera phones had nothing to do with his
offense. (*Id.*) Rosenberg responded, " '[B]ecause you're a sex
offender and all sex offenders get the same conditions that's
why they are being imposed.' " (*Id.*) Plaintiff asked if he
could speak with Rosenberger's supervisor before signing an
acknowledgment of his conditions of parole, but Rosenberger
said that his "senior and bureau chief" already approved of the
conditions, so Plaintiff signed the document listing the special
conditions. (*Id.*)

Rosenberger took Plaintiff to meet with a caseworker at the Department of Social Services ("DSS"), and to "the only Sexual Assault Reform Act ("SARA") [public] housing in Orange County," where Plaintiff would stay while on parole. (*Id.* ¶ 8.) Plaintiff's caseworker told Plaintiff that he had to seek employment and keep all employment-related appointments to remain on public assistance, and Rosenberger stated that if Plaintiff lost his public assistance, he would have to go back to prison for not having access to SARA-compliant housing. (*Id.* ¶ 11.)

**\*2** On or about January 21, 2019, Plaintiff requested permission from Rosenberger to take classes to renew his Emergency Medical Technician ("EMT") certificate. (*Id.* ¶ 12.) Rosenberger told Plaintiff that the request was under review. (*Id.*)

On January 22, Plaintiff went to the Department of Labor, where he was reminded that he had to search for employment while on parole. (*Id.* ¶ 13.) He was "introduced" to the resource room there, where he used a computer to update his resume and apply for jobs. (*Id.*) That same day, one of the employers to which he applied agreed to interview him for a position on January 24. (*Id.*)

On January 23, Plaintiff registered for anger management classes, which he was required to do under his parole conditions. (*Id.* ¶ 14.) Plaintiff told Rosenberger that the anger management class times would "conflict[ ]" with the potential employment opportunity" for which he had scheduled an interview. (*Id.*) Rosenberger responded that Plaintiff would not be permitted to take that job because of the conflict, so Plaintiff canceled the interview. (*Id.*)

On January 24, Rosenberger told Plaintiff that his request to renew his EMT certificate was denied because there was a chance that both the classes and a job as an EMT would bring Plaintiff into contact with minors. (*Id.* ¶ 15.) Rosenberger stated that his supervisor, Defendant Morgiewicz, made the decision to deny Plaintiff's request. Rosenberger explained that he had previously been an EMT while on probation, EMTs must be at least eighteen years old so there would be no minors in the certification classes, and Plaintiff would always be under the supervision of his EMT or paramedic partner if he obtained his certificate and got a job as an EMT. (*Id.*) Plaintiff then asked if he could take EMT certification classes at a local college, to which Rosenberger replied that Plaintiff would have to disclose his youthful offender adjudication to any college in which he enrolled. (*Id.*)

On January 24, Plaintiff went back to the Department of Labor and applied for more jobs. (*Id.*)

On January 28, Plaintiff met with Rosenberger and said that he had two upcoming interviews. (*Id.* ¶ 16.) Plaintiff also requested a copy of the reasons his request to take EMT classes was denied. (*Id.*)

On January 30, Rosenberg took Plaintiff into custody for violating his parole conditions by using a computer without permission while at the Department of Labor. (*Id.* ¶ 17.)

**B. Procedural History**

Plaintiff's Complaint, dated February 14, 2019, brought the following claims under [image] 42 U.S.C. § 1983 against Defendants in both their individual and official capacities: (1) procedural and substantive due process violations against both Defendants for designating Plaintiff as a "discretionary sex offender," (2) First Amendment and due process violations against both Defendants for the "40 special conditions" of parole imposed on Plaintiff, (3) First Amendment and due process violations against Morgiewicz for denying Plaintiff's request to take EMT classes, and (4) First Amendment and due process violations against Rosenberger for requiring Plaintiff to disclose to colleges that he was a sex offender and disclose to Rosenberger whenever Plaintiff entered into any relationship. (*Id.* ¶¶ 5, 18-21.) Plaintiff sought declaratory relief and money damages. (*Id.* at 8.)

**\*3** On October 11, 2019, Defendants filed a pre-motion letter, (Doc. 20), and the Court set a date for a pre-motion conference and ordered Plaintiff to respond to Defendants' letter by November 12, 2019, (Doc. 21). Plaintiff did not do so, but at the pre-motion conference on November 18, 2019, Plaintiff provided Defendants and the Court with his responsive letter, which was dated November 2. (Doc. 24 ¶ 2; *id.* Ex. A.) In Plaintiff's letter, he acknowledged that he was no longer on parole or under the supervision of DOCCS, and thus his claim for declaratory relief was moot. (*Id.* Ex. A at 1.)

At the pre-motion conference, the Court discussed Defendants' letter and Plaintiff's response and set a schedule for Plaintiff to amend his Complaint and for Defendants to move to dismiss. (Minute Entry dated Nov. 18, 2019.)

Plaintiff did not amend his Complaint by the deadline set by the Court.

On February 21, 2020, Defendants moved to dismiss, (Doc. 23), and filed a memorandum of law in support of their motion, (Doc. 23 ("Ds' Mem.")). Plaintiff to date has not opposed Defendants' motion. The Court thus considers the motion fully briefed.

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.' " *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

Complaints by *pro se* plaintiffs shall be examined with "special solicitude," interpreted "to raise the strongest arguments that they suggest," *Shibeshi v. City of N.Y.*, 475 F. App'x 807, 808 (2d Cir. 2012) (summary order) (internal quotation marks and emphasis omitted),[2] and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*) (internal quotation marks omitted). Nevertheless, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and district courts "cannot invent factual allegations that [the plaintiff] has not pled." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

**\*4** A plaintiff's failure to oppose a motion to dismiss "does not, without more, justify dismissal," *James v. John Jay Coll. of Criminal Justice*, 776 F. App'x 723, 724 (2d Cir. 2019) (summary order), especially where the plaintiff is *pro se*, *see Kucharczyk v. Westchester County*, 95 F. Supp. 3d 529, 536 (S.D.N.Y. 2015). That is because "the sufficiency of a complaint is a matter of law that the district court is capable of determining based on its own reading of the pleading and knowledge of the law." *Goldberg v. Danaher*, 599 F.3d 181, 184 (2d Cir. 2010) (internal quotation marks and alteration omitted).

## III. DISCUSSION

### A. Declaratory Relief

Plaintiff's Complaint seeks a declaration vacating his special conditions of parole, (Compl. at 8), but as Plaintiff acknowledges, the Court cannot provide that form of relief because Plaintiff has reached the maximum expiration date of his sentence and is no longer subject to any parole conditions. (Doc. 24 Ex. A at 1.) Accordingly, to the extent Plaintiff's claims seek declaratory relief, they are dismissed as moot. *See Krull v. Oey*, 805 F. App'x 73, 74 (2d Cir. 2020) (summary order) (dismissing equitable claim as moot where the court "can no longer provide that form of injunctive relief"); *Maldonado v. Fischer*, No. 11-CV-1091, 2013 WL 5487429, at \*4 (W.D.N.Y. Sept. 30, 2013) ("As plaintiff is no longer subject to special conditions of parole, his request for injunctive relief is moot.").

### B. Claims Against Defendants in Their Official Capacities

Plaintiff states his claims are brought against Defendants "in their official and individual capacities." (Compl. ¶ 5.) But "DOCCS officials enjoy Eleventh Amendment immunity from suit under § 1983 for damages in their official capacities." *Gunn v. Bentivegna*, No. 20-CV-2440, 2020 WL 2571015, at *3 (S.D.N.Y. May 19, 2020); *see Ortiz v. Russo*, No. 13-CV-5317, 2015 WL 1427247, at *5 (S.D.N.Y. Mar. 27, 2015) ("[E]ach of the Defendants are employees of DOCCS, a state entity, and are therefore entitled to Eleventh Amendment immunity from claims against them in their official capacity."). Accordingly, Plaintiff's claims against Defendants in their official capacities are dismissed.

### C. Plaintiff's Designation as a Discretionary Sex Offender

Plaintiff alleges he was denied procedural and substantive due process when Defendants designated him "as a discretionary sex offender while being fully aware of the liberty restrictions that would be placed on the Plaintiff as a result of that designation." (Compl. ¶ 18.)

#### 1. Procedural Due Process

Plaintiff alleges that he "was not given the opportunity to attend any hearing or given a choice to dispute th[e] designation," nor was he "given any form of individualized assessment clinical or otherwise to defend himself against th[e] designation" in violation of his procedural due process rights secured by the Fourteenth Amendment. *Id.*

When faced with a procedural due process claim under the Fourteenth Amendment, courts must proceed with the following two-step inquiry: first, inquire " 'whether there exists a liberty or property interest which has been interfered with,' " and second, inquire " 'whether the procedures attendant upon that deprivation were constitutionally sufficient.' " *Francis v. Fiacco*, 942 F.3d 126, 141 (2d Cir. 2019) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)); *see Singleton v. Doe*, 210 F. Supp. 3d 359, 366 (E.D.N.Y 2016) ("A court first asks whether there exists a liberty or property interest of which a person has been deprived, and if so, whether the procedures followed by the State were constitutionally sufficient.") (internal quotation marks omitted). In other words, if a plaintiff is not deprived of a constitutionally protected liberty interest, the Court need not reach the issue

of whether the attendant procedures were constitutionally sufficient.

**\*5** "[I]t is an unsettled question in this Circuit as to whether a prisoner holds a liberty interest in being designated as a [discretionary sex offender]." *Webster v. Himmelbach*, 271 F. Supp. 3d 458, 464 (W.D.N.Y. 2017); *see Singleton*, 210 F. Supp. 3d at 367 (court "unaware of any Second Circuit federal court determination that addresses a parolee's liberty interest in being free from a discretionary sex offender designation") (emphasis omitted). That said, the only cases that have considered a constitutionally protected liberty interest in not being designated as a discretionary sex offender have done so using the "stigma-plus" theory. *See Singleton*, 210 F. Supp. 3d at 367-71 (plaintiff established genuine issue of fact regarding whether designation as discretionary sex offender violated his due process rights under stigma-plus test); *see also Maldonado v. Mattingly*, No. 11-CV-1091, 2019 WL 5784940, at *8 (W.D.N.Y. Nov. 6, 2019) (granting summary judgment in favor of defendant, but analyzing plaintiff's claim under stigma-plus theory). The stigma-plus theory acknowledges that a liberty interest may be implicated "when a person's good name and reputation are at stake." *Singleton*, 210 F. Supp. 3d at 367.

"To establish a 'stigma plus' claim, a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (internal quotation marks omitted). "Thus, even where a plaintiff's allegations would be sufficient to demonstrate a government-imposed stigma, such defamation is not, absent more, a deprivation of a liberty or property interest protected by due process." *Id.* (internal quotation marks omitted).

Here, Plaintiff alleges that he pled guilty to a "Criminal Sexual Act involving his six year old cousin," after which he was placed on probation, which he violated. (Compl. ¶¶ 6-7.) After serving a term of incarceration, he was released on parole, and Defendants designated him as a "discretionary sex offender." (*Id.* ¶ 18.) Plaintiff has conceded that he was found guilty of engaging in criminal misconduct with his six-year-old cousin and that his conduct was sexual in nature. In other words, Plaintiff's Complaint leaves undisputed that he committed a sexual offense and that he is a sex offender. Thus, Plaintiff has failed to plausibly allege that his designation as a sex offender was false or is capable of

being proved false, and he therefore cannot establish that he had a constitutionally protected liberty interest in maintaining his good name and reputation under the stigma-plus theory.

*See* Vega, 596 F.3d at 82 (where plaintiff did not dispute committing sexual offense, he "has not established a threshold requirement" for a stigma-plus claim: "the existence of a reputation-tarnishing statement that is *false*") (emphasis in original). Accordingly, Plaintiff has failed to plausibly allege a constitutional violation under the stigma-plus theory. And because Plaintiff does not otherwise posit a theory under which he would have a constitutionally protected liberty interest in not being designated a discretionary sex offender, his procedural due process claim is dismissed.

### 2. Substantive Due Process

"To plead a substantive due process claim, a plaintiff must assert that: (1) a constitutionally cognizable property or liberty interest is at stake, and (2) defendants' alleged acts were arbitrary, conscience-shocking, or oppressive in the constitutional sense, not merely incorrect or ill-advised." *McCaul v. Ardsley Union Free Sch. Dist.*, 514 F. App'x 1, 3 (2d Cir. 2013) (summary order) (internal quotation marks and alterations omitted). Thus, like Plaintiff's procedural due process claim, the threshold inquiry is whether Plaintiff has plausibly pleaded that he has a constitutional liberty interest in being free from a discretionary sex offender designation. For essentially the same reasons discussed in the procedural due process section above, Plaintiff has not.

**\*6** As noted, Plaintiff does not dispute that he engaged in a criminal sexual act with his six-year-old cousin. While a plaintiff may have "a substantive liberty interest in not being labeled a sex offender *when he has committed no sexual offense*," *Yunus v. Robinson*, No. 17-CV-5839, 2019 WL 168544, at \*9 (S.D.N.Y. Jan. 11, 2019) (emphasis added), *appeal withdrawn sub nom.* Yunus v. Lewis-Robinson, No. 19-382, 2019 WL 3814554 (2d Cir. May 15, 2019), Plaintiff here has not plausibly alleged that he did not commit a sexual offense. In fact, he pleaded that he did commit a sexual offense. (Compl. ¶ 6.) Accordingly, Defendants' decision to designate Plaintiff as a discretionary sex offender did not implicate any constitutionally protected liberty interests, and Plaintiff's substantive due process claim regarding the designation is dismissed.

### D. Plaintiff's Special Parole Conditions

Plaintiff alleges that Defendants "imposed and enforced over 40 special conditions upon the Plaintiff while being aware that those conditions had nothing to do with his crime," thereby violating his substantive due process rights. (Compl. ¶ 19.) He also alleges that some of the forty conditions violated his First Amendment rights. (*See id.* ¶¶ 19-21.) But Plaintiff did not allege each of the forty conditions; rather he pleaded only the following special conditions: (1) prohibition on contact with minors without permission; (2) prohibition on possession of cameras or related equipment without permission; (3) prohibition on obtaining a driver's license without permission; (4) if Plaintiff got a driver's license, he was allowed to drive only to and from work; (5) prohibition on computer and internet use without permission, (6) prohibition on operating or being a passenger in a vehicle without permission; (7) denial of request to take EMT classes and receive EMT certification; (8) mandatory disclosure to any college in which he enrolled of his youthful-offender status; and (9) mandatory disclosure to Rosenberger of any "relationships ... sexual or not" into which Plaintiff entered. (*Id.* ¶¶ 9, 15, 19-21.) Defendants argue that the special conditions did not violate Plaintiff's constitutional rights because they are rational in light of his crime and previous probation violation and are not arbitrary and capricious. (Ds' Mem. at 15-19.)

"Parolees are entitled to some form of due process in the imposition of special conditions of parole." *Yunus*, 2019 WL 168544, at \*20 (S.D.N.Y. Jan. 11, 2019) (internal quotation marks and alteration omitted). "Generally, the imposition of conditions ... must be upheld as long as they are reasonably related to a parolee's past conduct, are not arbitrary and capricious, and are designed to deter recidivism and prevent further offenses." *Trisvan v. Annucci*, 284 F. Supp. 3d 288, 298-99 (E.D.N.Y. 2018) (internal quotation marks omitted); *see* Muhammad v. Evans, No. 11-CV-2113, 2014 WL 4232496, at \*9 (S.D.N.Y. Aug. 15, 2014) ("In the Second Circuit, special restrictions on a parolee's rights are upheld where they 'are reasonably and necessarily related to the interests that the Government retains after his conditional release.' ") (quoting *Birzon v. King*, 469 F.2d 1241, 1243 (2d Cir. 1972)); *see also* United States v. Myers, 426 F.3d 117, 125 (2d Cir. 2005) (in federal supervised release context, conditions "must involve no greater deprivation of liberty than is reasonably necessary for the purposes of sentencing") (internal quotation marks and alteration omitted); *Doe v. Lima*, 270 F. Supp. 3d 684, 702 (S.D.N.Y. 2017) (applying *Myers* to state parole context), *aff'd sub nom.* Doe v. Cappiello, 758 F. App'x 181 (2d Cir. 2019)

(summary order); *Doe v. Annucci*, No. 14-CV-2953, 2015 WL 4393012, at \*13 (S.D.N.Y. July 15, 2015) (applying *Myers* in addressing qualified immunity in state parole context). "However, where the condition is not related to the parolee's criminal history or to the State's interests, it may be prone to tailoring or invalidation." *Robinson v. New York*, No. 09-CV-455, 2010 WL 11507493, at \*6 (N.D.N.Y. Mar. 26, 2010) (collecting cases in which parole conditions were not reasonably related to offense). And where the condition deprives the parolee of a liberty interest that "is fundamental" under the Constitution, "a deprivation of that liberty is 'reasonably necessary' only if the deprivation is narrowly tailored to serve a compelling government interest." *Myers*, 426 F.3d at 126; *see* *Lima*, 270 F. Supp. 3d at 702 ("The Second Circuit has applied strict scrutiny to restrictions on liberty incident to post-prison supervisory regimes, whether denominated as parole (as in New York State) or as supervised release (as in the federal system)").

**\*7** "[W]hile a plaintiff who claims that his parole conditions are arbitrary and capricious must provide enough information concerning his underlying crimes to plausibly allege that those conditions are not reasonably related to his prior conduct," the plaintiff need not "establish the lack of a rational relationship between these parole conditions and his criminal history by describing in detail the facts underlying his crime of conviction as found at trial and explaining why the parole conditions are unreasonable or unnecessary despite the actions for which he was convicted." *Yunus v. Robinson*, No. 17-CV-5839, 2018 WL 3455408, at \*39 (S.D.N.Y. June 29, 2018) (internal quotation marks, emphasis, and alterations omitted), *report and recommendation adopted*, 2019 WL 168544.

### 1. Prohibition on Contact with Minors

Plaintiff's second claim is dismissed to the extent it is challenging the condition that he could not have contact with minors without permission from his parole officer. Plaintiff acknowledged engaging in a "Criminal Sex Act with a six year old." (Compl. ¶ 6.) Restricting his access to minors is thus reasonably related to Plaintiff's past conduct and is designed to prevent Plaintiff from committing further offenses, and Plaintiff has not plausibly alleged that the condition is arbitrary and capricious. *See* *Trisvan*, 284 F. Supp. 3d at 298-99. Accordingly, the condition did not violation Plaintiff's substantive due process rights.[3]

### 2. Prohibition on Cameras and Related Equipment

Plaintiff alleges that the special condition prohibiting possession or use of a camera or any related equipment violates (1) his Fourteenth Amendment rights because the condition is not related to his underlying offenses and (2) his First Amendment rights because he cannot possess a camera phone, which interferes with his ability to maintain a relationship with his son. (Compl. ¶ 19; *see id.* ¶ 9.)

As noted, special restrictions on a parolee's rights must be reasonably related to Plaintiff's past conduct. And if a restriction violates a parolee's fundamental liberty interests – like a parent's interest in maintaining a relationship with his child – that restriction must be narrowly tailored to serve a compelling state interest. *See* *Lima*, 270 F. Supp. 3d at 702. On the record before me, restricting Plaintiff's access to cameras or related equipment, including camera phones, has nothing to do with Plaintiff's past conduct. There is no indication in the Complaint that Plaintiff's Criminal Sex Act or subsequent probation violation involved cameras, videos, cellphones or any related equipment. And to the contrary, Plaintiff alleges that the condition "had nothing to do with his crime." (Compl. ¶ 19.) Perhaps in discovery it will come to light that Plaintiff's criminal conduct included taking pictures or videos, or possessing the same, but on the face of the Complaint, I cannot make that determination. Thus, because there is no indication that Plaintiff's crimes involved cameras, Plaintiff has plausibly alleged that this special condition violated his due process rights. *See* *Singleton*, 210 F. Supp. 3d at 376 (denying defendants' motion for summary judgment where "Defendants have not provided the Court with evidence that the cellular telephone restriction was related to Plaintiff's prior conduct").[4]

**\*8** Defendants do not even attempt to explain why this condition was reasonably related to his offense. Rather, they argue, as they do for all of the special conditions, that as a sex offender, Plaintiff is subject to "more intensive supervision," justifying all of the special conditions imposed on him. (Ds' Mem. at 16 (citing *Maldonado*, 2019 WL 5784940, at \*5 (noting that the discretionary sex offender designation is applied where "[i]t appears that the offender and/or community would benefit from intensive supervision practices that incorporate specialized sex offender 'containment' strategies.")) (alteration in

original).) If the Court were to follow Defendants' logic here, essentially any condition could be imposed on a sex offender. But the law is clear that special conditions, whether imposed on sex offenders or any other offenders, must be reasonably related to the offender's past conduct. *See Singleton*, 210 F. Supp. 3d at 376 (genuine issue of fact existed whether cellphone prohibition on plaintiff sex offender was unconstitutional). In fact, even in *Maldonado* (the case that Defendants cite to support this argument), the court engaged in a condition-by-condition analysis, determining that some were appropriate and some were not. *Maldonado*, 2019 WL 5784940, at *10-11 (condition preventing plaintiff from "communal worship" survived motion, while condition limiting access to "premium cable channels" did not).

Next, Defendants argue that because Plaintiff had violated his probation in the past, more restrictive conditions were appropriate for him on parole. (Ds' Mem. at 16.) But the Court does not know what Plaintiff did to violate his probation, and there is no indication that it had anything to do with the possession of a camera or related equipment. Thus, I cannot say that a condition restricting his access to cameras is reasonably related to his previous probation violation. And Defendants have provided no authority to suggest that a parolee who has violated conditions of supervision in the past may subsequently be subject to any special condition, no matter how restrictive or unrelated to his previous offense. Finding none myself, I reject Defendants' argument.

Finally, Defendants argue that the ban on cameras – and all of the other special conditions – "were the initial conditions imposed upon [Plaintiff's] release, which Plaintiff subsequently violated within less than three weeks," meaning that "Defendants had almost no time to adjust the conditions after assessing Plaintiff's adjustment to his release and gauging his efforts to reintegrate following his incarceration for a violation of probation." (*Id.* at 17-18.) But conditions of parole must be reasonably related to Plaintiff's past conduct and cannot be arbitrary and capricious "whether imposed prior to or subsequent to release." *Trisvan*, 284 F. Supp. 3d at 298-99 (internal quotation marks omitted). Defendants (or any parole officers, for that matter) are not permitted to impose unconstitutional conditions of parole merely because they are the "initial conditions" and Defendants may reel them back later so long as they deem Plaintiff to have sufficiently reintegrated. Accordingly, Defendants' argument that this special condition is valid, despite the fact that it is not reasonably related to Plaintiff's past conduct, is without merit.[5]

### 3. Vehicle Restrictions

Plaintiff alleges that Defendants violated his constitutional rights by restricting his ability to get a driver's license or ride in vehicles. (Compl. ¶¶ 9, 19.) Defendants argue that the vehicle restrictions were legitimate because they were not absolute bans but rather required Plaintiff to seek permission before getting in a car or obtaining a driver's license. (Ds' Mem. at 17.) Defendants further assert that "Courts have routinely upheld restrictions on parolees' movements and associations." (*Id.* citing *Trisvan*, 284 F. Supp. 3d at 299 & n.7 ("Traveling and access to vehicles, including a driver's license, may also be curtailed given Plaintiff's exhibited willingness to flee authorities.... The restriction on possessing a driver's license and operating a vehicle, in conjunction with the travel condition, may assist parole officers in monitoring Plaintiff's activities, a 'clearly legitimate penological objective.' ") (quoting *Muhammad v. Jenkins*, No. 12-CV-8525, 2014 U.S. Dist. LEXIS 158481, *18 (S.D.N.Y. Nov. 4, 2014)), and *Morrissey v. Brewer*, 408 U.S. 471, 478 (1972) ("Typically, [parolees] must seek permission from their parole officers before engaging in specified activities, such as ... acquiring or operating a motor vehicle ....")).) But these cases do not help Defendants, as Plaintiff has plausibly alleged that the vehicle restrictions were not reasonably related to the crimes he committed, at least on the record before me where there is no indication that his crimes involved vehicles or that he posed a flight risk.

**\*9** The cases on which Defendants rely do not change the Court's analysis. In *Trisvan*, the court asked whether the vehicle restrictions were "reasonably related to a parolee's past conduct," and it found that they were "given Plaintiff's exhibited willingness to flee authorities." *Trisvan*, 284 F. Supp. 3d at 299. Here, in contrast, there is nothing in the Complaint to suggest that Plaintiff had shown a willingness to flee authorities or was otherwise a flight risk. Nor can I determine at this stage that a ban on being in a car would be of any use in monitoring Plaintiff's activities or whereabouts. Thus, *Trisvan* does not help Defendants here.

The *Muhammed* opinion Defendants cited was a denial of a request for a preliminary injunction, and the Court merely noted that Plaintiff had a "checkered history as a parolee, replete with violations of parole conditions," which made it unlikely that he would succeed on the merits of a claim that an

imposed curfew was unconstitutional. 2014 U.S. Dist. LEXIS 158481, *17-18 (internal quotation marks omitted). That case is not factually analogous to the case at hand.

Finally, while *Morrissey* explained that parolees typically (at least as of 1972) had to seek permission from their parole officers before acquiring or operating a motor vehicle, the conditions here are far more restrictive, as Plaintiff must seek permission to even be a passenger in one. (Compl. ¶ 19.) Further, *Morrissey* – which held that due process requires a hearing in connection with revocation of parole, *see* 408 U.S. at 485-89 – did not address whether conditions of parole must be reasonably related to the parolee's past conduct, and does not contradict the law in this Circuit that they must. On the record before me now, there is nothing to suggest that Plaintiff's past conduct had anything to do with vehicles. And the possibility of case-by-case exceptions to a ban does not save an overly broad condition. *Yunus*, 2019 WL 168544, at *16. Accordingly, Plaintiff's claim that his special condition of parole restricting vehicle access violated his due process rights may proceed.

### 4. Computer and Internet Restrictions

Plaintiff alleges that conditions restricting his access to computers and the internet violated his First and Fourteenth Amendment rights. Defendants argue that the computer and internet restrictions are valid because they merely obligated Plaintiff "to seek and obtain permission from parole officials before using a computer or the internet, allowing close monitoring of his technology usage." (Ds' Mem. at 17 (citing *United States v. Browder*, 866 F.3d 504, 511, n.26 (2d Cir. 2017) (upholding supervised release condition allowing monitoring of plaintiff's computer usage)).) But again, Defendants' argument misses the mark. In *Browder*, the defendant "was convicted of possessing over 462 digital images of child pornography that he received (and shared) on internet exchanges, so computer monitoring is 'reasonably related' to the nature and circumstances of the offense and Browder's history and characteristics." 866 F.3d at 512. Here, there is nothing to suggest that Plaintiff's underlying crime or probation violation involved computers or the internet, so there is no indication that imposing restrictions on all computer or internet use without permission is reasonably related to Plaintiff's conduct. In other words, Plaintiff has plausibly alleged that the restriction was not reasonably related to his past conduct.

Further, such restrictions may infringe on Plaintiff's First Amendment rights. *See United States v. Eaglin*, 913 F.3d 88, 95 (2d Cir. 2019) (parolees have constitutional right to internet access and restrictions on that right presented heightened constitutional concerns, requiring more searching inquiry); *Browder*, 866 F.3d at 511 (even conditions imposing computer monitoring as opposed to a total ban have "a constitutional gloss"); *see also Lima*, 270 F. Supp. 3d at 702 ("[T]o satisfy substantive due process, such a restriction on a releasee's liberty 'must reflect the heightened constitutional concerns' of strict scrutiny, meaning that the deprivation must be 'narrowly tailored to serve a compelling government interest.' ") (quoting *Myers*, 426 F.3d at 126). At this stage, Plaintiff has alleged that the condition is not even reasonably related to his past conduct, so by definition he has also alleged that the condition would not survive a more searching inquiry. Accordingly, Plaintiff has sufficiently alleged that the computer and internet restrictions violated his rights guaranteed under the First Amendment as well as the Fourteenth, and Plaintiff's claim regarding this special condition may proceed.

### 5. EMT Certification Restriction

**\*10** Plaintiff claims that Morgiewicz's refusal to allow Plaintiff to obtain his EMT certification violated his First and Fourteenth Amendment rights. (Compl. ¶¶ 15, 20.) Defendants argue that that decision was not arbitrary and capricious and was reasonably related to Plaintiff's past conduct, and thus not unconstitutional, because "as an EMT, Plaintiff would come into contact with, and be obligated to treat, vulnerable persons, including minors." (Ds' Mem. at 18.) The problem with Defendants' argument, however, is that Plaintiff's claim relates only to his request to take classes to get his EMT certification. (Compl. ¶ 20.) As Plaintiff alleged, all EMTs must be at least eighteen years old, so Plaintiff has plausibly stated that he would not come into contact with minors – or at least not young minors near the age of the victim of his offense – by merely taking the certification classes. (Compl. ¶ 15.) Accordingly, this restriction is plausibly arbitrary and capricious, as it would deprive Plaintiff of the opportunity to pursue his desired occupation in the future, without achieving any desired goal of parole.[6]

Further, Plaintiff has adequately alleged that the restriction violated his First Amendment right to pursue his desired occupation. While not entirely on point, there is well-established law in this Circuit that conditions of federal supervised release may not impose "an occupational restriction" on a releasee unless

> (1) a reasonably direct relationship exist[s] between the defendant's occupation and the conduct relevant to the offense of conviction; and (2) imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted.

*United States v. Lombardi*, 727 F. App'x 18, 20 (2d Cir. 2018) (summary order) (internal quotation marks omitted). While the federal supervised release statute is different from New York's parole statute, the logic underlying the federal rule on occupational restrictions is persuasive in this context as well.

Defendants argue that there is a reasonable relationship between Plaintiff's conduct – a criminal sexual act with a six-year-old – and the occupational restriction: preventing potential access to minors. That might justify preventing Plaintiff from doing the job of an EMT while on parole, but it bears a more tenuous relationship to taking the classes for potential employment later on. Further, at this stage, Plaintiff has plausibly alleged that serving as an EMT would not create the risk that he would continue to engage in criminal misconduct similar to that for which he was convicted, because Plaintiff alleges that EMTs are always observed by their partners. [7] (Compl. ¶ 15.) Accordingly, he has plausibly stated that there is no risk that he would continue to engage in criminal sexual acts with minors if he served as an EMT, [8] and his claim regarding restrictions on EMT classes may proceed.

### 6. Requirement to Disclose Youthful-Offender Status to Colleges

Plaintiff next alleges that Rosenberger's condition that Plaintiff could attend college classes only if he disclosed his criminal history to the college violated his rights under the First and Fourteenth Amendments. (*Id.* ¶ 21.) Defendants argue that because "Plaintiff pleaded guilty to a sexual offense involving a minor, the condition is rationally related to his past conduct" because it "would permit school officials to be informed and take reasonably necessary measures to protect their students, some of whom may be minors." (Ds' Mem. at 18.) I disagree, at least at this stage.

**\*11** First, Defendants provide no authority suggesting that disclosure of sex-offender status to colleges is a reasonable condition of release. Second, colleges typically serve adult-aged students, and that some students may be minors – when Plaintiff's offense involved a minor so young that the chances of there being a college student of approximately that age are virtually nil – does not establish at this stage that a condition requiring disclosure before Plaintiff can access college is reasonably related to Plaintiff's criminal conduct. *Cf* *United States v. Peterson*, 248 F.3d 79, 86 (2d Cir. 2001) ("In view of the defendant's prior child sex abuse, the court had justification to impose a condition of probation that prohibits the defendant from being at educational and recreational facilities where children congregate.... [H]owever, there would be no justification to forbid the defendant from being at parks and educational or recreational facilities where children do not congregate."). Defendants' conclusory assertion that some minors may enroll in college is insufficient at this stage to defeat Plaintiff's claim. Accordingly, Plaintiff's claim regarding this special condition may proceed.

### 7. Requirement to Notify Defendants of Any Relationship

Plaintiff claims that Rosenberger imposed a condition under which Plaintiff had to "inform ... Rosenberger of all relationships formed by Plaintiff sexual or not," which violated his constitutional rights (Compl. ¶ 21.) Defendants argue that "a condition obligating Plaintiff to disclose his relationships to parole officials is rational to ensur[e] Plaintiff's continued rehabilitation, assisting parole officials in monitoring Plaintiff's compliance with conditions, and protecting members of the public." (Ds' Mem. at 18-19 (citing *Birzon*, 469 F.2d at 1243).) I find that Plaintiff has plausibly alleged that this condition was both

unconstitutionally vague and violated his substantive due process rights.

"A condition is unconstitutional if it is so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application." *United States v. Reeves*, 591 F.3d 77, 81 (2d Cir. 2010) (internal quotation marks omitted). Here, it is unclear to this Court what a "relationship ... sexual or not" would encompass. Would Plaintiff be at risk of re-incarceration if he waved to his neighbor but did not report that contact to his parole officer? What if he had a conversation with that neighbor in his elevator? Or what if he made a friend at his anger management classes and they had a conversation on their way home? Based on the inclusion of the term "sexual or not," Rosenberger may have been referring to any romantic relationship, but even that term has been found to be unconstitutionally vague in the post-release supervision context. *See Reeves*, 591 F.3d at 81. In any event, at this stage, I find Plaintiff has plausibly alleged that "people of common intelligence ... would find it impossible to agree on the proper application of a release condition triggered by entry into a ['relationship']." *Id.*

Further, Plaintiff has plausibly alleged that this restriction was not reasonably related to his past conduct. Regardless of what meaning one attributes to "relationship ... sexual or not," it is unclear how that relates to Plaintiff's criminal act involving his six-year-old cousin. There is nothing in the Complaint to suggest that Plaintiff ever engaged in any criminal act with a romantic partner or anyone else with whom he was in a relationship. (While the term "relationship" is undefined, the Court doubts Rosenberger was referring to the relationship Plaintiff had with his six-year-old cousin.) And the prohibition was not limited to relationships with children or with people who have children. A condition this broad and restrictive, without any relation to Plaintiff's underlying offense, is plausibly arbitrary and capricious. Accordingly, Plaintiff may proceed on his claim regarding this special condition.

### E. Qualified Immunity

Defendants argue that even if Plaintiff plausibly alleged that the special conditions of his parole were unconstitutional, Defendants are entitled to dismissal on qualified immunity grounds. (Ds' Mem. at 19-25.)

**\*12** "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known," *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (*per curiam*) (internal quotation marks omitted), or insofar as it was objectively reasonable for the official to believe that his or her conduct did not violate such rights, *see Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). A governmental official sued in his individual capacity is entitled to qualified immunity

> (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.

*Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 210 (2d Cir. 2002) (internal quotation marks, citations, and alterations omitted); *see Creighton*, 483 U.S. at 639 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken.") (internal quotation marks and citation omitted). Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted).

As the Second Circuit recently explained:

> To be sure, qualified immunity should be resolved at the earliest possible stage in litigation. But there is an obvious, if rarely expressed, corollary to that principle: The immunity question cannot be resolved before the earliest possible stage, *i.e.*, prior to ascertainment of the truth of

the plausible factual allegations on which a finding of qualified immunity is premised. And since qualified immunity is an affirmative defense that is typically asserted in an answer, as a general rule, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion.

*Chamberlain ex rel. Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) (internal quotation marks, citations, emphasis, and alteration omitted). In other words, the Second Circuit has cautioned district courts against granting motions to dismiss on qualified immunity grounds. *See id.; see also Barnett v. Mount Vernon Police Dep't*, 523 F. App'x 811, 813 (2d Cir. 2013) (summary order) ("[A] defendant asserting a qualified immunity defense on a motion to dismiss faces a formidable hurdle and is usually not successful.") (internal quotation marks and alteration omitted).

Here, Plaintiff has plausibly alleged that eight of the special conditions of his parole were not reasonably related to his past conduct, and thus those conditions violated his due process rights (as well as his First Amendment rights in some cases). As discussed at length in this opinion, it is well settled that conditions of release must be reasonably related to the parolee's underlying offense, and all parole officers should be aware of this fundamental legal principle setting the parameters of the conditions they may or may not impose. On one hand, once the facts are developed in discovery, it may come to light that Plaintiff's right to be free from all or some of his special conditions, given the facts and circumstances of his case, was not clearly established. On the other hand, it may become clear that no reasonable parole officer in the position of Defendants could have thought the restrictions to be constitutional. At this early stage, I cannot make that determination. For that reason, Defendants' motion to dismiss on qualified immunity grounds is rejected.

## IV. CONCLUSION

**\*13** For the foregoing reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART. Plaintiff's Complaint is dismissed to the extent it seeks declaratory relief and brings claims against Defendants in their official capacities. Plaintiff's first claim – alleging procedural and substantive due process violations due to Defendants designating him as a discretionary sex offender – is also dismissed. Plaintiff's second claim is dismissed to the extent it is premised on the special condition that he was prohibited from having contact with minors without permission. Defendants' motion is denied in all other respects, and Plaintiff may proceed on claims regarding the following conditions: camera restrictions, vehicle restrictions, computer and internet restrictions, prohibition of obtaining his EMT certification, required disclosure of youthful offender status to colleges, and required notice to Rosenberger of any relationships. The Clerk of Court is respectfully directed to terminate the pending motion. (Doc. 23.)

The parties shall attend a scheduling conference by telephone on August 6, 2020, at 4:15 p.m. Because Plaintiff did not amend his Complaint or oppose Defendants' motion, he may no longer intend to pursue this case. He is advised that if he fails to attend the conference as directed, this case may be dismissed under Federal Rule of Civil Procedure 41 for failure to prosecute, without further order. The Clerk of Court shall send Plaintiff a copy of this Opinion and Order.

**SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 4274226

## Footnotes

| | |
|---|---|
| 1 | It is unclear from the face of the Complaint whether the second "his" in that quotation refers to Plaintiff or Plaintiff's cousin. |
| 2 | The Court will send Plaintiff copies of all unreported cases cited in this Opinion and Order. |

3    In his Complaint, Plaintiff states that he has a "son who lives states away." (Compl. ¶ 19.) If Plaintiff alleged that the restriction on contact with minors without permission prevented him from maintaining a relationship with his son, heightened scrutiny might apply to that claim, which would require a different analysis than the one in which Court engaged above. *See* 🚩 *Lima*, 270 F. Supp. 3d at 702 ("It is well established that a parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest protected by substantive due process.... Restrictions on such protected liberty interests are subject to strict scrutiny."). *See generally* Max B. Bernstein, *Supervised Release, Sex-Offender Treatment Programs, and Substantive Due Process*, 85 Fordham L. Rev. 261, 283-86 (discussing heightened scrutiny applied to conditions of supervised release infringing on fundamental liberty interests). But Plaintiff did not allege that the restriction on contact with minors had any effect on his relationship with his son or even that he had the ability or right to visit his son. (Indeed, it would be unusual if a parolee could visit with relatives "states away.") Plaintiff was fully capable of alleging such interference if it existed, as he pleaded that the condition prohibiting camera phone possession "made it extremely difficult to establish and maintain a relationship with his son." (Compl. ¶ 19.) Accordingly, Plaintiff's condition of release restricting his contact with minors does not trigger any heightened scrutiny, and his claim stemming from that condition is dismissed for the reasons discussed above.

4    Defendants have not argued that Plaintiff has failed to plausibly allege how the restriction on having a camera, whether in a phone or otherwise, interfered with his relationship with his son. It seems to the Court that there are still phones available that do not have cameras and do not connect to the internet, and that Plaintiff could have communicated with his son using such a device. But whether the camera restriction in fact interfered with that relationship may be taken up at a later stage.

5    Defendants' arguments described in this section are raised with respect to all of the special conditions they imposed on Plaintiff. For the same reasons, those arguments are rejected as applied to all of the special conditions discussed below.

6    While Defendants suggest that Plaintiff could properly be prohibited from working as an EMT while on parole, the training would not necessarily be superfluous, as the record at this stage does not contain reference to any legal impediment to Plaintiff obtaining such employment once his parole term concluded.

7    Plaintiff also alleges that he would present no risk because EMTs cannot treat a minor without parental consent. (Compl. ¶ 15.) I do not find that allegation plausible. It seems plain that parental consent cannot always be obtained in emergency situations, and even if it could, such consent would do little to mitigate the risk if the parent were not informed of Plaintiff's criminal history.

8    The Court is not convinced that an EMT is so closely supervised at all times that he could not endanger a child, but at this stage I must accept Plaintiff's allegations as true.

---

**End of Document**                                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

523 Fed.Appx. 811
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Tafari BARNETT, Plaintiff–Appellee,

v.

MOUNT VERNON POLICE
DEPARTMENT, Defendant,
Detective Baia, Detective
Boncardo, Defendants–Appellants.

No. 12–1381.
|
May 3, 2013.

**Synopsis**

**Background:** Arrestee brought a § 1983 action against police department and detective alleging defendants arrested him without probable cause. The United States District Court for the Southern District of New York, Daniels, J., 2012 WL 733865, denied defendants' motion for a judgment on the pleadings. Defendants appealed.

**Holdings:** The Court of Appeals held that:

[1] arrestee's allegations plausibly stated a claim, and

[2] Court of Appeals could not consider evidence from documents not included or incorporated by reference in arrestee's complaint.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Judgment on the Pleadings.

West Headnotes (2)

[1]    **Civil Rights**    Arrest and detention

Arrestee's allegations that officers relied solely on assault victim's identification of arrestee in a photo array to establish probable cause, even though victim actually identified someone else

in the array, were sufficient to plausibly state § 1983 claim that he was arrested without probable cause. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[2]    **Federal Courts**    Matters or evidence considered

Neither evidence from documents that were not included with arrestee's complaint asserting § 1983 claim that he was arrested without probable cause, nor documents not incorporated by reference into the complaint because arrestee did not even mention them, could be considered by the Court of Appeals when considering whether district court properly denied officers' motion for judgment on the pleadings on qualified immunity grounds. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

30 Cases that cite this headnote

**\*812** Appeal from a decision of the United States District Court for the Southern District of New York (Daniels, J.).
**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the district court is **AFFIRMED.**

**Attorneys and Law Firms**

Hina Sherwani, Assistant Corporation Counsel, Mount Vernon, NY, for Defendants–Appellants.

Tafari Barnett, Oakdale, LA, pro se, Plaintiff–Appellee.

*SUMMARY ORDER*

**\*\*1** This is an interlocutory appeal from the district court's denial of a Rule 12(c) motion for a judgment on the pleadings. Plaintiff–Appellee Tafari Barnett, proceeding *pro se,* filed a complaint alleging that Defendants–Appellants Baia and Boncardo (collectively, "the defendants") arrested him without probable cause in violation of 42 U.S.C. § 1983. The defendants argued that they were entitled to

qualified immunity on the pleadings; however, the district court found that whether the defendants were immune from suit could not be resolved as a matter of law based on the complaint and the exhibits attached to the complaint. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal. [1]

**\*813** "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' ... notwithstanding the absence of a final judgment." *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). As with a motion to dismiss under Rule 12(b)(6), we review a district court's decision on a motion for judgment on the pleadings *de novo,* accepting the plaintiff's factual allegations as true and drawing all reasonable inferences in favor of the plaintiff. *Johnson v. Rowley,* 569 F.3d 40, 43–44 (2d Cir.2009). We, like the district court, must consider only those facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and items of which judicial notice may be taken. *See Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993).

As a result of this standard of review, a defendant asserting a qualified immunity defense on a motion to dismiss "faces a formidable hurdle ... and is usually not successful." *Field Day, LLC v. County of Suffolk,* 463 F.3d 167, 191–92 (2d Cir.2006). The defense will succeed only where entitlement to qualified immunity can be established "based [solely] on facts appearing on the face of the complaint." *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004). For these reasons, a motion to dismiss "is a mismatch for immunity and almost always a bad ground of dismissal." *Id.* (quoting *Jacobs v. City of Chicago,* 215 F.3d 758, 775 (7th Cir.2000) (Easterbrook, J., concurring in part)). Because the standard of review is the same on a motion for judgment on the pleadings, *see Johnson,* 569 F.3d at 43–44, the hurdle for the defendants here is similarly formidable. Defendants moving to dismiss a suit by reason of qualified immunity would in almost all cases be well advised to move for summary judgment, rather than for dismissal under Rule 12(b)(6) or 12(c).

[1] The existence of either actual probable cause or arguable probable cause establishes qualified immunity from a false arrest claim, *see Savino,* 331 F.3d at 76; therefore, the sole issue on this appeal is whether the defendants can demonstrate based only on the complaint and documents attached to the complaint that probable cause existed for Barnett's arrest. We agree with the district court that the defendants have failed to show "on the face of the complaint" that probable cause or arguable probable cause existed to arrest Barnett. *See McKenna,* 386 F.3d at 436.

**\*\*2** The complaint alleges that the defendants relied solely on the victim Dwight Douse's identification of Barnett in a photo array to establish probable cause even though Douse actually identified someone else in the array. As the district court found, Barnett pled sufficient facts to plausibly indicate that Douse identified someone other than the plaintiff and that the defendants did not have probable cause to arrest Barnett based on Douse's identification. Therefore, the defendants are not entitled to qualified immunity on the pleadings unless the documents attached by Barnett to his complaint (or any documents incorporated by reference into the complaint) demonstrate that the defendants had probable cause for other reasons.

[2] Although the defendants point to additional evidence that they contend establishes probable cause, they glean most of that evidence from documents that were not included with the complaint. This evidence, as the district court explicitly notified the defendants, could only be considered on a motion for summary judgment and *not* on a motion for judgment on the pleadings. The only facts contained in, or attached to, Barnett's complaint that could **\*814** demonstrate probable cause for his arrest were statements in a transcript of a police interview of Douse on August 27, 2009, when he was first shown a photo array. These recorded statements were Douse's statements that he was with Nordia Wright at the time of the assault and that he had heard that Nordia was the mother of Barnett's child, and a statement of one of the defendant police officers to Douse that "[i]n Nordia's original Police Report she lists Tafari Barnett as the suspect." The meaning of the apparently paraphrased, hearsay statement attributed by the police officer to Nordia is too unclear to establish that she was naming Barnett as the assailant.

Other evidence submitted by the defendants provides additional information about Wright's initial identification of Barnett and subsequent withdrawal of her identification and might well demonstrate that the defendants had probable cause. The defendants contend that we should consider this information. However, the documents containing the relevant information cannot reasonably be construed as incorporated

Case 9:18-cv-01472-TJM-TWD    Document 73    Filed 03/04/21    Page 134 of 134

by reference into Barnett's complaint because he did not even mention them. As the district court explained, "[t]hose facts are not the basis of Plaintiff's allegations in his complaint," *Barnett v. Mount Vernon Police Dep't,* No. 10 Civ. 03899, 2012 WL 733865, at *2 (S.D.N.Y. Mar. 5, 2012), and we therefore cannot consider them on a motion for judgment on the pleadings.

The defendants can, however, renew their qualified immunity defense upon a motion for summary judgment with the district court. Additionally, the district court would be well within its discretion to limit any discovery to the issue of qualified immunity, and we express no opinion concerning any other limits that the district court might impose on the discovery process. As the Supreme Court has explained, qualified immunity must be addressed promptly before a public official is dragged through an entire litigation. *See* 🏴 *Butz v. Economou,* 438 U.S. 478, 507–08, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

**\*\*3** We have considered the defendants' remaining arguments and find them to be without merit. Accordingly, the decision of the district court is hereby **AFFIRMED.**

**All Citations**

523 Fed.Appx. 811, 2013 WL 1846317

## Footnotes

1      Although Barnett has failed to file a brief responding to the defendants' arguments, an appellee's failure to file a brief on appeal does not divest this court of appellate jurisdiction. 🏴 *Chao v. Russell P. Le Frois Builder, Inc.,* 291 F.3d 219, 225–26 (2d Cir.2002).

**End of Document**                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.